## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

|  |  |  |
|---|---|---|
| **PROTECT OUR AQUIFER,** | ) | |
| **ALABAMA CENTER FOR SUSTAINABLE** | ) | |
| **ENERGY (dba ENERGY ALABAMA), and** | ) | |
| **APPALACHIAN VOICES,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. _____** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiffs Protect Our Aquifer, Energy Alabama, and Appalachian Voices ("Conservation Groups") respectfully allege as follows:

### NATURE OF THE ACTION

1.      This litigation arises from a fundamental and unlawful change in the relationship between the Tennessee Valley Authority ("TVA") and its electric distribution customers. In August of 2019, TVA began pressuring local distributors into signing a so-called "long-term agreement" that is dramatically different from TVA's prior power supply contracts. The "long-term agreement" automatically extends itself each year so that the contract never erodes or expires with the passage of time. In addition, if a local distributor wants to terminate a contract, the contract requires the distributor to provide TVA with twenty (20) years' advance

written notice of termination. In such event, the contract subjects the local distributor to severe penalties during the twenty-year termination period.

2.     The practical effect of TVA's so-called "long-term agreement" is that the contract, once signed, will last forever. TVA's Never-ending Contract[1] also places restrictive caps of three to five percent (3-5%) on the amount of power that local distributors can produce and procure locally from clean energy sources such as solar. In addition, TVA's Never-ending Contract is exclusive, meaning that local distributors are forbidden from selling or supplying power outside the confines of the contract.

3.     TVA relies heavily on fossil fuels, such as coal and natural gas, in order to generate electrical power. TVA adopted and implemented its anticompetitive perpetual contracts in an effort to shield itself forever from market forces, including beneficial market forces that increasingly favor clean energy generated from renewable sources like solar. TVA's public filings reveal that it is increasingly concerned about competing with solar and other distributed energy resources as the price of solar energy continues to fall and as energy consumers increasingly demand cleaner energy alternatives. Accordingly, TVA implemented its Never-ending Contract program as a means of permanently restricting the ability of local distributors to procure cheaper and cleaner power locally or from outside the TVA system. In fact, because they will never expire, the Never-ending Contracts

---

[1] The term "Never-ending Contract" refers to the instrument that TVA entitled "Long-Term Agreement" as approved by the TVA Board of Directors on August 22, 2019, a true and correct copy of which is attached hereto as Exhibit B.

will forever prevent local distributors from ever negotiating with TVA in the future in order to obtain cheaper, cleaner electricity.

4.      In August of 2019, TVA's Board of Directors expressly conditioned its approval of the Never-ending Contract program "upon satisfactory completion of any required environmental reviews." (*Minutes of Meeting of TVA Board of Directors – August 22, 2019, pg. 29*). In spite of that clear directive, TVA management implemented the Never-ending Contract program without conducting any environmental analysis and evaluation as required by the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA").

5.      TVA's complete failure to comply with NEPA deprived Conservation Groups, local distributors, and other interested stakeholders of vital information regarding alternatives to the Never-ending Contract and its potential impacts on the environment. NEPA has "twin aims:" first, it obligates federal entities to consider every significant aspect of the environmental impact of a proposed action; second, it ensures that a federal entity will inform the public that it has indeed considered environmental concerns in its decision-making process, providing a springboard for public comment on the agency's decision. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004); *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983); *see* 40 C.F.R. § 1502.1. TVA's complete failure to comply with NEPA prevented Conservation Groups, local distributors, and other interested stakeholders from providing input on TVA's monumental program change before TVA implemented the change.

6.     TVA's decision to brazenly disregard the environmental evaluation and public comment requirements of the National Environmental Policy Act renders the Never-ending Contracts unlawful, void, and subject to being vacated by this Court.

7.     The Never-ending Contracts also violate the provisions of the Tennessee Valley Authority Act of 1933. That statute prohibits the use of perpetual agreements by specifically providing that contracts for the sale of electric power must be "for a term ***not exceeding*** twenty years." 16 U.S.C. § 831i (emphasis added).

8.     Conservation Groups seek a judicial declaration that TVA's adoption and implementation of the Never-ending Contracts violates NEPA, exceeds TVA's statutory authority, and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law or procedure required by law. 5 U.S.C. § 706. In addition, Conservation Groups request that the Court vacate the Never-ending Contracts and enjoin their future use.

## <u>FEDERAL QUESTION JURISDICTION</u>

9.     This action is brought under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701—706 ("APA"). TVA's adoption and implementation of its Never-ending Contract program, without complying with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and in violation of the TVA Act, 16 U.S.C. § 831 *et seq.*, is a "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

10.     This Court is authorized to issue a declaratory judgment and further relief pursuant to the APA, 5 U.S.C. § 706, and Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. An actual controversy within the meaning of the Declaratory Judgment Act exists between the parties.

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

## VENUE

12.     This Court is a proper venue for these proceedings pursuant to 28 U.S.C. § 1391(e)(1), which provides for venue over proceedings against federal agencies. Defendant TVA is a corporate agency and instrumentality of the United States. A substantial part of the events giving rise to Conservation Groups' claims occurred in this District because the entirety of the Western District of Tennessee is within TVA's service area.

13.     A substantial part of TVA's power generation and transmission occurs within the Western District of Tennessee. TVA supplies energy to twenty-two (22) local distributors in West Tennessee. TVA has negotiated, executed, and performed Never-ending Contracts with approximately seventeen (17) local distributors in West Tennessee. In addition, TVA's largest customer Memphis Light Gas & Water ("MLGW"), located in the Western District of Tennessee, represents approximately nine percent (9%) of TVA's total revenue. MLGW is publicly considering whether to leave the TVA system rather than sign a Never-ending Contract. TVA also generates and transmits power from approximately eight (8) generation facilities in

West Tennessee to perform its Never-Ending Contracts in West Tennessee and throughout its service area. Plaintiff Protect Our Aquifer is also headquartered within this District.

## ABOUT TVA

14.     Defendant TVA is a corporate agency and instrumentality of the United States created by and existing pursuant to the Tennessee Valley Authority Act of 1933. *See* 16 U.S.C. § 831 *et seq.* ("the TVA Act"). The TVA Act provides that TVA "[m]ay sue or be sued in its corporate name." 16 U.S.C. § 831c(b). TVA operates the nation's largest public power system. It supplies power in most of Tennessee, northern Alabama, northeastern Mississippi, southwestern Kentucky, and in portions of northern Georgia, western North Carolina, and southwestern Virginia. TVA's Power Service Area comprises 202 counties and approximately fifty-nine million acres. TVA provides power to a population of nearly 10 million people, and TVA's total annual revenues exceed $10 billion.

15.     TVA generates and sells wholesale electric power to 153 local distributors that, in turn, distribute electricity to residential, commercial, and industrial customers within their service areas. Those non-profit distributors include publicly-owned municipal power systems and member-owned rural electric cooperatives. TVA receives no federal funding, deriving virtually all of its revenues from electricity sales.

16.     TVA relies heavily on burning fossil fuels in order to generate power. As of October 2018, TVA operated twenty-six (26) active coal-fired generating units

at six plant sites. (*TVA 2019 Integrated Resource Plan, Volume II, § 2.3.1*). During fiscal year 2018, TVA contracted to purchase 14.9 million tons of coal for burning in its coal-fired power plants. *Id.*

17.    In addition to burning coal, TVA burns other fossil fuels, particularly natural gas and some diesel. TVA has eighty-seven (87) gas-fueled simple-cycle combustion turbine units at nine sites as well as twenty-one (21) combined-cycle natural gas fueled units at eight sites. (*TVA 2019 Integrated Resource Plan, Volume II, § 2.3.3*).

18.    In addition to burning fossil fuels like coal and natural gas, TVA generates power through the use of nuclear power plants, hydroelectric dams, and a very limited amount of wind and solar capacity. Coal and gas combined account for approximately 45% of TVA's power generation, while generation from wind and solar account for only 3%.

19.    For fiscal year 2019, TVA depicted its energy generation as follows:



(*TVA Power Supply Flexibility Proposal, Final Environmental Assessment, Figure 3-1*).

7

20.     In 2019, TVA's generation system featured ninety-nine (99) watts per customer of solar energy capacity, placing it ninth out of the thirteen largest utilities in the Southeast. TVA's ranking is projected to fall further in the next five years, as utilities throughout the region have committed to increase solar capacity at a faster pace than TVA.  For example, in 2019 the leading utility offered 1,755 watts of solar capacity per customer—compared to TVA's ninety-nine (99) watts per customer. That disparity will only grow by 2024, when the leading utility is forecasted to provide 2,718 watts per customer, while TVA is projected to provide only 303 watts per customer. (*Solar in the Southeast - Southern Alliance for Clean Energy Annual Report, June 23, 2020, pg. 6*).

21.     Tennessee, a state served almost entirely by TVA, lags behind its peers with regard to solar energy capacity. Among the eight states of the Southeast, Tennessee ranks sixth in solar capacity. Whereas top-ranking North Carolina produces 5.94 percent of its electricity from solar, Tennessee produces only 0.54 percent from solar. For California, the national leader, that figure exceeds twenty percent. Tennessee is likely to fall further behind, as the state's solar capacity is projected to grow at a slower rate than all but one Southeastern state over the next five years. (*Solar State by State – Solar Energy Industries Association, https://www.seia.org/states-map*).

22.     TVA's power operations significantly impact the environment in the Tennessee Valley. Relying mostly on nuclear, coal, and gas plants, TVA's generation

system significantly impacts air quality, water resources, and wildlife, while emitting greenhouse gases that contribute substantially to climate change.

23.    With more than 16,200 miles of transmission lines and 500 substations, TVA's transmission system principally affects land use, vegetation, and wildlife. TVA's use of billions of gallons of water to cool coal and gas-burning power plants, and other TVA facilities, affects the quantity and quality of Tennessee's aquifers and surface water resources. In addition, TVA sets the rates for electricity for its vast Power Service Area, affecting energy efficiency, distributed energy resources, energy burden, and economic activity throughout the region.

24.    TVA maintains its headquarters in Knoxville, Tennessee, and service of process may be made on TVA through its Chief Executive Officer, Jeffrey J. Lyash, 400 West Summit Hill Drive, Knoxville, Tennessee, 37902.

## ABOUT CONSERVATION GROUPS

### Protect Our Aquifer

25.    Plaintiff Protect Our Aquifer is a 501(c)(3) non-profit organization dedicated to preserving and protecting the Memphis Sand Aquifer for the benefit of present and future generations. It is headquartered in Memphis, Tennessee.

26.    Protect Our Aquifer brings this action on its own institutional behalf and on behalf of its supporters in western Tennessee. Many supporters of Protect Our Aquifer are Memphis Light Gas & Water ("MLGW") ratepayers who obtain their drinking water from the Memphis Sand Aquifer.

9

27.   The Memphis Sand Aquifer is a precious and limited natural resource that underlies much of West Tennessee. The aquifer supplies Memphis and Shelby County with clean, reliable drinking water. According to the United States Geological Survey, the Memphis, Tennessee area is one of the largest metropolitan areas in the world that relies exclusively on groundwater for municipal supply. Large withdrawals have caused regional water-level declines of up to 70 feet. (*U.S. Geological Survey, Ground-Water Depletion Across the Nation, USGS Fact Sheet-103-03, 3 (2003)*). The large withdrawals of groundwater for municipal supply in the Memphis, Tennessee area have caused interstate water concerns and disputes, including over continued and increased pumping in the Memphis area.

28.   The Memphis Sand Aquifer is also vulnerable to contamination from a variety of sources in the Memphis area, including in the vicinity of TVA's Allen Gas Plant and Allen Coal Plant. Withdrawing large amounts of water from the Memphis Sand Aquifer exacerbates the contamination risk.

29.   To achieve its mission, Protect Our Aquifer and its supporters work to raise public awareness of threats to the Memphis Sand Aquifer. Additionally, the organization works with government, elected officials, local power distributors, and members of the community to develop and implement strategies to manage, monitor, and protect this drinking water source for Shelby County.

30.   Protect Our Aquifer frequently advocates on behalf of the aquifer to TVA and other decision makers regarding the impact of TVA's electricity generation on water quantity and water quality in the aquifer. Protect Our Aquifer also speaks

to the media and participates in informal advocacy as well as the proceedings of state and local public agencies regarding these impacts.

31.     Protect Our Aquifer was founded in 2016 in response to TVA's plan to drill wells into the Memphis Sand Aquifer and withdraw over one billion gallons of water per year to operate its Allen Gas Plant. Originally, TVA had proposed to operate the Allen Gas Plant using recycled water from the nearby T.E. Maxson Wastewater Treatment Plant.

32.     Protect Our Aquifer organized public turnout and supported a challenge to the Shelby County Groundwater Control Board's issuance of well permits to TVA for the Allen Gas Plant. Protect Our Aquifer also filed litigation against the Shelby County Groundwater Control Board regarding its decision to issue permits to TVA for the Allen Gas Plant wells.

33.     In 2017, after TVA drilled its wells into the Memphis Sand Aquifer, the federal utility disclosed extremely high levels of arsenic and other coal ash contaminants in the shallow groundwater near a coal ash pond at its Allen Coal Plant, less than half a mile away from the Allen Gas Plant wells. In 2018, the United States Geological Survey and University of Memphis Center for Applied Earth Science and Engineering Research found that operating TVA's wells at the Allen Gas Plant would risk pulling the contaminated shallow groundwater into the Memphis Sand Aquifer.

34.     In response to TVA's disclosure of coal ash contaminants that could further threaten the aquifer, Protect Our Aquifer provided written comments to the

Shelby County Groundwater Control Board, the Tennessee Department of Environment and Conservation, and TVA regarding the threat of coal ash contamination to the aquifer posed by the Allen Gas Plant wells and sought to cease the operation of the wells.

35.     TVA subsequently announced that it would temporarily stop using its wells and purchase water from MLGW. MLGW withdraws water from the Memphis Sand Aquifer in order to meet TVA's requirements for operating the Allen Gas Plant. TVA's Allen Gas Plant therefore continues to rely on more than one billion gallons of water per year drawn from the Memphis Sand Aquifer.

36.     For more than three years, Protect Our Aquifer has advocated to a range of decision makers, including TVA, MLGW, and the Shelby County Groundwater Board, that TVA should return to their original plan of operating the Allen Gas Plant with recycled water.

37.     Protect Our Aquifer has also advocated that TVA should move away from reliance on fossil fuels like coal and gas and adopt more solar and distributed energy resources to further reduce potential impacts on the Memphis Sand Aquifer.

38.     Protect Our Aquifer frequently uses information from environmental review documents prepared on behalf of TVA in order to further its mission. For example, during the Allen Gas Plant well water controversy, Protect Our Aquifer used and relied upon documents developed by the United States Geological Survey on behalf of TVA during the federal utility's environmental review process, and it consulted with outside experts to review the data from those documents, as well as

12

from environmental documents that TVA submitted to the Tennessee Department of Environment and Conservation, in order to better understand the threat to the aquifer and to provide more information and analysis to the media, the public and to public agencies that could influence TVA's actions.

39.     In addition to its advocacy regarding TVA's Allen Gas Plant wells, Protect Our Aquifer has a history of commenting on and using information from publicly-disclosed environmental review documents to protect the Memphis Sand Aquifer. For example, Protect Our Aquifer joined Energy Alabama and other groups to comment on TVA's 2019 Draft Integrated Resource Plan and Draft Environmental Impact Statement. Protect Our Aquifer also provided comments on TVA's environmental impact statement regarding the Allen Coal Ash Impoundment Closure, comments to the Tennessee Department of Environment and Conservation regarding TVA's plans for dewatering the coal ash impoundment, and comments on TVA's rule revising its NEPA implementing procedures.

40.     Adoption of the Never-ending Contract program across the TVA service area is likely to lead to increased electricity demand, continued and increased use of and investment in fossil fuel generation, a slower transition to renewable energy, increased water usage, and increased water pollution. In Memphis, the Never-ending Contract program is likely to result in changes to the Allen Gas Plant's generation pattern, which, in turn, increases the risk of greater water withdrawals from the Memphis Sand Aquifer for many decades into the future.

41.     TVA's adoption and implementation of its Never-ending Contract program, without complying with NEPA's environmental analysis, public disclosure and public comment requirements, directly harm Protect Our Aquifer and its supporters by increasing the likelihood of depletion of the supply of safe drinking water available to Protect Our Aquifer supporters and will interfere with Protect Our Aquifer's central mission of protecting the quantity and quality of water in the Memphis Sand Aquifer.

42.     TVA's adoption and implementation of its Never-ending Contracts without complying with NEPA also directly harm Protect Our Aquifer and its supporters by depriving them of vital information about the potential environmental impacts of the Never-ending Contract and depriving them of their legally protected opportunity to participate in TVA's decision-making process, including examining alternatives to the Never-ending Contract. Without the analysis and public disclosures required by NEPA, Protect Our Aquifer and its supporters are unable to adequately assess the impact of the Never-ending Contract on TVA's operations and their implications for the Memphis Sand Aquifer. By depriving Protect Our Aquifer of the opportunity to understand, comment upon and engage in public outreach and education regarding TVA's Never-ending Contract, TVA is impeding Protect Our Aquifer's ability to advocate for the preservation and protection of the Memphis Sand Aquifer.

43.     The need for complete information about the consequences of signing a Never-ending Contract is particularly urgent for Protect Our Aquifer and its

supporters. In Memphis, the local distributor, MLGW, is in the process of deciding whether to leave TVA's service altogether, maintain its existing contract with TVA, or sign the Never-ending Contract. By disregarding its obligation to conduct environmental review before adopting and implementing its Never-ending Contract program, TVA has prevented Protect Our Aquifer and its supporters from using information required to be provided by TVA to adequately evaluate the relative impacts of MLGW's options on the aquifer. MLGW's decision could set energy policy and impact local water resources in Memphis for decades to come. Without Protect Our Aquifer's informed advocacy, there is an increased and reasonable likelihood that MLGW's momentous decision will harm the Memphis Sand Aquifer. TVA has further impeded Protect Our Aquifer's and its supporters' efforts to use that information in order to encourage MLGW and other local distributors to negotiate for contract terms with less potential to harm the Memphis Sand Aquifer.

44.     The consequences of TVA's Never-ending Contract program also harm individual supporters of Protect Our Aquifer. Supporters of Protect Our Aquifer, including its Board members, work to preserve and protect the Memphis Sand Aquifer for the benefit of present and future generations. These supporters are concerned about the increased likelihood of depletion of the Memphis Sand Aquifer, and the resulting impacts on Shelby County's drinking water source that may occur as a result of the Never-ending Contract program. The Allen Gas Plant is likely to be operated more often and more intensely than it would have been without the adoption of the Never-ending Contract program, and Protect Our Aquifer's

supporters will face an increased risk of depletion of the Memphis Sand Aquifer and their drinking water source as a result. Because the preservation of the aquifer is important to Protect Our Aquifer's mission, its supporters' interests can be represented by the organization in this suit.

45.    The harm and injury suffered by Protect Our Aquifer and its supporters can and should be redressed through the entry of a judgment enjoining, setting aside, and vacating the Never-ending Contracts pursuant to Section 706 of the APA. 5 U.S.C. § 706.

**Energy Alabama**

46.    Plaintiff Alabama Center for Sustainable Energy (d/b/a Energy Alabama) is a non-profit 501(c)(3) organization advocating for the transition to clean, sustainable energy in Alabama. Energy Alabama is headquartered in Huntsville, Alabama, and was founded in 2014. Its membership includes approximately 400 people living in Alabama who support sustainable energy that is socially equitable, environmentally beneficial, and economically sound. Energy Alabama brings this action on its own institutional behalf and on behalf of its members, more than 50 of whom live in the Alabama territory served by TVA. In TVA territory, Energy Alabama's members are ratepayers of municipal utilities or member-owners of electric membership cooperatives who purchase power from TVA.

47.    Energy Alabama works to accelerate the transition to sustainable energy through public education at all levels, informing smart energy policy, and

providing technical assistance to deploy more sustainable energy in homes and businesses throughout the state of Alabama.

48.     Energy Alabama and its members regularly speak and submit comments to TVA, local distributors, and local governments in order to advocate for sustainable energy. Energy Alabama recently submitted comments to TVA along with other organizations on the draft Environmental Assessment for TVA's Power Supply Flexibility Proposal, which addressed one provision within the Never-ending Contracts. Through those comments, Energy Alabama asserted that TVA failed to perform required NEPA environmental review before adopting and implementing the Never-ending Contracts. Energy Alabama also provided comments to TVA on TVA's 2019 Draft Integrated Resource Plan and Draft Environmental Impact Statement, and its Chief Operating Officer served on TVA's 2019 Integrated Resource Plan Working Group.

49.     Energy Alabama monitors TVA activities in order to ensure that TVA fulfills its obligations as a federal utility. In May 2019, Energy Alabama, along with other environmental and energy non-profits, wrote to request that the TVA Office of Inspector General open an investigation into TVA's membership in and use of ratepayer dollars for unincorporated trade groups, such as the Utility Air Regulatory Group. Energy Alabama is also a plaintiff in a lawsuit in the United States District Court for the Northern District of Alabama challenging TVA's decision to establish grid access fees, arguing that said decision makes it more

expensive for people to connect to the electric grid and thus disincentivizes small-scale solar energy generation.

50.     Energy Alabama has a history of evaluating the impact of TVA's decisions, advocating for greater public engagement in TVA's decision-making process, and encouraging the development of more equitable and sustainable energy generation throughout the state.

51.     Energy Alabama and its members are harmed by TVA's failure to perform proper environmental review before adopting and implementing the Never-ending Contract program. TVA deprived Energy Alabama and its members of information they needed to fully assess the environmental impacts of the Never-ending Contracts. TVA also denied Energy Alabama and its members their legally protected opportunity to provide public comments and input on the draft environmental review documents that NEPA requires, but TVA failed to prepare, before TVA adopted and implemented its Never-ending Contract program.

52.     The preparation and publication of legally required environmental review documents would have allowed for greater citizen engagement, and would have increased TVA's and the public's understanding of the consequences of its proposed Never-ending Contract program. TVA's failure to perform that environmental review injured Energy Alabama and its members by denying their right to assist TVA in making better, more sustainable energy decisions.

53.     Without the information contained in NEPA environmental review documents, Energy Alabama and its members are not able to participate

meaningfully in local decision-making processes regarding the Never-ending Contracts. Local distributors, who were likewise denied important information, are therefore more likely to sign the endless agreements without fully considering alternatives to the Never-ending Contracts or the overall consequences for renewable energy and distributed energy resources in the TVA region. For example, although Energy Alabama advocated for more sustainable contract terms at several public hearings before the Huntsville Utility Board and the Huntsville City Council, its efforts were severely constrained by the lack of complete and timely information about the details of the proposal, its possible environmental effects, and alternatives to the Never-ending Contract. The Huntsville Utility Board subsequently signed the Never-ending Contract.

54.     Energy Alabama and its members advocate for investment in solar and distributed energy resources. This advocacy, which supports Energy Alabama's mission, is impeded by TVA's Never-ending Contracts, which, because of their perpetual nature, threaten to eliminate any opportunity for Energy Alabama and its members to advocate to their local municipal distributors and electric membership cooperatives to renegotiate the power supply contract for more access to solar and distributed resources in the future. The Never-ending Contracts further impede Energy Alabama and its members' advocacy and goals by constraining TVA's and local distributors' investments in solar and distributed energy resources, including rooftop solar, and creating a substantial risk of less access and higher costs for Energy Alabama and its members.

55.     Energy Alabama has members who recreate in areas of Tennessee in which TVA fossil fuel plants pollute the water and air. Increased and prolonged reliance on fossil fuels by TVA that is likely to occur as a result of its Never-ending Contract program will increase and prolong the level of water and air pollution associated with those plants. As a result, Energy Alabama members will suffer increased health risks associated with breathing air and swimming in water containing pollution from large coal- and gas-fired power plants.

56.     TVA's efforts to lock local distributors into its Never-ending Contracts, without disclosing the environmental and community impacts of those legal instruments, will likely lead to increased electricity demand, continuing reliance on and investment in fossil fuel generation, a strict cap on investment in more sustainable energy, and ultimately increased air and water pollution—all further harming Energy Alabama and its members.

57.     The harm and injury suffered by Energy Alabama and its members can and should be redressed through the entry of a judgment enjoining, setting aside, and vacating the Never-ending Contracts pursuant to Section 706 of the APA. 5 U.S.C. § 706.

**Appalachian Voices**

58.     Plaintiff Appalachian Voices is a 501(c)(3) non-profit organization. Its mission is to bring people together to protect the land, air, and water of Central and Southern Appalachia and to advance a just transition to a generative and equitable clean energy economy.

20

59. Appalachian Voices was founded in 1997, and is headquartered in Boone, North Carolina, with additional offices in Charlottesville and Norton, Virginia, Durham, North Carolina, and Knoxville, Tennessee.

60. Appalachian Voices has over 1,100 members throughout the country, and combines grassroots organizing, policy advocacy, and technical expertise in order to hold decision-makers accountable. Through public comments, education, communication initiatives, and the provision of resources and data to electric cooperatives, Appalachian Voices works collaboratively with local, state, and regional partners to promote energy efficiency and encourage the development of clean and affordable energy.

61. Appalachian Voices brings this action on its own institutional behalf and on behalf of its members, more than 100 of whom live in areas served by TVA. Appalachian Voices' members who live in TVA's Power Service Area are ratepayers of municipal utilities or member-owners of rural electric membership cooperatives that purchase power from TVA.

62. Appalachian Voices is committed to assisting people throughout Appalachia in their efforts to shape the energy future of their own communities. Appalachian Voices recently initiated an Energy Democracy Tour, a community listening project in order to learn what the people of the Tennessee Valley want for the future of energy in their area. Appalachian Voices gathered input at twelve urban and rural listening sessions throughout the Tennessee Valley, including in Memphis, Tennessee. Information from that tour was compiled to create a policy

platform on how TVA can work with communities in its service territory to realize community goals.

63.     Appalachian Voices has a history of commenting on environmental review documents, and of using information provided in those documents in its advocacy and community-organizing efforts. Appalachian Voices recently joined with Energy Alabama and other organizations in submitting comments on the draft Environmental Assessment for TVA's Power Supply Flexibility Proposal, noting the lack of review for the overall Never-ending Contract program and arguing that going forward with the Never-ending Contracts would violate NEPA. Appalachian Voices has also reviewed, commented on, and generated public engagement around other environmental review documents from TVA, such as the environmental assessment on TVA's replacement of the Green Power Providers program and the environmental assessment on the closure of the Bull Run Fossil Plant.

64.     Appalachian Voices has worked for years to promote energy efficiency and energy savings, affordable renewable energy, and increased transparency and public involvement in the decision-making process around the future of sustainable energy throughout Appalachia, including in TVA's Power Service Area.

65.     TVA's failure to perform environmental review directly prevented Appalachian Voices and its members from providing information and commentary to TVA during the review process. A core component of NEPA is citizen engagement around the decisions of federal agencies, with the understanding that increased engagement will lead to better, more informed decision-making on the part of the

22

agency. Denying Appalachian Voices and its members the opportunity for engagement effectively denies their right to influence and inform TVA in its decision-making on an issue that personally affects them, and which will have substantial effects on their ability to pursue Appalachian Voices' organizational mission: the advancement of equitable, democratic, and sustainable energy generation in the region.

66.    TVA's failure to provide Appalachian Voices and its members, and their local distributors, complete information about the environmental effects of the Never-ending Contract program and alternatives to it increases the risk of locking local distributors into a less sustainable future, as widespread adoption of said contracts leads to increased electricity demand, continuing reliance on and investment in fossil fuel generation, and constrained investment in more sustainable energy—all of which are directly contrary to the goals of Appalachian Voices as an organization.

67.    TVA's failure to conduct public environmental review severely hampered Appalachian Voices' ability to raise awareness among members of the public regarding how to express their own views to their local municipal distributors and electric membership cooperatives. By depriving Appalachian Voices of the analysis provided in NEPA environmental review documents, TVA diminished Appalachian Voices' ability to achieve its core mission of being effective advocates for a cleaner energy future in Appalachia.

68.     TVA's Never-ending Contracts harm the ability of all Appalachian Voices members to take full advantage of the clean energy jobs and economic development that come with a transition to cleaner, renewable energy.

69.     Appalachian Voices has members who want to promote renewable energy by investing in their own solar and distributed energy resources. These members are harmed and injured by TVA's Never-ending Contracts because they are likely to constrain TVA's and local distributors' investments in solar and distributed energy resources, including rooftop solar, creating a substantial risk of less access and higher costs for these members.

70.     Because of the perpetual nature of the Never-ending Contracts, Appalachian Voices members are also harmed by the lost opportunity to advocate to their municipal distributors and electric membership cooperatives regarding the terms of TVA's power supply contracts to achieve greater access to solar and distributed energy resources in the future.

71.     By failing to perform the required environmental review, TVA fast-tracked the adoption and implementation of its Never-ending Contracts, rushing power distributors to make permanent decisions before Appalachian Voices and its members were able to gather sufficient information to evaluate the impact of the contracts. Not knowing the full details of how the Never-ending Contract program would be implemented and alternatives to the program impaired and continues to impair the ability of Appalachian Voices and its members to advise their municipal distributors and electric cooperatives about the potential impacts of the contracts,

24

increasing the risk that fewer opportunities for access to solar and distributed energy resources will be available in Appalachian Voices members' local distributor service areas within TVA's Power Service Area in the future.

72.     TVA has injured Appalachian Voices members who are ratepayers of municipal distributors or member-owners of electric cooperatives that have signed or may sign the Never-ending Contract with TVA. By depriving Appalachian Voices members of legally required NEPA disclosures, TVA hampers their ability to advocate to their municipal distributors and electric cooperatives about the long-term consequences of TVA's Never-ending Contract and to educate other ratepayers or member-owners regarding the consequences for coal- and gas-fired power, renewable energy, and distributed energy resources, including energy efficiency. Increasing transparency and public engagement within their electric cooperatives is a long-standing interest for Appalachian Voices members, and the ability to pursue this interest is severely restricted when they are denied the information they need to most effectively educate other members of the community and influence local decision makers. Appalachian Voices members would have used this information to inform their communities and advocate to their electric cooperatives regarding the Never-ending Contracts.

73.     The harm and injury suffered by Appalachian Voices and its members can and should be redressed through the entry of a judgment enjoining, setting aside, and vacating the Never-ending Contracts pursuant to Section 706 of the APA. 5 US.C. § 706.

25

## ADMINISTRATIVE PROCEDURE ACT ("APA")

74.     The Administrative Procedure Act, 5 U.S.C. §§ 701–706, provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

75.     The APA provides that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. In addition, the APA provides that a court shall "set aside agency action, findings, and conclusions" that are "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law." 5 U.S.C. §706(2)(A)(C)&(D).

## THE NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA")

76.     The National Environmental Policy Act is our country's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted NEPA, in part, "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321.

77.     NEPA and its implementing regulations require "all agencies of the Federal Government" to include "a detailed statement" on  "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). That statement, known as an Environmental Impact Statement ("EIS"), must describe (1) "the environmental impact of the proposed action," (2) "any adverse environmental effects which cannot be avoided should the proposal be implemented," (3) "alternatives to the proposed action," (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and" (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.*

78.   Among the factors a federal agency must consider in order to determine whether an action may "significantly affect" the environment, and therefore require an EIS, is the "intensity" or severity of the action's impacts. 40 C.F.R. § 1508.27(b). Among other relevant factors, the intensity of the impact must be judged based on:

(a) "[t]he degree to which the proposed action affects public health or safety";

(b) "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas";

(c) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial";

(d) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks";

(e) "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration";

    (f) "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts"; and

    (g) "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."

*Id.* Just "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005). An agency's belief that a project will produce more environmental benefit than harm does not obviate the need to conduct an EIS; "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1).

79.    When it is not readily discernible whether the environmental effects of a proposed action will be "significant," such that the proposal would "[n]ormally require[] an environmental impact statement," federal agencies may first prepare a less rigorous Environmental Assessment (EA) in order to establish the project's impacts and determine whether preparation of an EIS is required. 40 C.F.R. §§ 1501.4(a)-(b), 1508.9(a).

80.    Under NEPA, "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action" must "be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a).

81.    In order to achieve Congress' goal of preventing or eliminating damage to the environment, federal agencies must conduct NEPA analysis at the "earliest possible time," fully considering and publicly disclosing the environmental consequences of an agency action and exploring alternatives *before* proceeding with the action. 40 C.F.R. §§ 1501.2, 1502.5.

## TENNESSEE VALLEY AUTHORITY ACT ("TVA Act")

82.    Congress created TVA in 1933, and it authorized TVA, *inter alia*, "[t]o produce, distribute, and sell electric power." 16 U.S.C. § 831d(l). Under the TVA Act, TVA "[m]ay make contracts, as herein authorized." 16 U.S.C. § 831c(d).

83.    Congress granted TVA limited authority "to sell the surplus power not used in its operations." 16 U.S.C. § 831i. Among the constraints Congress imposed is that TVA may only "enter into contracts for [the sale of electric power] for a term **not exceeding twenty years**." *Id.* (emphasis added).

84.    In selling electric power, TVA must "give preference to States, counties, municipalities, and cooperative organizations of citizens or farmers, not organized or doing business for profit, but primarily for the purpose of supplying electricity to its own citizens or members." *Id.* Further, with some exceptions, Congress generally barred TVA from entering into "contracts for the sale or delivery of power" beyond the service area TVA had established by July 1, 1957. 16 U.S.C. §831n-4(a).

85.    In 1992, Congress added a "least-cost planning program" to TVA's mandates, requiring TVA to engage in "a planning and selection process for new energy resources which evaluates the full range of existing and incremental resources (including new power supplies, energy conservation and efficiency, and renewable energy resources) in order to provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest system cost." 16 U.S.C. § 831m-1(b)(1). TVA must "treat demand and supply resources on a

consistent and integrated basis." 16 U.S.C. § 831m-1(b)(2)(C).

86.     In 2004, Congress amended the TVA Act to provide that TVA's "objectives and missions" include "being a national leader in technological innovation, low-cost power, and environmental stewardship." 16 U.S.C. § 831a(b)(5).

87.     Finally, the TVA Board of Directors must "ensure that all activities of the Corporation are carried out in compliance with applicable law." 16 U.S.C. § 831a(g)(1)(H).

## TVA ADOPTS ANTICOMPETITIVE NEVER-ENDING CONTRACTS WITHOUT PERFORMING ENVIROMENTAL REVIEW

88.     In its most recent quarterly filing with the United States Securities Exchange Commission (Form 10-Q), TVA reported to investors that the energy market is changing as consumers demand cleaner, greener energy. Specifically, TVA stated:

> As more consumers and businesses are demanding cleaner energy, the utility industry is evolving to meet those needs. As TVA also evolves, it will see impacts to the way it does business through the pricing of products, transmission of energy, and development of new products and services for its customers in support of changing customer preferences and its economic development efforts. End-use customers are becoming more technologically sophisticated and want greater control over their energy usage. Many companies are focusing on sustainability and requiring more energy efficiency and renewable energy options.

(*TVA Form 10-Q for quarterly period ended June 30, 2020, pg. 62*).

89.     TVA views distributed energy resources as a business risk and competitive threat. Distributed energy resources are a broad set of customer-sited

energy generation and management tools including solar, energy efficiency and demand response.

90. TVA's filings with the Securities Exchange Commission expressly acknowledge that customer preference for renewables and other DER represents a competitive business risk. For example, in its Form 10-K for fiscal year ended September 30, 2018, TVA stated:

> Research and development activities are ongoing to improve existing and alternative technologies to produce or store electricity, including large-scale energy storage, gas or wind turbines, fuel cells, microturbines, solar cells, and distributed energy or storage resources. It is possible that advances in these or other alternative technologies could reduce the costs of such production methods to a level that will enable these technologies to compete effectively with traditional power plants such as TVA's. These technologies could be more appealing to customers and could lead them to bring pressure on TVA to modify the power contracts to allow customers to generate some of their own power
> requirements or purchase power from other suppliers. Other customers might also cease purchasing power from TVA altogether. To the extent that sales to such customers are reduced or eliminated, TVA's cash flows, results of operations, and financial condition could be negatively affected.

(*TVA Form 10-K for fiscal year ended September 30, 2018, pgs. 38-39*).

91. In its Form 10-K/A (Amendment No. 1) for fiscal year ended September 30, 2019, TVA stated:

> TVA also faces competition in the form of emerging technologies. Improvements in energy efficiency technologies, smart technologies, and energy storage technologies may reduce the demand for centrally provided power. The growing interest by customers in generating their own power through [distributed energy resources] has the potential to lead to a reduction in the load served by TVA as well as cause TVA to re-evaluate how it operates the overall grid system to continue to provide highly reliable power at affordable rates.

*(TVA Form 10-K/A – Amendment No. 1 for fiscal year ended September 30, 2019)*.

92.    TVA also acknowledged that competitive pressures from renewable energy resources threaten TVA's monopolistic business model of selling power from centrally located plants:

> **TVA may have difficulty in adapting its business model to changes in the utility industry and customer preferences.**
>
> The traditional business model for power production, selling power from centrally located plants, is facing pressure from a variety of sources, including the potential for self-generation by current or potential customers, new technologies such as energy storage, and increased energy efficiency. These pressures may reduce the demand for TVA power. If TVA does not or cannot adapt to this pressure by adequately changing its business model, TVA's financial condition and results of operations could be negatively affected.

*Id.* (emphasis in original).

93.    TVA's largest single customer is Memphis Light, Gas & Water, which serves more than 420,000 electric consumers and accounts for approximately 9% of TVA's operating revenues.

94.    TVA's current power supply contract with MLGW affords MLGW the opportunity to terminate its agreement with TVA upon five years' written notice to TVA.

95.    In early 2019, MLGW began publicly considering whether to leave TVA and procure electric power from other sources. Several stakeholders and other interested parties commissioned studies at the time examining alternative power sources and the costs and potential savings associated with MLGW's procuring power outside the TVA system. Those studies concluded that MLGW could save hundreds of millions of dollars by procuring power from non-TVA sources. Such

32

alternate sources might include self-generation of solar power, the purchase of nuclear power, and/or the purchase of power through the Midcontinent Independent System Operator ("MISO"), and/or the Southwest Power Pool.

96.     Ultimately, MLGW commissioned Siemens Power Technologies to prepare an Integrated Resource Plan to evaluate the power supply options available to MLGW. Siemens concluded that MLGW could save $122 million annually if Memphis builds certain local power generation facilities and joins MISO, a power network and market place that stretches across central North America. Siemens also concluded that MLGW could reduce carbon dioxide emissions associated with its power consumption by more than fifty percent (50%) and dramatically increase generation from solar and wind resources if it chooses to procure power outside the TVA system.

97.     In addition to MLGW, other local distributors have actively considered obtaining power from non-TVA sources. One such distributor is Volunteer Energy Cooperative ("VEC"), which distributes power to more than 115,900 members in all or part of 17 Tennessee counties.

98.     In September of 2019, VEC submitted a request for proposal to TVA, requesting a bid for partial wholesale electric supply for service of 50% or 75% of VEC's load beginning on January 1, 2025.

99.     TVA responded to VEC's request for proposal by letter dated October 3, 2019, a true and correct copy of which is attached hereto as Exhibit A.

100.    TVA declined to submit a proposal to VEC for service of 50% or 75% of VEC's load as requested. Instead, TVA offered VEC a Never-ending Contract.

101.    Upon information and belief, VEC has not signed a Never-ending Contract.

102.    In response to competitive pressures, including from renewable energy resources, as well as several distributors' public consideration of alternative power sources, TVA decided to develop and implement a new program designed to preserve its monopolistic stronghold over the generation and sale of wholesale electric power in the Tennessee Valley.

103.    TVA refers to its new program as the "Long Term Partnership Option for Local Power Companies." The central feature of that program is to offer TVA's distributors exclusive "long-term agreements" that never expire and, for all practical purposes, will never be terminated once signed and in effect. These Never-ending Contracts also place perpetual caps of three to five percent (3-5%) on the amount of power that local distributors can procure from non-TVA clean energy sources such as solar or other distributed energy resources.

104.    A true and correct copy of TVA's Long-Term Agreement form is attached hereto as Exhibit B.

105.    TVA prepared the form Long-Term Agreement that is attached as Exhibit B.

106.    Although the purported initial term of TVA's proposed "long-term agreement" is twenty (20) years, that term extends automatically each year so that

34

the length of the contract term never erodes and the contract never expires with the passage of time. Specifically, Section 1 of the agreement states in pertinent part as follows:

> This contract is effective as of [DATE1], and will continue in effect for an initial term of 20 years from [DATE1], provided, however, that beginning on the first anniversary of said effective date, and on each subsequent anniversary thereof (whether falling during said initial term or any renewal term as provided for herein), this contract shall be extended automatically without further action of the parties for an additional 1-year renewal term beyond its then-existing time of expiration.

107.     The Never-ending Contract also provides that, if a local distributor wants to terminate its agreement with TVA, it must provide TVA with twenty (20) years' advance written notice of termination. In such event, TVA will have no obligation to make or complete any additions to or changes in any transformers or transmission lines that service the terminating local distributor during the twenty-year termination period. Specifically, the agreement provides:

> Notwithstanding any other provision of this section, [Cooperative/Municipality] may terminate this contract at any time upon not less than 20 years' prior written notice, and TVA may terminate this contract upon not less than 20 years' prior written notice. If [Cooperative/Municipality] delivers a notice of termination to TVA, as stated above, then from and after its date of receipt of such notice, TVA will have no obligation to make or complete any additions to or changes in any transformation or transmission facilities for service to [Cooperative/Municipality], unless (by means of a fully-executed amendment to this contract) [Cooperative/Municipality] agrees to reimburse TVA for its non-recoverable costs in connection with the making or completion of such additions or changes.

108.     The practical effect of the automatically renewing and non-expiring contract term, coupled with TVA's onerous and punitive termination clause, is that the so-called long-term agreements, once signed, will last forever. TVA enjoys

complete monopoly power throughout its service area, and it is fully aware that the inability of a local distributor to foresee the future over a span of two decades will always prevent a local distributor from providing a twenty-year notice of termination of a Never-ending Contract. No reasonable governing body of a municipal distributor or electric cooperative could ever decide to provide TVA with a twenty-year notice of termination and thus suffer the associated penalties during the twenty-year termination period.

109.    The anticompetitive Never-ending Contracts are also exclusive. Under Sections 3(b)(2)&(e) of the contracts, local distributors are forbidden from selling or supplying power that is not provided by TVA. If a local distributor supplies customers with power not supplied by TVA, such action constitutes a default under the agreement, thereby giving TVA the contractual right to recover for TVA's "losses of revenue and load served" plus attorneys' and administrative costs.

110.    Under the guise of providing "enhanced flexibility" to the local distributors, TVA places a cap of three to five percent (3-5%) on the amount of power that local distributors can procure locally from clean energy sources such as solar or other distributed energy resources. Specifically, the Never-ending Contract provides:

> TVA commits to collaborating with Distributor (and other distributors of TVA power who have executed a similar long-term agreement) to develop and provide enhanced power supply flexibility, with mutually agreed-upon pricing structures, for 3-5% of Distributor's energy, by no later than December 31, 2021.

111.    In order to pressure and entice local distributors into signing Never-ending Contracts, TVA adopted a carrot and stick approach. TVA offers the contracts to local distributors on a 'take it or leave it' basis. The contracts provide a 3.1% Wholesale Credit against energy charges paid  to TVA by local distributors that sign the agreements. TVA does not provide a corresponding Wholesale Credit to local distributors who decline to sign the perpetual agreements. Thus, TVA established a new contract regime in which some local distributors enjoy favored status while others are treated like second-class citizens.

112.    Those local distributors that do not sign Never-ending Contracts, and therefore do not receive the Wholesale Credit, suffer a competitive disadvantage as compared to their signing neighbors. Non-signing distributors are required to pay more for the electric power purchased from the TVA, thereby making it more difficult to attract power- consuming industries and jobs into their communities.

113.    In 2019, TVA prepared an Integrated Resource Plan and accompanying Environmental Impact Statement. Those documents did not discuss or analyze the environmental effects of TVA's so-called "long-term agreements," i.e., the Never-ending Contracts.

114.    On July 31, 2019, TVA's CEO and CFO prepared a memorandum to TVA's Board of Directors recommending that the Board authorize TVA's use of the so-called "long-term agreements." At that time, the weighted average length of the termination notice required under TVA's then-existing wholesale power contracts with local distributors was less than seven years.

37

115.    The TVA Board of Directors considered TVA management's recommendation at its August 22, 2019 Board Meeting. The TVA Board approved TVA's use of the so-called long-term agreements "contingent upon satisfactory completion of any required environmental reviews." (*Minutes of Meeting of TVA Board of Directors – August 22, 2019, pg. 29*).

116.    A true and correct copy of the minutes of the TVA Board of Directors' August 22, 2019 meeting is attached hereto as Exhibit C.

117.    Rather than follow the Board's directive to undertake "required environmental reviews," TVA management rushed to implement Never-ending Contract across the TVA region while disregarding completely the statutory mandates of NEPA. For example, TVA offered a Never-ending Contract to its second largest customer, Nashville Electric Service ("NES"), shortly after the TVA Board's conditional approval, and NES adopted the contract six days later.

118.    TVA completely dismissed the legal requirements of NEPA, thereby avoiding the disclosure, analysis, public participation, and public comment procedures mandated by the statute. Instead, TVA rushed forward to sign and implement as many Never-ending Contracts across the Tennessee Valley as quickly as possible. In fact, as of September 30, 2019, 131 of the 153 local distributors across the TVA region had adopted Never-ending Contracts. As of April 3, 2020, 138 of TVA's local distributers had adopted Never-ending Contracts.

119.    After signing 138 Never-ending Contracts, TVA began a limited NEPA review regarding a single provision contained in those contracts. Through the

contracts' "Flexibility Proposal" provision, TVA had already "commit[ted] to collaborating with Distributor (and other distributors of TVA power who have executed a similar long-term agreement) to develop and provide enhanced power supply flexibility, with mutually agreed-upon pricing structures, for 3-5% of Distributor's energy." On April 3, 2020, TVA published for comment a draft Environmental Assessment, which considered the environmental impacts of the Flexibility Proposal provision but ignored the environmental impacts of the Never-ending Contracts overall. Plaintiffs Energy Alabama and Appalachian Voices commented that such NEPA review was too little, too late: NEPA required TVA to consider the impacts of the overall Never-ending Contracts and alternatives *before* signing them, and that analysis has never occurred. On June 22, 2020, TVA finalized the Flexibility Proposal EA. To date, TVA has not published any NEPA review—whether an EIS, EA, or even the invocation of a categorical exclusion—addressing in detail the potentially significant effects of and alternatives to the Never-ending Contract program.

## CLAIMS FOR RELIEF

### Claim One – TVA Violated NEPA and the APA by Failing to Conduct Required Environmental Review

120.    All allegations stated above are incorporated herein by reference.

121.    NEPA requires federal agencies to prepare a detailed Environmental Impact Statement for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). When it is not readily discernible whether the environmental effects of a proposed action will be "significant," federal

agencies may first prepare a less rigorous Environmental Assessment in order to establish the project's impacts. 40 C.F.R. §§ 1501.4(b), 1508.9(a)(1). If impacts are likely to be significant, however, an EIS is then required.

122.    NEPA requires federal agencies to conduct environmental analysis at the "earliest possible time," fully considering and publicly disclosing the environmental consequences of an agency action and alternatives *before* proceeding with the action. 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1501.2, 1502.5. Moreover, the TVA Board of Directors conditioned its approval of the so-called long-term agreements "upon satisfactory completion of any required environmental reviews." In spite of those clear requirements, TVA chose to disregard the requirements of NEPA completely, and it began entering into Never-ending Contracts with local distributors almost immediately after receiving the Board's conditional approval.

123.    TVA violated NEPA, 42 U.S.C. § 4332(C), by failing to prepare an EA or EIS before it adopted and implemented Never-ending Contracts.

124.    TVA's system-wide adoption and implementation of Never-ending Contracts is a major "federal action" under NEPA. *See* 40 C.F.R. § 1508.18(b)(3) (listing examples of agency actions, including "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan").

125.    TVA's Never-ending Contracts are likely to have significant environmental impacts. The long-term agreements will likely affect the quality of the air, water, wildlife, public health, and economic wellbeing in TVA's seven-state, 80,000-square mile region in perpetuity.

126.   The Never-ending Contracts commit TVA and local distributors to binding legal instruments with everlasting consequences, and they will shape the nature and scope of the load requirements placed upon the TVA energy grid indefinitely.

127.   The Never-ending Contracts insulate TVA from market forces and competitive pressures, thereby hindering the growth of renewable energy and distributed energy resources in the Tennessee Valley. The Never-ending Contracts effectively insulate TVA from competition at a time when local distributors, residents, and commercial and industrial customers are demanding more renewable and distributed energy. Insulation from competitive market forces will forever constrain the development of renewable energy in the TVA region, resulting in greater emissions of greenhouse gases and other pollutants.

128.   TVA's increased reliance on coal and gas-fired power plants, which must be operated with millions of gallons of water, will have lasting and harmful consequences for the Valley's aquifers and surface water resources.

129.   The Never-ending Contract program is likely to result in increased energy consumption while constraining TVA's and local distributors' investments in solar and distributed energy resources, further exacerbating TVA's greenhouse gas emissions, other pollution and water consumption.

130.   The Never-ending Contracts also have harmful cumulative impacts when added to TVA's previous pattern and practice of disfavoring the development of DER and renewable solar power generation. For example, in 2018 TVA adopted a

rate structure change that discourages distributed energy and energy efficiency. In 2019, TVA terminated its Green Power Providers program, a rooftop solar program that compensated customers who generate their own solar power for the value they provide to the grid and to the Valley. In fact, TVA's 2019 Integrated Resource Plan expressly acknowledges that TVA has "reduced" energy efficiency incentives.

131.    Adoption of the Never-ending Contract as the standard agreement across the TVA region sets a dramatic and game-changing precedent in the Tennessee Valley energy market. The long-term agreement has proven highly controversial as multiple local distributors, including some of the region's largest, explore whether to terminate their relationships with TVA.

132.    By signing Never-ending Contracts, TVA irretrievably committed its resources to servicing local distributors under the confines of those perpetual legal instruments.

133.    By adopting and implementing the Never-ending Contracts without conducting NEPA environmental review, TVA harmed the interests of Conservation Groups and their members and directly injured them. TVA prevented Conservation Groups and their members from receiving required disclosures and analysis about the human and environmental impacts of TVA's planned course of action and a range of alternatives to that action. TVA prevented Conservation Groups and their members from commenting upon, participating in, and influencing TVA's planned course of action before TVA irretrievably committed resources to the program. TVA prevented the Conservation Groups from undertaking their core advocacy missions

by failing to allow them to arm themselves with facts and analysis that should be contained in legally required NEPA disclosures. As a result, TVA prevented Conservation Groups and their members from effectively advocating to local distributors that they should eschew the Never-ending Contracts. Likewise, TVA prevented Conservation Groups from effectively pushing back against the Never-ending Contract program on behalf of Conservation Groups' individual members, thereby inhibiting Conservation Groups' ability to protect the interests of their individual members.

134.    TVA's failure to undertake required NEPA review before adopting and implementing the Never-ending Contracts was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, the Never-ending Contracts must be held unlawful and set aside as required by Section 706(2) of the APA. 5 U.S.C. § 706(2).

135.    TVA's failure to undertake required NEPA review before adopting and implementing the Forever Contracts occurred "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Accordingly, the Never-ending Contracts must be held unlawful and set aside as required by Section 706(2) of the APA. 5 U.S.C. § 706(2).

136.    TVA's failure to undertake required environmental reviews as mandated by the TVA Board of Directors' August 22, 2019 conditional approval of the Never-ending Contracts was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, the Never-

43

ending Contracts must be held unlawful and set aside as required by Section 706(2) of the APA. 5 U.S.C. § 706(2).

## Claim Two – TVA Violated the TVA Act and the APA by Entering into Perpetual Agreements

137.    All allegations stated above are incorporated herein by reference.

138.    The TVA Act authorizes TVA to enter into agreements for the sale of electric power "for a term ***not exceeding*** twenty years." 16 U.S.C. § 831i (emphasis added).

139.    The TVA Act does not authorize TVA to enter into agreements for the sale of electric power that exceed twenty years.

140.    The TVA Act does not authorize TVA to enter into agreements for the sale of electric power that never expire with the passage of time.

141.    Although the purported initial term of TVA's Never-ending Contracts is twenty (20) years, that contract term extends itself automatically each year so that contract never expires with the passage of time.

142.    The punitive notice and termination provisions contained in TVA's Never-ending Contracts have the practical effect of preventing local distributors from terminating the agreements once signed. The Never-ending Contracts provide that, if a local distributor wants to terminate its agreement with TVA, it must provide TVA with twenty (20) years' advance written notice of termination. In such event, TVA will have no obligation to make or complete any additions to or changes in any transformers or transmission lines that service the terminating distributor during the twenty-year termination period. Further, distributors will lose the 3.1%

Wholesale Credit, incurring higher rates and placing them at a competitive disadvantage relative to non-terminating distributors.

143.    TVA enjoys complete monopoly power throughout its service area. TVA is fully aware that the inability of a local distributor to foresee the future over a span of two decades will always prevent a local distributor from providing a twenty-year notice of termination of a Never-ending Contract.

144.    By entering into Never-ending Contracts that exceed the TVA Act's statutory limit of twenty (20) years, TVA harmed the interests of the Conservation Groups and their members and directly injured them.

145.    Before TVA implemented the Never-ending Contract program, the weighted average length of the termination notice required under TVA's then existing wholesale power contracts with local distributors was less than seven years.

146.    In addition to lasting forever, the subject agreements contain restrictive caps of three to five percent (3-5%) on the amount of power that local distributors can procure locally from clean energy sources such as solar or other distributed energy resources. Moreover, those contracts are exclusive, meaning that local distributors are forbidden from selling or supplying power outside the confines of the contract.

147.    By entering into perpetual agreements that threaten to permanently hobble the development of clean energy resources such as solar and wind, TVA prevents Conservation Groups from achieving their common organizational

missions of promoting the expansion of clean, renewable energy in the Tennessee Valley.

148.    By entering into perpetual energy contracts, TVA prevents the Plaintiff Protect Our Aquifer from periodically advocating to local distributors that the distributors should search for cleaner renewable power not controlled by TVA, thereby reducing the impacts of TVA power generation on the Memphis Sand Aquifer and other Tennessee water resources. By cementing TVA's reliance of fossil fuels and permanently insulating TVA from competitive market forces at play in the broader energy market, Never-ending Contracts permanently hamper the ability of Protect Our Aquifer to influence TVA's future power generation and use of water resources. Perpetual contracts prevent Plaintiff Protect Our Aquifer from periodically advocating to TVA and local distributors to adopt or amend their power supply contracts to increase renewable power, thereby protecting local and state-wide water resources.

149.    By entering into perpetual energy contracts, TVA prevents the Plaintiff Energy Alabama from periodically advocating to local distributors in northern Alabama that those distributors should search for cleaner renewable power not controlled by TVA. Similarly, the perpetual contracts prevent Energy Alabama from periodically advocating to TVA and local distributors to adopt or amend and implement contracts that promote distributed and renewable energy. TVA's perpetual agreements directly interfere with Energy Alabama's central mission of promoting the adoption of clean, sustainable energy in Alabama.

46

150.    By entering into perpetual energy contracts, TVA prevents the Plaintiff Appalachian Voices from periodically advocating to rural electric cooperatives and other local power distributors that they should increase their use of cleaner renewable power not controlled by TVA. TVA's perpetual agreements also prevent Appalachian Voices and its members from periodically encouraging member-owned electric cooperatives to negotiate for more favorable contract terms with TVA. By tying the hands of electric cooperatives in perpetuity, TVA undercuts completely Appalachian Voices' central mission of democratizing decision-making processes employed by member owned electric cooperatives. The perpetual contracts prevent Appalachian Voices from periodically advocating to TVA and member-owned electric cooperatives to adopt and implement contracts that promote local control and distributed and renewable energy. By cementing TVA's reliance on fossil fuels and permanently insulating TVA from competitive market forces at play in the broader energy market, Never-ending Contracts permanently hamper the ability of Appalachian Voices to influence TVA's future power generation decisions.

151.    TVA's adoption and implementation of perpetual energy contracts in violation of Section 831i of the TVA Act contravenes the APA's prohibition against agency action "in excess of statutory jurisdiction, authority or limitations." 5 U.S.C. § 706(2)(C). Accordingly, the Never-ending Contracts must be held unlawful and set aside as required by Section 706(2) of the APA. 5 U.S.C. § 706(2).

152.    TVA's adoption and implementation of perpetual energy contracts in violation of Section 831i of the TVA Act was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, the Never-ending Contracts must be held unlawful and set aside as required by Section 706(2) of the APA. 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

WHEREFORE, based upon all the allegations contained in the foregoing paragraphs, the Plaintiff Conservation Groups respectfully request the following relief:

a) a judicial declaration that TVA's use of the above described Never-ending Contracts, without preparing an Environmental Impact Statement or conducting other environmental review, violates the National Environmental Policy Act, 42 U.S.C. § 4332(C);

b) a judicial declaration that TVA exceeded its statutory authority by entering into perpetual energy contracts in violation of Section 831i of the TVA Act, 16 U.S.C. § 831i;

c) a finding under the Administrative Procedures Act that TVA's conduct as described above was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A);

d) a finding under the Administrative Procedures Act that TVA's conduct as described above was "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C);

e) a finding under the Administrative Procedures Act that TVA's conduct as described above was "without observance of procedure required by law," 5

U.S.C. § 706(2)(D);

f)   a judgment setting aside and vacating the Never-ending Contracts described above pursuant to Section 706(2) of the Administrative Procedures Act, 5 U.S.C. § 706(2);

g)   an injunction against TVA entering into additional perpetual energy contracts;

h)   an injunction requiring TVA to comply with the terms of the National Environmental Policy Act, 42 U.S.C. § 4332(C), before implementing system-wide energy contract programs that significantly affect the environment;

i)   an award of attorney fees and all recoverable costs pursuant to 28 U.S.C. § 2412(d); and/or

j)   such other relief as this Court deems just and equitable.

Respectfully submitted,

DATE: August 17, 2020

*Attorneys for Protect Our Aquifer, Alabama Center for Sustainable Energy (dba Energy Alabama), and Appalachian Voices*

s/George Nolan
George Nolan, BPR#014974
Amanda Garcia, BPR#033773
O. W. "Trey" Bussey, BPR#037814
Chelsea Bowling, BPR#037812
Southern Environmental Law Center
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Facsimile: (615) 921-8011
gnolan@selctn.org
agarcia@selctn.org
tbussey@selctn.org
cbowling@selctn.org