UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE

PROTECT OUR AQUIFER,
ALABAMA CENTER FOR SUSTAINABLE
ENERGY (dba ENERGY ALABAMA), and
APPALACHIAN VOICES,                              No. 2:20-cv-02615-TLP-atc
Plaintiffs,

       v.

TENNESSEE VALLEY AUTHORITY,
Defendant.

---

**TENNESSEE VALLEY AUTHORITY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6)
OF THE FEDERAL RULES OF CIVIL PROCEDURE**

---

David D. Ayliffe, Director, Litigation
Maria V. Gillen, Sr. Manager, Litigation
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741
ddayliffe@tva.gov
mvgillen@tva.gov

## INTRODUCTION

Because there is no private right of action against TVA, Plaintiffs Protect Our Aquifer, Alabama Center for Sustainable Energy, and Appalachian Voices bring this lawsuit pursuant to the Administrative Procedure Act ("APA") challenging the terms and conditions of TVA's long-term wholesale power contract. Plaintiffs claim TVA violated the National Environmental Policy Act ("NEPA") "by failing to conduct an environmental review before it adopted and implemented" certain contractual terms and conditions. (Compl., Doc. 1 ¶ 123.) Plaintiffs further claim TVA violated the TVA Act by entering into twenty-year contracts that automatically renew each year. (*Id.* ¶ 141.) Plaintiffs ask the Court to declare TVA violated each statute, vacate and set aside the over 140 long-term agreements TVA has in place with distributors of its power, and enjoin TVA from entering into its wholesale power contracts. (*Id.* at PageID# 48-49.)

Plaintiffs' real concern, however, is not the terms and conditions of TVA's wholesale power contracts. Indeed, since 1933, and no different from its utility industry peers which have even longer contractual terms, TVA has entered into twenty-year agreements for the supply of electric power, which have included provisions similar to those in place today. The twenty-year contractual term limitation set forth in the TVA Act—part of the law as enacted—was designed to (1) provide TVA with security in power demand to invest in its power system and to fulfill its statutory mandates; and (2) provide customers with security that they would receive the power for which they contracted. While time has passed, nothing has changed. TVA's current wholesale power contracts continue to reflect the same mutual commitments between TVA and its customers.

It is clear from the Complaint that Plaintiffs' real concern is the source of power that TVA generates. But Plaintiffs have no way to successfully challenge TVA's decisions on power generation because TVA fully complies with NEPA and engages in environmental reviews for those decisions. So, Plaintiffs try something different: they challenge the terms and conditions of

TVA's wholesale power contracts by alleging that certain terms and conditions harm their alleged environmental and advocacy interests. But Plaintiffs' challenge must fail. TVA's wholesale power contracts are not subject to judicial review. Congress intentionally committed the decisions regarding the terms and conditions of power contracts to the discretion of the TVA Board of Directors, and concerns about how the Board exercises that discretion are properly addressed by Congress.

Moreover, Plaintiffs lack any type of standing to bring their claims. As to organizational standing, Plaintiffs cannot establish the constitutional minimum elements of injury-in-fact, causation, and redressability. Their environmental harms are wholly speculative and the information they seek for advocacy purposes does not come from any environmental review of the long-term agreements; the information they seek comes from the reviews associated with TVA's power generation decisions, in which Plaintiffs participated. As for associational standing, Plaintiffs fail to identify any members who have suffered harm as a result of TVA's long-term agreements with its customers, and even if they could, they cannot establish the requisite elements for Article III standing necessary to maintain suit for the same reasons they cannot demonstrate organizational standing. Finally, there are prudential reasons why this Court should not hear this case: Plaintiffs challenge agreements to which they are neither a party nor a third-party beneficiary, and they lodge a generalized grievance.

This lawsuit is an attempted end-run around the longstanding precedent that the terms and conditions of TVA's wholesale power agreements are not subject to judicial review. No matter how Plaintiffs plead it, this Court lacks jurisdiction to hear it.

## BACKGROUND

I.      **TVA's Statutory Mission to Provide Low-Cost, Reliable Electricity**

TVA is a constitutionally authorized executive branch corporate agency and

instrumentality of the United States created by and existing pursuant to the TVA Act of 1933, 16 U.S.C. §§ 831 et seq. ("TVA Act"). *Ctr. for Biological Diversity v. TVA*, No. 3:18-CV-1446-LCB, 2020 WL 5819673, at *1 (N.D. Ala. Sept. 30, 2020). TVA is responsible for the multi-purpose development of the Tennessee Valley's resources and economy. *See* 16 U.S.C. § 831.[1] One of its statutory objectives is to provide low-cost, reliable electricity to ten million people in TVA's seven-state service area. *See* 16 U.S.C. § 831j; *id.* §§ 831n-4(f) & (h); *id.* § 831d(l).

To achieve this objective, TVA maintains and operates the nation's largest public power system (Ex. A, TVA, 2019 Integrated Resource Plan ("2019 IRP") at 6),[2] which generates electricity using a diverse power portfolio, (*see* Ex. B, TVA, Our Power System). TVA's "emphasis has moved away from traditional coal-based production and toward cleaner forms of power generation, and today the power [TVA] deliver[s] is 54 percent carbon-free." (*See id.*) TVA sells this electricity to 154 local power companies ("LPCs"), which then distribute it to residential, commercial, industrial, and governmental customers.[3] (Ex. A, 2019 IRP at 31.)

Congress vested the Board with exclusive authority to set rates for the sale of TVA electricity. *See* 16 U.S.C. § 831a(g)(1)(L); *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 406 (6th Cir. 2006); *Bekaert Corp. v. City of Dyersburg*, No. 07-2316-STA-DKV,

---

[1]    TVA is governed by a nine-member Board of Directors, who have a statutory duty to "establish the broad goals, objectives, and policies of [TVA] that are appropriate to carry out [the TVA Act]." 16 U.S.C. § 831a(g)(1)(A).

[2]    The Court may take judicial notice of the information on TVA's website. *See New England Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) (in ruling on a Rule 12(b)(6) motion, court may consider matters of which it can take judicial notice); *Mirabella v. Univ. of Tenn.*, 915 F. Supp. 925, 926 (E.D. Tenn. 1994) (same with respect to Rule 12(b)(1) motion); *see also Mitchell v. TVA*, No. 3:14-cv-360-TAV-HBG, 2015 WL 1962203, at *4 & *4 n.2 (E.D. Tenn. Apr. 30, 2015) (taking judicial notice of TVA's website).

[3]    TVA also sells its electricity directly to industrial customers with large or unusual loads and to several federal agency installations. (Ex. A, 2019 IRP at 31.)

2009 WL 7196672, at *3-4 (W.D. Tenn. May 20, 2009). TVA exercises this authority primarily through the contracts it enters into with LPCs. The Board is authorized to include in these contracts "for the sale of power such terms and conditions, including resale rate schedules, . . . as in its judgment may be necessary or desirable for carrying out the purposes of [the TVA Act]." 16 U.S.C. § 831i. One purpose is to sell power "at rates as low as are feasible," 16 U.S.C. § 831n-4(f), and the Board must ensure this obligation is balanced with (among others) its responsibility to earn sufficient income to remain financially sound, *see id.* Ultimately, as it has been since 1933, TVA's generation and sale of reliable, environmentally clean power at low rates in the Valley is designed to foster economic and industrial development and a higher quality of life in the region.

## II.   TVA's Integrated Resource Plan Guides the Delivery of Low-Cost, Reliable Energy

TVA's 2019 Integrated Resource Plan ("IRP") "is a long-term plan that provides direction on how TVA can best meet future demand for power" for a twenty-year period. (Ex. A, 2019 IRP at 6.) Together with an Environmental Impact Statement ("EIS") (Ex. C, 2019 IRP Final EIS), the 2019 IRP "evaluate[ed] TVA's current energy resource portfolio and alternative future portfolios of energy resource options to meet the future electrical energy needs of the TVA region at a least system-wide cost while taking into account TVA's mission of energy, environmental stewardship and economic development." (Ex. A, 2019 IRP at 34.) The Board approved the 2019 Final IRP and EIS in August 2019. (Doc. 1-7 at 10-12.)

The IRP's long-range forecasting is required under 16 U.S.C. § 831m-1. TVA is required to employ a "least-cost planning" process for selecting "new energy sources" that "evaluates the full range of existing and incremental resources (including new power supplies, energy conservation and efficiency, and renewable energy resources) in order to provide adequate and reliable service to electric customers of [TVA] at the lowest system cost." 16 U.S.C. § 831m-1(b)(1). It must "take into account necessary features for system operation, including diversity,

reliability, dispatchability, and other factors of risk" and "treat demand and supply sources on a consistent and integrated basis." 16 U.S.C. § 831m-1(b)(2)(A), (C). With respect to demand, the 2019 IRP base case assumed all 154 LPCs remained TVA customers for the twenty-year period.

The 2019 IRP reflects changing technologies and public priorities by focusing on system flexibility, distributed energy resources ("DER"),[4] and portfolio diversity. Pursuant to previous IRPs, TVA has already reduced the coal-based component of its power supply from approximately 60 percent in FY 2007 to 20 percent in FY 2019. The 2019 IRP contemplates further reductions in coal-based generation up to 2200 MW by 2028, including retirement of coal-fired power plants. As to solar generation, the Board adopted a power supply mix based on the IRP's analysis that would add between 1,500 and 8,000 MW of solar power by 2028, and up to 14,000 MW by 2038.[5] (*See* Ex. A, 2019 IRP at 3.) Indeed, the solar component represents the largest projected MW addition of any resource type in the IRP (*id.*), and unlike coal, solar expansion plays a critical role in all future power supply scenarios. (*See id.* at 2-4.)

In addition to the IRP, TVA engages in annual power supply planning, which more specifically depicts expected portfolio changes, within IRP parameters, based upon current planning assumptions. TVA also continuously monitors the fleet for the most optimal portfolio to provide low-cost, reliable, and increasingly cleaner energy to TVA customers. When evaluations

---

[4]     "Distributed energy resources (DER) are power generation and storage systems that are connected to the power distribution system and deliver power to the grid or that are 'behind the meter' and deliver power directly to an end-user. Examples include solar panels, combined heat and power systems, microturbines, and battery storage systems. DER also includes energy management, such as energy efficiency and demand response." (Ex. A, 2019 IRP at 35.)

[5]     Solar resources include both distributed solar (e.g., private rooftop solar installations) and utility scale solar (i.e., large solar generation facilities operated by utilities and managed in concert with their other generating facilities). (Ex. G, Changes to Green Power Providers Program, Final Environmental Assessment at 3-4.) The 2019 IRP's modeling shows that utility-scale solar capacity is expected to be much higher than distributed solar in the TVA service area due to its low cost. (Ex. A, 2019 IRP at 103.)

indicate a specific asset addition or retirement in the tactical window is economic, TVA performs an environmental review to further assess alternatives and broader impacts. Once that review is completed, an asset decision is recommended to the Board, which considers all aspects of the proposed action, including whether the recommended action fits within IRP parameters and any associated environmental, cultural, and socio-economic impacts.

## III.   TVA Delivers Low-Cost, Reliable Energy to LPCs via Long-Term Agreements

As it did in 1933, TVA supplies power by entering into wholesale power contracts with its customers. In its first Annual Report to Congress, TVA noted that "[a] standard form 20-year contract was devised to govern the sale of power at wholesale to municipal distribution systems." (*See* Ex. D, TVA, 1934 Annual Report at 28 (June 30, 1934).) "The major provisions of the standard contract" at that time are similar to the provisions in the agreements TVA has in place today, including specifically the provision that the customer agrees to purchase all of its power requirements from TVA at rates set by TVA and to resell it at rates established by TVA. (*Id.*). These terms and conditions are critical to the success of TVA's statutory mission; that is, to deliver low-cost, reliable energy to promote a higher quality of life in the region.

In August 2019, the Board approved terms and conditions for a standard long-term agreement ("LTA") with LPCs. (*See* Doc. 1-7 at 28.) One is a termination notice requirement of twenty years, "which [supports] TVA's mission to make life better for the people of the Valley by helping fulfill TVA's statutory obligation to sell power at rates as low as are feasible."[6] (*Id.*) This provision provides TVA with assurance "that TVA has the revenue necessary to satisfy its long-

---

[6]     A notice termination period of twenty years is nothing new nor outside the norm of utility industry standards. Prior to August 2019, "wholesale power contracts between TVA and individual LPCs had termination notice periods ranging from 5 to 20 years." (Ex. E, TVA, Power Supply Flexibility Proposal Final Environmental Assessment ("Flexibility EA") (June 2020) at 9.)

term financial obligations as they come due" and "certainty in TVA's long-term generation and financial planning." (*Id.*) The financial benefits stemming from a long-term contract are shared with the LPCs in the form of monthly bill credits. (*Id.*)

Recent performance has shown that the certainty provided by a stronger partnership between TVA and LPCs benefits the entire Valley, not just those LPCs which have LTAs. In August 2020, TVA announced that the LTAs helped enable TVA to provide $2 million to the COVID-19 Community Care Fund and to offer LPCs $200 million worth of pandemic relief through a 2.5% rate credit for fiscal year 2021. (TVA, August 27, 2020 Board Meeting Presentation.)[7] As of August 3, 2020, 141 LPCs had signed a LTA, which is more than ninety percent of all LPCs, and those LPCs had received $108 million in bill credits under the LTAs, a savings that ultimately benefits the people of the Valley. (*Id.*)

Another term and condition is the "power supply flexibility option," under which "TVA committed to develop, by a specified date, an option for power supply flexibility for [LPCs] to generate a portion of their energy." (Ex. E, Flexibility EA at 7.) Following LPCs' execution of LTAs, TVA and the LPCs "developed the principles, criteria, and mechanisms that comprise [what came to be known as] the Flexibility Proposal. In February 2020, the Board approved the Power Supply Flexibility resolution, which would allow [LTA signatories] to self-generate three to five percent of their energy," and TVA conducted an EA in June 2020 (*Id.* at 9.) Under the flexibility option, approximately 2,000 MW could be developed if all 154 LPCs "participate and deploy only solar to develop their maximum allowable capacity." (*Id.* at 14.)

## ARGUMENT

While TVA may "sue and be sued," 16 U.S.C. § 831c(b), that clause does not provide

---

[7]     Video of the meeting is available at https://www.tva.com/about-tva/our-leadership/board-of-directors/meetings- archive/2020/08/27/default-calendar/board-meeting-august-27-2020.

parties with a private right of action against TVA. *See, e.g.*, *Smith v. Russellville Prod. Credit Ass'n*, 777 F.2d 1544, 1548 (11th Cir. 1985); *Town of Secaucus v. U.S. Dep't of Transp.*, 889 F. Supp. 779, 786-88 (D.N.J. 1995). And although judicial review of TVA action is available under the APA, 5 U.S.C. § 702, action committed to agency discretion is not judicially reviewable. 5 U.S.C. § 701(a)(2). Nor is action subject to review under the APA if the party bringing the suit does not have standing. Plaintiffs' Complaint suffers in both respects.

I.      **TVA's Long Term Agreements with LPCs are Not Subject to Judicial Review**

"[B]efore any review [of agency action] at all may be had, a party must first clear the hurdle of [5 U.S.C.] § 701(a)," *Heckler v. Chaney*, 470 U.S. 821, 828 (1985), which removes action "committed to agency discretion by law" from judicial review, 5 U.S.C. § 701(a)(2). If a litigant cannot clear that hurdle, then the Court "must decline to exercise jurisdiction over the matter." *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1124 (6th Cir. 1996) (citing *Heckler*, 470 U.S. at 828); *accord Sheldon v. Vilsack*, 538 F. App'x 644, 649 & 649 n.4 (6th Cir. 2013).

Courts have long recognized that the TVA Act contains "broad grants of authority" regarding rate-making, which Congress directed should be liberally construed. *Siegelman v. TVA*, No. 87-AR-2224-M, Mem. Op. at 8 (N.D. Ala. Aug. 18, 1988);[8] *accord Ferguson v. Elec. Power Bd. of Chattanooga*, 378 F. Supp. 787, 789 (E.D. Tenn. 1974), *aff'd*, 511 F.2d 1403 (6th Cir. 1975); *Mobil Oil Corp. v. TVA*, 387 F. Supp. 498, 507 (N.D. Ala. 1974). Indeed, to allow TVA's rate-making decisions to be reviewed by courts would "'create uncertainties that would make the declared statutory policy impossible to carry out.'" *Bekaert Corp*, 2009 WL 7196672, at *3 (citation omitted). Numerous cases recognize the broad discretion Congress gave the Board to set power rates and the terms and conditions of TVA's power contracts. *See, e.g., McCarthy*, 466 F.3d

---

[8]      *See* Ex. H.

at 405; *Matthews v. Town of Greeneville, Tenn.*, 932 F.2d 968 (Table), 1991 WL 71414, at *3 (6th Cir. May 2, 1991).[9]

Nonetheless, Plaintiffs challenge the LTAs, asserting they violate the limit on contracts for the sale of power to "a term not exceeding twenty years." 16 U.S.C. § 831i; *but see* 16 U.S.C. § 831k (allowing TVA to enter into power contracts "for a term not exceeding thirty years"). But the LTAs *are for a term of twenty years,* which Plaintiffs admit. (Doc. 1-6 at 2; *see also* Compl. ¶ 106.) Plaintiffs' gripe is really with the renewal and termination provisions of the LTAs.

Yet, Congress delegated to the Board the authority and discretion to set rates for the sale of its electricity, which is federal property. *TVA v. United States*, 13 Cl. Ct. 692, 697 (1987) ("[I]ndeed, the dispute involves property of the United States, i.e., the electricity generated by TVA[.]").[10] And Congress broadly empowered the Board "to include in any contract for the sale of power *such terms and conditions . . . as in its judgment may be necessary or desirable for carrying out the purposes of [the TVA Act]*." 16 U.S.C. § 831i (emphasis added). The "length of contracts" is one such term and condition; it is therefore "unreviewable." *4-Cnty. Elec. Power Ass'n*, 930 F. Supp. at 1138 (finding "unreviewable" a 20-year wholesale power contract with a rural electric cooperative corporation that sells TVA power to its members); *see also Bekaert Corp.*, 2009 WL 7196672, at *3-4 (declining to review where the court would be required to "fix

---

[9]     *See also Bekaert Corp.*, 2009 WL 7196672, at *3; *4-Cnty. Elec. Power Ass'n v. TVA*, 930 F. Supp. 1132, 1138 (S.D. Miss. 1996); *Carborundum Co. v. TVA*, 521 F. Supp. 590, 593 (E.D. Tenn. 1981); *Consol. Aluminum Corp. v. TVA*, 462 F. Supp. 464, 474 (M.D. Tenn. 1978); *Ferguson*, 378 F. Supp. at 789; *Mobil Oil Corp.*, 387 F. Supp. at 505. *Accord Electricities of N.C., Inc. v. Se. Power Admin.*, 774 F.2d 1262, 1266 (4th Cir. 1985).

[10]     Congress has the power to dispose of federal property and to place conditions upon such transfers pursuant to the Property Clause of the Constitution. *See, e.g., Alabama v. Texas*, 347 U.S. 272, 273 (1954) (per curiam); *United States v. City & Cnty. of S.F.*, 310 U.S. 16, 30 (1940); *Ashwander v. TVA*, 297 U.S. 288, 338 (1936).

a new . . . contract term length"). Likewise, termination and renewal provisions are unreviewable. *Seigleman*, Mem. Op. at 12 ("[TVA's] rate-making authority . . . encompasses matters far beyond the mere setting of dollars and cents figures for units of energy use."). *Accord Consol. Aluminum Corp.*, 462 F. Supp. at 474 (finding that rate-making includes the setting of a sufficient margin "to assure the financial soundness of the TVA power system").[11] Accordingly, this Court lacks jurisdiction to review Plaintiffs' claim.

## II.     Plaintiffs Lack Standing to Pursue their Claims

Plaintiffs sue on behalf of their members and on their own behalf. Therefore, they are proceeding under theories of associational and organizational standing. They cannot, however, proceed under either theory.

Associational standing requires a plaintiff organization to show that "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim requested nor the relief requested requires the participation of individual members in the lawsuit."[12] *Shelby Cnty. Advocates for Valid Elections v. Hargett*, No. 2:18-cv-02706-TLP-dkv, 2019 WL 4394754, at *7 (W.D. Tenn. Sept. 13, 2019) (citation omitted), *aff'd*, 947 F.3d 977 (6th Cir. 2020). When relying upon associational standing,

---

[11]     This precedent is consistent with "the intention of Congress, clearly manifest from a reading of the act as a whole, that the Board, in disposing of the surplus power generated as a result of its operations under the act, should not only have the power but should be under the duty, to specify in the contracts under which such power is disposed of, the terms and conditions upon which it is to be purchased by the other party to the contract." (Ex. D, 1934 Annual Report at 26.) Indeed, from TVA's inception, the Board "has felt it should dispose of [federal] property only upon terms and conditions that would assure its utilization in the public interest." (*Id.*)

[12]     Protect Our Aquifer does not even allege that it has members; rather, it alleges it has "supporters." (Compl. ¶ 26.) Protect Our Aquifer, therefore, "stumbles on the first step" and cannot rely upon associational standing absent showing it "is the functional equivalent of a traditional membership organization." *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977)).

"plaintiff-organizations [must] make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). "Such specificity requires that the plaintiff-organization 'name the individuals who were harmed' unless 'all the members of the organization are affected by the challenged activity.'" *Tenn. Republican Party v. Sec. & Exch. Comm'n*, 863 F.3d 507, 507 (6th Cir. 2017) (citation omitted). Plaintiffs do not identify any specific member of their organizations who has suffered or will suffer harm, nor do they allege that all of the members of the organizations are affected by TVA's entry into LTAs with LPCs; nor can they, as not all members reside in the Valley. (*See* Compl. ¶¶ 26, 44, 46, 55, 60-61, 69 & 72.) Plaintiffs do not have associational standing.[13]

Nor can Plaintiffs demonstrate organizational standing. An organization may proceed "on its own behalf [where] it has suffered a palpable injury as a result of the defendants' actions." *Shelby Cnty. Advocs. for Valid Elections*, 2019 WL 4394754, at *5 (citations omitted). It "must establish the three traditional elements of standing."[14] *Id.* (citation omitted). "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved.'" *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

The three elements of the "irreducible constitutional minimum" of standing are that a plaintiff must have (1) suffered an injury in fact, which is "actual or imminent, not conjectural or hypothetical," (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540,

---

[13]     And for the reasons explained *infra*, Plaintiffs also lack associational standing because they cannot show the three necessary elements of Article III standing for any individual members.

[14]     "[A] plaintiff must demonstrate standing for each claim he seeks to press." *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 652 (6th Cir. 2007).

1547 (2016); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). As the party invoking federal jurisdiction, a plaintiff bears the burden of establishing these elements, *Spokeo*, 136 S. Ct. at 1547 (citation omitted), which at the pleading stage, requires plaintiff to "clearly . . . allege facts demonstrating" each element, *id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

But even if the Court finds that a plaintiff has Article III standing, it must still determine whether, as a prudential matter, it should adjudicate the claims before it. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985). Like their constitutional counterparts, these judicially self-imposed limits on the exercise of federal jurisdiction are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth*, 422 U.S. at 498. The Supreme Court has "explained that prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights[ and] the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004), *abrogated on other grounds by Lexmark Int'l, Inc., v. Static Control Components*, 572 U.S. 118, 128-29 (2014).

## A.    Plaintiffs Lack Standing to Bring Their TVA Act Claim

Plaintiffs allege they are harmed by the LTAs because they preclude Plaintiffs' ability to advocate to LPCs to consider suppliers other than TVA, and to LPCs and TVA to include power supply contract terms that are more favorable to DER and renewable energy. (Compl. ¶¶ 148-50.) They complain the LTAs prevent them from influencing LPCs' decisions on the source of their power and the terms and conditions for that power. But these alleged injuries are conjectural and are neither actual nor imminent. Nowhere in the Complaint do Plaintiffs allege that they attempted to meet with an LPC to discuss the terms of or terminating the LPC's contract with TVA or that they were turned away by that LPC because the LPC had entered into a LTA. Nor have Plaintiffs

alleged that TVA has turned Plaintiffs away when they have attempted to meet with TVA regarding its power contracts with LPCs. Plaintiffs' alleged injuries are therefore neither concrete nor imminent; they are nothing more than a fear of speculative harm. *Spokeo*, 136 S. Ct. at 1548 ("A 'concrete' injury must be 'de facto'; that is, it must actually exist." (citation omitted)); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (finding injury of "highly speculative fear" not cognizable).

But Plaintiffs' claims suffer from a more fundamental defect; Plaintiffs are not the parties who are injured by the alleged violation. Plaintiffs are neither signatories to nor third-party beneficiaries of the LTAs. *See* Ex. F, *Cauthen v. TVA et al.*, No. CIV 1-87-75 (E.D. Tenn. June 26, 1987) (finding customer of LPC is not a third-party beneficiary to power contract). Yet, Plaintiffs ask the Court to review and interpret the LTAs. By doing so, they are "effectively seeking to enforce the rights of third parties (here, [the LPCs]), which the doctrine of prudential standing prohibits." *Deutsche Bank Nat'l Trust Co. v. FDIC*, 717 F.3d 189, 194 (D.C. Cir. 2013) (finding proposed intervenor lacked prudential standing because, in wishing "to be heard on the specific question of contract interpretation," plaintiffs sought to "enforce the rights of third parties"); *see also JPMorgan Chase Bank, N.A. v. First Am. Title Ins. Co.*, 750 F.3d 573, 581-82 (6th Cir. 2014) (finding party who is "neither a party to nor a third-party beneficiary" of an agreement lacks standing to challenge the contracting parties' "understanding of their own contract"). "The Supreme Court repeatedly has recognized that 'a litigant must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *JPMorgan Chase Bank*, 750 F.3d at 582 (citation omitted). Hearing Plaintiffs "on the issue of contract interpretation here would allow [them] to assert [the LPCs'] right." *Id.*

If this were not enough, Plaintiffs also have causation and redressability problems. Plaintiffs' injury cannot be fairly traced to TVA's entry into LTAs because the LTAs do not dictate

the source of generation. Rather, that decision is guided by TVA's 2019 IRP. The source of Plaintiffs' alleged injury, if any, is the 2019 IRP for which TVA conducted an EIS.[15] Moreover, the LTAs actually provide Plaintiffs with *more* opportunities to advocate for the production of particular types of energy because they provide LPCs the ability to generate a portion of their own power supply. To the extent Plaintiffs are choosing not to advocate because of the terms and conditions TVA and the LPCs have agreed upon, then Plaintiffs' injury is "self-inflicted" and not cognizable. *See Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866-67 (6th Cir. 2020).

As for redressability, Plaintiffs ask the Court to declare that TVA violated the TVA Act, vacate the LTAs, and enjoin TVA from entering into "perpetual energy contracts." (Compl. at PageID# 48-49.) This relief would require the Court to set new terms and conditions in TVA's wholesale power contracts. Congress committed these matters to TVA's discretion. (*Supra*, Section I.) It is therefore impossible for the Court to grant relief. *See Newdow v. Roberts*, 603 F.3d 1002, 1010–11 (D.C. Cir. 2010) (plaintiffs could not establish redressability because "[i]t [was] impossible for th[e] court to grant [their requested] relief"); *McNeil v. Harvey*, No. 17-1720 (RC), 2018 WL 4623571, at *5 (D.D.C. Sept. 26, 2018) (court could not redress the injury because it "lack[ed] the power to void other federal courts' orders"), *reconsid. denied*, 2019 WL 1003582 (Feb. 28, 2019).

Moreover, vacating over 140 LTAs would strip LPCs of the benefit of their bargain, potentially requiring their repayment of millions of dollars, without any opportunity to be heard or to protect their interests. It would also remove the bill credit savings and disrupt a model that has been effective at mitigating the effects of unprecedented hardships the Valley has faced this year.

---

[15]    As Plaintiffs acknowledge, Energy Alabama had the opportunity to participate in the decision-making process for the 2019 IRP. (Compl. ¶ 48.)

For all of these reasons, Plaintiffs do not have standing to pursue their TVA Act claim.[16]

**B.    Plaintiffs Lack Article III Standing to Bring Their NEPA Claim**

Each Plaintiff claims an environmental injury as a result of the LTAs. Protect Our Aquifer alleges depletion of the Memphis Sand Aquifer and increased water pollution, Energy Alabama alleges an increase in water and air pollution, and Appalachian Voices alleges likely constraint of investment in solar and DER. (*See, e.g.*, Compl. ¶¶ 40-41, 55 & 69.) But the underlying premise of these alleged injuries is that TVA's entry into the standard LTAs with LPCs will increase TVA's reliance on fossil fuels. (Compl. ¶¶ 40, 56, 148 & 150.)

Plaintiffs' allegation that the LTAs will increase TVA's reliance on fossil fuels is wholly conclusory. (*See* Compl. ¶¶ 40, 55 & 66.) Nothing alleged in the Complaint, other than an equally conclusory allegation that the LTAs will "likely lead to increased electricity demand" (*see id.*), supports an inference that TVA will increase its reliance on fossil fuels because of the terms and conditions of the LTAs. The Court cannot, therefore, rely upon these allegations for purposes of standing. *See Binno*, 826 F.3d at 344 ("Conclusory allegations do not satisfy the requirements of Article III." (citation omitted)); *Ctr. for Biological Diversity v. TVA*, 2020 WL 5819673, at *6

---

[16]    Alternatively, TVA seeks dismissal because Plaintiffs do not satisfy the "zone of interests" test, which is analyzed under Rule 12(b)(6). *See Keen v. Helson*, 930 F.3d 799, 802 (6th Cir. 2019); *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1197 (M.D. Tenn. 2017). A plaintiff pursuing an APA claim must show that "that the interest he or she seeks to protect, 'is arguably within the zone of interests to be protected [ ] by the statute' under which the plaintiff sues." *Bangura v. Hansen*, 434 F.3d 487, 499 (6th Cir. 2006) (citation omitted). The provision of the TVA Act that limits contracts for that class for the sale of power to "a term not exceeding twenty years," 16 U.S.C. § 831i, serves to protect TVA and distributors of electricity—not environmental groups like Plaintiffs. *See Dean v. Herrington*, 668 F. Supp. 646, 653-54 (E.D. Tenn. 1987) ("The issue of standing to bring an action under Section 10 of the APA turns ultimately on 'whether Congress intended for that class to be relied upon to challenge agency disregard of the law.'" (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1983)). Plaintiffs are not the parties Congress intended to "police the interests that the statute protects." *Grand Council of Crees (of Quebec) v. F.E.R.C.*, 198 F.3d 950, 958 (D.C. Cir. 2000) (citation omitted) (finding environmental group not within zone of interests protected by ratemaking provision in the Federal Power Act).

(finding plaintiff's statement, "*ipse dixit*, that a decrease in DER investment will necessarily lead to the increased use of fossil fuels to make up the deficit"). Without their speculative conclusions, Plaintiffs' claims of environmental harm fall apart.

Plaintiffs' conclusion also is demonstrably false. TVA's 2019 IRP, which Plaintiffs cite in the Complaint (*see, e.g.*, *id.* ¶¶ 16-17), directly contradicts the proposition that TVA will increase its reliance on fossil fuel, and it is the 2019 IRP, not the LTAs, that guides TVA's decisions regarding power generation. The 2019 IRP, which assumes a constant demand for power for a period of twenty years, examined how best to meet electricity demand over that time period. For the next twenty years, TVA contemplates reducing coal-based generation, potentially retiring gas combustion turbines, and increasing reliance on solar. And the LTAs provide LPCs with the ability to generate their own power consistent with the 2019 IRP, which means that Plaintiffs cannot allege that LPCs will use that opportunity to invest in power generated by fossil fuels. Accordingly, Plaintiffs' alleged basis for environmental harm is nothing more than conjecture.[17]

Plaintiffs' other alleged injuries are that they were deprived of information, of the opportunity to participate in the decision-making process, and of the opportunity to advocate for their environmental concerns because TVA did not conduct an assessment under NEPA. (*See, e.g.*, Compl. ¶¶ 41-43, 51-53, 65, 67 & 70-72.)[18] These too fail to support standing.

---

[17]    "Even if the plaintiffs could establish that [the LTAs] would lead to increased fossil fuel use, they have, at best, shown that it would generally affect a seven-state area. Such a large geographic area cannot support Article III standing." *Ctr. for Biological Diversity v. TVA*, 2020 WL 5819673, at *7 (citation omitted).

[18]    To the extent that Plaintiffs allege a procedural injury, "[t]he mere violation of a procedural requirement . . . does not permit any and all persons to sue to enforce the requirement." *Fla. Audubon*, 94 F.3d at 664. "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496. As explained herein, Plaintiffs cannot show a concrete interest that is affected by the alleged failure to conduct an environmental review under NEPA.

In a NEPA case, informational injury alone is not a basis for standing. *Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84 (D.C. Cir. 1991) ("[W]e have never sustained an organization's standing in a NEPA case solely on the basis of 'informational injury,' that is, damage to the organization's interest in disseminating the environmental data an impact statement could be expected to contain."). If that were the case, it "would potentially eliminate any standing requirement in NEPA cases" because "any member of the public—anywhere—would seem to be entitled to receive [information contemplated by the statute]." *Id.* at 84–85. "'[W]ithout more,' a standalone assertion of an improper denial of information pursuant to NEPA would convert 'a mere interest in a problem' into a cognizable injury—a result at odds with established jurisprudence.'" *Ctr. for Biological Diversity v. Bernhardt*, No. 19-cv-02898 (APM), 2020 WL 5702087, at *6 (D.D.C. Sept. 24, 2020) (quoting *Lyng*, 943 F.2d at 84-85).

Rather, "[a] plaintiff suffers sufficiently concrete and particularized informational injury [only] where the plaintiff alleges that: (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). Here, Plaintiffs fail prong two. "Plaintiffs do not [and cannot] allege a deprivation of information under NEPA any greater than that which is suffered by the general public," *Ctr. for Biological Diversity v. Bernhardt*, 2020 WL 5702087, at *6 (dismissing NEPA claim), which is a harm that is insufficient to confer standing, *Lujan*, 504 U.S. at 573-76.

Moreover, for an organization "[t]o satisfy the injury-in-fact requirement, [it] must allege that it suffered a "concrete and demonstrable injury to [its] activities—with the consequent drain on [its] resources—[that] constitutes far more than simply a setback to [it's] abstract social interests." *Tex. Low Income Housing Info. Serv. v. Carson*, 427 F. Supp. 3d 43, 52 (D.D.C. 2019)

17

(quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "The D.C. Circuit has

articulated a two-prong test for determining whether an organization meets this standard." *Id.*

> First, the organization must plausibly allege that the defendant's action or omission
> to act injured the organization's interest. To make such a showing, the organization
> must plausibly allege that the challenged conduct perceptibly impaired its ability to
> provide services by causing an inhibition of the organization's daily operations.
>
> . . . .
>
> Second, the organization must plausibly allege that it used its resources to
> counteract the alleged harm. . . . . An organization must allege that it used its
> resources in response to, and to counteract, the effects of the defendant's challenged
> conduct, and for a purpose other than advocacy or litigation.

*Id.* (cleaned up).

Plaintiffs' allegations fall far short of this standard. Plaintiffs allege that without an

environmental review of the LTAs they may not be able to educate their members and the public

or engage in advocacy efforts. Their allegations, though, are speculative. At best, Plaintiffs assert

a "setback" to their interests. Plaintiffs have further failed to allege that they used their resources

to counteract any impairment to their ability to provide services. *See Pub. Citizen v. U.S. Trade*

*Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) ("[A]lthough the argument that the absence of

an EIS 'directly affects' Public Citizen's ability to lobby Congress and disseminate information

seems persuasive on its face, this court has stated that an agency's failure to prepare an EIS, by

itself, is not sufficient to trigger APA review in the absence of identifiable substantive agency

action putting the parties at risk." (citing *Lyng*, 943 F.2d at 85)). But more importantly, the

information Plaintiffs seek to engage in their advocacy efforts has already been provided via the

2019 IRP and associated EIS and the EA for the Flexibility Proposal. Plaintiffs fully participated

in those reviews (Compl. ¶¶ 39 & 48); thus, there is no actual, concrete, or imminent harm.

Ultimately, Plaintiffs' alleged injury is nothing more than "injury to [Plaintiffs'] interest in

seeing that [TVA] complied with the requirements of NEPA," *Heartwood, Inc. v. U.S. Forest*

*Serv.*, No. 1:00–CV–683, 2001 WL 1699203, at \*10 (W.D. Mich. Dec. 3, 2001), which is "insufficient to confer standing," *id.* (citing *Michigan v. United States*, 994 F.2d 1197, 1203-04 (6th Cir. 1993)).

If this were not enough, Plaintiffs again have a problem with causation and redressability. "To prove causation, a plaintiff seeking the preparation of an [environmental review] must demonstrate that the particularized injury that the plaintiff is suffering or is likely to suffer is fairly traceable to the agency action that implicated the need for [a review]." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996) (en banc). "In other words, unless there is a substantial probability, that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff, the plaintiff lacks standing." *Id.* (citation omitted).

Plaintiffs claim that as a result of the LTAs, there will be an increased demand for electricity, an increased reliance on fossil fuel generation, a slower or capped transition to renewable and sustainable energy, increased water usage, and increased air and water pollution. (Compl. ¶¶ 40, 56 & 66.) But Plaintiffs' theory of causation is made up of a number of speculative links that do not hold up to support standing in this action.

*Florida Audubon Soc'y v. Bentsen* is instructive here. There, the Secretary of the Treasury expanded a tax credit for adding certain types of alternative fuel additives to gasoline. 94 F.3d at 662. Because the Secretary did not prepare an EIS, the Florida Audubon Society and others sued to enjoin the tax credit, alleging a violation of NEPA. *Id.* at 662, 665. In affirming the district court's dismissal for lack of standing, the D.C. Circuit explained how the plaintiffs failed to establish the "substantial probability" of each individual link occurring and how they wrongly assumed that each individual link would be present without any consideration of any outside factors that might break the chain of causation. *See id.* at 669-70 (explaining that the court

"routinely refuse[s] to permit . . . predictive assumptions to establish standing" (citations omitted)).

In *Center for Biological Diversity v. TVA*, the plaintiffs, including Energy Alabama, made allegations similar to those in this action. *See* 2020 WL 5819673, at *5-7. The Court relied upon *Bentsen* to find that the plaintiffs failed to show the necessary causal link to support standing for their claim that TVA failed to conduct an environmental review of a rate change.

So too here. Similar to *Bentsen* and *Center for Biological Diversity*, "there are several links in the alleged chain of causation." *Id.* at *5. There are no facts that support why entry into the LTAs alters the demand for electricity or why, even if that is true, an increased demand for electricity would cause an increased reliance on fossil fuel generation. "This hypothetical chain of events fails as a showing of Article III standing." *See Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 175 (D.C. Cir. 2012). But even more, the hypothetical chain depends on the actions of third parties, namely, LPCs and consumers of electricity. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976) (explaining that standing cannot rest on injury to "third party not before the court").

If the Court were to order TVA to perform an environmental review of its LTAs, it would have no effect on the current generation sources for TVA power. TVA's future generation decisions are guided by the 2019 IRP, not the LTAs. Nor would a review generate any additional or different information from the information produced in the EIS associated with the 2019 IRP, as the 2019 IRP studied TVA's power generation options for the next twenty years assuming consistent demand, or from the Flexibility EA. Indeed, by asking the Court to invalidate the LTAs, Plaintiffs seek to harm the very interests they purport to advance—if all LPCs take full advantage of the flexibility option, then more solar energy could be added across the Valley.

For all these reasons, Plaintiffs do not have standing to assert their NEPA claim.

## CONCLUSION

For all the reasons set forth above, the Court should dismiss Plaintiffs' Complaint.

Respectfully submitted,

*s/Maria V. Gillen*
David D. Ayliffe, (TN BPR 024297)
Director, Litigation
Maria V. Gillen (TN BPR 030655)
Sr. Manager, Litigation
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741
ddayliffe@tva.gov
mvgillen@tva.gov

Attorneys for Tennessee Valley Authority

101002723

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

*s/Maria V. Gillen*
Attorney for Tennessee Valley Authority
