## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

|  |  |  |
|---|---|---|
| PROTECT OUR AQUIFER, ALABAMA CENTER FOR SUSTAINABLE ENERGY (dba ENERGY ALABAMA), and APPALACHIAN VOICES, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:20-cv-02615-TLP-atc |
| v. | ) ) | |
| TENNESSEE VALLEY AUTHORITY, | ) ) | |
| Defendant. | ) | |

---

## AMENDED COMPLAINT

---

Plaintiffs Protect Our Aquifer, Energy Alabama, and Appalachian Voices ("Conservation Groups") respectfully allege as follows:

### <u>NATURE OF THE ACTION</u>

1.     This litigation arises from a fundamental and unlawful change in the relationship between the Tennessee Valley Authority ("TVA") and its electric distribution customers. In August of 2019, TVA began pressuring local distributors into signing a so-called "long-term agreement" that is dramatically different from TVA's prior power supply contracts. The "long-term agreement" automatically extends itself each year so that the contract never erodes or expires with the passage of time. In addition, if a local distributor wants to terminate a contract, the contract requires the distributor to provide TVA with twenty (20) years' advance written notice of termination. In such event, the contract subjects the local distributor to severe penalties during the twenty-year termination period.

1

2.      The practical effect of TVA's so-called "long-term agreement" is that the contract, once signed, will last forever. TVA's Never-ending Contract[1] also places restrictive caps of three to five percent on the amount of power that local distributors can produce and procure locally from clean energy sources such as solar. In addition, TVA's Never-ending Contract is exclusive, meaning that local distributors are forbidden from selling or supplying power outside the confines of the contract.

3.      TVA relies heavily on fossil fuels, such as coal and natural gas, in order to generate electrical power. TVA adopted and implemented its anticompetitive perpetual contracts in an effort to shield itself forever from market forces, including beneficial market forces that increasingly favor clean energy generated from renewable sources like solar. TVA's public filings reveal that it is increasingly concerned about competing with solar and other distributed energy resources as the price of solar energy continues to fall and as energy consumers increasingly demand cleaner energy alternatives. Accordingly, TVA implemented its Never-ending Contract program as a means of permanently restricting the ability of local distributors to procure cheaper and cleaner power locally or from outside the TVA system. In fact, because they will never expire, the Never-ending Contracts will forever prevent local distributors from negotiating with TVA in the future in order to obtain cheaper, cleaner electricity.

4.      In August of 2019, TVA's Board of Directors expressly conditioned its approval of the Never-ending Contract program "upon satisfactory completion of any required environmental reviews." (*Minutes of Meeting of TVA Board of Directors – August 22, 2019, pg. 29*). In spite of that clear directive, TVA management implemented the Never-ending Contract program without

---

[1] The term "Never-ending Contract" refers to the instrument that TVA entitled "Long-Term Agreement" as approved by the TVA Board of Directors on August 22, 2019, a true and correct copy of which is attached hereto as Exhibit A.

conducting any environmental analysis and evaluation as required by the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA").

5. TVA's complete failure to comply with NEPA deprived Conservation Groups, local distributors, and other interested stakeholders of vital information regarding alternatives to the Never-ending Contract and its potential impacts on the environment. NEPA has "twin aims": first, it obligates federal entities to consider every significant aspect of the environmental impact of a proposed action; second, it ensures that a federal entity will inform the public that it has indeed considered environmental concerns in its decision-making process, providing a springboard for public comment on the agency's decision. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004); *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983). TVA's complete failure to comply with NEPA prevented Conservation Groups, local distributors, and other interested stakeholders from providing input on TVA's monumental program change before TVA implemented the change.

6. TVA's decision to brazenly disregard the environmental evaluation and public comment requirements of the National Environmental Policy Act renders the Never-ending Contracts unlawful, void, and subject to being vacated by this Court.

7. The Never-ending Contracts also violate the provisions of the Tennessee Valley Authority Act of 1933. That statute prohibits the use of perpetual agreements by specifically providing that contracts for the sale of electric power to distributors must be "for a term ***not exceeding*** twenty years." 16 U.S.C. § 831i (emphasis added).

8. Conservation Groups seek a judicial declaration that TVA's adoption and implementation of the Never-ending Contracts violates NEPA, exceeds TVA's statutory authority, and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance

with law or procedure required by law. 5 U.S.C. § 706. In addition, Conservation Groups request that the Court vacate the Never-ending Contracts and enjoin their future use, or in the alternative, reform the subject contracts so that they comply with the law.

## FEDERAL QUESTION JURISDICTION

9.      This action is brought under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"). TVA's adoption and implementation of its Never-ending Contract program, without complying with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*., and in violation of the TVA Act, 16 U.S.C. § 831 *et seq*., is a "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

10.     This Court is authorized to issue a declaratory judgment and further relief pursuant to the APA, 5 U.S.C. § 706, and Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. An actual controversy within the meaning of the Declaratory Judgment Act exists between the parties.

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

## VENUE

12.     This Court is a proper venue for these proceedings pursuant to 28 U.S.C. § 1391(e)(1), which provides for venue over proceedings against federal agencies. Defendant TVA is a corporate agency and instrumentality of the United States. A substantial part of the events giving rise to Conservation Groups' claims occurred in this District because the entirety of the Western District of Tennessee is within TVA's service area.

13.     A substantial part of TVA's power generation and transmission occurs within the Western District of Tennessee. TVA supplies energy to twenty-two (22) local distributors in West

4

Tennessee. TVA has negotiated, executed, and performed Never-ending Contracts with approximately seventeen (17) local distributors in West Tennessee. In addition, TVA's largest customer Memphis Light Gas & Water ("MLGW"), located in the Western District of Tennessee, represents approximately nine percent of TVA's total revenue. MLGW is publicly considering whether to leave the TVA system rather than sign a Never-ending Contract. TVA also generates and transmits power from approximately eight (8) generation facilities in West Tennessee to perform its Never-ending Contracts in West Tennessee and throughout its service area. Plaintiff Protect Our Aquifer is also headquartered within this District.

## ABOUT TVA

14.     Defendant TVA is a corporate agency and instrumentality of the United States created by and existing pursuant to the Tennessee Valley Authority Act of 1933. *See* 16 U.S.C. § 831 *et seq.* ("TVA Act"). The TVA Act provides that TVA "[m]ay sue or be sued in its corporate name." 16 U.S.C. § 831c(b).

15.     TVA operates the nation's largest public power system. It supplies power in most of Tennessee, northern Alabama, northeastern Mississippi, southwestern Kentucky, and in portions of northern Georgia, western North Carolina, and southwestern Virginia.

16.     TVA's Power Service Area comprises 202 counties and approximately fifty-nine million acres. TVA provides power to a population of nearly 10 million people, and TVA's total annual revenues exceed $10 billion.

17.     TVA generates and sells wholesale electric power to 153 local distributors that, in turn, distribute electricity to residential, commercial, and industrial customers within their service areas. Those non-profit distributors include publicly-owned municipal power systems and member-owned rural electric cooperatives.

18.     TVA receives no federal funding, deriving virtually all of its revenues from electricity sales.

19.     TVA relies heavily on burning fossil fuels in order to generate power.

20.     As of October 2018, TVA operated twenty-six (26) active coal-fired generating units at six plant sites. (*TVA 2019 Integrated Resource Plan*, *Volume II, § 2.3.1*).

21.     During fiscal year 2018, TVA contracted to purchase 14.9 million tons of coal for burning in its coal-fired power plants. *Id.*

22.     In addition to burning coal, TVA burns other fossil fuels, particularly natural gas and some diesel.

23.     TVA has eighty-seven (87) gas-fueled simple-cycle combustion turbine units at nine sites as well as twenty-one (21) combined-cycle natural gas fueled units at eight sites. (*TVA 2019 Integrated Resource Plan, Volume II, § 2.3.3*).

24.     In addition to burning fossil fuels like coal and natural gas, TVA generates power through the use of nuclear power plants, hydroelectric dams, and a very limited amount of wind and solar technology.

25.     Coal and gas combined account for approximately 45 percent of TVA's power generation, while generation from wind and solar account for only three percent.

26.     For fiscal year 2019, TVA depicted its energy generation as follows:



(*TVA Power Supply Flexibility Proposal, Final Environmental Assessment, Figure 3-1*).

27.    TVA's power operations significantly impact the environment in the Tennessee Valley.

28.    Relying mostly on nuclear, coal, and gas plants, TVA's generation system significantly impacts air quality, water resources, and wildlife, while emitting greenhouse gases that contribute substantially to climate change.

29.    According to TVA, greenhouse gas emissions are "widely considered to be a major source of climate change."  (*TVA 2019 Integrated Resource Plan, Volume II, Final EIS, June 2019, Section 4.3*).

30.    TVA recently described "Greenhouse Gas Emissions" as follows:

The sun is the primary source of energy for the Earth's climate. About 30 percent of the sun's energy that reaches Earth is reflected back to space by clouds, gases and small particles in the atmosphere. The remainder is absorbed by the atmosphere and the surface. Earth's temperature depends on the balance between the energy entering and leaving the planet's system. When energy is absorbed by the Earth's system, global temperatures increase.

. . .

Similar to the glass in a greenhouse, certain gases, primarily $CO_2$, nitrous oxide ($N_2O$), methane ($CH_4$), hydroflurocarbons (HFCs), perflourocarbons (PFCs) and sulfur hexafluoride ($SF_6$), absorb heat that is radiated from the surface of the Earth. Increases in the atmospheric concentrations of these gases cause the Earth

to warm by trapping more heat. The common term for this phenomenon is the "greenhouse effect," and these gases are typically referred to as GHGs. Atmospheric levels of $CO_2$ are currently increasing at a rate of 0.5 percent per year and between 1900 and 2017 increased from less than 300 parts per million (ppm) to 405 ppm (NOAA 2018), higher than the Earth has experienced in over a million years (Walsh et al. 2014b).

. . .

The primary GHG emitted by electric utilities is $CO_2$ produced by the combustion of fossil fuels. $CO_2$ is also produced by the combustion of biomass fuels, although these fuels when derived from plant (i.e., vegetation) sources are often considered to be carbonneutral since the subsequent plant regrowth sequesters carbon. Small amounts of $SF_6$, which has a very high global warming potential relative to other GHGs (Global Warming Potential for $SF_6$ = 22,800 times $CO_2$ on a pound-for-pound basis, per 40 CFR 98), are released due to its use in high-voltage circuit breakers, switchgears, and other electrical equipment. $CH_4$, which has a global warming potential of 25 times that of $CO_2$ (per 40 CFR 98), is emitted during coal mining and from natural gas wells and delivery systems.

Nationwide anthropogenic emissions of GHGs are estimated by USEPA annually, for each of several sectors of the economy. The 2016 estimates by sector are shown in the chart in Figure 4-12 and represent the most recent data available. Transportation and electricity generation each represented approximately 28 percent of nationwide GHG emissions in 2016, with industrial sources, commercial and residential buildings, and agriculture each representing successively smaller portions of the total.



U.S. Environmental Protection Agency (2018). Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2016

8

(*TVA 2019 Integrated Resource Plan, Volume II, Final EIS, June 2019, Section 4.3.2*).

31.     TVA's coal, gas, and diesel burning power plants emit greenhouse gases.

32.     With more than 16,200 miles of transmission lines and 500 substations, TVA's transmission system affects land use, vegetation, and wildlife in the Tennessee Valley.

33.     TVA uses billions of gallons of water annually to operate coal and gas-burning power plants, as well as TVA's nuclear facilities.

34.     TVA's water use affects the quantity and quality of Tennessee's aquifers and surface water resources.

35.     TVA sets the wholesale rates for electricity for its vast Power Service Area, affecting energy efficiency, distributed energy resources, energy burden, and economic activity throughout the region.

36.     TVA maintains its headquarters in Knoxville, Tennessee, and service of process may be made on TVA through its Chief Executive Officer, Jeffrey J. Lyash, 400 West Summit Hill Drive, Knoxville, Tennessee, 37902.

## ADMINISTRATIVE PROCEDURE ACT ("APA")

37.     The Administrative Procedure Act, 5 U.S.C. §§ 701–706, provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

38.     The APA provides that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. In addition, the APA provides that a court shall "set aside agency action,

findings, and conclusions" that are "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law." 5 U.S.C. §706(2)(A)(C)&(D).

## THE NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA")

39.     The National Environmental Policy Act is our country's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (1978).[2] Congress enacted NEPA, in part, "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321.

40.     NEPA requires "all agencies of the Federal Government" to include "a detailed statement" on "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). That statement, known as an Environmental Impact Statement ("EIS"), must describe (1) "the environmental impact of the proposed action," (2) "any adverse environmental effects which cannot be avoided should the proposal be implemented," (3) "alternatives to the proposed action," (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and" (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id*.

41.     Among the factors a federal agency must consider in order to determine whether an action may "significantly affect" the environment, and therefore require an EIS, is the

---

[2] This action alleges violations of NEPA and the 1978 regulations promulgated by the Council on Environmental Quality because those regulations were in effect in August of 2019 when the subject agency action occurred.

"intensity" or severity of the action's impacts. 40 C.F.R. § 1508.27(b) (1978). Among other

relevant factors, the intensity of the impact must be judged based on:

(a) "[t]he degree to which the proposed action affects public health or safety";

(b) "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas";

(c) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial";

(d) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks";

(e) "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration";

(f) "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts"; and

(g) "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."

*Id.* Just "one of these factors may be sufficient to require preparation of an EIS in appropriate

circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir.

2005). An agency's belief that a project will produce more environmental benefit than harm does

not obviate the need to conduct an EIS; "[a] significant effect may exist even if the Federal

agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1) (1978).

42.     When it is not readily discernible whether the environmental effects of a proposed

action will be "significant," such that the proposal would "[n]ormally require[] an environmental

impact statement," federal agencies may first prepare a less rigorous Environmental Assessment

(EA) in order to establish the project's impacts and determine whether preparation of an EIS is

required. 40 C.F.R. §§ 1501.4(a)-(b), 1508.9(a) (1978).

43.     Under NEPA, "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action" must "be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a) (1978).

44.     In order to achieve Congress' goal of preventing or eliminating damage to the environment, federal agencies must conduct NEPA analysis at the "earliest possible time," fully considering and publicly disclosing the environmental consequences of an agency action and exploring alternatives *before* proceeding with the action. 40 C.F.R. §§ 1501.2, 1502.5 (1978).

## TENNESSEE VALLEY AUTHORITY ACT ("TVA ACT")

45.     Congress created TVA in 1933, and it authorized TVA, *inter alia*, "[t]o produce, distribute, and sell electric power." 16 U.S.C. § 831d(l). Under the TVA Act, TVA "[m]ay make contracts, as herein authorized." 16 U.S.C. § 831c(d).

46.     Congress granted TVA limited authority "to sell the surplus power not used in its operations." 16 U.S.C. § 831i. Among the constraints Congress imposed is that TVA may only "enter into contracts for [the sale of electric power] for a term ***not exceeding twenty years***." *Id.* (emphasis added).

47.     In selling electric power, TVA must "give preference to States, counties, municipalities, and cooperative organizations of citizens or farmers, not organized or doing business for profit, but ***primarily*** for the purpose of supplying electricity to its own citizens or members." *Id.* (emphasis added). Further, with some exceptions, Congress generally barred TVA from entering into "contracts for the sale or delivery of power" beyond the service area TVA had established by July 1, 1957. 16 U.S.C. §831n-4(a).

48.     In 1992, Congress added a "least-cost planning program" to TVA's mandates, requiring TVA to engage in "a planning and selection process for new energy resources which

evaluates the full range of existing and incremental resources (including new power supplies, energy conservation and efficiency, and renewable energy resources) in order to provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest system cost." 16 U.S.C. § 831m-1(b)(1). TVA must take into account necessary features for system operation, including diversity, reliability, dispatchability, and other factors of risk" and "treat demand and supply resources on a consistent and integrated basis." 16 U.S.C. § 831m-1(b)(2)(A), (C).

49.     In 2004, Congress amended the TVA Act to provide that TVA's "objectives and missions" include "being a national leader in technological innovation, low-cost power, and environmental stewardship." 16 U.S.C. § 831a(b)(5).

50.     Finally, the TVA Board of Directors must "ensure that all activities of the Corporation are carried out in compliance with applicable law." 16 U.S.C. § 831a(g)(1)(H).

## THE CHANGING ENERGY MARKET

51.     The energy market is rapidly changing. Solar and wind energy prices continue to fall as more companies, local governments, and other consumers demand clean, renewable power.

52.     From 2009 to 2019, costs for wind and solar power declined by 70 percent and 89 percent respectively, such that wind and solar are outcompeting carbon-based resources in an increasing number of markets. (*Lazard's Levelized Cost of Energy Analysis (Version 13)*).

53.     Solar costs are decreasing more rapidly than experts previously projected. In July 2020, the National Renewable Energy Laboratory (NREL) updated its forecast for solar energy costs. Relative to its 2019 projections, NREL's 2020 study projects utility-scale solar costs to decrease at a dramatically faster rate. NREL now projects solar costs in 2030 to be roughly one

quarter lower than it projected just last year. (*NREL, Annual Technology Baseline: The 2020 Electricity Update, 27 (July 27, 2020)*).

54.     In 2019, corporations bought 65 times more renewable energy than they purchased a decade earlier. (*BloombergNEF*).

55.     Recently published cost evaluations show that, due to the recent rapid cost decline associated with wind and solar energy, the combined fuel, maintenance, and other going-forward costs of coal-fired power is now more expensive than the all-in costs of new wind or solar projects. (*Vibrant Clean Energy, The Coal Cost Crossover: Economic Viability of Existing Coal Compared to New Local Wind and Solar Resources (2019)*). Those same evaluations show that generating electricity at the vast majority of TVA's coal fired power plants can be achieved more cost-effectively by using renewables located within 35 miles of those plants, and within five years, renewables would be more than 25 percent more cost-effective. *Id.* The same study showed that many existing coal-fired units in the Tennessee Valley could be replaced *today* by local renewables "at an all-in cost lower than the existing coal plant's ongoing marginal costs." *Id. at 2-3.*

56.     Another recent study found that decarbonizing the U.S. electricity system by 2035 would create 500,000 jobs every year, save $1.2 trillion in avoided health and environmental costs, and lower electricity costs by 13 percent. (*Goldman School of Public Policy, University of California Berkeley, 2035 Electric Decarbonization Modeling Study*).

57.     Unfortunately, TVA lags behind its peers as far as renewable energy is concerned. In 2019, TVA's generation system featured ninety-nine (99) watts per customer of solar energy capacity, placing it ninth out of the thirteen largest utilities in the Southeast. TVA's ranking is projected to fall further in the next five years, as utilities throughout the region have committed

14

to increase solar capacity at a faster pace than TVA. (*Solar in the Southeast - Southern Alliance for Clean Energy Annual Report, (June 23, 2020)*). For example, in 2019 the leading utility offered 1,755 watts of solar capacity per customer—compared to TVA's ninety-nine (99) watts per customer. That disparity will only grow by 2024, when the leading utility is forecasted to provide 2,718 watts per customer, while TVA is projected to provide only 303 watts per customer. *Id.*

58.     Tennessee, a state served almost entirely by TVA, likewise lags behind its peers with regard to solar energy capacity. Among the eight states of the Southeast, Tennessee ranks sixth in solar capacity. Whereas top-ranking North Carolina produces 5.94 percent of its electricity from solar, Tennessee produces only 0.54 percent from solar. For California, the national leader, that figure exceeds twenty percent. (*Solar State by State – Solar Energy Industries Association*). Tennessee is likely to fall further behind, as the state's solar capacity is projected to grow at a slower rate than all but one Southeastern state over the next five years. *Id.*

## **TVA DISCLOSES RISK OF COMPETING WITH RENEWABLE ENERGY**

59.     In its most recent quarterly filing with the United States Securities Exchange Commission (Form 10-Q), TVA reported to investors that the energy market is changing as consumers demand cleaner, greener energy.

60.     In its Form 10-Q for the quarterly period ended June 30, 2020, TVA stated:

> As more consumers and businesses are demanding cleaner energy, the utility industry is evolving to meet those needs. As TVA also evolves, it will see impacts to the way it does business through the pricing of products, transmission of energy, and development of new products and services for its customers in support of changing customer preferences and its economic development efforts. End-use customers are becoming more technologically sophisticated and want greater control over their energy usage. Many companies are focusing on sustainability and requiring more energy efficiency and renewable energy options.

(*TVA Form 10-Q for quarterly period ended June 30, 2020, 62*).

61.     Distributed energy resources ("DER") are power generation and storage systems that are connected to the power distribution system and deliver power to the grid or that are "behind the meter" and deliver power directly to an end-user. Examples include solar panels, combined heat and power systems, microturbines, and battery storage systems. DER also includes energy management, such as energy efficiency and demand response. (*TVA 2019 Integrated Resource Plan, Volume II, § 1.2.2*).

62.     TVA views distributed energy resources as a business risk and competitive threat.

63.     TVA's filings with the Securities Exchange Commission expressly acknowledge that customer preference for renewables and other DER represents a competitive business risk.

64.     In its Form 10-K for fiscal year ended September 30, 2018, TVA stated:

Research and development activities are ongoing to improve existing and alternative technologies to produce or store electricity, including large-scale energy storage, gas or wind turbines, fuel cells, microturbines, solar cells, and distributed energy or storage resources. It is possible that advances in these or other alternative technologies could reduce the costs of such production methods to a level that will enable these technologies to compete effectively with traditional power plants such as TVA's. These technologies could be more appealing to customers and could lead them to bring pressure on TVA to modify the power contracts to allow customers to generate some of their own power requirements or purchase power from other suppliers. Other customers might also cease purchasing power from TVA altogether. To the extent that sales to such customers are reduced or eliminated, TVA's cash flows, results of operations, and financial condition could be negatively affected.

(*TVA Form 10-K for fiscal year ended September 30, 2018, pgs. 38-39*).

65.     In its Form 10-K/A (Amendment No. 1) for fiscal year ended September 30, 2019, TVA stated:

TVA also faces competition in the form of emerging technologies. Improvements in energy efficiency technologies, smart technologies, and energy storage technologies may reduce the demand for centrally provided power. The growing interest by customers in generating their own power through [distributed energy resources] has the potential to lead to a reduction in the load served by TVA as

well as cause TVA to re-evaluate how it operates the overall grid system to continue to provide highly reliable power at affordable rates.

(*TVA Form 10-K/A – Amendment No. 1 for fiscal year ended September 30, 2019*).

66.    TVA acknowledges that competitive pressures from renewable energy resources threaten TVA's business model of selling power from centrally located plants.

67.    In its Form 10-K/A (Amendment No. 1) for fiscal year ended September 30, 2019, TVA stated:

> **TVA may have difficulty in adapting its business model to changes in the utility industry and customer preferences.**
>
> The traditional business model for power production, selling power from centrally located plants, is facing pressure from a variety of sources, including the potential for self-generation by current or potential customers, new technologies such as energy storage, and increased energy efficiency. These pressures may reduce the demand for TVA power. If TVA does not or cannot adapt to this pressure by adequately changing its business model, TVA's financial condition and results of operations could be negatively affected.

*Id.* (emphasis in original).

## LOCAL DISTRIBUTORS OPENLY CONSIDER LEAVING TVA

68.    TVA's largest single customer is Memphis Light, Gas & Water, which serves more than 420,000 electric consumers and accounts for approximately 9 percent of TVA's operating revenues. TVA's current power supply contract with MLGW affords MLGW the opportunity to terminate its agreement with TVA upon five years' written notice to TVA.

69.    In early 2019, MLGW began publicly considering whether to leave TVA and procure electric power from other sources.

70.    Several stakeholders and other interested parties commissioned studies examining alternative power sources and the costs and potential savings associated with MLGW's procuring power outside the TVA system. Those studies concluded that MLGW could save hundreds of

millions of dollars by procuring power from non-TVA sources. Such alternate sources might include self-generation of solar power, the purchase of nuclear power, the purchase of power through the Midcontinent Independent System Operator ("MISO"), and/or the Southwest Power Pool.

71.     Ultimately, MLGW commissioned Siemens Power Technologies to prepare an Integrated Resource Plan to evaluate the power supply options available to MLGW. Siemens concluded that MLGW could save $122 million annually if Memphis builds certain local power generation facilities and joins MISO, a power network and market place that stretches across central North America. Siemens also concluded that MLGW could reduce carbon dioxide emissions associated with its power consumption by more than 50 percent and dramatically increase generation from solar and wind resources if it chooses to procure power outside the TVA system.

72.     TVA's response was to offer MLGW the Never-ending Contract, or a recommitment to its existing contract, with some additional, non-contractual enticements.

73.     In August 2020, based on the Siemens study, the MLGW board directed staff to pursue a request for proposals for the MLGW power supply.

74.     Upon information and belief, MLGW has not signed a Never-ending Contract.

75.     In addition to MLGW, other local distributors have actively considered obtaining power from non-TVA sources. One such distributor is Volunteer Energy Cooperative ("VEC"), which distributes power to more than 115,900 members in all or part of 17 Tennessee counties.

76.     In September of 2019, VEC submitted a request for proposal to TVA, requesting a bid for partial wholesale electric supply for service of 50 percent or 75 percent of VEC's load beginning on January 1, 2025.

77.     TVA responded to VEC's request for proposal by letter dated October 3, 2019, a true and correct copy of which is attached hereto as <u>Exhibit B</u>.

78.     TVA declined to submit a proposal to VEC for service of 50 percent or 75 percent of VEC's load as requested. Instead, TVA offered VEC a Never-ending Contract.

79.     Upon information and belief, VEC has not signed a Never-ending Contract.

## TVA DEVISED THE NEVER-ENDING CONTRACT PROGRAM IN RESPONSE TO COMPETITIVE PRESSURE

80.     In response to competitive pressures, including from renewable energy resources, as well as several distributors' public consideration of alternative power sources, TVA decided to develop and implement a new program designed to preserve its monopolistic stronghold over the generation and sale of wholesale electric power in the Tennessee Valley.

81.     TVA refers to its new program as the "Long-Term Partnership Option for Local Power Companies." The central feature of that program is to offer TVA's distributors exclusive "long-term agreements" that never expire and, for all practical purposes, will never be terminated once signed and in effect. These Never-ending Contracts also place perpetual caps of three to five percent on the amount of power that local distributors can procure from non-TVA clean energy sources such as solar or other distributed energy resources.

82.     A true and correct copy of TVA's Long-Term Agreement form is attached hereto as <u>Exhibit A</u>.

83.     TVA prepared the form Long-Term Agreement that is attached as <u>Exhibit A</u>.

84.     Although the purported initial term of TVA's proposed "long-term agreement" is twenty (20) years, that term extends automatically each year so that the length of the contract term never erodes and the contract never expires with the passage of time. Specifically, Section 1 of the agreement states in pertinent part as follows:

19

This contract is effective as of [DATE1], and will continue in effect for an initial term of 20 years from [DATE1], provided, however, that beginning on the first anniversary of said effective date, and on each subsequent anniversary thereof (whether falling during said initial term or any renewal term as provided for herein), this contract shall be extended automatically without further action of the parties for an additional 1-year renewal term beyond its then-existing time of expiration.

85.     The Never-ending Contract also provides that, if a local distributor wants to terminate its agreement with TVA, it must provide TVA with twenty (20) years' advance written notice of termination. In such event, TVA will have no obligation to make or complete any additions to or changes in any transformers or transmission lines that service the terminating local distributor during the twenty-year termination period. Specifically, the agreement provides:

Notwithstanding any other provision of this section, [Cooperative/Municipality] may terminate this contract at any time upon not less than 20 years' prior written notice, and TVA may terminate this contract upon not less than 20 years' prior written notice. If [Cooperative/Municipality] delivers a notice of termination to TVA, as stated above, then from and after its date of receipt of such notice, TVA will have no obligation to make or complete any additions to or changes in any transformation or transmission facilities for service to [Cooperative/Municipality], unless (by means of a fully-executed amendment to this contract) [Cooperative/Municipality] agrees to reimburse TVA for its non-recoverable costs in connection with the making or completion of such additions or changes.

86.     The practical effect of the automatically renewing and non-expiring contract term, coupled with TVA's onerous and punitive termination clause, is that the so-called long-term agreements, once signed, will last forever.

87.     TVA enjoys complete monopoly power throughout its service area, and it is fully aware that the inability of a local distributor to foresee the future over a span of two decades will always prevent a local distributor from providing a twenty-year notice of termination of a Never-ending Contract. No reasonable governing body of a municipal distributor or electric cooperative could ever decide to provide TVA with a twenty-year notice of termination and thus suffer the associated penalties during the twenty-year termination period.

88.     The anticompetitive Never-ending Contracts are also exclusive. Under Sections 3(b)(2) & (e) of the contracts, local distributors are forbidden from selling or supplying power that is not provided by TVA. If a local distributor supplies customers with power not supplied by TVA, such action constitutes a default under the agreement, thereby giving TVA the contractual right to recover for TVA's "losses of revenue and load served" plus attorneys' and administrative costs.

89.     Under the guise of providing "enhanced flexibility" to the local distributors, TVA places a cap of three to five percent on the amount of power that local distributors can procure locally from clean energy sources such as solar or other distributed energy resources. Specifically, the Never-ending Contract provides:

> TVA commits to collaborating with Distributor (and other distributors of TVA power who have executed a similar long-term agreement) to develop and provide enhanced power supply flexibility, with mutually agreed-upon pricing structures, for 3-5% of Distributor's energy, by no later than December 31, 2021.

90.     In order to pressure and entice local distributors into signing Never-ending Contracts, TVA adopted a carrot-and-stick approach. TVA offers the contracts to local distributors on a 'take it or leave it' basis. The contracts provide a 3.1% Wholesale Credit against energy charges paid to TVA by local distributors that sign the agreements. TVA does not provide a corresponding Wholesale Credit to local distributors who decline to sign the perpetual agreements.

91.     TVA also offers to "establish a process of engagement with Distributor for strategic resource and financial planning decisions," which will not be available to non-participating distributors.

92.     Thus, TVA has established a new contract regime in which some local distributors enjoy favored status while others are treated like second-class citizens.

93.     Those local distributors that do not sign Never-ending Contracts, and therefore do not receive the Wholesale Credit, suffer a competitive disadvantage as compared to their signing neighbors. Non-signing distributors are required to pay more for the electric power purchased from the TVA, thereby making it more difficult to attract power-consuming industries and jobs into their communities.

94.     Under the express terms of the Never-ending Contract, non-signing distributors will also lack the same access to TVA enjoyed by participating distributors.

## TVA ADOPTS AND IMPLEMENTS THE NEVER-ENDING CONTRACT PROGRAM WITHOUT PERFORMING ENVIRONMENTAL REVIEW

95.     On July 31, 2019, TVA's CEO and CFO prepared a memorandum to TVA's Board of Directors recommending that the Board authorize TVA's use of the so-called "long-term agreements." (*TVA Board Exhibit 8-22-19J-July 31, 2019*).

96.     A true and correct copy of the memorandum provided to TVA's Board of Directors regarding the "long-term agreements" is attached as <u>Exhibit C</u>.

97.     TVA prepared the memorandum that is attached as <u>Exhibit C</u>.

98.     At that time, the weighted average length of the termination notice required under TVA's then-existing wholesale power contracts with local distributors was less than seven years. *Id.*

99.     In advising the Board to adopt the Never-ending Contract program, TVA management rejected the alternative of retaining existing contract termination provisions, reasoning that "TVA's long-term planning decisions would continue to be subject to significant risk as the time needed to generate revenue needed to satisfy TVA's long-term financial commitments would exceed greatly the weighted average length of the current termination notice period." *Id.*

22

100.     In other words, TVA management was concerned that, if it retained its then-current contract provisions, within the foreseeable future it faced a "significant risk" that some or all of its distributors would notify TVA of their intent to terminate their power supply contracts, resulting in lower demand for power on the TVA system and less revenue for TVA.

101.     TVA derives virtually all of its revenues from electricity sales. Approximately 93 percent of TVA's revenue is from sales of electricity to its distributors. (*TVA Form 10-Q–for the quarterly period ended December 31, 2019*).

102.     By August 2019, TVA was aware that its largest distributor, MLGW, was considering notifying TVA of its intent to terminate its power supply contract.

103.     The length of term, including notice of termination provisions, in TVA's power supply contracts with its distributors have a direct effect on TVA's revenues, power system, and long-term power supply planning.

104.     The TVA Board of Directors considered TVA management's recommendation at its August 22, 2019 Board Meeting. The TVA Board approved TVA's use of the so-called long-term agreements "contingent upon satisfactory completion of any required environmental reviews." (*Minutes of Meeting of TVA Board of Directors – August 22, 2019, pg. 29*).

105.     A true and correct copy of the minutes of the TVA Board of Directors' August 22, 2019 meeting is attached hereto as <u>Exhibit D</u>.

106.     Rather than follow the Board's directive to undertake "required environmental reviews," TVA management rushed to implement Never-ending Contract across the TVA region while disregarding completely the statutory mandates of NEPA. For example, TVA offered a Never-ending Contract to its second largest customer, Nashville Electric Service ("NES"), shortly after the TVA Board's conditional approval, and NES adopted the contract six days later.

23

107.    TVA completely dismissed the legal requirements of NEPA, thereby avoiding the disclosure, analysis, public participation, and public comment procedures mandated by the statute.

108.    Instead, TVA rushed forward to sign and implement as many Never-ending Contracts across the Tennessee Valley as quickly as possible. In fact, as of September 30, 2019, 131 of the 153 local distributors across the TVA region had adopted Never-ending Contracts. As of April 3, 2020, 138 of TVA's local distributers had adopted Never-ending Contracts.

109.    TVA has no NEPA documentation relating to the adoption and implementation of the Long-term Contract program because TVA determined that the action was not subject to NEPA review. (*Letter from Denise Smith, TVA, to Amanda Garcia, SELC (April 24, 2020)*).

110.    A true and correct copy of the letter from Denise Smith of TVA to Amanda Garcia of the Southern Environmental Law Center dated April 24, 2020 is attached hereto as Exhibit E.

## DISTRIBUTORS UPSET BY TVA's HEAVY HANDED AND ANTICOMPETITIVE TACTICS

111.    On October 28, 2019, representatives of several TVA distributors ("Holdout Distributors") met in Murfreesboro, Tennessee for the purpose of discussing a strategy for contending with TVA's Never-ending Contract program.   Those Holdout Distributors represented approximately 30-35% of TVA's energy load.  Approximately thirty representatives attended, including legal counsel.

112.    A true and correct copy of a summary of that meeting, entitled "Summary of October 28, 2019 Meeting of Holdout Distributors," is attached as Exhibit F.

113.    The Holdout Distributors were not happy about TVA's anticompetitive and overbearing tactics.  According to the meeting notes:

Many distributors feel the Long-Term Partnership Agreement is heavy-handed

and over reaching in terms of fairness.

114.    The Holdout Distributors were understandably upset by the perpetual constraints contained in TVA's Never-ending Contract proposal.  According to the meeting notes:

> Almost without exception, distributors felt the 20-year rolling evergreen clause in the Long-Term Agreement was unacceptable. Objections to the rolling evergreen included an inability to have any input on rates or actions by TVA under the constraints of a "lifetime" contract. Many expressed concern about the limitations on "flexibility" considering the mandate many industries are under to initiate the use of renewable energy.  It was pointed out by many that TVA no longer fits the mold of charging the "lowest feasible rates" under the "public power model." One distributor mentioned that TVA now has a nine member board which is not selected from the public power community and a CEO who earns $8 million a year. That distributor pointed out that TVA has no resemblance to the supplier it was when LPCs signed 20-year power contracts with 5-year evergreen clauses.

115.    One Holdout Distributor explained that the lack of competition in the Tennessee Valley is resulting in TVA charging unfavorably high power rates even though the cost of renewable energy production is low.

## NO OTHER ENVIRONMENTAL REVIEWS DISCLOSE OR ANALYZE THE IMPACTS OF AND ALTERNATIVES TO THE NEVER-ENDING CONTRACTS

116.    At the same August 2019 Board meeting at which it contingently authorized TVA to implement the Never-ending Contract program, the TVA Board adopted an Integrated Resource Plan and accompanying Environmental Impact Statement. (*Minutes of Meeting of TVA Board of Directors – August 22, 2019, pp. 9-11*).

117.    The 2019 Integrated Resource Plan recommends ranges of resource capacity additions over the next twenty years, without committing TVA to any particular future power supply portfolio. (*TVA 2019 Integrated Resource Plan, Vol. I, 9-2 and Fig. 9-1.*)

118.    Neither the Integrated Resource Plan nor the accompanying Environmental Impact Statement discusses, analyzes, or even discloses the existence of the Never-ending Contract program or its environmental effects.

119.    Neither the Integrated Resource Plan nor the accompanying Environmental Impact Statement analyzes the load loss and reduced revenues associated with TVA's then-current distributor contracts (with an average duration of seven years) described by TVA management in its memorandum in support of the Never-ending Contract program.

120.    Contrary to the "significant risk" of revenue and load loss claimed by TVA management to support the Never-ending Contract program, the 2019 Integrated Resource Plan and accompanying Environmental Impact Statement assume that TVA will continue to provide power for all of its 153 distributors for the next twenty years.

121.    Neither the 2019 Integrated Resource Plan nor the accompanying Environmental Impact Statement satisfies TVA's obligation to provide "a detailed statement" on the Never-ending Contract program and its significant effects on the human environment. 42 U.S.C. § 4332(C).

122.    Neither the 2019 Integrated Resource Plan nor the accompanying Environmental Impact Statement evaluates a no-action alternative that incorporates the distributor contracts in place *before* adoption of the Never-ending Contract program and their effects on the quality of the human environment, including the load loss and reduced revenues described by TVA management in its memorandum to the Board in support of the Never-ending Contract program.

123.    Neither the 2019 Integrated Resource Plan nor the accompanying Environmental Impact Statement evaluates the effects of a reduced-footprint no-action alternative against the effects associated with a range of alternatives to the Never-ending Contract program. Such alternatives could include, *inter alia*, addressing competitive pressure by increasing TVA's commitment to renewable energy or adopting a twenty-year contract program that did not include automatic perpetual extensions, a twenty-year notice of termination, and punitive

termination penalties.

124.    After signing and committing its resources to 138 Never-ending Contracts, TVA began a limited NEPA review regarding a single provision contained in those contracts, the "Flexibility Proposal" provision. That *post facto* limited NEPA review likewise did not disclose, analyze, or consider the environmental impacts of the Never-ending Contracts as a whole and/or their game-changing shift toward requiring that all power supply contracts be perpetual. That limited review did not satisfy TVA's obligation to consider and publicly disclose the environmental consequences of an agency action, and explore alternatives, *before* proceeding with the action. 40 C.F.R. §§ 1501.2, 1502.5 (1978).

## ABOUT CONSERVATION GROUPS

**Protect Our Aquifer**

125.    Plaintiff Protect Our Aquifer is a 501(c)(3) non-profit organization dedicated to preserving and protecting the Memphis Sand Aquifer for the benefit of present and future generations. It is headquartered in Memphis, Tennessee.

126.    Protect Our Aquifer brings this action on its own institutional behalf and on behalf of its supporters in western Tennessee. Protect Our Aquifer's supporters include 13 board members and two paid (part-time) staff, over 1,000 financial donors, and a Facebook Group page with 3,000 members who can only join with permission of the administrator. Supporters inform the activities of Protect Our Aquifer in a variety of ways, including through board participation and Facebook Group member comments.

127.    Many supporters of Protect Our Aquifer are MLGW ratepayers who obtain their drinking water from the Memphis Sand Aquifer.

128.    The Memphis Sand Aquifer is a precious and limited natural resource that

underlies much of West Tennessee. The aquifer supplies Memphis and Shelby County with clean, reliable drinking water. According to the United States Geological Survey, the Memphis, Tennessee area is one of the largest metropolitan areas in the world that relies exclusively on groundwater for municipal supply. Large withdrawals have caused regional water-level declines of up to 70 feet. (*U.S. Geological Survey, Ground-Water Depletion Across the Nation, USGS Fact Sheet-103-03, 3* (2003)). The large withdrawals of groundwater for municipal supply in the Memphis, Tennessee area have caused interstate water concerns and disputes, including over continued and increased pumping in the Memphis area.

129.    The Memphis Sand Aquifer is also vulnerable to contamination from a variety of sources in the Memphis area, including in the vicinity of TVA's Allen Gas Plant and Allen Coal Plant. Withdrawing large amounts of water from the Memphis Sand Aquifer exacerbates the contamination risk.

130.    To achieve its mission, Protect Our Aquifer and its supporters work to raise public awareness of threats to the Memphis Sand Aquifer. Additionally, the organization works with government, elected officials, local power distributors, and members of the community to develop and implement strategies to manage, monitor, and protect this drinking water source for Shelby County.

131.    Protect Our Aquifer frequently advocates on behalf of the aquifer to TVA and other decision makers regarding the impact of TVA's electricity generation on water quantity and water quality in the aquifer. Protect Our Aquifer also speaks to the media and participates in informal advocacy as well as the proceedings of state and local public agencies regarding those impacts.

132.    Protect Our Aquifer was founded in 2016 in response to TVA's plan to drill wells

into the Memphis Sand Aquifer and withdraw over one billion gallons of water per year to operate its Allen Gas Plant. Originally, TVA had proposed to operate the Allen Gas Plant using recycled water from the nearby T.E. Maxson Wastewater Treatment Plant.

133.    Protect Our Aquifer organized public turnout and supported a challenge to the Shelby County Groundwater Control Board's issuance of well permits to TVA for the Allen Gas Plant. Protect Our Aquifer also filed litigation against the Shelby County Groundwater Control Board regarding its decision to issue permits to TVA for the Allen Gas Plant wells.

134.    In 2017, after TVA drilled its wells into the Memphis Sand Aquifer, the federal utility disclosed extremely high levels of arsenic and other coal ash contaminants in the shallow groundwater near a coal ash pond at its Allen Coal Plant, less than half a mile away from the Allen Gas Plant wells. In 2018, the United States Geological Survey and University of Memphis Center for Applied Earth Science and Engineering Research found that operating TVA's wells at the Allen Gas Plant would risk pulling the contaminated shallow groundwater into the Memphis Sand Aquifer.

135.    In response to TVA's disclosure of coal ash contaminants that could further threaten the aquifer, Protect Our Aquifer provided written comments to the Shelby County Groundwater Control Board, the Tennessee Department of Environment and Conservation, and TVA regarding the threat of coal ash contamination to the aquifer posed by the Allen Gas Plant wells and sought to cease the operation of the wells.

136.    TVA subsequently announced that it would temporarily stop using its wells and purchase water from MLGW. MLGW withdraws water from the Memphis Sand Aquifer in order to meet TVA's requirements for operating the Allen Gas Plant. TVA's Allen Gas Plant therefore continues to rely on more than one billion gallons of water per year drawn from the Memphis

29

Sand Aquifer.

137.    For more than three years, Protect Our Aquifer has advocated to a range of decision makers, including TVA, MLGW, and the Shelby County Groundwater Control Board, that TVA should return to their original plan of operating the Allen Gas Plant with recycled water.

138.    Protect Our Aquifer has also advocated that TVA should move away from reliance on fossil fuels like coal and gas and adopt more solar and distributed energy resources to further reduce potential impacts on the Memphis Sand Aquifer.

139.    Protect Our Aquifer frequently uses information from environmental review documents prepared on behalf of TVA in order to further its mission. For example, during the Allen Gas Plant well water controversy, Protect Our Aquifer used and relied upon documents developed by the United States Geological Survey on behalf of TVA during the federal utility's environmental review process, and it consulted with outside experts to review the data from those documents, as well as from environmental documents that TVA submitted to the Tennessee Department of Environment and Conservation, in order to better understand the threat to the aquifer and to provide more information and analysis to the media, the public and to public agencies that could influence TVA's actions.

140.    In addition to its advocacy regarding TVA's Allen Gas Plant wells, Protect Our Aquifer has a history of commenting on and using information from publicly-disclosed environmental review documents to protect the Memphis Sand Aquifer. For example, Protect Our Aquifer joined Energy Alabama and other groups to comment on TVA's 2019 Draft Integrated Resource Plan and Draft Environmental Impact Statement. Protect Our Aquifer also provided comments on TVA's environmental impact statement regarding the Allen Coal Ash

Impoundment Closure, comments to the Tennessee Department of Environment and Conservation regarding TVA's plans for dewatering the coal ash impoundment, and comments on TVA's rule revising its NEPA implementing procedures.

141.    Adoption of the Never-ending Contract program across the TVA service area is likely to lead to increased electricity demand relative to the load loss projected by TVA management as justification for the Never-ending Contract program, extended and increased use of and investment in fossil fuel generation, a slower transition to renewable energy, increased water usage, and increased water pollution. In Memphis, the Never-ending Contract program is likely to result in changes to the Allen Gas Plant's generation pattern, which, in turn, increases the risk of greater water withdrawals from the Memphis Sand Aquifer for many decades into the future.

142.    TVA's adoption and implementation of its Never-ending Contract program, without complying with NEPA's environmental analysis, public disclosure, and public comment requirements, directly harm Protect Our Aquifer and its supporters by increasing the likelihood of depletion of the supply of safe drinking water available to Protect Our Aquifer supporters, and will interfere with Protect Our Aquifer's central mission of protecting the quantity and quality of water in the Memphis Sand Aquifer.

143.    TVA's adoption and implementation of its Never-ending Contracts without complying with NEPA also directly harm Protect Our Aquifer and its supporters by depriving them of vital information about the potential environmental impacts of the Never-ending Contract and depriving them of their legally protected opportunity to participate in TVA's decision-making process, including examining alternatives to the Never-ending Contract. Without the analysis and public disclosures required by NEPA, Protect Our Aquifer and its

supporters are unable to adequately assess the impact of the Never-ending Contract on TVA's operations and their implications for the Memphis Sand Aquifer. By depriving Protect Our Aquifer of the opportunity to understand, comment upon, and engage in public outreach and education regarding TVA's Never-ending Contract, TVA is impeding Protect Our Aquifer's ability to advocate for the preservation and protection of the Memphis Sand Aquifer.

144.    The need for complete information about the consequences of signing a Never-ending Contract is particularly urgent for Protect Our Aquifer and its supporters. In Memphis, the local distributor, MLGW, is in the process of deciding whether to leave TVA's service altogether, maintain its existing contract with TVA, or sign the Never-ending Contract. By disregarding its obligation to conduct environmental review before adopting and implementing its Never-ending Contract program, TVA has prevented Protect Our Aquifer and its supporters from using information required to be provided by TVA to adequately evaluate the relative impacts of MLGW's options on the aquifer.

145.    Protect Our Aquifer, through its Executive Director, Jim Kovarik, submitted comments to the MLGW Board of Commissioners regarding the MLGW Integrated Resource Plan, requesting that the Board consider impacts of each power supply option, including the options offered by TVA, on the Memphis Sand Aquifer. However, TVA's lack of environmental review of the Never-ending Contract program impeded Protect Our Aquifer's ability to evaluate alternatives to the Never-ending Contract program and their potential impacts on the Memphis Sand Aquifer. Protect Our Aquifer would have used that information in order to advocate to MLGW for recycled water to be used for cooling operations at the Allen Gas Plant, or for a portfolio with more renewable energy to reduce reliance on the Allen Gas Plant and other gas resources.

146.   By failing to disclose and analyze potential impacts of the Never-ending Contract program on TVA's power supply planning and the Memphis Sand Aquifer, and by failing to analyze alternatives to the Never-ending Contract program, TVA has impeded Protect Our Aquifer's and its supporters' efforts to use that information in order to encourage MLGW and other local distributors to negotiate for contract terms with less potential to harm the Memphis Sand Aquifer.

147.   MLGW's decision could set energy policy and impact local water resources in Memphis for decades to come. Without Protect Our Aquifer's informed advocacy, there is an increased and reasonable likelihood that MLGW's momentous decision will harm the Memphis Sand Aquifer.

148.   By insisting on offering perpetual contracts, TVA has significantly impeded Protect Our Aquifer's ability to pursue its mission. MLGW has been TVA's largest distributor, and that status has given Protect Our Aquifer leverage to advocate with TVA. Once MLGW makes its decision to stay with or leave TVA, TVA's insulation from competitive forces means it will have little incentive to engage with Protect Our Aquifer. Protect Our Aquifer's mission will be substantially impaired if it loses the ability to meaningfully advocate with one of the Aquifer's most significant users.

149.   Allegations regarding Protect Our Aquifer contained in this pleading are supported by the Declaration of Jim Kovarik which is attached as Exhibit G and incorporated herein by reference.

150.   Protect Our Aquifer also represents the interests of its individual supporters, including Ward Archer, among others, in prosecuting this lawsuit.

151.   The sworn Declaration of Ward Archer is attached hereto as Exhibit H and

incorporated herein by reference. Mr. Archer is the former CEO of the advertising firm Archer Malmo and is president of the board of Memphis magazine. Mr. Archer serves on the CAESER (Center for Applied Earth Science and Engineering Research) Advisory Board at the University of Memphis, and previously served as a member of the groundwater working group for former Governor Haslam's Tennessee H2O task force.

152.    Mr. Archer founded Protect Our Aquifer in response to TVA's plan to withdraw water from the Memphis Sand Aquifer to provide cooling water for its Allen Gas Plant. Mr. Archer is a supporter of Protect Our Aquifer and currently serves as President of the organization's Board of Directors. As a member of the Board, Mr. Archer participates in voting regarding the leadership of Protect Our Aquifer, serves the organization as the President, and contributes financially to Protect Our Aquifer's activities.

153.    Before Mr. Archer founded Protect Our Aquifer, there was no voice in the Memphis community that specifically advocated for the protection of the Memphis Sand Aquifer. The Memphis Sand Aquifer is Shelby County's drinking water source and a resource about which Mr. Archer cares deeply. It is Mr. Archer's belief that without the dedication of the members of its board and its community of supporters, Protect Our Aquifer could not exist.

154.    The consequences of TVA's Never-ending Contract program harm individual supporters of Protect Our Aquifer, including Mr. Archer, who work to preserve and protect the Memphis Sand Aquifer for the benefit of present and future generations. Mr. Archer is concerned about the increased likelihood of depletion of the Memphis Sand Aquifer, and the resulting impacts on Shelby County's drinking water source that may occur as a result of the Never-ending Contract program. The Allen Gas Plant is likely to be operated more often and more intensely than it would have been without the adoption of the Never-ending Contract program,

and Protect Our Aquifer's supporters like Mr. Archer will face an increased risk of depletion and contamination of the Memphis Sand Aquifer and their drinking water source as a result. Because the preservation of the aquifer is important to Protect Our Aquifer's mission, its supporters' interests can be represented by the organization in this suit.

155.    If TVA had performed an environmental review before implementing the Never-ending Contract program, Mr. Archer would have participated in order to push TVA to consider the effects of the Never-ending Contracts on critical water resources like the Memphis Sand Aquifer and consider alternatives to the Never-ending Contracts that would be likely to reduce impacts on the Memphis Sand Aquifer, such as investing in more renewable power.

156.    If TVA had performed an environmental review before implementing the Never-ending Contract program, Mr. Archer would have used that information in MLGW's power supply planning process to advocate for power supply contract terms with less potential to harm the Memphis Sand Aquifer. For example, that information would have helped Mr. Archer to advocate in the MLGW power supply planning process for recycled water to be used for the cooling operations at the Allen Gas Plant, or for greater investment in renewable energy in order to reduce reliance on the water-intensive Allen Gas Plant.

157.    Mr. Archer obtains his residential and commercial electricity from TVA when he purchases electricity from MLGW, and he wants the opportunity to buy cleaner, less drinking water-dependent, cheaper renewable energy. Mr. Archer is concerned about the effect that TVA's anticompetitive Never-ending Contracts will have on his future electric and water bills, whether MLGW signs one or does not. If MLGW does not sign a Never-ending Contract but stays with TVA, it will have higher rates than other distributors that signed the Never-ending Contract, even though the Never-ending Contracts were adopted in violation of NEPA and the

TVA Act. If MLGW signs the Never-ending Contract, it will forgo its right to explore any future opportunities to purchase cleaner, cheaper power from other sources outside of that contract, with the result of higher prices for dirtier power that harms the quality and quantity of water in the Memphis Sand Aquifer.

158.     Mr. Archer is also concerned about how TVA's Never-ending Contracts will impact energy burdens faced by Memphis residents. It has been reported that low-income households in Memphis face one of the highest energy burdens in the country, meaning that an outsized portion of their income goes toward energy bills. Mr. Archer is concerned about TVA's failure to analyze the impact of its Never-ending Contracts on those energy burden costs. This is particularly concerning to Mr. Archer given the burden that TVA is also imposing on the Memphis Sand Aquifer and MLGW's role as the drinking water utility for the Memphis community.

159.     The harm and injury suffered by Protect Our Aquifer and its supporters can and should be redressed through the entry of a judgment enjoining, setting aside, vacating, or reforming the Never-ending Contracts pursuant to Section 706 of the APA. 5 U.S.C. § 706.

**Energy Alabama**

160.     Plaintiff Alabama Center for Sustainable Energy (d/b/a Energy Alabama) is a non-profit 501(c)(3) organization advocating for the transition to clean, sustainable energy in Alabama. Energy Alabama is headquartered in Huntsville, Alabama, and was founded in 2014. Its membership includes approximately 400 people living in Alabama who support sustainable energy that is socially equitable, environmentally beneficial, and economically sound.

161.     Energy Alabama brings this action on its own institutional behalf and on behalf of its members, more than 200 of whom live in the Alabama territory served by TVA. In TVA

territory, Energy Alabama's members are ratepayers of municipal utilities or member-owners of electric membership cooperatives who purchase power from TVA.

162.    Energy Alabama works to accelerate the transition to sustainable energy through public education at all levels, informing smart energy policy, and providing technical assistance to deploy more sustainable energy in homes and businesses throughout the state of Alabama.

163.    Energy Alabama has a history of evaluating the impact of TVA's decisions, advocating for greater public engagement in TVA's decision-making process, and encouraging the development of more equitable and sustainable energy generation throughout the state.

164.    Energy Alabama and its members regularly speak and submit comments to TVA, local distributors, and local governments in order to advocate for sustainable energy. Energy Alabama recently submitted comments to TVA along with other organizations on the draft Environmental Assessment for TVA's Power Supply Flexibility Proposal, which addressed one provision within the Never-ending Contracts. Through those comments, Energy Alabama asserted that TVA failed to perform required NEPA environmental review before adopting and implementing the Never-ending Contracts.

165.    Energy Alabama also provided comments to TVA on TVA's 2019 Draft Integrated Resource Plan and Draft Environmental Impact Statement, and its Chief Operating Officer, Daniel Tait, served on TVA's 2019 Integrated Resource Plan Working Group. Mr. Tait explains that TVA never disclosed to group members that it was planning to undertake a long-term (never-ending) contract strategy within the Tennessee Valley, despite flexibility being a stated goal of the IRP. Mr. Tait is very frustrated by the fact that TVA asked working group members to spend countless hours reviewing and commenting upon TVA's Integrated Resource Plan without disclosing TVA's plans to implement a long-term (never-ending) contract strategy. Thus, TVA's

conduct harmed Mr. Tait personally by wasting his time, and it harmed Energy Alabama by wasting its resources, as Mr. Tait's participation in the working group prevented him from doing other important work at Energy Alabama.

166.    Energy Alabama monitors TVA activities in order to ensure that TVA fulfills its obligations as a federal utility. In May 2019, Energy Alabama, along with other environmental and energy non-profits, wrote to request that the TVA Office of Inspector General open an investigation into TVA's membership in and use of ratepayer dollars for unincorporated trade groups, such as the Utility Air Regulatory Group.

167.    Energy Alabama and its members are harmed by TVA's failure to perform proper environmental review before adopting and implementing the Never-ending Contract program. TVA deprived Energy Alabama and its members of information they needed to fully assess the environmental impacts of the Never-ending Contracts. That deprivation required Energy Alabama to spend time and effort researching alternatives to the flexibility provisions contained in the Never-ending contracts. For example, Energy Alabama's Chief Operating Officer Mr. Tait spent several hours researching flexibility caps imposed in other regions, such as with Tri-State Generation and Transmission Association based in Colorado, and he learned that a 5 percent flexibility cap was inadequate and caused various problems in that region. TVA's failure to perform environmental review thus forced Energy Alabama to divert some of its limited resources away from its other programmatic activities and towards gathering the information and analysis that TVA was obligated to provide under NEPA.

168.    TVA also denied Energy Alabama and its members their legally protected opportunity to provide public comments and input on the draft environmental review documents that NEPA requires, but TVA failed to prepare, before TVA adopted and implemented its Never-

ending Contract program.

169.    By failing to undertake proper environmental review before implementing its Never-ending Contract program, TVA deprived Energy Alabama and its members of their right to assist TVA in making better, more sustainable energy decisions. That right is central to Energy Alabama's mission.

170.    Without the information contained in NEPA environmental review documents, Energy Alabama and its members are not able to participate meaningfully in local decision-making processes regarding the Never-ending Contracts. TVA's decision to skip the public disclosure and comment requirements of NEPA, while simultaneously rushing forward to execute as many perpetual contracts as possible, allowed TVA to implement its perpetual contract strategy across most of the Tennessee Valley before Energy Alabama could understand and react to the contracts.

171.    After learning of the Never-ending Contracts, Energy Alabama, through its Chief Operating Officer Mr. Tait, appeared at several public hearings before the Huntsville Utility Board and the Huntsville City Council and encouraged local leaders to push TVA for better contract terms. Those efforts were severely hampered by TVA's failure to study and disclose details of the perpetual contract proposal, its likely environmental effects, and alternatives to the Never-ending Contracts. The Huntsville Utility Board subsequently signed a Never-ending Contract.

172.    TVA never analyzed or disclosed the market and environmental impacts of allowing local power companies to periodically renegotiate the terms of their power contracts. TVA never analyzed or disclosed the environmental impacts of allowing local power companies to acquire up to 25 percent or 50 percent or more of their energy needs from distributed energy

resources such as roof top solar or locally owned industrial-scale solar. Instead, TVA imposed restrictive and arbitrary three percent to five percent flexibility caps, in perpetuity, across the vast majority of it service region without studying the impact of that action before it had committed to the Never-ending Contracts. That conduct by TVA prevented Energy Alabama from achieving its core mission of promoting sustainable energy policy.

173.    Energy Alabama and its members advocate for investment in solar and distributed energy resources. This advocacy, which supports Energy Alabama's mission, is impeded by TVA's Never-ending Contracts, which, because of their perpetual nature, threaten to eliminate any opportunity for Energy Alabama and its members to advocate to their local municipal distributors and electric membership cooperatives to renegotiate the power supply contract for more access to solar and distributed resources in the future. The Never-ending Contracts further impede Energy Alabama and its members' advocacy and goals by constraining TVA's and local distributors' investments in solar and distributed energy resources, including rooftop solar, and creating a substantial risk of less access and higher energy costs for Energy Alabama and its members.

174.    As an organization, Energy Alabama is deeply concerned by TVA's failure to analyze the anticompetitive impact that TVA's Never-ending Contracts will have on the adoption of cleaner, less expensive renewable energy in the Tennessee Valley. Given that the energy market is changing rapidly while the cost of solar and other renewable energy continues to fall, Energy Alabama has a fundamental interest in understanding the anticipated impact of TVA's use of perpetual contracts. By skipping NEPA review entirely, TVA harmed Energy Alabama's ability to fulfill its central mission of promoting cleaner, sustainable renewable energy.

175.    Allegations regarding Energy Alabama contained in this pleading are supported

by the Declaration of Daniel Tait which is attached as <u>Exhibit I</u> and incorporated herein by reference. As Mr. Tait explains, not only did TVA harm Energy Alabama's organizational interests, TVA also harmed Mr. Tait personally. Mr. Tait wants an opportunity to buy cleaner, cheaper renewable energy, and he is deeply concerned that the anticompetitive nature of TVA's perpetual contracts will ultimately result in north Alabama ratepayers, including him, being required to pay more for dirtier power. Mr. Tait is also concerned that TVA's efforts to insulate itself from competing with less expensive solar and renewable energy will foster continued reliance on and investment in fossil fuel electricity generation, thereby increasing air and water pollution—all further harming Energy Alabama and its members.

176.    Energy Alabama also represents the interests of its individual members, including Daniel Tait, Jonathon Rossow and Randy Buckner, among others, in prosecuting this lawsuit.

177.    The sworn Declaration of Jonathon Rossow is attached hereto as <u>Exhibit J</u> and incorporated herein by reference. Mr. Rossow is a retired United States Air Colonel, and he is currently a consultant at the Department of Defense. He has two Masters' Degrees, one in Strategic Intelligence and one in Aviation Safety and Management. He is a member of Energy Alabama and serves on its governing Board.

178.    Mr. Rossow installed a rooftop solar system (30 panels, 10kW system) at his home by participating in TVA's Green Power Providers (GPP) program. Through that program, he sells electric power to the grid. Frequently, his power sales to the grid create credits on his utility bills as he often generates more power than his household consumes. Those transactions are used as part of a carbon offset program in which organizations who want to contribute to the consumption of solar energy can purchase carbon offsets. TVA has since discontinued the GPP program so that other homeowners can no longer enroll.

179.     The three to five percent flexibility caps contained in TVA's perpetual power contracts harm Mr. Rossow's interests. TVA's perpetual flexibility caps will likely retard the future market for rooftop generated solar energy, and those perpetual caps will dampen the market for the solar power that Mr. Rossow will continue generating once his GPP contract expires. Mr. Rossow is concerned that TVA has diminished the value of his investment in a solar system. Mr. Rossow is also concerned about the impact that TVA's perpetual power contracts will have on property values, particularly the value of homes like his, which have solar panels.

180.     Mr. Rossow is an avid endurance runner and triathlon participant, and he travels to Tennessee for athletic events at least once a year. Given the extra breaths taken during endurance running, he is concerned that the particulate matter in the air that he breathes is causing him harm during training. Based upon his experience in the military (i.e. burn pits in Iraq), Mr. Rossow is keenly aware of the serious health risks associated with breathing dirty air, and he is genuinely concerned about the particulate matter and other pollution that comes from TVA's coal fired power plants.

181.     While competing in triathlons, Mr. Rossow swims in the Tennessee River in Chattanooga and Huntsville, areas that are downstream of TVA's Kingston Fossil Plant (a coal fired plant). Because coal plants maintain coal ash ponds, Mr. Rossow is very concerned about pollution that the plant places in the river or that migrates from its coal as ponds to the river. Unfortunately, TVA did nothing to analyze or disclose the impact of its Never-ending power Contracts on the operations of the Kingston Fossil Plant before it adopted the perpetual agreements.

182.     Mr. Rossow is concerned that the three to five percent caps that TVA's perpetual power contracts place on local power flexibility will discourage and dampen rooftop solar

development. As a result, TVA's fossil fuel plants will inevitably generate more dirty energy used to power businesses and homes that would have elected to go solar if TVA had never imposed forever caps. Thus, TVA harmed Mr. Rossow's interests in breathing clean air and recreating in clean water, as well as in his work as a member of Energy Alabama.

183.    The perpetual nature of the Never-ending Contracts mean that local distributors will have fewer opportunities to negotiate with TVA and encourage more renewable generation. Those local distributors will find it almost impossible to leave TVA entirely in order to find a cleaner power provider. By insulating TVA from competition from cleaner, renewable power, the Never-ending Contracts are likely to allow TVA to rely more heavily on its existing fossil fuel plants than it would in a more competitive environment. As fossil fuel plants generate more air and water pollution as they are used more intensively or over longer periods of time, Mr. Rossow's interests in clean air and water are even further harmed by the perpetual, anticompetitive Never-ending Contracts.

184.    The sworn Declaration of Randy Buckner is attached hereto as Exhibit K and incorporated herein by reference. Mr. Buckner is retired from a career as an engineer. He obtained a Bachelor's Degree in Engineering from West Point, after which he served in the United States Army. He obtained a Master's Degree in Engineering Management from George Washington University, and he spent more than twenty-five years as a civilian aerospace engineer in the U.S. Army. In that work, he served in numerous engineering and program management positions in the U.S. Army Aviation and Missile Systems Command in Huntsville, Alabama.

185.    Mr. Buckner lives in Limestone County, Alabama, and he has been a ratepaying consumer of TVA electricity for the last twenty-three years. He is a member of Energy Alabama,

and he serves as its CEO and Chairman of its governing Board. Energy efficiency has been a longtime interest of Mr. Buckner's. He is passionate about and works hard toward his goal of making sustainable energy available for all Alabamians.

186.     Mr. Buckner has 20 kW solar system on his home, and he carefully tracks the cost savings associated with that system. He installed that system through TVA's GPP program.

187.     The three to five percent flexibility cap contained in TVA's perpetual power contracts harms Mr. Buckner by wrongfully restricting the future market for rooftop generated solar energy. Mr. Buckner is concerned that the Never-ending Contract program will diminish the value of his solar system. He is concerned about whether there will even be a viable market for the solar power that he generates with his rooftop system once his present GPP contract expires.

188.     Mr. Buckner is concerned about the impact that TVA's perpetual power contracts will have on property values, particularly the value of homes like his, which have solar panels. Solar panels should enhance property values, but if TVA kills the market for rooftop solar power through its restrictive and permanent flexibility caps, that will likely push down the value of having a solar system.

189.     Mr. Buckner is concerned about and frustrated by the way that TVA implemented its Never-ending Contract strategy. He believes that it was wrong for TVA to skip required environmental review, public disclosure, and public comment requirements. Those shortcuts allowed TVA to rush forward with procuring as many Never-ending ontracts as possible before organizations like Energy Alabama could weigh in and push back. He thinks that it is wrong for TVA to cut the public out of public power decisions.

190.     The anticompetitive nature of TVA's perpetual power contracts will insulate TVA

from having to compete with cleaner, cheaper renewable energy as the energy market continues to evolve. That circumstance will harm ratepayers like Mr. Rossow and Mr. Buckner, who will be forced to pay higher electric bills for a dirtier mix of power.

191.    The harm and injury suffered by Energy Alabama and its members can and should be redressed through the entry of a judgment enjoining, setting aside, vacating, or reforming the Never-ending Contracts pursuant to Section 706 of the APA. 5 U.S.C. § 706.

**Appalachian Voices**

192.    Plaintiff Appalachian Voices is a 501(c)(3) non-profit organization. Its mission is to bring people together to protect the land, air, and water of Central and Southern Appalachia and to advance a just transition to a generative and equitable clean energy economy.

193.    Appalachian Voices was founded in 1997, and is headquartered in Boone, North Carolina, with additional offices in Charlottesville and Norton, Virginia, Durham, North Carolina, and Knoxville, Tennessee.

194.    Appalachian Voices has over 1,100 members throughout the country, and combines grassroots organizing, policy advocacy, and technical expertise in order to hold decision-makers accountable. Through public comments, education, communication initiatives, and the provision of resources and data to electric cooperatives, Appalachian Voices works collaboratively with local, state, and regional partners to promote energy efficiency and encourage the development of clean and affordable energy.

195.    Appalachian Voices brings this action on its own institutional behalf and on behalf of its members, more than 100 of whom live in areas served by TVA. Those members include, but are not limited to, William Kornrich, Prentice Lynn Tobey, and JoAnn McIntosh. Appalachian Voices' members who live in TVA's Power Service Area are ratepayers of

municipal utilities or member-owners of rural electric membership cooperatives that purchase power from TVA.

196.    Appalachian Voices is committed to assisting people throughout Appalachia in their efforts to shape the energy future of their own communities. Appalachian Voices recently initiated an Energy Democracy Tour, a community listening project in order to learn what the people of the Tennessee Valley want for the future of energy in their area. Appalachian Voices gathered input at thirteen urban and rural listening sessions throughout the Tennessee Valley, including in Memphis, Tennessee. Information from that tour was compiled to create a policy platform on how TVA can work with communities in its service territory to realize community goals.

197.    Appalachian Voices has a history of commenting on environmental review documents and of using information provided in those documents in its advocacy and community-organizing efforts. Appalachian Voices recently joined with Energy Alabama and other organizations in submitting comments on the draft Environmental Assessment for TVA's Power Supply Flexibility Proposal, noting the lack of review for the overall Never-ending Contract program and arguing that going forward with the Never-ending Contracts would violate NEPA. Appalachian Voices has also reviewed, commented on, and generated public engagement around other environmental review documents from TVA, such as the environmental assessment on TVA's replacement of the Green Power Providers program and the environmental assessment on the closure of the Bull Run Fossil Plant.

198.    Appalachian Voices has worked for years to promote energy efficiency and energy savings, affordable renewable energy, and increased transparency and public involvement in the decision-making process around the future of sustainable energy throughout Appalachia,

including in TVA's Power Service Area.

199.   TVA's failure to perform environmental review directly prevented Appalachian Voices and its members from providing information and commentary to TVA during the review process. A core component of NEPA is citizen engagement around the decisions of federal agencies, with the understanding that increased engagement will lead to better, more informed decision-making on the part of the agency. Denying Appalachian Voices and its members the opportunity for engagement effectively denies their right to influence and inform TVA in its decision-making on an issue that personally affects them, and which will have substantial effects on their ability to pursue Appalachian Voices' organizational mission: the advancement of equitable, democratic, and sustainable energy generation in the region.

200.   TVA's failure to provide Appalachian Voices and its members, and their local distributors, complete information about the environmental effects of the Never-ending Contract program and alternatives to it increases the risk of locking local distributors into a less sustainable future, as widespread adoption of said contracts leads to increased electricity demand relative to the load loss projected by TVA management as justification for the Never-ending Contract program, extended and increased reliance on and investment in fossil fuel generation, and constrained investment in more sustainable energy—all of which are directly contrary to the goals of Appalachian Voices as an organization.

201.   TVA's failure to conduct public environmental review severely hampered Appalachian Voices' ability to raise awareness among members of the public regarding how to express their own views to their local municipal distributors and electric membership cooperatives. By depriving Appalachian Voices of the analysis provided in NEPA environmental review documents, TVA diminished Appalachian Voices' ability to achieve its core mission of

being effective advocates for a cleaner energy future in Appalachia.

202.     TVA's Never-ending Contracts harm the ability of all Appalachian Voices members to take full advantage of the clean energy jobs and economic development that come with a transition to cleaner, renewable energy.

203.     Appalachian Voices has members who want to promote renewable energy by investing in their own solar and distributed energy resources. These members are harmed and injured by TVA's Never-ending Contracts because they are likely to constrain TVA's and local distributors' investments in solar and distributed energy resources, including rooftop solar, creating a substantial risk of less access and higher costs for these members.

204.     Because of the perpetual nature of the Never-ending Contracts, Appalachian Voices members are also harmed by the lost opportunity to advocate to their municipal distributors and electric membership cooperatives regarding the terms of TVA's power supply contracts to achieve greater access to solar and distributed energy resources in the future.

205.     By failing to perform the required environmental review, TVA fast-tracked the adoption and implementation of its Never-ending Contracts, rushing power distributors to make permanent decisions before Appalachian Voices and its members were able to gather sufficient information to evaluate the impact of the contracts. Not knowing the full details of how the Never-ending Contract program would be implemented and alternatives to the program impaired and continues to impair the ability of Appalachian Voices and its members to advise their municipal distributors and electric cooperatives about the potential impacts of the contracts, increasing the risk that fewer opportunities for access to solar and distributed energy resources will be available in Appalachian Voices members' local distributor service areas within TVA's Power Service Area in the future.

206.    TVA injured Appalachian Voices members who are ratepayers of municipal distributors or member-owners of electric cooperatives that have signed or may sign the Never-ending Contract with TVA. By depriving Appalachian Voices members of legally required NEPA disclosures, TVA hampers their ability to advocate to their municipal distributors and electric cooperatives about the long-term consequences of TVA's Never-ending Contract and to educate other ratepayers or member-owners regarding the consequences for coal- and gas-fired power, renewable energy, and distributed energy resources, including energy efficiency. Increasing transparency and public engagement within their electric cooperatives is a long-standing interest for Appalachian Voices members, and the ability to pursue this interest is severely restricted when they are denied the information they need to most effectively educate other members of the community and influence local decision makers. Appalachian Voices members would have used this information to inform their communities and advocate to their electric cooperatives regarding the Never-ending Contracts.

207.    Appalachian Voices' members include ratepayers who are concerned about the size of their electric bills. The perpetual nature of TVA's Never-ending contracts insulates TVA from market forces that would otherwise require TVA to compete with cleaner, cheaper solar energy, renewables and other distributed energy resources. As a result, the Never-ending Contracts harm members of Appalachian Voices by interrupting market forces that otherwise put downward pressure on electric rates.

208.    Allegations pertaining to Appalachian Voices are supported by the sworn declarations of Rory McIlmoil (Exhibit L attached) and Brianna Knisley (Exhibit M attached) which are incorporated herein by reference.

209.    Attached as Exhibit N is the Declaration of William Kornrich, which is

incorporated herein by reference. Mr. Kornrich is a member of Appalachian Voices who lives in Hancock County, Tennessee. Since 1982, he has obtained his electricity from Powell Valley Electric Cooperative (PVEC), a distributor of TVA power. Mr. Kornrich is a strong supporter of sustainable energy, and he attends monthly PVEC board meetings. In addition, he writes a biweekly column about PVEC in a local newspaper that goes to every household in Hancock County.

210.    Through his involvement with Appalachian Voices, Mr. Kornrich has advocated on behalf of himself and other coop member-owners to push for more energy efficiency, renewable energy, transparency, and public involvement in decision-making. Because TVA did not engage in environmental review and a public comment process before adopting its perpetual power contracts, PVEC and TVA were able to rush through the decision-making process. That rush by TVA harmed Mr. Kornrich and made it more difficult for him to be an effective community advocate.

211.    If TVA had followed proper environmental review and public comment processes, Mr. Kornrich would have commented to TVA and PVEC about the perpetual contracts; he would have written about the issue in his bi-weekly newspaper column; and he would have urged people to participate in the public process and to comment to both TVA and PVEC. TVA's failure to follow the law harmed Mr. Kornrich by preventing him from engaging in those activities, which are important to him.

212.    Because TVA's Never-ending Contracts contain a cap on distributed energy resources, PVEC will be limited in its ability to invest in renewable power as it becomes less expensive. With such a limited ability to invest in local renewable power, PVEC will be less likely to offer Mr. Kornrich or other member-owners choices about how local power is

generated. Being able to choose more renewable power is important to Mr. Kornrich.

213.    TVA's Never-ending Contracts harm Mr. Kornrich's interests. He is interested in investing in solar energy for his home, if there are programs to incentivize it, and Mr. Kornrich is concerned that such programs will no longer be possible given the restrictive caps contained in TVA's perpetual agreements.

214.    Attached as Exhibit O is the Declaration of Prentice Lynn Tobey, which is incorporated herein by reference. Ms. Tobey lives in Sharps Chapel, Tennessee, and she has purchased TVA generated power from PVEC since 1992. She is a member of Appalachian Voices, and she attends monthly PVEC board meetings. Ms. Tobey pushes PVEC to prioritize environmental stewardship (through more support for energy efficiency and renewable energy) and economic development. She encourages more transparency and public involvement in PVEC decisions, and she updates a local website for those purposes.

215.    By not engaging in environmental review of the Never-ending Contracts, TVA harmed Ms. Tobey by preventing her, as a member-owner of her local electric coop, from evaluating whether the contracts are a good idea for PVEC. TVA prevented Ms. Tobey from effectively working with community members to encourage PVEC to request a better deal from TVA.

216.    PVEC signed a Never-ending Contract with TVA in the fall of 2019 without active engagement with member-owners, and Ms. Tobey learned about it after the fact. TVA harmed Ms. Tobey by not affording her the opportunity to comment, talk with local leaders, and be involved. Those opportunities are important to Ms. Tobey.

217.    TVA's Never-ending Contract has harmed Ms. Tobey because her local electric coop will never be able to push for a better deal that includes a larger mix of cleaner, cheaper

renewable energy. Accordingly, Ms. Tobey is relegated to a future in which she will likely pay more for less sustainable electric power.

218.    Ms. Tobey has a solar system at her home. She usually has very low or even negative electric bills because of her solar energy production. Not being able to sell back her solar energy would have a negative impact on her economically, diminishing the value of her investment in a solar system and decreasing the value of her property. TVA has harmed Ms. Tobey's interests by imposing perpetual, restrictive caps on distributed energy. Because of TVA's anticompetitive conduct, Ms. Tobey is not likely to have a reasonable option to sell her solar energy back to the grid at a reasonable price once her solar contract expires.

219.    Attached as Exhibit P is the Declaration of JoAnn McIntosh, which is incorporated herein by reference. Ms. McIntosh lives in Clarksville, Montgomery County, Tennessee. She is a member of Appalachian Voices as well as the Tennessee Chapter of the Sierra Club. She is committed to promoting sustainable energy in her community, an she has worked on a volunteer sustainability task force in Clarksville in hopes that Clarksville (Tennessee's 5th largest city) will adopt a sustainability plan. Ms. McIntosh has a history of commenting on TVA actions, including its 2019 Integrated Resource Plan.

220.    Ms. McIntosh is a member of Cumberland Electric Membership Corporation, which is the electric cooperative from which she buys electricity. She is very frustrated by the fact that TVA implemented its Never-ending Contracts without undertaking required public disclosure, public comment, and environmental impact analysis. TVA rushed its perpetual contracts forward without giving people like her the chance to comment upon TVA's course of action and to encourage Cumberland Electric to push for a better deal. Ms. McIntosh believes TVA's strategy of cutting the public out of important public power decisions is wrong, and it

harmed Ms. McIntosh's ability to stand up for what she believes before the perpetual contracts were signed.

221.   Ms. McIntosh believes that TVA's perpetual power contracts with local power companies are anticompetitive and wrong. TVA should not be allowed to use forever contracts to shield itself permanently from having to compete with cleaner, cheaper renewable energy as the energy market evolves. She wants the opportunity to buy cleaner, cheaper renewable energy, and she worries that ratepayers like her will be forced to pay higher electric bills for a dirtier mix of power in the future.

222.   Ms. McIntosh has a solar system at her home which was installed through TVA's Green Power Providers program, a program which TVA has since discontinued. The three to five percent flexibility cap contained in TVA's perpetual power contracts will likely restrict the future market for rooftop generated solar energy, thereby harming Ms. McIntosh's ability to sell power at a reasonable price in the future. That permanent cap is also likely to harm the value of Ms. McIntosh's solar system and the value of her home.

223.   The harm and injury suffered by Appalachian Voices and its members can and should be redressed through the entry of a judgment enjoining, setting aside, vacating, or reforming the Never-ending Contracts pursuant to Section 706 of the APA. 5 US.C. § 706.

## CLAIMS FOR RELIEF

### Claim One – TVA Violated NEPA and the APA by Failing to Conduct Required Environmental Review

224.   All allegations stated above are incorporated herein by reference.

225.   NEPA requires federal agencies to prepare a detailed Environmental Impact Statement for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). When it is not readily discernible whether the

environmental effects of a proposed action will be "significant," federal agencies may first prepare a less rigorous Environmental Assessment in order to establish the project's impacts. 40 C.F.R. §§ 1501.4(b), 1508.9(a)(1). If impacts are likely to be significant, however, an EIS is then required.

226.    NEPA requires federal agencies to conduct environmental analysis at the "earliest possible time," fully considering and publicly disclosing the environmental consequences of an agency action and alternatives *before* proceeding with the action. 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1501.2, 1502.5 (1978). Moreover, the TVA Board of Directors conditioned its approval of the so-called long-term agreements "upon satisfactory completion of any required environmental reviews." In spite of those clear requirements, TVA chose to disregard the requirements of NEPA completely, and it began entering into Never-ending Contracts with local distributors almost immediately after receiving the Board's conditional approval.

227.    TVA violated NEPA, 42 U.S.C. § 4332(C), by failing to prepare an EA or EIS before it adopted and implemented Never-ending Contracts.

228.    TVA's system-wide adoption and implementation of Never-ending Contracts is a major "federal action" under NEPA. *See* 40 C.F.R. § 1508.18(b)(3) (1978) (listing examples of agency actions, including "[a]doption of programs, such as a group of concerted actions to implement a specific policy or plan").

229.    TVA's Never-ending Contracts are likely to have significant environmental impacts. The long-term agreements will likely affect the quality of the air, water, wildlife, public health, and economic wellbeing in TVA's seven-state, 80,000-square mile region in perpetuity.

230.    The Never-ending Contracts commit TVA and local distributors to binding legal instruments with everlasting consequences, and they will shape the nature and scope of the load

requirements placed upon the TVA energy grid indefinitely.

231.    The Never-ending Contracts insulate TVA from market forces and competitive pressures, thereby hindering the growth of renewable energy and distributed energy resources in the Tennessee Valley. The Never-ending Contracts effectively insulate TVA from competition at a time when local distributors, residents, and commercial and industrial customers are demanding more renewable and distributed energy. Insulation from competitive market forces will forever constrain the development of renewable energy in the TVA region, resulting in greater emissions of greenhouse gases and other pollutants.

232.    TVA's extended and increased reliance on coal and gas-fired power plants, which must be operated with millions of gallons of water, will have lasting and harmful consequences for the Valley's aquifers and surface water resources.

233.    The Never-ending Contract program is likely to result in increased electricity demand relative to the load loss projected by TVA management as justification for the Never-ending Contract program,  while constraining TVA's and local distributors' investments in solar and distributed energy resources, further exacerbating TVA's greenhouse gas emissions, other pollution, and water consumption.

234.    The Never-ending Contracts also have harmful cumulative impacts when added to TVA's previous pattern and practice of disfavoring the development of DER and renewable solar power generation. For example, in 2018 TVA adopted a rate structure change that discourages distributed energy and energy efficiency. In 2019, TVA terminated its Green Power Providers program, a rooftop solar program that compensated customers who generate their own solar power for the value they provide to the grid and to the Valley. In fact, TVA's 2019 Integrated Resource Plan expressly acknowledges that TVA has "reduced" energy efficiency incentives.

235.     Adoption of the Never-ending Contract as the standard agreement across the TVA region sets a dramatic and game-changing precedent in the Tennessee Valley energy market. The long-term agreement has proven highly controversial as multiple local distributors, including some of the region's largest, explore whether to terminate their relationships with TVA.

236.     By signing Never-ending Contracts, TVA irretrievably committed its resources to servicing local distributors under the confines of those perpetual legal instruments.

237.     By adopting and implementing the Never-ending Contracts without conducting NEPA environmental review, TVA harmed the interests of Conservation Groups and their members and directly injured them. TVA prevented Conservation Groups and their members from receiving required disclosures and analysis about the human and environmental impacts of TVA's planned course of action and a range of alternatives to that action. TVA prevented Conservation Groups and their members from commenting upon, participating in, and influencing TVA's planned course of action before TVA irretrievably committed resources to the program. TVA prevented the Conservation Groups from undertaking their core advocacy missions by failing to allow them to arm themselves with facts and analysis that should be contained in legally required NEPA disclosures. As a result, TVA prevented Conservation Groups and their members from effectively advocating to local distributors that they should eschew the Never-ending Contracts. Likewise, TVA prevented Conservation Groups from effectively pushing back against the Never-ending Contract program on behalf of Conservation Groups' individual members, thereby inhibiting Conservation Groups' ability to protect the interests of their individual members.

238.     TVA's failure to undertake required NEPA review before adopting and implementing the Never-ending Contracts was "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, the Never-ending Contracts must be held unlawful and set aside as required by Section 706(2) of the APA. 5 U.S.C. § 706(2).

239.    TVA's failure to undertake required NEPA review before adopting and implementing the Forever Contracts occurred "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Accordingly, the Never-ending Contracts must be held unlawful and set aside as required by Section 706(2) of the APA. 5 U.S.C. § 706(2).

240.    TVA's failure to undertake required environmental reviews as mandated by the TVA Board of Directors' August 22, 2019 conditional approval of the Never-ending Contracts was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, the Never-ending Contracts must be held unlawful and set aside as required by Section 706(2) of the APA. 5 U.S.C. § 706(2).

### Claim Two – TVA Violated the TVA Act and the APA by Entering into Perpetual Agreements

241.    All allegations stated above are incorporated herein by reference.

242.    The TVA Act authorizes TVA to enter into agreements for the sale of electric power "for a term *not exceeding* twenty years." 16 U.S.C. § 831i (emphasis added).

243.    The TVA Act does not authorize TVA to enter into agreements for the sale of electric power that exceed twenty years.

244.    The TVA Act does not authorize TVA to enter into agreements for the sale of electric power that never expire with the passage of time.

245.    Although the purported initial term of TVA's Never-ending Contracts is twenty (20) years, that contract term extends itself automatically each year so that contract never expires with the passage of time.

246.    The punitive notice and termination provisions contained in TVA's Never-ending Contracts have the practical effect of preventing local distributors from terminating the agreements once signed. The Never-ending Contracts provide that, if a local distributor wants to terminate its agreement with TVA, it must provide TVA with twenty (20) years' advance written notice of termination. In such event, TVA will have no obligation to make or complete any additions to or changes in any transformers or transmission lines that service the terminating distributor during the twenty-year termination period. Further, distributors will lose the 3.1% Wholesale Credit, incurring higher rates and placing them at a competitive disadvantage relative to non-terminating distributors.

247.    TVA enjoys complete monopoly power throughout its service area. TVA is fully aware that the inability of a local distributor to foresee the future over a span of two decades will always prevent a local distributor from providing a twenty-year notice of termination of a Never-ending Contract.

248.    By entering into Never-ending Contracts that exceed the TVA Act's statutory limit of twenty (20) years, TVA harmed the interests of the Conservation Groups and their members and directly injured them.

249.    Before TVA implemented the Never-ending Contract program, the weighted average length of the termination notice required under TVA's then existing wholesale power contracts with local distributors was less than seven years.

250.    In addition to lasting forever, the subject agreements contain restrictive caps of three to five percent on the amount of power that local distributors can procure locally from clean energy sources such as solar or other distributed energy resources. Moreover, those contracts are exclusive, meaning that local distributors are forbidden from selling or supplying

power outside the confines of the contract.

251.    By entering into perpetual agreements that threaten to permanently hobble the development of clean energy resources such as solar and wind, TVA prevents Conservation Groups from achieving their common organizational missions of promoting the expansion of clean, renewable energy in the Tennessee Valley.

252.    By entering into perpetual energy contracts, TVA prevents the Plaintiff Protect Our Aquifer from periodically advocating to local distributors that the distributors should search for cleaner renewable power not controlled by TVA, thereby reducing the impacts of TVA power generation on the Memphis Sand Aquifer and other Tennessee water resources. By cementing TVA's reliance of fossil fuels and permanently insulating TVA from competitive market forces at play in the broader energy market, Never-ending Contracts permanently hamper the ability of Protect Our Aquifer to influence TVA's future power generation and use of water resources. Perpetual contracts prevent Plaintiff Protect Our Aquifer from periodically advocating to TVA and local distributors to adopt or amend their power supply contracts to increase renewable power, thereby protecting local and state-wide water resources. The Never-ending Contracts also deprive supporters of Protect Our Aquifer of opportunities to purchase cleaner, less drinking water-dependent, cheaper renewable energy.

253.    By entering into perpetual energy contracts, TVA prevents the Plaintiff Energy Alabama from periodically advocating to local distributors in northern Alabama that those distributors should search for cleaner renewable power not controlled by TVA. Similarly, the perpetual contracts prevent Energy Alabama from periodically advocating to TVA and local distributors to adopt or amend and implement contracts that promote distributed and renewable energy. TVA's perpetual agreements directly interfere with Energy Alabama's central mission of

promoting the adoption of clean, sustainable energy in Alabama. The Never-ending Contracts harm the economic interests of members of Energy Alabama who own rooftop solar photovoltaic systems by constraining the market for the electricity they generate, which diminish the value of their investments in solar systems and could in turn decrease the property value of their homes. The Never-ending Contracts also harm members of Energy Alabama who are ratepayers of municipal utilities and membership cooperatives served by TVA by forcing them to pay higher electric bills for a dirtier mix of power.

254.    By entering into perpetual energy contracts, TVA prevents the Plaintiff Appalachian Voices from periodically advocating to rural electric cooperatives and other local power distributors that they should increase their use of cleaner renewable power not controlled by TVA. TVA's perpetual agreements also prevent Appalachian Voices and its members from periodically encouraging member-owned electric cooperatives to negotiate for more favorable contract terms with TVA. By tying the hands of electric cooperatives in perpetuity, TVA undercuts completely Appalachian Voices' central mission of democratizing decision-making processes employed by member owned electric cooperatives. The perpetual contracts prevent Appalachian Voices from periodically advocating to TVA and member-owned electric cooperatives to adopt and implement contracts that promote local control and distributed and renewable energy. By cementing TVA's reliance on fossil fuels and permanently insulating TVA from competitive market forces at play in the broader energy market, Never-ending Contracts permanently hamper the ability of Appalachian Voices to influence TVA's future power generation decisions. The Never-ending Contracts harm the economic interests of members of Appalachian Voices who own rooftop solar photovoltaic systems by constraining the market for the electricity they generate, which could in turn affect the property value of their homes. The

Never-ending Contracts harm members of Appalachian Voices who are ratepayers of municipal utilities and membership cooperatives served by TVA by forcing them to pay higher electric bills for a dirtier mix of power. The Never-ending Contracts also deprive members of Appalachian Voices of opportunities to purchase cleaner, cheaper renewable energy.

255.   TVA's adoption and implementation of perpetual energy contracts in violation of Section 831i of the TVA Act contravenes the APA's prohibition against agency action "in excess of statutory jurisdiction, authority or limitations." 5 U.S.C. § 706(2)(C). Accordingly, the Never-ending Contracts must be held unlawful and set aside as required by Section 706(2) of the APA. 5 U.S.C. § 706(2).

256.   TVA's adoption and implementation of perpetual energy contracts in violation of Section 831i of the TVA Act was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, the Never-ending Contracts must be held unlawful and set aside as required by Section 706(2) of the APA. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, based upon all the allegations contained in the foregoing paragraphs, the Plaintiff Conservation Groups respectfully request the following relief:

a)  a judicial declaration that TVA's use of the above described Never-ending Contracts, without preparing an Environmental Impact Statement or conducting other environmental review, violates the National Environmental Policy Act, 42 U.S.C. § 4332(C);

b)  a judicial declaration that TVA exceeded its statutory authority by entering into perpetual energy contracts in violation of Section 831i of the TVA Act, 16 U.S.C. § 831i;

c)  a finding under the Administrative Procedures Act that TVA's conduct as described above was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A);

d)  a finding under the Administrative Procedures Act that TVA's conduct as described above was "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C);

e)  a finding under the Administrative Procedures Act that TVA's conduct as described above was "without observance of procedure required by law," 5 U.S.C. § 706(2)(D);

f)  a judgment setting aside and vacating the Never-ending Contracts described above pursuant to Section 706(2) of the Administrative Procedures Act, 5 U.S.C. § 706(2);

g)  a judgment declaring that Section 1 of the Never-ending Contracts described above is unenforceable because it violates Section 831i of the TVA Act, 16 U.S.C. § 831i;

h)  in accordance with Section 7 (SEVERABILITY) of the Never-ending Contracts, a judgment replacing Section 1 of the contracts with a substitute provision that complies with Section 831i of the TVA Act, 16 U.S.C. § 831i;

i)  an injunction against TVA entering into additional perpetual energy contracts;

j)  an injunction requiring TVA to comply with the terms of the National Environmental Policy Act, 42 U.S.C. § 4332(C), before implementing system-wide energy contract programs that significantly affect the environment;

k)  an award of attorney fees and all recoverable costs pursuant to 28 U.S.C. § 2412(d); and/or

l)  such other relief as this Court deems just and equitable.

Respectfully submitted,

DATE: November 5, 2020

*Attorneys for Protect Our Aquifer, Alabama Center for Sustainable Energy (dba Energy Alabama), and Appalachian Voices*

s/George Nolan
George Nolan, BPR#014974
Amanda Garcia, BPR#033773
O. W. "Trey" Bussey, BPR#037814
Chelsea Bowling, BPR#037812
Southern Environmental Law Center
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Facsimile: (615) 921-8011
gnolan@selctn.org
agarcia@selctn.org
tbussey@selctn.org
cbowling@selctn.org