**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| PROTECT OUR AQUIFER, ALABAMA CENTER FOR SUSTAINABLE ENERGY, doing business as Energy Alabama, and APPALACHIAN VOICES, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 2:20-cv-02615-TLP-atc |
| v. | ) ) | |
| TENNESSEE VALLEY AUTHORITY, | ) ) | |
| Defendant. | ) | |

**ORDER DENYING MOTION TO DISMISS**

This case is about long-term contracts for electricity between the Tennessee Valley Authority ("TVA") and local utilities. Plaintiffs here allege those contracts not only pose negative consequences for the environment but they violate the law. Plaintiffs are not the local utilities. So they are not parties to the contracts. Instead, Plaintiffs are three conservation groups that sue TVA over these long-term contracts, which Plaintiffs dub "never-ending." (ECF No. 17.) TVA now moves to dismiss Plaintiffs' claims. (ECF No. 20.) Plaintiffs responded in opposition (ECF No. 26), and TVA replied. (ECF No. 27.) And as explained below, the Court **DENIES** Defendant's Motion to Dismiss.

But before addressing the parties' arguments, the Court will give a bit of background.

## **BACKGROUND**

I.      **Description of TVA and its Long-Term Agreement**

To begin, Congress formed the Tennessee Valley Authority under the TVA Act of 1933 in part "to produce, distribute, and sell electric power." 16 U.S.C. § 831(d)(l). And one of

TVA's "core statutory objectives is to provide low-cost, reliable electricity to ten million people in TVA's seven-state service area." (ECF No. 20-1 at PageID 1390.)  To achieve this mission, the TVA Act authorizes TVA to enter into contracts with local power distributors "for a term not exceeding twenty years."  16 U.S.C. § 831(i).

So in 2019, TVA started offering a long-term agreement ("LTA") to local utilities to purchase its electricity exclusively from TVA for twenty years with a provision that calls for the contract to automatically renew each year. (ECF No. 17 at PageID 1199.)  And if the local distributor wants to terminate the contract, it must give 20 years' notice.  (*Id.*)  If a local power company chooses to execute the LTA contract, in return, TVA provides monthly bill credits throughout the contract. (ECF No. 20-1 at PageID 1394.)  But Plaintiffs contend that if the local utility gives notice of termination, TVA will stop the bill credits for the next twenty-years until termination. (ECF No. 17 at PageID 1256.)  They argue the length of the LTAs violate the TVA Act. (*Id.*)

TVA claims that these LTAs help it to ensure that it can meet its long-term financial and power generation goals.[1] (ECF No. 20-1 at PageID 1393.)  And while the LTA is exclusive, it introduces a "Flexibility Proposal," in which local distributors can self-generate three to five percent of their energy from non-TVA, renewable sources. (*Id.*)

As for environmental concerns, some TVA decisions fall under the National Environmental Protection Act ("NEPA"), so it has to conduct environmental impact assessments under NEPA for those decisions.  *See* 42 U.S.C. § 4332.  For the LTA, TVA decided that it did

---

[1] Another way that TVA conducts long-range planning is through its Integrated Resource Plan ("IRP"), which assesses demand for power for a twenty-year period.  (ECF No. 20-1 at PageID 1391.)  TVA completed its most recent IRP in 2019, and during that process TVA claims that it prepared an Environmental Impact Statement under the National Environmental Protection Act. (*Id.*)  After that IRP process, TVA's Board approved adopting the LTA.  (*Id.* at PageID 1393.)

not need to prepare an Environmental Impact Statement ("EIS")[2] under NEPA.  (*See* ECF No. 20-1 at PageID 1394 n. 8.)[3]

To date, at least 142 local power companies have signed the LTA.  (ECF No. 27 at PageID 2878.)  To TVA, the LTAs are mutually beneficial because they give incentives to local distributors and help TVA with long-range planning.  (*See* ECF No. 20-1 at PageID 1393.) Plaintiffs accuse TVA of enticing local distributors to sign the LTAs by using a "carrot-and-stick" approach.  (ECF No. 17 at PageID 1219.)  TVA provides a wholesale credit to distributors that sign the LTAs—but those who decline do not get the incentive.  (*Id.*)  Plaintiffs believe this creates a "regime in which some local distributors enjoy favored status while others are treated like second-class citizens."  (*Id.*)

## II.    Description of Plaintiff Conservation Groups and Their Claims

Plaintiffs here are three environmental conservation groups—Protect Our Aquifer, Alabama Center for Sustainable Energy, and Appalachian Voices.  (ECF No. 17.)  And Plaintiffs claim TVA is using the LTA to further a monopolistic strategy designed to insulate TVA from competition—including local distributors' consideration of alternative, renewable energy sources.  (*Id.* at PageID 1217.)  Meanwhile, TVA counters that nothing in the LTA limits TVA's ability to acquire energy from renewable sources in the future.  (ECF No. 20-1 at PageID 1390–92.)  Indeed, TVA touts its recent commitments to reducing coal-based power and increasing its reliance on nuclear and solar generation.  (*See id.*)

---

[2] An EIS includes descriptions of the environmental impact of the proposed action and any unavoidable adverse environmental effects if the agency adopts the proposed action. 42 U.S.C. § 4332(C); *see Shoreline All. v. Tenn. Valley Auth.*, 961 F. Supp. 2d 890, 896 (W.D. Tenn. 2013).
[3] TVA explains that it assessed whether it needed to conduct NEPA review when adopting the LTA and that it did not "because the flexibility proposal had not taken shape and because the bill credit had no effect on the existing rate structure."  (ECF No. 20-1 at PageID 1394 n.4.)  TVA also argues that it conducted environmental assessments for its 2019 IRP, which governs its power generation decisions.  (*See id.* at PageID 1405, 1407.)

But Plaintiffs allege TVA pressures local electricity distributors into signing the exclusive LTA that caps (i.e., the "Flexibility Proposal") the amount of power that distributors may obtain from other clean energy sources from 3 to 5% forever.  (*See* ECF No. 17 at PageID 1219.)  What is more, Plaintiffs allege that TVA should have conducted environmental review under NEPA before adopting the LTA.  (*Id.* at PageID 1221.)

This suit centers on TVA's adopting the LTA.  Plaintiffs have two claims against TVA: (1) By adopting a never-ending contract, TVA violated the TVA Act of 1933, which prohibits contracts lasting longer than 20 years, and (2) TVA violated NEPA by failing to conduct required environmental assessments before adopting the LTA.  (*Id.* at PageID 1251–59.)

Plaintiffs bring these claims under the Administrative Procedures Act ("APA"), which allows parties to seek judicial review of an agency action.  5 U.S.C. § 702.  Because TVA is an agency, Plaintiffs believe the APA gives them a route to force TVA compliance under the TVA Act and NEPA.  First, Plaintiffs claim that the TVA Act prohibits contracts lasting longer than 20 years.  (ECF No. 17 at PageID 1255.)  And the LTA violates that prohibition because it renews every year for another twenty-year term and requires twenty-years' notice to terminate. (*Id.*)  So Plaintiffs ask this Court to declare the contract term invalid or to reform the offending contract provision and issue an injunction forbidding TVA from entering into additional perpetual contracts.  (*Id.* at PageID 1260.)

Second, Plaintiffs claim that NEPA requires federal agencies like TVA to prepare an EIS for all "major federal actions significantly affecting the quality of the human environment."  (*Id.* at PageID 1251 (citing 42 U.S.C. § 4332(C)).)  If an agency expects that a proposed action may not have "significant" effects, it may prepare a less rigorous Environmental Assessment ("EA"), instead.  (*Id.* at PageID 1252.)  Plaintiffs allege that TVA violated NEPA, because it prepared

neither an EIS nor an EA.  (*Id.*)  Plaintiffs ask the Court to declare that TVA violated NEPA and issue an injunction requiring TVA to comply with NEPA.  (*Id.* at PageID 1260.)

## III.    Defendant's Motion to Dismiss

Defendant moves to dismiss all Plaintiffs' claims.  (ECF No. 20.)  First, Defendant argues the Court should dismiss Plaintiffs' TVA Act claim, because the LTA complies with the TVA Act.  (ECF Nos. 20-1 at PageID 1396; 27 at PageID 2878–79.)  What is more, TVA argues that it has discretionary rate-making authority, which includes setting the LTA length.  (ECF No. 20-1 at PageID 1395–97.)  And because TVA has this discretion, this Court cannot review whether the LTA violates the TVA Act.  (*Id.*)  Second, Defendant moves to dismiss arguing that Plaintiffs do not have standing to bring either of their claims.  (*Id.* at 1399–1403.)

This motion depends on three threshold jurisdictional questions that the Court will address in the following order.  First, may the Court judicially review whether the LTA complies with the TVA Act?  Second, do Plaintiffs have standing to bring their TVA Act claim?  And third, do Plaintiffs have standing to pursue their NEPA claim?

But for starters, the Court will outline the legal standards for a motion to dismiss.

## MOTION TO DISMISS STANDARD OF REVIEW

Defendant moves to dismiss under both Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

To analyze a motion to dismiss under Rule 12(b)(6), the Court begins with the pleading requirements in Rule 8 of the Federal Rules of Civil Procedure.  Under Rule 8, a complaint must contain "a short and plain statement . . . showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In practice, Rule 8 requires that a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v.*

*Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007));

*Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017).

Though a court will grant a motion to dismiss if a plaintiff has no plausible claim for

relief, a court must "construe the complaint in the light most favorable to the plaintiff, accept its

allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirecTV v.

Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  "A complaint should only be dismissed if it is clear

to the court that 'no relief could be granted under any set of facts that could be proved consistent

with the allegations.'" *Herhold v. Green Tree Serv., LLC*, 608 F. App'x 328, 331 (6th Cir. 2015)

(quoting *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003)).  "Dismissal of

the action is proper if there is an absence of law to support the type of claim made, if the facts

alleged are insufficient to state a valid claim, or if, on the face of the complaint, there is an

insurmountable bar to relief." *Doe v. Ohio*, No. 2:91-CV-464, 2012 WL 12985973, at *5 (S.D.

Ohio Feb. 16, 2012) (citations omitted).

Additionally, a party may move to dismiss the claims for lack of subject-matter

jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  A motion made under this Rule

involves a different analysis.  This is so because a Rule 12(b)(1) motion challenges a federal

court's authority to decide a case, while a Rule 12(b)(6) motion tests whether the plaintiff has

pleaded a cognizable claim. *Primax Recovers, Inc. v. Gunter*, 433 F.3d 515, 517 (6th Cir. 2006)

(quoting 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND

PROCEDURE § 1350 (3d ed. 2004)).  One instance in which subject-matter jurisdiction is absent is

when a plaintiff cannot meet the standing requirements of Article III of the United States

Constitution. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016).  "When ruling on a motion to

dismiss for lack of standing . . . the district court must accept all material allegations of the

complaint as true." *Hawkins v. Richter*, No. 17-1968, 2018 WL 4042465, *2 (6th Cir. July 6,

2018) (citing *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012)).  And "[t]o adequately allege jurisdiction, the complaint 'must contain non-conclusory facts which, if true, establish that the district court had jurisdiction over the dispute.'"  *Id.*

    With these standards in mind, the Court will now address the parties' arguments.

## <u>REVIEWABILITY OF TVA'S LONG TERM AGREEMENT UNDER THE APA</u>

    The first question is whether this Court has the authority to review whether the length of the LTA violates the TVA Act.  This Court finds that it does.

## I.    Legal Standards for Reviewability of the TVA Contract Under the APA

    For starters, the Court evaluates reviewability here under the APA.  *See McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 406 (6th Cir. 2006).   And under the APA, parties may generally seek judicial review of an agency action.  5 U.S.C. § 702.[4]  But there is an exception to that rule—a court may not review an agency action if Congress gave the agency *discretion* to commit that action.  5 U.S.C. § 701(a)(2); *McCarthy*, 466 F.3d at 406; *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1124 (6th Cir. 1996).  Defendant's argument here is that Congress gave it discretion to make rates and that defining the length of the LTA qualifies as ratemaking.  (ECF No. 20-1 at PageID 1395.)  Thus, because setting the length of the contract is discretionary, this Court should decline to review the LTA term.  (*Id.* at PageID 1395.)

    At the same time however, "[c]ongress rarely intends to prevent courts from enforcing its directives to federal agencies."  *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015).  As a result, there is a strong presumption favoring judicial review of an administrative action.  *Id.*  TVA may rebut that presumption if the statutory language shows that Congress wanted TVA to

---

[4] "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review."  5 U.S.C. § 702.

police its own conduct; yet, TVA bears a heavy burden to show that Congress prohibited all review of whether TVA complied with its mandate. *See id.* And the Sixth Circuit has cautioned that courts must be "'wary of interpreting the APA in a manner that precludes any judicial review of agency decisions.'" *Fligiel v. Samson*, 440 F.3d 747, 751 (6th Cir. 2006) (quoting *UHI Inc. v. Thompson*, 250 F.3d 993, 996 (6th Cir. 2001)). To decline review, there must be a "'showing of clear and convincing evidence' that Congress intended to eliminate judicial review in matters of agency discretion." *Id.*

## II.    Analysis of Reviewability Under the APA

TVA argues here that it may make rates and that deciding the length of the LTA qualifies as ratemaking. (ECF No. 20-1 at PageID 1395.) As TVA argues, "the (TVA) Board is authorized to include in any contract for the sale of power such terms and conditions, including resale rate schedules, ... as in its judgment may be necessary or desirable for carrying out the purposes of this chapter." 16 U.S.C. § 831(i). And "TVA's statutorily sanctioned authority to set resale rates is limited only by the provision that they not violate the purposes of the TVA Act, and thus, in the absence of a clear violation, rates set by TVA are not subject to judicial review." *Bekaert Corp. v. City of Dyersburg*, No. 07-2316-STA-dkv, 2009 WL 7196672, at *3 (W.D. Tenn. May 20, 2009).

The problem with TVA's argument here is that Plaintiffs allege exactly the type of violation that the APA allows this Court to review—that the LTA's contract term "clearly violates" the TVA Act. *See id.* To be sure, this Court recognizes that TVA has broad authority to set rates and that courts cannot review TVA ratemaking. *See e.g., McCarthy*, 466 F.3d at 405–06; *Matthews v. Town of Greeneville*, No. 90-5772, 1991 WL 71414, at * 2 (6th Cir. May 2, 1992).

8

But Congress has also given TVA a clear directive—its contracts cannot exceed twenty years.  16 U.S.C. § 831(i).  And here, Plaintiffs claim TVA violated that directive by adopting a contract that never ends.  (ECF No. 17.)  That TVA may eventually argue and show that it has not violated the TVA Act is immaterial now, for the Court has to accept Plaintiffs' allegations as true at the motion to dismiss stage.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).  There is also a strong presumption favoring judicial review under the APA.  *See Mach Mining*, *LLC*, 575 U.S. at 486.  So even though TVA has broad *rate-making* authority, it would seem inconsistent for Congress both to forbid TVA from entering into contracts longer than 20 years, while also giving TVA unlimited discretion to set its own contract length.

Simply put, Plaintiffs have alleged that the LTAs contract term violates the TVA Act's prohibition against contracts lasting longer than twenty years.  (ECF No. 17.)  And accepting that allegation as true, the Court finds that it may review whether TVA complied with the TVA Act in setting the LTA length.

### STANDING

The next question the Court has to confront is whether Plaintiffs have standing to pursue these claims, because "'[t]he threshold question in every federal case is whether the court has the judicial power to entertain the suit.'"  *Parsons v. United States Dept. of Just.*, 801 F.3d 701, 709 (6th Cir. 2015) (quoting *Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)).

In considering a motion to dismiss for want of standing "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Id.* at 710 (internal quotation marks omitted) (quoting *Warth*, 422 U.S. at 501).  But it is Plaintiff's burden to establish standing.  *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

I.      **Description of Article III Standing**

First, the Court will consider Article III Constitutional Standing, which requires a plaintiff to show: (1) that she suffered an injury in fact; (2) that the injury is fairly traceable to the conduct of the defendant; and (3) that a favorable court decision will likely redress the injury. *Defs. of Wildlife*, 504 U.S. at 560–61.  And "[w]here, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating each element.'"  *Spokeo, Inc.*, 136 S. Ct. at 1547 (quoting *Warth*, 422 U.S. at 518)).

As for injury, the plaintiff must have suffered an injury in fact "actual or imminent, not conjectural or hypothetical."  *Spokeo*, 136 S. Ct. at 1547; *Defs. of Wildlife*, 504 U.S. at 560–61.  And a "highly speculative fear" of injury is not cognizable.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).  But "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."  *Defs. of Wildlife*, 504 U.S. at 561 (internal quotation marks omitted).  For causation, Plaintiffs must show that the injury is fairly traceable to the challenged action.  *Id.* at 560.  And "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* at 560–61 (internal quotation marks omitted).

Plaintiffs here are all organizations, and organizations may establish standing in two ways.  First, the organization may assert organizational standing "on its own behalf because it has suffered a palpable injury as a result of the defendants' actions."  *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 332–33 (6th Cir. 2002).  Second, an organization may claim standing as a representative of its members who would have standing to sue individually through associational standing.  *Id.* at 333.  Plaintiffs claim both organizational and associational standing.  (*See* ECF No. 17.)

## II.   Description of Prudential Standing

And finally, the Court will also consider prudential standing, which in essence goes a step further and asks *should* the Court exercise jurisdiction.  Under the APA, a party has prudential standing if the agency action adversely affected him or aggrieved him.  5 U.S.C. § 702.  A party is adversely affected or aggrieved if the interest he seeks to protect is "arguably within the zone of interests to be protected or regulated by the statute that he says was violated."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012); *Patel v. U.S. Citizenship & Immigr. Servs.*, 732 F.3d 633, 635 (6th Cir. 2013).  But the Sixth Circuit has explained

> The prudential standing test is not meant to be especially demanding.  Rather, in enacting the Administrative Procedure Act, Congress intended to make agency action presumptively reviewable.  Thus, a plaintiff lacks prudential standing only if his interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.  And because the plaintiff only needs to be arguably within the statute's zone of interests, the benefit of any doubt goes to the plaintiff.

*Patel*, 732 F.3d at 635 (internal citations and quotation marks omitted).

With these standards in mind, the Court will now (1) describe Plaintiffs and their injuries and address Plaintiffs' (2) standing to bring the TVA Act Claim, and (3) standing to bring the NEPA claim.

## III.   Description of Plaintiffs and Their Alleged Injuries

### A.   Protect Our Aquifer

Protect Our Aquifer ("POA") is a Memphis, Tennessee nonprofit that advocates for the protection and preservation of the Memphis Sand Aquifer.  (ECF No. 17 at PageID 1225.)  POA has 13 board members, over 1,000 donors, and a social media page with 3,000 members.  (*Id.*)  And POA's headquarters are in Memphis, where Memphis Light, Gas, & Water ("MLGW")

11

supplies most of the city's power demands. (*Id.* at PageID 1225–26.) MLGW has not yet entered into an LTA with TVA, but it is considering doing so. (*Id.* at PageID 1230.)

     If MLGW signs the LTA, POA asserts the agreement will lead to increased electricity demand. (*Id.* at PageID 1225–1234.) POA's claim is that the LTA locks in demand for TVA power for such a long period that the LTA will inevitably increase demand for TVA electricity. (*Id.*) And TVA currently withdraws large amounts of water from the aquifer to operate its Allen Gas Plant. (*Id.*) POA claims that these aquifer withdrawals will only increase because of the LTA. (*Id.*) This in turn could lower water levels in the aquifer there and add pollution. (*Id.*)

     What is more, POA often participates in the public commenting phase of NEPA assessments and then uses information from NEPA assessments to advocate for their cause. (*Id.*) They allege TVA deprived them of those opportunities by failing to conduct the NEPA assessments. (*Id.*) And they claim that the LTA will lead inevitably to environmental consequences that TVA failed to assess under NEPA. (*Id.*)

     POA includes a Declaration from one of its members, Ward Archer. (ECF No. 17-8.) Mr. Archer expresses that the LTA will likely lead to greater use of the Allen Gas Plant which will increase the depletion and contamination of the aquifer—Archer's source of drinking water. (*Id.*) In other words, POA alleges that the LTA and the lack of NEPA review harms it and its members.

### B.    Energy Alabama

     Plaintiff Energy Alabama is an Alabama nonprofit "advocating for the transition to clean, sustainable energy in Alabama." (ECF No. 17 at PageID 1234.) Energy Alabama has around 400 members, and more than 200 of those members live in areas that TVA serves. (*See id.* at PageID 1234–1235.) Energy Alabama claims the LTAs harm it and its members, because the LTAs are anti-competitive and perpetual. (*Id.* at PageID 1241.) The LTA threatens "to

eliminate any opportunity for Energy Alabama and its members to advocate for . . . more access to solar and distributed resources in the future." (*Id.* at PageID 1238.)  Even more, TVA's failure to perform NEPA reviews, harms them because they often use environmental assessment information to advocate for cleaner energy. (*See id.* at PageID 1234–1238.)

Energy Alabama also attaches Declarations from some of its members.  For example, Daniel Tait believes that through adopting the LTA, TVA is insulating itself from competition with renewable energy. (ECF No. 17-9.)  In turn, this will continue reliance on fossil fuels and will increase air and water pollution in his area. (*Id.*)  And Jonathan Russow competes in triathlons and completes training in the Tennessee River downstream of TVA's Kingston Fossil Plant. (ECF No. 17-10.)  He asserts that the LTA will cause increased pollution where he trains. (*Id.*)  Energy Alabama also has many members who attach Declarations explaining that they installed solar rooftop panels in their homes. (ECF No. 17 at PageID 1239–43.)  But the LTA caps the amount of renewable energy that they can get from other sources to 3 to 5% and "will likely retard the future market for rooftop generated solar energy." (*Id.*at PageID 1240.) Because TVA locks the local utility into a perpetual contract, TVA has no incentive to explore alternative sources of energy.  They assert that the LTA will ultimately diminish the value of their solar panel investments and force them to pay higher prices for a dirtier mix of power that harms the environment. (*Id.* at PageID 1240–41.)

### C.    Appalachian Voices

Plaintiff Appalachian Voices is a nonprofit headquartered in Boone, North Carolina, and its mission is to "protect the land, air, and water of Central and Southern Appalachia" and to advance a transition to clean energy. (ECF No. 70 at PageID 1243.)  Appalachian Voices has over 1,100 members and over 100 of them live in areas that TVA serves. (*Id.*)

Appalachian Voices has a history of participating in the public comment phase of NEPA assessments and then using environmental assessment information to advocate for their mission. (*Id.* at PageID 1243–47.)  They claim TVA deprived them of the opportunity to review and comment on the LTA.  (*Id.*)  What is more, they argue that TVA deprived them of the ability to use NEPA information to assess the LTA's environmental impact and then advocate appropriately.  (*Id.*)  Plaintiff asserts that its members' power bills will increase because of the LTA insulating TVA from competing with cheaper, renewable energy sources.  (*Id.*)  And ultimately, the LTAs will force those members to pay more for dirtier energy.  (*Id.*)

Plaintiff also includes declarations from some of its members explaining how they claim the LTA harms them.  (*Id.* at PageID 1247–51.)  These members live in an area where their local electric company has already signed an LTA.  (*Id.*)  These members wanted the opportunity to participate in NEPA reviews for the LTA.  (*Id.*) And Appalachian Voices member William Kornrich writes a newspaper column about energy issues.  (*Id.*)  He could have used the NEPA information to inform the public about the LTA and to advocate to their local electric cooperative about the LTA's effects.  (*Id.*)  Some of Appalachian Voices' members also have solar rooftop panels and argue that the LTAs will adversely affect those investments.  (*Id.*)

All Plaintiffs assert that the LTA locks in demand for TVA power, which will then lead to more expensive, dirtier energy.  (*See* ECF No. 17.)  And they request that this Court (1) declare that TVA violated the TVA Act and NEPA, (2) find that TVA's conduct violated the APA, (3) enter a judgment setting aside and vacating the LTA and declaring that Section 1 of the LTA is unenforceable, (4) enter a judgment reforming Section 1 of the LTA, (5) enter an injunction preventing TVA from entering into additional perpetual contracts, and (6) enter an injunction requiring TVA to comply with NEPA.  (*Id.* at PageID 1259–60.)

## STANDING FOR TVA ACT CLAIM

For the reasons below, the Court finds that Plaintiffs allege enough to establish standing at this early stage to bring their TVA Act claim.

## I.      Analysis of Article III Standing for TVA Act Claim

For starters, the Court finds that Plaintiffs sufficiently allege Article III standing to bring their TVA Act claim.

To be sure, the Court recognizes Plaintiff's alleged injuries involve some speculation, because it is unclear at this point that the LTA will cause the environmental harms that Plaintiffs[5] allege.  But we are early here.  And at this stage, "general factual allegations of injury resulting from Defendant's conduct may suffice." *Defs. of Wildlife*, 504 U.S. at 561.  What is more, an "attenuated line of causation to the eventual injury" may suffice to satisfy standing at the pleading stage. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688 (1973) (holding that Plaintiffs had standing at the motion to dismiss stage where Plaintiffs alleged a protracted line of causation).

Plaintiffs allege at least three injuries stemming from the LTA's length.  For instance, all three Plaintiffs allege that the LTA inhibits their ability to advocate, because it insulates TVA from competition making TVA and local distributors less willing to engage in meaningful conversation.  (ECF No. 17 at PageID 1257–58.)  They point to the length and the automatic renewal provision of the contract as limiting their ability to advocate.  (*Id.*)

---

[5] And the Court notes that Plaintiff Protect Our Aquifer ("POA"), in particular, has claims that are somewhat speculative.  POA bases its injuries on Memphis Light, Gas, and Water's ("MLGW") relationship with TVA.  (*See* ECF No. 17 at PageID 1230.)  Yet MLGW has not decided whether it will even enter into an LTA with TVA.  (*Id.*)  MLGW is still considering its options.  (*Id.*)  With that in mind, POA's alleged injuries are even further from realization than the other two Plaintiff conservation groups, which have members who live in areas operating under an LTA.  (*See id.* at PageID 1237, 1249.)

Defendant, meanwhile, argues that if Plaintiffs choose not to advocate, that is a choice each organization makes for itself—a self-inflicted injury. (ECF No. 20-1 at PageID 1400.) And Defendant points out that Plaintiffs have not tried to advocate and seen TVA turn them away. (*Id.* at PageID 1399.) Instead, according to Defendant, Plaintiffs speculate that the LTA will impede their advocacy efforts. (*Id.*)

But Plaintiffs counter that they have continued to advocate for cleaner energy and alternatives to the LTAs to no avail. (ECF No. 26 at PageID 2469.) And if the LTAs are indeed never-ending, then what incentive does an entity like TVA have to engage with conservation groups? On the one hand, this argument is somewhat persuasive. But at the same time, just because TVA and the local distributors have not yet given Plaintiffs their desired result, does not stop Plaintiffs from continuing their efforts. This is not the type of concrete injury that standing requires. *See Spokeo*, 136 S. Ct. at 1548.

But another injury that Plaintiffs claim is that the longevity of the allegedly unlawful contract deprives their group members of the opportunity to purchase affordable, renewable energy on a competitive market. (ECF No. 26 at PageID 2469.) This happens when the LTAs lock in a cap on the amount of renewable energy the local distributor can get from other sources. (*Id.*) That, in turn, encourages the local distributor to get electricity from existing fossil fuel sources instead. (*Id.*) Plaintiffs then point to the LTA's caps on renewable energy. (*Id.* at PageID 2469–70.) And given that the contract is never-ending in their view, the caps will perpetually hamper their opportunity to purchase renewable energy for the foreseeable future. (*Id.*) This will then harm the environment and require Plaintiffs to pay more for dirtier energy. (*Id.*)

But Defendant pokes several holes in Plaintiffs' arguments. For one, Defendant counters that Plaintiffs' alleged environmental injuries are speculative. (*See* ECF No. 27 at PageID 2882.)

16

Defendant asserts that Plaintiffs' real gripe is with TVA's power generation choices.  (*Id.*)  And according to TVA, Plaintiffs really seek to force TVA to purchase the type of power that they want it to purchase.  (*Id.*)  In fact, TVA argues that the LTAs do not determine TVA's power sources—instead, the 2019 IRP does.  (*Id.*)  And when TVA adopted the IRP, it performed thorough environmental assessments (in which Plaintiffs participated).  (*Id.*)

What is more, TVA argues that the LTA does the opposite of what Plaintiffs speculate will happen.  To TVA, the LTAs provide greater flexibility for local distributors to generate a portion of their own power from renewable sources.  (*Id.*)  TVA calls the 3 to 5% caps "flexibility agreements," instead of caps.  (*Id.* at PageID 2880.)  TVA also explains that the IRP proposal contemplates moving away from coal-based production towards more renewable options, and so, Plaintiffs merely *fear* that they will pay more for dirtier energy.  (*See* ECF No. 20-1 at PageID 1392.)  But that fear is speculative.  (*Id.* at PageID 1399.)

Again, the Court recognizes that TVA puts forth compelling arguments that may prevail in the end.  But this is a motion to dismiss.  And Plaintiffs' burden to show standing will increase at each successive stage of litigation.  *Defs. Of Wildlife*, 504 U.S. at 561.  For standing,

> each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation . . . At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presume that general allegations embrace those specific facts that are necessary to support the claim."  In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," . . . which for purposes of the summary judgment motion will be taken to be true.  And at the final stage, those facts, (if controverted) must be "supported adequately by the evidence adduced at trial."

*Id.* (internal citations omitted).  So here, Plaintiffs have a lower hurdle to clear.  Accepting their allegations as true, the Court finds that Plaintiffs have alleged enough at this stage.  The real

question is whether, with the benefit of the administrative record, they can put forth enough evidence at the summary judgment stage.

And assuming Plaintiffs can prove that the never-ending nature of the LTA likely causes their injuries, then reforming the LTA could conceivably redress their injuries. *See* 5 U.S.C. § 706 (2)(C) (explaining that a reviewing court will "hold unlawful and set aside agency action . . . found to be in excess of statutory jurisdiction, authority, or limitations"). The Court, then, could conceivably strike an offending provision from the LTA. So here, Plaintiffs claim that the LTAs injure their organizations and their members and that the Court can do something about it. Plaintiffs have alleged enough to get over the Article III standing hurdle. It's not high.

But even though Plaintiffs allege enough for Article III standing, the Court has to consider prudential standing too.

## II. Analysis of Prudential Standing for TVA Act Claim

The question here is whether Plaintiffs fall within the zone of interests of 16 U.S.C. § 831(i)—the TVA Act provision prohibiting contracts longer than twenty years. Plaintiffs argue that their claims are both "economic (more robust market) and democratic (more local control)." (ECF No. 26 at PageID 2471.) And they argue that Congress included the twenty-year limit in the TVA Act to subject TVA to more competition and local decision-making. (*Id.*) Thus, Plaintiffs contend their claims fall within the zone of interests that Congress passed 16 U.S.C. § 831(i) to protect.

By contrast, Defendant argues Plaintiffs are neither parties to the LTA nor third-party beneficiaries, and so, Plaintiffs remain outside the zone of interests. (ECF No. 27 at PageID 2883.) TVA asserts that because Plaintiffs are not signatories to the LTAs, they are trying to enforce the rights of third parties—the local distributors. But Defendant relies on cases that involved non-parties to a contract suing for breach of that contract. *See Cauthen v. TVA, et al.,*

No. CIV 1-87-75 (E.D. Tenn. June 26, 1987) (where the customer of local distributor claimed that TVA was liable for breaching its contract with the local distributor); *JPMorgan Chase Bank, N.A. v. First Am. Title Ins. Co*., 750 F.3d 573, 581–82 (6th Cir. 2014).  The Court therefore finds Defendant's position unpersuasive.  Plaintiffs are not seeking to enforce a contract; instead, they sue under the APA asking this Court to review whether TVA violated the TVA Act.  (*See* ECF No. 17.)

Defendant further argues that when Congress included the twenty-year limit in the TVA Act, it did not have this type of citizen suit in mind.  Instead, Congress imposed the twenty-year contract limit "to provide (1) TVA with necessary security in power demand to invest in its power system and to fulfill its statutory mandates; and (2) TVA's customers with security that they would receive the power for which they contracted."  (*Id*. at PageID 2882–83.)

Defendant cites *Dean v. Herrington*, 668 F. Supp. 646 (E.D. Tenn. 1987), to argue that Plaintiffs do not fall within the zone of interests here.  In *Herrington*, the plaintiffs were local distributors that sought an injunction against the Department of Energy ("DOE").  *Id.* at 648–49. The DOE and TVA entered into a power contract, and the distributors wanted the DOE to fulfill its obligations under the contract.  *Id.*  But the court there explained that those distributors were non-contracting parties and were thus outside the zone of interests of the TVA Act.  *Id.* at 654. The Court stated, "[n]othing in the TVA Act nor its legislative history warrants an inference that Congress intended citizen suits as a tool for enforcing TVA's ratemaking authority."  *Id.*

But this Court sees an important difference between *Herrington* and here.  Again, *Herrington* involved a third party essentially bringing a breach claim on another party's behalf. *See id.*  Plaintiffs here sue over TVA's alleged violation of the TVA Act.  To be sure, environmental plaintiffs often sue under statutes where they fall within the "zone of interests." Take NEPA, for example.  Congress designed NEPA to ensure that federal agencies consider

how their actions may harm the environment.  *See* 42 U.S.C. § 4331.  NEPA stands for the "National Environmental Protection Act."  And given that context, environmental Plaintiffs are expected under NEPA.  But Plaintiffs here present the Court with somewhat of a unique situation.  They sue to enforce a limitation on TVA's contracting power.  Congress created the TVA Act, and its 20-year limit on contracts, in 1933.  16 U.S.C. § 831(i).  So it seems to be a bit of stretch to imagine that Congress had in mind environmental concerns as we understand them today.  But perhaps it was thinking of customers.

But even so, prudential standing is not "especially demanding."  *Patel*, 732 F.3d at 635; *see Patchak*, 567 U.S. at 224.  And because Plaintiffs need only fall "arguably" within the zone of interests, any doubt should be construed in their favor.  *Patchak*, 567 U.S. at 225.  Is it at least arguable that conservations groups are proper plaintiffs to sue over the TVA Act?  The Court finds that it is.

Congress, in part, adopted the TVA Act to provide a better quality of life for people in the Tennessee Valley by using the Valley's resources.  (*See* ECF No. 201-1 at PageID 1391 (stating, "TVA is responsible for the multi-purpose development of the Tennessee Valley's resources and economy.").)  And Plaintiffs argue that Congress included the twenty-year limit to "constrain TVA's monopoly power by subjecting TVA to competition in the energy market and periodic local decision-making."  (ECF No. 26 at PageID 2471.)  In turn, Plaintiffs assert environmental interests including a "more robust market" and "more local control."  (*Id.*)  As a result, they argue their interests "fall squarely within the zone of interests" protected by the twenty-year limit.  (*Id.*)  And given that the benefit of the doubt goes to Plaintiffs, the Court sees no compelling reason to question Plaintiffs' logic now.  *See Patchak*, 567 U.S. at 225.  The Court agrees that Plaintiffs' interests are "arguably" within the zone of interests.  Plaintiffs thus have prudential standing to bring their TVA claim.

20

**STANDING FOR NEPA CLAIM**

For Plaintiffs' NEPA claim, the Court finds that they have alleged enough to establish standing at this stage.

## I.     NEPA Background

First, "NEPA is a procedural statute 'designed to ensure that federal agencies consider the environmental impact of their actions.'"  *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 968 (6th Cir. 2009) (quoting *State of Mich. v. United States*, 994 F. 2d 1197, 1199 (6th Cir. 1993)).  To accomplish that goal, NEPA requires that federal agencies prepare an EIS when they undertake "major federal actions significantly affecting the quality of the human environment." *Id.* (citing 42 U.S.C. § 4332(2)(C)).  And the purpose of this requirement guarantees "that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA "gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process . . . and, perhaps more significantly, provides a springboard for public comment."  *Id.*

And "NEPA does not authorize a private right of action, but judicial review is granted through the APA."  *Friends of Tims Ford*, 585 F.3d at 964.  Plaintiffs here sue under the APA alleging that TVA should have conducted NEPA review before adopting the LTA but failed to do so.  (ECF No. 17 at PageID 1252.)  Plaintiffs claim that this failure injures them in at least three ways.  First, the LTA (and TVA's decision not to vet it through an EIS) will ultimately harm the environment, because it increases and lengthens TVA's reliance on fossil fuels while decreasing or limiting opportunities for consumers to buy renewable energy.[6]  (*See* ECF No. 26

---

[6] And Plaintiff organizations attached Declarations from some of their members alleging environmental harms from the LTA.  (*See* ECF Nos. 17-9 & 17-10.)

at PageID 2477.)  Plaintiffs claim they allege a straightforward chain of causation—the LTA is

an

> anticompetitive program [that] has a direct effect on the demand for TVA's power,
> and therefore on the operation of its grid including the Allen gas plant in Memphis
> and the Kingston Fossil Plain in Harriman, Tennessee.   Conservation Groups
> further allege that their environmental injuries are caused by the Never-ending
> Contract program because that program, through its restrictive caps on distributed
> solar, has a direct effect on their ability to access or purchase renewable power,
> including from solar panels already installed on their members' own homes.

(*Id.*)

Second, Plaintiffs assert that TVA deprived them of the opportunity to participate in the

NEPA public comment phase—an important part of their organizational missions.  (*Id.* at

PageID 2479–80.)  And third, Plaintiffs often use information from NEPA assessments to

advocate, and TVA deprived them of access to that information.  (*Id.*)

What is more, Plaintiffs give examples of how some of their individual members also use

NEPA information.  For example, William Kornrich of Appalachian Voices writes a regular

column about his local power distribution in his local newspaper.  (*Id.* at PageID 2481.)  Mr.

Kornrich would have participated in the public comment phase and used the EIS information to

advocate through his column.  (*Id.*)

But TVA argues that Plaintiffs fail to show standing to bring their NEPA claim.  (ECF

No. 20-1 at PageID 1402.)  TVA argues that there is nothing to support Plaintiffs' claims that the

"LTAs will result in an increased reliance on fossil fuels."  (*Id.*)  And so Plaintiffs' alleged

environmental harm is conclusory and speculative.  (*Id.* at PageID 1403.)  And as for Plaintiffs'

alleged informational injury, TVA argues that under NEPA, "informational injury alone is not a

basis for standing."[7]  (*Id.* at PageID 1404.)  Besides, TVA notes that Plaintiffs' only interest is in

---

[7] TVA also points out that in 2019 it conducted an IRP, and for that endeavor, it did prepare an
EIS and the Flexibility EA.  (ECF No. 20-1 at PageID 1407.)  And Plaintiffs participated in those

seeing that TVA complied with NEPA.  (*Id.* at PageID 1405.)  And that is not enough to confer

standing.  (*Id.* (citing *Heartwood, Inc. v. U.S. Forest Serv.*, No. 1:00–CV–683, 2001 WL

1699203, at *10 (W.D. Mich. Dec. 3, 2001)).)

For the reasons below, the Court finds that Plaintiffs have sufficiently alleged standing to

bring their NEPA claim.

## II.    Analysis of Article III Standing for NEPA Claim

Again, Plaintiffs must allege injury, causation, and redressability to establish Article III

Standing.  The Court finds that Plaintiffs satisfy those requirements for their NEPA claim.

### A.    Injury

As for environmental injury, the Court recognizes that Plaintiffs base their alleged

environmental harms on a bit of speculation at this point, but that is not necessarily fatal at the

motion to dismiss stage.  *See Ctr. for Biological Diversity v. Tenn. Valley Auth.*, No. 3:18-CV-

1446-LCB, 2019 WL 12070340, at *4 (N.D. Ala. Aug. 26, 2019) (holding that plaintiffs had

standing to bring NEPA claim at motion to dismiss stage, despite some speculation).[8]

At this early stage, "general allegations that embrace those specifics that are necessary to

support the claim," are enough, and Plaintiffs have done that here.  *Defs. of Wildlife*, 504 U.S. at

561.  They allege that the LTAs will lock in demand for fossil fuels indefinitely while "limiting"

---

reviews.  (*Id.* at PageID 1389.)  And TVA argues that the IRP governs its power generation
decisions—not the LTA.  (*Id.* at PageID 1407.)

[8] Defendant cites *Florida Audubon Soc'y v. Bentsen*, 94 F. 3d 658 (D.C. Cir. 1996), to argue that
Plaintiffs have too many links in their chain of causation to support standing.  (ECF No. 20-1 at
PageID 1406.)  But in *Ctr. For Biological Diversity*, the court distinguishes *Bentsen*, because
that court was ruling on a summary judgment motion and not a motion to dismiss.  2019 WL
12070340, at *4 (stating, "*Bentsen* is distinguishable because the court in that case was
reviewing the district court's decision to grant summary judgment.  Thus, the standard of review
was different in *Bentsen* than it is in the present case.").  So too here.

access to clean sources of power. (ECF Nos. 17 & 26.) Plaintiffs focus on the practices of power plants located in their communities. And they include declarations from individual organization members explaining how they claim fossil fuels affect them. (*See, e.g.*, ECF Nos. 17-10 & 17-14.) They allege that TVA's failure to comply with the procedural requirements of NEPA will harm the environment and, in turn, will harm them and their members. (ECF Nos. 17 & 26.) That is enough for now. But the burden on Plaintiffs will increase as this case moves ahead.

The Court also finds that Plaintiffs have successfully alleged an informational injury. Plaintiffs show a concrete and particularized informational injury where Plaintiffs allege that they (1) have been "deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) [they suffer] by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).

For the first prong, Congress adopted NEPA in part to ensure that a wider, public audience had access to environmental information and could participate in the decision-making and implementation processes. *Robertson*, 490 U.S. at 349. And Plaintiffs allege that NEPA required TVA to conduct an EIS before adopting the LTA, and it did not do so. (ECF No. 17 at PageID 1221.) Because the Court must take Plaintiffs' allegations as true at this stage, that TVA may later argue and show that it did not have to conduct an EIS in this situation is immaterial at the motion to dismiss stage. Plaintiffs have alleged that TVA violated NEPA and that TVA deprived them of information that NEPA required it to provide.

Second, Plaintiffs claim they will suffer environmental harm, because TVA did not properly vet the environmental effect of the LTA. (*See id.* at PageID 1221–1222.) And they claim that they would have participated in the public phase of the EIS and then used the EIS

information to advocate.  (*Id.* at PageID 1254.)  Plaintiffs often engage in NEPA assessment

preparation and could not do so here.  (*See id.*)  And Congress no doubt wanted community

members that may suffer environmental harm from an agency decision to have the opportunity to

participate in EIS preparation.  *See Robertson*, 490 U.S. at 349.  Based on Plaintiffs' allegations,

TVA deprived them of that opportunity here, and this is evidently the type of harm Congress

intended to prevent in adopting NEPA.

   TVA notes that these Plaintiffs did participate in NEPA review during the IRP process

and that is all NEPA requires.  (*See* ECF No. 20-1.)  This argument may have merit as the case

moves ahead.  But right now, Plaintiffs have done enough.  Plaintiffs therefore successfully

allege an informational injury.

   **B.**  **Causation**

   The Court also finds that Plaintiffs successfully allege causation.  Plaintiffs contend that

TVA's failure to conduct NEPA assessments inflicted a procedural injury and that TVA's failure

will lead to environmental damage.  (*See* ECF No. 26 at PageID 2477.)  They claim that TVA's

adopting the LTA had its intended effect—"it permanently locks in TVA's distributors and load,

with all of the environmental consequences of the operation of TVA's system."  (*Id.*)  Later

down the road, Plaintiffs will have to prove each link in their chain of causation.  *See Ctr. For*

*Biological Diversity*, 2019 WL 12070340, at *4.  But here, the Court accepts their allegations as

true and finds that Plaintiffs' complaint alleges enough facts that, if true, show causation.

   **C.**  **Redressability**

   And finally, "a litigant to whom Congress has accorded a procedural right to protect his

concrete interest… can assert that right without meeting all the normal standards for

redressability and immediacy."  *Massachusetts v. E.P.A.*, 549 U.S. 497, 517-18 (2007) (internal

citations omitted).  What is more,

> When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury causing party to reconsider the decision that allegedly harmed the litigant. NEPA compliance presumptively reduces the threat of environmental harm by increasing the chance that the government will modify—even slightly—its actions if it understands the nature and magnitude of that harm, and that is all the redressability prong requires.

*Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 586 (6th Cir. 2014) (Stranch, J., concurring) (internal citations and quotations omitted). Assuming Plaintiffs prove their case, their alleged injuries are precisely the type this Court could redress by requiring TVA to comply with NEPA.

## III.    Analysis of Prudential Standing for NEPA Claim

The Court holds that Plaintiffs also have prudential standing, because they are organizations that advocate to protect the environment. This work is at the heart of NEPA's purpose. *See* 42 U.S.C. § 4332. Congress created NEPA to ensure that agencies assess how their decisions will impact the environment. *Robertson*, 490 U.S. at 349. And Congress designed it to allow the public to participate in the process. *See id.* Plaintiffs allege that the LTAs will inevitably harm their environments and that TVA should have conducted NEPA review to evaluate the potential environmental harm. (*See* ECF Nos. 17 & 26.) And as organizations (with members) who seek to advocate about environmental issues in TVA's service area, Plaintiffs might be within NEPA's zone of interests. The Court will not deny standing based on prudential concerns at this early stage.

In the end, the Court **DENIES** TVA's motion to dismiss Plaintiffs' NEPA claim.

## <u>CONCLUSION</u>

In sum, the Court **DENIES** Defendant's motion to dismiss for both the TVA Act and

NEPA claims.

**SO ORDERED**, this 12th day of August, 2021.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE