UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

PROTECT OUR AQUIFER,
ENERGY ALABAMA, and
APPALACHIAN VOICES,
Plaintiffs,

v.

TENNESSEE VALLEY AUTHORITY,
Defendant.

No. 2:20-cv-02615-TLP-atc
(Oral Argument Requested)

---

**TENNESSEE VALLEY AUTHORITY'S STATEMENT OF UNDISPUTED MATERIAL FACTS FROM THE ADMINISTRATIVE RECORD AND/OR THAT ARE SUBJECT TO JUDICIAL NOTICE**

---

David D. Ayliffe,
Director, Litigation
Steven C. Chin
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.8964
ddayliffe@tva.gov
scchin@tva.gov

Attorneys for Tennessee Valley Authority

Pursuant to the Court's Order Modifying Case Deadlines and Extending Summary Judgment Page Limits (Doc. 70) and in accordance with Federal Rule of Civil Procedure 56 and Local Rules 7.2 and 56.1, Defendant Tennessee Valley Authority ("TVA") respectfully submits its Statement of Undisputed Material Facts from the Administrative Record and/or that are Subject to Judicial Notice in support of TVA's Motion to Dismiss the Amended Complaint for Lack of Subject Matter Jurisdiction or for Summary Judgment on Plaintiffs' Administrative Procedure Act claims.

## The Tennessee Valley Authority

1. TVA is a wholly-owned executive branch corporate agency and instrumentality of the United States created by and existing pursuant to the TVA Act of 1933, 16 U.S.C. §§ 831–831ee.

2. TVA is responsible for the multi-purpose development of the Tennessee Valley region's resources and economy. *See* 16 U.S.C. §§ 831, 831d, 831dd.

3. One of TVA's "primary objectives" under the TVA Act is to supply electric power "at rates as low as are feasible." 16 U.S.C. §§ 831d(f), (*l*), 831j, 831n-4(f), (h).

4. TVA has built, maintains, and operates the nation's largest public power system delivering electric power to 10 million people in TVA's seven-state service area. (TVA, Fiscal Year 2021 Annual Report (Form 10-K) at 9–10 (Nov. 15, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/1376986/000137698621000028/tve-20210930.htm) ("TVA 2021 Form 10-K") (cited excerpts included as Attach. 1 hereto).[1]

---

[1] Pursuant to Federal Rule of Evidence 201(b)(2) and (d), TVA respectfully requests that the Court take judicial notice of its 2021 Form 10-K, which has been filed with the Securities and Exchange Commission. "The court may take judicial notice at any stage of the proceeding," Fed. R. Evid. 201(d), and TVA's 2021 10-K is a matter of public record of which the Court may take judicial notice. *See Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360–61 (6th Cir. 2001)

5. TVA's power portfolio includes a diverse array of generating assets that are dynamic and adaptable, and in recent years, TVA's "emphasis has moved away from traditional coal-based production and toward cleaner forms of power generation." TVA, *Our Power System*, https://www.tva.com/energy/our-power-system (last visited Oct. 5, 2022) (Attach. 2).[2]

6. TVA has reduced carbon emissions 63 percent below its 2005 baseline; 56 percent of the current generation mix is carbon-free. TVA, 2021 Annual Report at 3, 20, https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/annual-report/fy21/fy21-tva-annual-reportf0b7c813-3280-43f4-82a3-efa25ec69f14.pdf?sfvrsn=8a476ce8_3 ("TVA 2021 Annual Report") (cited excerpts included as Attach. 3 hereto).[3]

7. TVA has stated publicly that it is on track to reduce its carbon emission rates 70 percent by 2030 compared to 2005 levels. (*Id.* at 20.)

---

(noting that judicial notice extends to "the full text of SEC filings"). Courts may take judicial notice of facts from "public records and government documents available from reliable sources on the Internet." *U.S. ex rel. Dingle v. BioPort Corp.*, 270 F.Supp. 2d 968, 972 (W.D. Mich. 2003), *aff'd sub nom. Dingle v. Bioport Corp.*, 388 F.3d 209 (6th Cir. 2004).

[2] The Court may take judicial notice of the information on TVA's website. *See New England Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003); *see also Mitchell v. TVA*, No. 3:14-cv-360-TAV-HBG, 2015 WL 1962203, at *4 & *4 n.2 (E.D. Tenn. Apr. 30, 2015) (taking judicial notice of TVA's website); *see also Mayberry v. Univ. of Kentucky Med. Ctr.*, 39 F. Supp. 3d 872, 875 (E.D. Ky. 2014) ("The Court takes judicial notice of records and information located on government websites because they are self-authenticating under Federal Rule of Evidence 902.") (internal citations omitted).

[3] TVA's 2021 Annual Report also is subject to judicial notice. *See supra* nn. 1–2; *see also U.S. ex rel. TVA vs. Two Tracts of Land, in Logan Cnty., Ky.*, 246 F. Supp. 263, 269 (W.D. Ky. 1965) ("The basic facts as to the activities of TVA, including the development of its power program and other statutory programs, are matters of public record and common knowledge; they are contained in TVA's annual reports to Congress and are judicially known to the Court."), *aff'd*, 375 F.2d 120 (6th Cir. 1967).

**The LPCs and the Wholesale Power Contract**

8. TVA is primarily a wholesaler of electric power to 153 non-profit LPCs—municipalities and other local government entities and customer-owned cooperatives— which distribute that power to their retail customers.[4] (Attach. 1, TVA 2021 Form 10-K, at 9–10.)

9. In 1934, TVA reported to Congress that a "20-year contract was devised to govern the sale of power at wholesale to municipal distribution systems" for the distributor's "entire power requirements." (1934 Annual Report, Doc. 20-9 at PageID#2188).[5]

10. For nearly 90 years, TVA has supplied the LPCs "entire power requirements" (*id.*) under standard 20-year wholesale power contracts (the "Power Contract")—since 1934 with Athens, Alabama ("Athens") (*id.* at PageID#2190); since 1938 with Cumberland Electric Membership Corporation ("Cumberland") (Supp. AR 58 at 4186, 4287–90 (Attach. 4)); since 1940 with Huntsville, Alabama ("Huntsville") (*id.* at 4186, 4216–31); and since 1945 with Powell Valley Electric Cooperative ("Powell Valley") (Supp. AR 59 at 4638, 4692–704 (Attach. 5)).

11. Since 1934, the Power Contract has been renewed and/or amended hundreds of times—100 amendments for Athens; 197 amendments for Cumberland; 154 amendments for Huntsville; and 90 amendments for Powell Valley Electric Cooperative. (*See generally* Athens LTA, Second Supp. AR Doc. 20 at 8741 (Attach. 6); Cumberland LTA, Second Supp. AR 85 at

---

[4] TVA also sells electric power directly to industrial customers with large or unusual loads and to several federal agency installations. (TVA 2021 Form 10-K, at 9–10.)

[5] TVA's 1934 Annual Report is part of the Administrative Record (Second Supp. AR No. 235 at 9822) and is also part of the Court's CM/ECF record. Where a cited document is available in both the Court's CM/ECF record and the Administrative Record, the text citation is to the document ("Doc.") and page ("PageID#") number in the Court's CM/ECF record. TVA has lodged the Administrative Record in three parts with corresponding indices. Citations to the Administrative Record contain the following information: (1) Administrative Record index designator ("AR", "Supp. AR", or "Second Supp. AR"); (2) Administrative Record document number; and (3) Administrative Record page number.

3

9130 (Attach. 7); Huntsville LTA, Second Supp. AR 45 at 8890 (Attach. 8); Powell Valley LTA, Second Supp. AR 125 at 9364 (Attach. 9).)

12.     Around 1989, the Power Contract was amended to include automatic renewal and termination notice provisions. (TVA Bd. Mtg. Mins. (Sept. 27, 1989), Doc. 33-11 at PageID#3448; Mem. Request for Board Approval – Proposed Growth Credit For New and Expanding General Power Customers (Sept. 12, 1989), Doc. 33-12 at PageID##3449-453; *see also* Athens Supp. 16 (Oct. 1, 1989), Second Supp. AR 240 at 10005 (Attach. 10); Cumberland Supp. 45 (Oct. 1, 1989), Supp. AR 68 at 6444 (Attach. 11); Huntsville Supp. 17 (Oct. 1, 1989), Supp. AR Doc. 69 at 6469 (Attach. 12); Powell Valley Supp. 17 (May 1, 1992), Supp. AR 70 at 6491 (Attach. 13).)

13.     The "initial term of 20 years" has been part of the Power Contract since at least 1989. (*Compare* Athens Supp. 16, Second Supp. AR 240 at 10005 (Attach. 10), *with* Athens LTA, Second Supp. AR 20 at 8741 (Attach. 6).)

**Least Cost Planning and TVA's 2019 Integrated Resource Plan**

14.     The TVA Act, as amended by the Energy Policy Act of 1992, requires TVA to employ a "least-cost planning" process for selecting "new energy sources" 16 U.S.C. § 831m-1(b)(1), and TVA implements the least-cost planning mandate through its Integrated Resource Plan(s), *see Ky. Coal Ass'n, Inc. v. TVA*, 804 F.3d 799, 801–02 (6th Cir. 2015).

15.     TVA's 2019 Integrated Resource Plan ("2019 IRP") "is a long-term plan that provides direction on how TVA can best meet future demand for power" for a twenty-year period. (TVA, 2019 Integrated Resource Plan, Doc. 33-14 at PageID#3496.)

16.     The 2019 IRP "evaluate[ed] TVA's current energy resource portfolio and alternative future portfolios of energy resource options to meet the future electrical energy needs of the TVA region at a least system-wide cost while taking into account TVA's mission of energy, environmental stewardship and economic development." (Doc. 33-14 at PageID#3523.)

4

17. One of the primary purposes of the 2019 IRP was "to determine the optimal mix of resources to supply the power the Tennessee Valley region will need over the 2019 to 2038 study period." (*Id.* at PageID#3540.)

18. TVA prepared an Environmental Impact Statement ("EIS") in connection with the 2019 IRP. (2019 IRP EIS, Docs. 33-18 to 33-25.)

19. The 2019 IRP EIS stated that "[t]he IRP will serve as a roadmap for meeting the energy needs of TVA's customers over the next 20 years," and for that twenty-year period, the IRP and the EIS "address[ed] the demand for power in the TVA service area, the resource options available for meeting that demand, and the potential environmental, economic and operating impacts of these options." (Doc. 33-18 at PageID#3796.)

20. Regarding power demand, the 2019 IRP base case applied a planning reserve margin constraint (as did the other strategies evaluated in the IRP), "represent[ing] the minimum amount of capacity required to ensure reliable power" for all TVA customers, including all 153 LPCs, during the twenty-year planning period evaluated in the IRP. (*Id.* at PageID#3501; *see also* Power Supply Flexibility Proposal Final Environmental Assessment ("Flexibility EA") (June 2020), Doc. 33-28 at PageID##4301–03, 4307–10.)

21. The IRP base case served as the NEPA No-Action Alternative (2019 IRP EIS, Doc. 33-18 at PageID#3782), "represent[ing] the continued implementation of the 2015 IRP" and "the continuation of TVA's current power supply planning (*id.* at PageID##3822–23).

22. For the IRP base case, which accounted for reserve margins necessary to provide reliability for all customers during the twenty-year evaluation period (*id.* at PageID#3826), the EIS studied the environmental impacts of the base case and its associated power supply portfolios. (2019 IRP EIS, Doc. 33-21 at PageID#3946.)

5

23.     The IRP base case also incorporated TVA's decision to retire Paradise Fossil Plant Unit 3 in 2020 and Bull Run Fossil Plant in 2023. (*Id.* at PageID#3965.)

24.     The 2019 IRP EIS noted that, under every alternative strategy including the base case, "TVA would continue to operate most of its existing generation units for the duration of the 20-year planning period," except for the coal plants/units and older gas units that would be retired. (2019 IRP EIS, Doc. 33-22 at PageID#3994.)

25.     The energy resource options for the preferred alternative studied in the EIS "include[d] continued investment in TVA's hydroelectric resources, license renewal for nuclear resources, expansion of solar and natural gas-fired generation, increased energy efficiency, demand response, and energy storage, and decreased coal-fired generation." (*Id.*)

26.     The TVA Board approved the 2019 Final IRP and EIS in August 2019. (Doc. 17-4 at PageID##1292–94.)

27.     On September 17, 2019, TVA published the Record of Decision announcing TVA's adoption of the preferred alternative, Target Power Supply Mix, studied in the 2019 IRP EIS, which "will guide TVA's selection of energy resource options to meet the energy needs of the Tennessee Valley region over the next 20 years." 84 Fed. Reg. 48987 (Sept. 17, 2019).

28.     The Record of Decision states that the 2019 IRP is the basis for TVA's "energy resource strategies that will meet demand for electricity in its service area over a 20-year planning period." *Id.*

**The Long-Term Agreement's Amendment of the Power Contract**

29. In the spring of 2019, TVA's Senior Vice President of Commercial Energy Solutions, Doug Perry, led a team responsible for developing terms for a long-term partnership proposal. (Perry Decl., Supp. AR Doc. 18 ¶¶6-7 (Attach. 14). [6])

30. In June 2019, Mr. Perry prepared an update for the TVA Board on the status of the long-term partnership proposal ("Board Update"). (*Id.* ¶ 9.)

31. The Board Update summarized the key details of the proposal, including the amendment to the "existing evergreen contract to extend [the] termination notice period to 20 years" with "no change to the underlying full requirements provision," a 3.1% partnership credit for participating LPCs, and TVA's "commit[ment] to explore additional power supply flexibility for" LPCs. (*Id.* at 3585.)

32. The Board Update identified the principal assumptions underlying the proposal, including no base rate increases through 2030, the 3.1% bill credit, holding future strategic capital (new debt) consistent with the FY20 Power Supply Plan, maintaining a targeted cash balance of $300 million, and maintaining TVA's pension and asset trust contributions. (*Id.* at 3587.)

33. The Board Update outlined the proposal's anticipated financial impacts for TVA, including better alignment of TVA's amortization of total financing obligations with partner commitments, improvement of TVA's net portfolio position by aligning committed revenue to

---

[6] Where available and practical, pinpoint citations are to the paragraph(s) in the source document; however, where citation to a paragraph is not possible or would be confusing, pinpoint citations are to the source document's Administrative Record page number or CM/ECF PageID number.

TVA's total financial obligations, and achievement of TVA's FY23 strategic debt reduction goal.[7] (*Id.* at 3588–3591.)

34. By July 2019, the proposal had crystallized into the terms of a standard long-term agreement ("LTA"). (Meade Decl. & Attach. 1, Supp. AR Doc. 17 at 3550–57 (Attach. 15).)

35. TVA management recommended to the TVA Board's Finance Committee that the TVA Board approve offering the LTA to LPCs as an amendment to the Power Contract because the LTA represented an opportunity to strengthen the Valley Public Power Model and would be benefit to the TVA system's financial profile, which could be shared with participating LPCs. (*Id.* at 3554–57.)

36. At the August 22, 2019 TVA Board meeting, TVA's Chief Executive Officer, Jeff Lyash, identified three elements that would set TVA's direction for the future: the IRP, the 10-year financial plan, and the long-term partnership proposal. (Aug. 22, 2019 Bd. Mtg. Tr., Supp. AR 1 at 1558 (Attach. 16).)

37. Mr. Lyash stated that, while working on the 10-year financial plan, it became clear that TVA needed a more collaborative partnership with LPCs, which resulted in the long-term partnership proposal. (*Id.* at 1561–62.)

38. Mr. Lyash stated that the proposal would better align the decision timeframes for TVA's generation assets, "which are 20, 30, 40, year decisions, with the contract terms we have with our LPCs," and would position TVA to hold rates flat, provide more LPC engagement in TVA's power supply planning process, and enable TVA to offer more flexibility to LPCs. (*Id.*)

---

[7]  TVA committed to the Office of Management and Budget to reduce TVA's debt to $21.8 million by 2023. (Aug. 22, 2019 Bd. Mtg. Tr., Supp. AR 1 at 10 (Attach. 16); Aug. 22, 2019 Bd. Mtg. Tr. & Slides, Supp. AR 3 at 2 (Attach. 17).)

39. After the CEO's presentation, TVA's Chief Financial Officer, John Thomas, updated the Board on the 10-year financial plan explaining TVA's responsibility to balance its debt and 20 to 30-year generation asset commitments with revenue commitments sufficient to satisfy those obligations, and he explained how "this was the genesis of the long-term partner proposal." (Aug. 22, 2019 Bd. Mtg. Tr. & Slides, Supp. AR 3 at 1625–28 (Attach. 17).)

40. Slides 77 and 78 from the presentation at the August 22, 2019 TVA Board Meeting are provided below (Doc. 33-4 at PageID##3336-337):





41.     After the CFO's presentation, Mr. Perry presented the long-term partnership option for Board approval as an opportunity to strengthen the Valley Public Power Model; which is defined by TVA's relationships with LPCs, not shareholder interests or profits; and which utilizes the scale and resiliency of TVA's transmission system to attract economic development and to create jobs; and which, ultimately, seeks to improve the quality of life in the Tennessee Valley region. (Aug. 22, 2019 Bd. Mtg. Tr. & Slides, Supp. AR 3 at 1648-49, (Attach. 17).)

42.     Mr. Perry explained that one of the key influences for the proposal was the LPCs' interest in strengthening the Valley Public Power Model through long term rate stability, flexibility to meet changing customer needs, and opportunities for LPCs to participate in TVA's strategic planning decisions. (*Id.*)

43.     The TVA Board approved the implementation of a standard long-term agreement consistent with certain identified Standard Elements and authorized the CEO to offer the LTA to interested LPCs. (Doc. 33-5 at PageID##340–02; Doc. 33-6 at PageID##3414–23.)

44.     In the TVA Board's judgment, the LTA presented an opportunity to secure the long-term success of the Valley Public Power Model by ensuring that TVA has the revenue to satisfy its long-term obligations, providing TVA with more certainty in its long-term generation and financial planning decisions, sharing the benefits of that enhanced certainty with LPCs in the form of a 3.1% monthly bill credit, and helping TVA fulfill its statutory obligation to sell power at rates as low as feasible. (TVA Bd. Mtg. Mins. (Aug. 22, 2019), Doc. 33-5 at PageID##3401–02.)

45.     One of the key elements of the LTA was the amendment of the termination notice requirement in a participating LPC's existing evergreen Power Contract "to establish a 20-year term and termination notice requirement." (Doc. 33-6 at PageID#3416).

46.     The TVA Board concluded that these amendments would carry out the purposes of the TVA Act by "helping fulfill TVA's statutory obligation to sell power at rates as low as are feasible." (Doc. 33-5 at PageID#3401.)

47.     The LTA amended the Power Contract by replacing "[t]he section of the Power Contract entitled 'Term of Contract'" to include amended automatic renewal and termination notice provisions. (*E.g.*, Athens LTA, Second Supp. AR 20 at 8741 (Attach. 6).)

48.     This amendment changed the trigger date for the automatic renewal provision and extended the termination notice period to twenty years ("the LTA Amendments"). (*Compare id.*, *with* Athens Supp. 85 (Dec. 16, 2015), AR 242 at 10029 (Attach. 18), *with* Athens Supp. 38 (Oct. 1, 1997), Second Supp. AR 241 at 10026 (Attach. 19), *with* Athens Supp. 16 (Oct. 1, 1989), Second

11

Supp. AR 240 at 10005 (Attach. 10), *and* Athens Power Contract, Second Supp. AR 239 at 9980 (Attach. 20).)

49. The automatic renewal provision triggers an evergreen "1-year renewal term," and the LTA amended the trigger date for the automatic renewal from the tenth anniversary of the Power Contract's effective date to the first anniversary of the Power Contract's effective date. (*Compare* Athens LTA, Second Supp. AR 20 at 8741 (Attach. 6), *with* Athens Supp. 16 (Oct. 1, 1989), Second Supp. AR 240 at 10005 (Attach. 10).)

50. Before the LTA, "the weighted average length of the termination notice required under" the Power Contract before the LTA was "less than 7 years." (Doc. 33-5 at PageID#3401.)

51. As amended by the LTA, the Power Contract's termination notice period is extended to 20-years. (Doc. 33-6 at PageID#3416; *see generally* Athens LTA, Second Supp. AR 20 at 8741 (Attach. 6).)

52. As of October 2022, 147 out of 153 LPCs have signed the LTA. (Second Supp. AR Doc. Index, Doc. 71-2 at PageID##5389–5403).[8]

53. Since August 2019, there have been no changes to the LTA Amendments in the Notice of Termination section of the Power Contract. (*Compare* Doc. 33-6 at PageID#3419, *with* Jackson Energy Authority LTA (Nov. 19, 2021), Second Supp. AR 104 at 9242 (Attach. 22).)

54. TVA has returned over $500 million in bill credits to LPCs participating in the LTA through June 30, 2022.

      a. $14 million for the year ending on September 30, 2019.
      b. $163 million for the year ending on September 30, 2020.
      c. $189 million for the year ending on September 30, 2021.

---

[8] On September 7, 2022, after TVA lodged the Second Supplemental Administrative Record, Gibson Electric Membership Corporation became the 147th LPC to sign the LTA. https://www.wbbjtv.com/2022/09/07/gibson-emc-board-resolves-to-sign-long-term-contract-with-tva/ (last visited October 5, 2022) (Attach. 21).

    d.  $141 million for the nine months ending on June 30, 2022.

(TVA 2021 Form 10-K at 138 (Attach. 1); TVA, Quarterly Report (Form 10-Q) (August 2, 2022) ("August 2022 Form 10-Q") at 40, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001376986/000137698622000014/tve-20220630.htm (cited excerpts included as Attach. 23 hereto).)

### TVA's NEPA Determinations Related to the Long-Term Agreement
### The NEPA Memorandum

55. In June 2019, before the LTA was submitted for TVA Board consideration, TVA's Vice-President of Pricing & Contracts, Cassidy Larson, requested that TVA's Senior NEPA Specialist, Matthew Higdon, "determine whether the [long-term partnership proposal] was subject to review under NEPA." (Higdon Decl., Supp. AR 4 at 1654 (Attach. 24).)

56. Mr. Larson and Mr. Higdon discussed the proposal, and Mr. Higdon learned "that the LTP Proposal would result in 'literally no change at all' to TVA's load and "[n]o change in [TVA's] generation mix." (*Id.*; *see also id*. at 1659.)

57. In August 2019, Mr. Higdon prepared a memorandum after "discuss[ing] the proposal at length with" TVA's Pricing and Contracts organization, TVA's Enterprise Planning organization, and TVA's Office of the General Counsel ("NEPA Memo"). (NEPA Mem., Doc. 33-26 at PageID##4234–35; Higdon Decl., Supp. AR 4 at 1654 (Attach. 24).)

58. As referenced in the NEPA Memo, the proposed action was an amendment to the automatic renewal and termination notice provisions in the existing Power Contract. (Doc. 33-26 at PageID#4234.)

59. As summarized in the NEPA Memo, TVA's NEPA Program determined that the proposal was "not subject to review under NEPA" because "[t]he proposal would not result in any impacts to the physical environment and would not have any effect on growth of [distributed

13

energy resources]. In essence, the proposal would not change the 'environmental status quo.'" (*Id.* at PageID##4235–36.)

60. Specifically, the NEPA Memo concluded:

- "[T]he proposal would have no effect on TVA's generation portfolio mix since the lengthening of the contract period (from the present 5-year term to a 20-year term) would have the effect of continuing the 'environmental status quo' for which review under NEPA is not required since current environmental conditions would continue under the proposal without change."

- "[T]he proposal would not result in any physical environmental impacts."

- TVA's IRP "already incorporate[s] the assumption of serving LPC electricity demand for 20 years regardless of the actual level of commitment under the" Power Contract.

- "[T]he lengthening of the contract to a 20-year term . . . would still be within the analytical boundaries of . . . the 2019 Integrated Resource Plan review. This further reaffirms the nature of the LTP Proposal as one that involves an 'environmental status quo' situation from a NEPA perspective."

(*Id.* at PageID#4235.)

61. The NEPA Memo stated that TVA's NEPA Program developed these supporting facts as part of its effort "to gain a full understanding of the proposal and of any potential environmental effects of the proposal" and "to learn more about its potential to affect TVA's generation portfolio mix or to impact the environment." (*Id.* at PageID##4234–35.)

### The Power Supply Flexibility Option and Environmental Assessment

62. Another key element of the LTA (Doc. 33-6 at PageID#3417) was TVA's "commit[ment] to develop, by a specified date, an option for power supply flexibility for [LPCs] to generate a portion of their energy" (Flexibility EA, Doc. 33-28 at PageID#4248).

63. TVA and the LPCs "developed the principles, criteria, and mechanisms that comprise [what came to be known as] the Flexibility Proposal." (*Id.* at PageID#4250.)

14

64. In February 2020, the TVA Board approved a power supply flexibility option for LPCs that had signed the LTA subject to completion of any applicable NEPA review. (Board Mtg. Mins. (Feb. 13, 2020), (Doc. 33-28 at PageID#4250).)

65. TVA completed the Flexibility EA in June 2020 (Flexibility EA, Doc. 33-28.)

66. The flexibility option allows LTA signatories "to self-generate three to five percent of their energy," and while TVA continues to supply the full power requirements, the flexibility option enables participating LPCs to reduce costs for their retail customers, to address customer demands for carbon footprint reductions, and to lower the LPCs wholesale power costs. (*Id.* at PageID##4249–50, 4254–55.)

67. Flexible generation must "be consistent with TVA's IRP to ensure that TVA's carbon position is improved," including renewables and other distributed energy resources (*Id.*)

68. Under the flexibility option, approximately 2,000 MW could be developed if all 154 LPCs "participate and deploy only solar to develop their maximum allowable capacity." (Doc. 33-28 at PageID#4255.)

69. As of November 13, 2020, sixty-three LPC's had signed a flexibility agreement, and many were already developing renewable energy projects. *See* TVA, Minutes of Meeting of TVA Board on Nov. 13, 2020, at 19-20, https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/about-tva/board-of-directors/november-13-2020/november-13-2020-board-meeting-minutes-(final---12-31-2020)d7374add-a7a5-410d-ac38-59cbfd25f188.pdf?sfvrsn=e35b2ac1_3 (Attach. 25).

70. As of August 1, 2022, 79 LPCs had signed a Power Supply Flexibility Agreement. (August 2022 Form 10-Q at 40 (Attach. 23).)

15

**The Plaintiffs in this Lawsuit**

71.     Plaintiffs are three environmental advocacy groups and some of their respective members who have submitted declarations to support Plaintiffs' claim to standing in this lawsuit. (Am. Compl., Doc. 17 at PageID##1225–51; Docs. 17-7 to 17-16).

72.     TVA does not sell power to any Plaintiff, and neither Plaintiffs nor their members are signatories to a Power Contract (*See* Doc. 17 at PageID##1225–51; Docs. 17-7 to 17-16).

73.     No Plaintiff organization alleges that it is a customer of a TVA LPC (Docs. 17-7 to 17-9, 17-12, 17-13).

74.     Plaintiffs Protect our Aquifer and Energy Alabama are headquartered within TVA's service territory; Plaintiff Appalachian Voices is headquartered in Boone, North Carolina.

75.     With the exception of Appalachian Voices' Rory McIlmoil,[9] Plaintiffs' respective members claim to be customers of LPCs that, in turn, contract with TVA for their power supply. (Doc. 17 ¶¶ 125, 160, 193.)

76.     Plaintiffs members who do allege that they are customers of a TVA LPC are, collectively, individual customers of only four of the 147 LPCs that have signed the LTA: Athens, Huntsville, Cumberland, and Powell Valley. (Docs. 17-9 to 17-11, 17-14 to 17-16.)

77.     Protect our Aquifer and its two members who submitted standing declarations are located in Memphis, Tennessee (Docs. 17-7, 17-8); however, Memphis Light, Gas, and Water has not signed the LTA (Order, Doc. 48 at PageID#5083 n.5).

78.     Daniel Tait, one of Plaintiffs' standing declarants (Doc. 17-9), represented Plaintiff Energy Alabama on the IRP Working Group (2019 IRP, Doc. 33-14 at PageID#3536).

---

**9**     Mr. McIlmoil does not allege that he is a customer of a TVA LPC (Doc. 17-12), and according to the Appalachian Voices' website, he lives in Deep Gap, North Carolina (outside of TVA's power service territory). Appalachian Voices, *Meet our Team*, https://appvoices.org/about/team/ (last visited Oct. 5, 2022) (Attach. 26).

79. Mr. Tait and other "IRP Working Group members reviewed and commented on proposed scenarios, planning assumptions, analytical techniques, energy resource options and strategies . . . load and commodity forecasts, resource planning framework, resource options and energy efficiency and DER approach in the IRP models;" and they shared "a wide range of views on specific issues such as the value of DER and [energy efficiency] programs, environmental concerns and the costs associated with various generation technologies." (*Id.* at PageID#3535.)

80. Plaintiffs Energy Alabama and its standing declarants (Tait and Rossow) and Appalachian Voices and its standing declarants (Knisley, Kornrich, McIntosh, and Tobey) commented extensively on the IRP EIS, and TVA responded to those comments. (2019 IRP EIS, Doc. 33-24 at PageID##4141, 4144, 4178–79; Doc. 33-25 at PageID##4180–81, 4227–28, 4230.)

81. TVA provided all three Plaintiffs and all ten of their standing declarants with copies of the IRP EIS. (2019 IRP EIS, Doc. 33-22 at PageID##4022–4023, 4027–31.)

82. TVA also responded to the extensive comments submitted by Plaintiffs' counsel, Southern Environmental Law Center. (Doc. 33-23 at PageID##4110–11; Doc. 33-24 at PageID##4149, 4152, 4164–68; Doc. 33-25 at PageID##4181–87, 4205.)

                                                             Respectfully submitted,

                                                             *s/David D. Ayliffe*
                                                             David D. Ayliffe, (TN BPR 024297)
                                                            Director, Litigation
                                                             Steven C. Chin (TN BPR 030011)
                                                            Office of the General Counsel
                                                           Tennessee Valley Authority
                                                           400 West Summit Hill Drive
                                                           Knoxville, Tennessee 37902-1401
                                                           Telephone 865.632.8964
                                                           ddayliffe@tva.gov
                                                           scchin@tva.gov

                                                           Attorneys for Tennessee Valley Authority

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

*s/Steven C. Chin*
Attorney for Tennessee Valley Authority

114813745