UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

PROTECT OUR AQUIFER,
ENERGY ALABAMA, and
APPALACHIAN VOICES,
Plaintiffs,

v.

No.2:20-cv-02615-TLP-atc
(Oral Argument Requested)

TENNESSEE VALLEY AUTHORITY,
Defendant.

---

**TENNESSEE VALLEY AUTHORITY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION OR FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADMINISTRATIVE PROCEDURE ACT CLAIMS**

---

David D. Ayliffe
Director, Litigation
Steven C. Chin
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.8964
ddayliffe@tva.gov
scchin@tva.gov

Attorneys for Tennessee Valley Authority

**TABLE OF CONTENTS**

<strong>Page</strong>

INTRODUCTION ........................................................................................................1

    FACTUAL BACKGROUND .............................................................................3

    I.    The TVA Act and the Valley Public Power Model .................................3

        A.    The Tennessee Valley Authority ................................................3

        B.    The LPCs and the Wholesale Power Contract .............................4

        C.    Least Cost Planning and TVA's 2019 Integrated Resource Plan ...............4

        D.    The Long-Term Agreement's Amendment of the Power Contract ............6

    II.    TVA's NEPA Determinations Related to the Long-Term Agreement ...................9

        A.    The NEPA Memorandum ........................................................9

        B.    The Power Supply Flexibility Option and Environmental Assessment .........................................................................10

    III.    The Plaintiffs in this Lawsuit .................................................................11

STANDARD OF REVIEW ......................................................................................11

ARGUMENT ............................................................................................................14

    I.    Plaintiffs' TVA Act Claim Should Be Dismissed for Lack of Subject Matter Jurisdiction Because It is Not Reviewable Under the APA. Alternatively, TVA is Entitled to Summary Judgment Because TVA's Execution of the LTA Was Lawful. ................................................................................14

        A.    Section 10 Prescribes the "Term" of the Power Contract but Commits the "Terms and Conditions" of the Power Contract, Including the LTA Amendments, to the Discretion of the TVA Board. ..................................................................................15

        B.    Because the Term of the Power Contract, as Amended by the LTA, Never Exceeds Twenty Years, the APA Does Not Authorize Further Judicial Review of Plaintiffs' TVA Act Claim. .............................19

    II.    TVA is Entitled to Summary Judgment on Plaintiffs' NEPA Claim Because TVA Reasonably Concluded That the LTA Amendments Did Not Require a NEPA Review. Alternatively, Plaintiffs' Claim is Categorically Excluded from NEPA Review. ...........................................................................23

A.      The LTA Amendments Are Not Subject to NEPA....................................24

    1.      Agency actions that do not proximately cause a significant impact to the physical environment or that do not result in a change to the environmental status quo are not subject to NEPA. ............................................................................................24

    2.      TVA reasonably determined that the LTA Amendments did not require a NEPA review. ...........................................................28

B.      The LTA Amendments Are Categorically Excluded From NEPA. ..........31

III.    Because Plaintiffs Do Not Have Standing to Bring Their TVA Act and NEPA Claims, the Amended Complaint Should Be Dismissed for Lack of Subject Matter Jurisdiction. ...................................................................................33

A.      Plaintiffs Lack Standing to Bring Their TVA Act Claim. ........................34

B.      Plaintiffs Lack Article III Standing to Bring Their NEPA Claim. ............39

CONCLUSION....................................................................................................................44

ADDENDUM OF STATUTES AND REGULATIONS

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page**

*All. for Bio-Integrity v. Shalala*,
  116 F.Supp.2d 166 (D.D.C. 2000) .................................................................. 27

*Allison Engine Co. v. U.S. ex rel. Sanders*,
  553 U.S. 662 (2008) ........................................................................................ 19

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ...................................................................... 12

*Amezola-Garcia v. Lynch*,
  846 F.3d 135,  (6th Cir. 2016) ........................................................................ 12

*Angelex Ltd. v. United States*,
  723 F.3d 500 (4th Cir. 2013) .......................................................................... 21

*Ascendium Educ. Sols., Inc. v. Cardona*,
  No. 1:19-CV-03831 (CJN), 2022 WL 558190 (D.D.C. Feb. 24, 2022) .......................... 13

*Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*,
  13 F.4th 531 (6th Cir. 2021) ........................................................................... 33

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002) ........................................................................................ 19

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................ 24

*Binno v. Am. Bar Ass'n*,
  826 F.3d 338 (6th Cir. 2016) .......................................................................... 38

*Burbank Anti-Noise Grp. v. Goldschmidt*,
  623 F.2d 115 (9th Cir. 1980) .......................................................................... 28

*Cath. Soc. Serv. v. Shalala*,
  12 F.3d 1123 (D.C. Cir. 1994) ........................................................................ 13

*Catron Cnty. Bd. of Comm'rs, N.M. v. U.S. Fish & Wildlife Serv.*,
  75 F.3d 1429 (10th Cir. 1996) ........................................................................ 24

*Cauthen v. TVA et al.*,
  No. CIV 1-87-75, slip op. (E.D. Tenn. June 26, 1987) .................................... 35

*Ctr. for Biological Diversity v. Bernhardt*,
  No. 19-cv-02898 (APM), 2020 WL 5702087 (D.D.C. Sept. 24, 2020) .......................... 39

*Ctr. for Biological Diversity v. EPA*,
  937 F.3d 533 (5th Cir. 2019) .......................................................................... 41

*Ctr. for Biological Diversity v. Ilano*,
928 F.3d 774 (9th Cir. 2019) ........................................................... 26

*Ctr. For Biological Diversity v. Lueckel*,
417 F.3d 532 (6th Cir. 2005) ........................................................... 36

*Ctr. for Biological Diversity v. TVA.*,
No. 3:21-CV-319-TAV-DCP, 2022 WL 4137824 (E.D. Tenn. Sept. 12, 2022) ........ 37, 38

*Ctr. for Biological Diversity v. TVA*,
491 F.Supp.3d 1180 (N.D. Ala. 2020) ....................................... 41, 43

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ....................................................................... 13

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.*,
267 F.3d 1144 (D.C. Cir. 2001) ................................................ 25, 28

*City of Cleveland v. Ohio*,
508 F.3d 827 (6th Cir. 2007) ........................................................... 31

*Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*,
365 F.3d 435 (6th Cir. 2004) ........................................................... 13

*Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*,
220 F.3d 1171 (10th Cir. 2000) ....................................................... 24

*Comm. for Auto Resp. (C.A.R.) v. Solomon*,
603 F.2d 992 (D.C. Cir. 1979) .................................................. 26, 27

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) ....................................................................... 16

*Dean v. Herrington*,
668 F.Supp. 646 (E.D. Tenn. 1987) .................................................. 38

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ................................................................... 20

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ................................................................. 25, 30

*Elecs. of N.C., Inc. v. Se. Power Admin.*,
774 F.2d 1262 (4th Cir. 1985) ......................................................... 21

*Fair Elections Ohio v. Husted*,
770 F.3d 456 (6th Cir. 2014) ..................................................... 36, 38

*Fla. Audubon Society v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) (en banc) ............................................. 42

*Food & Water Watch v. U.S. Dep't of Agric.*,
1 F.4th 1112 (D.C. Cir. 2021) ................................................................. 43

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
397 F.Supp.2d 1241 (D. Mont. 2005) ...................................................... 24

*Franciscan All., Inc. v. Azar*,
414 F.Supp.3d 928 (N.D. Tex. 2019) ....................................................... 13

*Friends of Tims Ford v. TVA*,
585 F.3d 955 (6th Cir. 2009) ........................................................... 14, 33

*Grand Council of Crees (of Quebec) v. F.E.R.C.*,
198 F.3d 950 (D.C. Cir. 2000) ................................................................ 38

*Grant Cnty. Black Sands Irrigation Dist. v. U.S. Bureau of Reclamation*,
579 F.3d 1345 (Fed. Cir. 2009) ............................................................... 18

*Gilham v. TVA*,
488 F. App'x 80 (6th Cir. 2012) ............................................................. 18

*Gross v. Hougland*,
712 F.2d 1034 (6th Cir. 1983) ................................................................ 11

*Hardin v. Ky. Utils. Co.*,
390 U.S. 1 (1968) ............................................................................. 19, 38

*Harkness v. Sec'y of the Navy*,
174 F.Supp.3d 990 (W.D. Tenn. 2016) aff'd, 858 F.3d 437 (6th Cir. 2017) .................. 12

*Hazlehurst v. Ctrs. for Disease Control*,
No. 117CV02095STAEGB, 2017 WL 3037808 (W.D. Tenn. July 18, 2017) ................. 12

*Heckler v. Chaney*,
470 U.S. 821 (1985) ......................................................................... 20, 23

*Help Alert W. Ky., Inc. v. TVA*,
191 F.3d 452, 1999 WL 775931 (6th Cir. Sept. 24, 1999) ............................... 32

*Heydon v. MediaOne of Se. Mich., Inc.*,
327 F.3d 466 (6th Cir. 2003) .................................................................. 12

*Holbrook v. TVA*,
_ F. 4th. _, 2022 WL 4089813 (4th Cir. Sept. 7, 2022) ............................... 20, 21

*Hosseini v. Nielsen*,
911 F.3d 366 (6th Cir. 2018) .............................................................. 13, 31

*Idaho Conservation League v. Bonneville Power Admin.*,
826 F.3d 1173 (9th Cir. 2016) ................................................................ 26

*ICC v. Brotherhood of Locomotive Eng'rs*,
    482 U.S. 270 (1987) ................................................................ 20

*Int'l Ctr. for Tech. Assessment v. Thompson*,
    421 F.Supp.2d 1 (D.D.C. 2006) ............................................ 27

*K Mart Corp. v. Cartier, Inc.*,
    486 U.S. 281 (1988) ................................................................ 15

*Ky. Coal Ass'n, Inc. v. TVA*,
    804 F.3d 799 (6th Cir. 2015) ................................................ 5

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ................................................................ 38

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................ 20

*Lower Alloways Creek Tp. v. Pub. Ser. Elec. & Gas Co.*,
    687 F.2d 737 (3d Cir. 1982) .................................................. 28

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .......................................................... *passim*

*Mach Mining, LLC v. E.E.O.C.*,
    575 U.S. 480 (2015) .......................................................... 22, 23

*Macht v. Skinner*,
    916 F.2d 13 (D.C. Cir. 1990) ................................................ 25

*Madison-Hughes v. Shalala*,
    80 F.3d 1121 (6th Cir. 1996) ................................................ 11

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ................................................................ 38

*Matthews v. Town of Greeneville, Tenn.*,
    932 F.2d 968, 1991 WL 71414 (6th Cir. May 2, 1991) .................... 21

*McCarthy v. Middle Tenn. Elec. Membership Corp.*,
    466 F.3d 399 (6th Cir. 2006) ................................................ 21

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ................................................................ 17

*Meister v. U.S. Dep't of Agric.*,
    623 F.3d 363 (6th Cir. 2010) ............................................ 13, 31

*Metro. Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983) .......................................................... *passim*

*Min. Pol'y Ctr. v. Norton,*
    292 F.Supp.2d 30 (D.D.C. 2003) ................................................................ 25

*Morissette v. United States,*
    342 U.S. 246 (1952) ................................................................................ 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................. 13

*MX Group, Inc. v. City of Covington,*
    293 F.3d 326 (6th Cir. 2002) .................................................................. 33

*Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.,*
    522 U.S. 479 (1998) ................................................................................ 33

*Nat'l Wildlife Fed'n v. Dep't of Transp.,*
    960 F.3d 872 (6th Cir. 2020) ........................................................... 25, 41

*Ness Inv. Corp. v. U.S. Dep't of Agr., Forest Serv.,*
    512 F.2d 706 (9th Cir. 1975) .................................................................. 23

*Northcoast Env't Ctr. v. Glickman,*
    136 F.3d 660 (9th Cir. 1998) .................................................................. 28

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n,*
    45 F.4th 291 (D.C. Cir. 2022) ........................................................... 31, 33

*Ogle v. Church of God,*
    153 F. App'x 371 (6th Cir. 2005) ........................................................... 12

*Olmstead Citizens for a Better Cmty. v. United States,*
    793 F.2d 201 (8th Cir. 1986) .................................................................. 43

*Penn. Dep't of Hum. Servs. v. United States,*
    897 F.3d 497 (3d Cir. 2018) ................................................................... 31

*Pub. Citizen v. U.S. Trade Rep.,*
    5 F.3d 549 (D.C. Cir. 1993) ................................................................... 40

*Ry. Lab. Executives' Ass'n v. I.C.C.,*
    930 F.2d 511 (6th Cir. 1991) .................................................................. 13

*Raymond Proffitt Found. v. U.S. Army Corps of Eng'gs,*
    343 F.3d 199 (3d Cir. 2003) ............................................................. 21, 22

*Raymond Proffitt Found. v. U.S. Army Corps of Eng'gs,*
    175 F.Supp.2d 755 (E.D. Pa. 2001) ....................................................... 26

*Rebel Motor Freight, Inc. v. I.C.C.,*
    971 F.2d 1288 (6th Cir. 1992) ......................................................... 13, 19

*Sabine River Auth. v. U.S. Dep't of Interior*,
　951 F.2d 669 (5th Cir. 1992) ................................................................ 26

*Save Barton Creek Ass'n v. Fed. Highway Admin.*,
　950 F.2d 1129 (5th Cir.1992) .............................................................. 26

*SEC v. Chenery Corp.*,
　332 U.S. 194 (1947) ............................................................................ 31

*Sekhar v. United States*,
　570 U.S. 729 (2013) ............................................................................ 16

*Shelby Cnty. Advocs. for Valid Elections v. Hargett*,
　No. 2:18-CV-2706, 2019 WL 4394754 (W.D. Tenn. Sept. 13, 2019) ...................... 34, 37

*Shelby Advocs. for Valid Elections v. Hargett*,
　947 F.3d 977 (6th Cir. 2020) ............................................................... 35, 36

*Sheldon v. Vilsack*,
　538 F. App'x 644 (6th Cir. 2013) ......................................................... 12

*Sierra Club v. U.S. Army Corps of Eng'gs*,
　990 F.Supp.2d 9 (D.D.C. 2013) ........................................................... 25

*Sierra Club v. U.S. Army Corps of Eng'gs*,
　64 F.Supp.3d 128 (D.D.C. 2014), *aff'd*, 803 F.3d 31 (D.C. Cir. 2015) .......................... 25

*Sierra Club v. U.S. Forest Serv.*,
　828 F.3d 402 (6th Cir. 2016) .............................................................. 32

*Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*,
　243 F.3d 270 (6th Cir. 2001) .............................................................. 26

*Spokeo, Inc. v. Robins*,
　578 U.S. 330 (2016) ........................................................................ 35, 36

*State by & through Tenn. Gen. Assembly v. U.S. Dep't of State*,
　931 F.3d 499 (6th Cir. 2019) .............................................................. 12

*State of Utah v. Babbitt*,
　137 F.3d 1193 (10th Cir. 1998) ......................................................... 39, 41

*Sugarloaf Citizens Ass'n v. FERC*,
　959 F.2d 508 (4th Cir. 1992) .............................................................. 25

*TVA. v. Exxon Nuclear Co.*,
　753 F.2d 493 (6th Cir. 1985) .............................................................. 35

*Tex. Low Income Housing Info. Serv. v. Carson*,
　427 F.Supp.3d 43 (D.D.C. 2019) ........................................................ 40

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ................................................................................ *passim*

*Turner v. U.S. Parole Comm'n,*
    810 F.2d 612 (7th Cir. 1987) .............................................................................. 21

*United States v. Students Challenging Regul. Agency Procs. (SCRAP),*
    412 U.S. 669 (1973) ........................................................................................... 35

*United Video, Inc. v. F.C.C.,*
    890 F.2d 1173 (D.C. Cir. 1989) .................................................................. 31, 32

*Universal Health Servs., Inc. v. United States,*
    579 U.S. 176 (2016) ........................................................................................... 15

*Upper Snake River Chapter of Trout Unlimited v. Hodel,*
    921 F.2d 232 (9th Cir. 1990) ...................................................................... 27, 29

*Utah Env't Cong. v. Bosworth,*
    372 F.3d 1219 (10th Cir. 2004) .................................................................. 32, 33

*Varity Corp. v. Howe,*
    516 U.S. 489 (1996) ........................................................................................... 17

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ........................................................................................... 30

*Warth v. Seldin,*
    422 U.S. 490 (1975) ........................................................................................... 34

*Waterhouse v. TVA,*
    No. 20-5978, 2021 WL 1230371 (6th Cir. Mar. 17, 2021) ................................. 3

*Webster v. Doe,*
    486 U.S. 592 (1988) ........................................................................................... 21

**Statutes**                                                                                        **Page**

5 U.S.C. § 706(2)(A) ................................................................................................ 13

5 U.S.C. § 706(2)(C) ................................................................................................ 13

5 U.S.C § 706(2)(D) ................................................................................................. 13

16 U.S.C. § 831d ........................................................................................................ 3

16 U.S.C. § 831dd ...................................................................................................... 3

16 U.S.C. § 831d(f) .................................................................................................... 3

16 U.S.C. § 831i ............................................................................................... *passim*

16 U.S.C. § 831j ......................................................................................................... 3

16 U.S.C. § 831m-1 ................................................................................................ 39

16 U.S.C. § 831m-1(b)(1) ........................................................................................ 4

16 U.S.C. § 831n-4(f) ............................................................................................... 3

16 U.S.C. § 831n-4(h) .............................................................................................. 3

42 U.S.C. § 4332 ............................................................................................... 24, 26

**Rules**                                                                 **Page**

Federal Rule of Civil Procedure 12(h)(3) .............................................................. 12

Federal Rule of Civil Procedure 56 ....................................................................... 12

**Regulations**                                                **Page**

40 C.F.R. § 1508.4 .................................................................................................. 31

47 Fed. Reg. 54586 (Dec. 3, 1982) .................................................................. 32, 39

48 Fed. Reg. 19264 (Apr. 28, 1983) ...................................................................... 32

48 Fed. Reg. 34263 (July 28, 1983) ...................................................................... 32

48 Fed. Reg. 34265 (July 28, 1983) ...................................................................... 32

84 Fed. Reg. 48987 (Sept. 17, 2019) ................................................................. 5, 30

85 Fed. Reg. 17434 (Mar. 27, 2020) ..................................................................... 32

**Other Authorities**                                              **Page**

Antonin Scalia & Bryan A. Garner,
    *Reading Law: The Interpretation of Legal Texts* 93 (2012) ............................. 18

Black's Law Dictionary 1639 (4th ed. 1968) .......................................................... 16

Black's Law Dictionary (11th ed. 2019) ........................................................... 16, 17

Bouvier's Law Dictionary 203 (Baldwin's Students Ed. 1934) .............................. 17

C Charles A. Wright & Arthur R. Miller,
    Federal Practice and Procedure §§ 1350 (3d ed. 2022) ................................. 12

Restatement (Second) of Contracts Ch. 9 Intro. Note (1981) ............................ 16, 17

Samuel Williston & Richard A. Lord,
    A Treatise on the Law of Contracts § 38:1 (4th ed. 2006) .............................. 16

W. Eskridge, Interpreting Law: Primer on How to Read Statutes and
    the Constitution (2016) .................................................................................. 17

## INTRODUCTION

This lawsuit is an attempt by environmental groups to usurp the authority Congress expressly delegated to the TVA Board to establish and administer the longstanding contractual relationships between TVA and the local power company ("LPC") customers that purchase electric power from TVA. To convince the Court to supplant the judgment of the TVA Board, Plaintiffs claim that TVA violated Section 10 of the TVA Act and the National Environmental Policy Act ("NEPA") by amending the terms and conditions of the standard 20-year wholesale power contract with LPCs ("Power Contract") through a long-term agreement ("LTA") after Board approval in August 2019. They claim that the "practical effect" of the amendments is an unlawful "perpetual" contract because Section 10 authorizes "a term not exceeding twenty years," and because TVA did not conduct a formal NEPA review before offering the LTA to LPCs. Above all, Plaintiffs make clear that their opposition to the LTA is motivated by the sources of the power that TVA generates. They also speculate that TVA's real reason for the LTA was to inflate electricity demand so that TVA could increase its revenue and its reliance on fossil fuels. But these are policy objections shoehorned into a lawsuit.

And Plaintiffs' version of the story does not check out. The administrative record shows that TVA developed the LTA to better align the amortization of TVA's total financing obligations, including investments in generation assets, with revenue from customer contract commitments and to respond to the LPCs' desire for long-term rate stability, flexibility, and involvement in TVA's asset planning decisions. Also, Plaintiffs know from their involvement in TVA's 2019 Integrated Resource Plan ("2019 IRP") and NEPA review that the IRP—not the LTA—guides TVA's power supply planning and that the IRP reflects TVA's commitment to increase its renewable generation capacity and to decrease its carbon footprint. Still, Plaintiffs want TVA to do more, faster.

But Congress assigned TVA the responsibility to generate and deliver reliable, resilient, affordable electric power and empowered the TVA Board to enter into contracts with LPCs and to develop the contractual terms and conditions it deemed necessary or desirable to achieve TVA's statutory mission. Since 1934, the Power Contract has served as the basis for TVA's relationship with LPCs, and in the TVA Board's judgment, the LTA is another amendment to that contractual relationship that best positions TVA and the LPCs to ensure the long-term success of the Valley Public Power Model for the benefit of the entire Tennessee Valley region. Since August 2019, 147 of 153 LPCs have executed the LTA, and 79 LPCs have exercised the flexibility option made possible by the LTA.

This lawsuit is calculated to hijack that partnership and the vision for the future it represents by Plaintiffs who are not parties to the Power Contract. Yet, Plaintiffs' seek to strip 147 LPCs of the benefit of their bargain; none of the LPCs is before the Court and many are outside this Court's jurisdiction. Without opportunity to be heard or to protect their interests, Plaintiffs' claims jeopardize hundreds of millions of dollars in LPC bill credit savings and nearly 80 flexibility agreements through which LPCs are offering renewable generation to customers just like Plaintiffs' members.

At bottom, Plaintiffs' challenge fails. For starters, they lack standing. And no matter how they plead their TVA Act claim, this Court lacks jurisdiction to hear it because it challenges amendments to the Power Contract that are part of the terms and conditions Congress committed to the TVA Board's unreviewable discretion. Alternatively, the TVA Act claim fails on the merits because the term of the Power Contract, as amended by the LTA, never exceeds twenty years. Last, Plaintiffs' NEPA claim falls short because TVA reasonably concluded that the LTA was not subject to NEPA, and the LTA is categorically excluded from NEPA review in any event.

## FACTUAL BACKGROUND

I.    **The TVA Act and the Valley Public Power Model**

    A.    **The Tennessee Valley Authority**

TVA is a wholly-owned executive branch corporate agency and instrumentality of the United States created by and existing pursuant to the TVA Act of 1933, 16 U.S.C. §§ 831–831ee. *E.g.*, *Waterhouse v. TVA*, No. 20-5978, 2021 WL 1230371, at *2 (6th Cir. Mar. 17, 2021). TVA is responsible for the multi-purpose development of the Tennessee Valley region's resources and economy. *See* 16 U.S.C. §§ 831, 831d, 831dd. One of TVA's "primary objectives" is to supply low-cost, reliable electricity "at rates as low as are feasible." 16 U.S.C. §§ 831d(f), (*l*), 831j, 831n-4(f), (h). To achieve this objective, TVA built, maintains, and operates the nation's largest public power system delivering electric power to 10 million people in TVA's seven-state service area. (TVA's Statement of Facts ("SOF"), Doc.73 ¶ 4.)[1]

TVA's power portfolio includes a diverse array of generating assets that are dynamic and adaptable. (*Id.* ¶ 5.) Since the 1930s, TVA has relied on its system of hydroelectric dams to generate clean, renewable power and has recently shifted "away from traditional coal-based production and toward cleaner forms of power generation." (*Id.*) Since 2005, TVA has reduced carbon emissions by 63 percent; today, 56 percent of TVA's current generation mix is carbon-free. (*Id.* ¶ 6.) And TVA is on track to reduce its carbon emission rates 70 percent by 2030 compared to 2005 levels. (*Id.* ¶ 7.) TVA also plans to expand its existing diverse asset portfolio, with solar expansion playing a substantial role in the generation mix. (*Id.* ¶ 25.)

---

[1]    Citations in this brief to TVA's Statement of Facts incorporate the record citations supporting the referenced facts. Where available and practical, pinpoint citations are to the paragraph(s) in the source document; however, where citation to a paragraph is not possible or would be confusing, pinpoint citations are to the source document's CM/ECF PageID number.

B.      **The LPCs and the Wholesale Power Contract**

TVA is primarily a wholesaler of electric power to 153 non-profit LPCs—municipalities and other local government entities and customer-owned cooperatives—which distribute that power to their retail customers. (*Id.* ¶ 8.) In 1934, TVA reported to Congress that a "20-year contract was devised to govern the sale of power at wholesale to municipal distribution systems" for the distributor's "entire power requirements." (1934 Annual Report, Doc. 20-9 at PageID#2188. For nearly 90 years, TVA has supplied the LPCs' "entire power requirements" (*id.*) under standard 20-year wholesale power contracts (the "Power Contract")—since 1934 with Athens, Alabama ("Athens") (*id.* at PageID#2190); since 1938 with Cumberland Electric Membership Corporation ("Cumberland") (Doc. 73-4 at PageID#5475); since 1940 with Huntsville, Alabama ("Huntsville") (Doc. 73-4 at PageID#5459); and since 1945 with Powell Valley Electric Cooperative ("Powell Valley") (Doc.73-5 at PageID#5487.)[2]

Since 1934, the Power Contract has been renewed and/or amended hundreds of times. (SOF, Doc. 73 ¶ 11.) For example, around 1989, the Power Contract was amended to include automatic renewal and termination notice provisions. (*Id.* ¶ 12; *see also* Athens Supp. 16, (Oct. 1, 1989), Doc. 73-10 at PageID#5527; Cumberland Supp. 45 (Oct. 1, 1989), Doc. 73-11 at PageID#5550; Huntsville Supp. 17 (Oct. 1, 1989), Doc. 73-12 at PageID#5572; Powell Valley Supp. 17 (May 1, 1992), Doc. 73-13 at PageID#5594.)

C.      **Least Cost Planning and TVA's 2019 Integrated Resource Plan**

The TVA Act, as amended by the Energy Policy Act of 1992, requires TVA to employ a "least-cost planning" process for selecting "new energy sources." 16 U.S.C. § 831m-1(b)(1). TVA

---

[2]      For Article III standing reasons, *see infra* pp. 34-38, TVA has selected these LPCs as representative examples of TVA's longstanding relationships with its LPCs.

"must evaluate the full range of existing and incremental resources so as not to skip over any new power supplies, energy conservation and efficiency efforts, or renewable energy resources" and "must: (1) consider necessary features for system operation, (2) factor in its ability to verify energy savings, and (3) treat demand and supply resources on a consistent and integrated basis." *Ky. Coal Ass'n, Inc. v. TVA*, 804 F.3d 799, 801–02 (6th Cir. 2015) (cleaned up). TVA implements the least-cost planning mandate through its Integrated Resource Plan(s). *See id.*

TVA's 2019 Integrated Resource Plan ("IRP") "is a long-term plan that provides direction on how TVA can best meet future demand for power" for a twenty-year period. (Doc. 33-14 at PageID#3495.) Together with an Environmental Impact Statement ("EIS") (2019 IRP EIS, Docs. 33-18 to 33-25), the 2019 IRP "evaluate[ed] TVA's current energy resource portfolio and alternative future portfolios of energy resource options to meet the future electrical energy needs of the TVA region at a least system-wide cost while taking into account TVA's mission of energy, environmental stewardship and economic development" (Doc. 33-14 at PageID#3523). Regarding power demand, the 2019 IRP base case applied a planning reserve margin constraint (as did the other strategies evaluated in the IRP) "represent[ing] the minimum amount of capacity required to ensure reliable power" for all TVA customers, including all 153 LPCs, during the twenty-year planning period evaluated in the IRP. (Doc. 33-14 at PageID#3501; *see also* Power Supply Flexibility Proposal Final Environmental Assessment ("Flexibility EA") (June 2020), Doc. 33-28 at PageID##4301–03, 4307–10.) Following TVA Board approval (Doc. 33-5 at PageID#3382–84), TVA published the Record of Decision for the IRP EIS announcing that TVA adopted a plan that "will guide TVA's selection of energy resource options to meet the energy needs of the Tennessee Valley region over the next 20 years." 84 Fed. Reg. 48,987 (Sept. 17, 2019).

###### D.       The Long-Term Agreement's Amendment of the Power Contract

In Spring 2019, TVA's Senior Vice President of Commercial Energy Solutions, Doug Perry, led a team responsible for developing terms for a long-term partnership proposal. (Perry Decl., Doc. 73-14 ¶¶ 6-8.) In June 2019, Mr. Perry prepared an update for the TVA Board on the status of the long-term partnership proposal ("Board Update"). (*Id.* ¶¶ 8-9.) The Board Update summarized the key details of the proposal, including the amendment to the "existing evergreen contract to extend [the] termination notice period to 20 years" with "no change to the underlying full requirements provision," a 3.1% partnership credit, and TVA's "commit[ment] to explore additional power supply flexibility." (*Id.* at PageID#5605.) The Board Update also identified the principal assumptions underlying the proposal, including no base rate increases through 2030, the 3.1% bill credit, holding future strategic capital (new debt) consistent with the FY20 Power Supply Plan, maintaining a cash balance of $300 million, and maintaining TVA's pension and asset trust contributions. (*Id.* at PageID#5607.) And it outlined the proposal's anticipated financial impacts for TVA, including better alignment of TVA's amortization of total financing obligations with partner commitments, improvement of TVA's net portfolio position by aligning committed revenue to TVA's total financial obligations, and achievement of TVA's FY23 strategic debt reduction goal.[3] (*Id.* at PageID##5608-611.)

By July 2019, the proposal had crystallized into the terms of a standard long-term agreement ("LTA"). (Meade Decl., Doc. 73-15 at PageID##5622-637.) TVA management recommended to the TVA Board's Finance Committee that the Board approve offering the LTA to LPCs as an amendment to the Power Contract because the LTA represented an opportunity to

---

[3]       TVA committed to the Office of Management and Budget to reduce TVA's debt to $21.8 million by 2023. (SOF, Doc. 73 ¶ 33 & n.7.)

strengthen the Valley Public Power Model and would benefit the TVA system's financial profile, which could be shared with participating LPCs. (*Id.* ¶ 3.)

At the August 22, 2019 TVA Board meeting, TVA's Chief Executive Officer, Jeff Lyash, emphasized three elements that would set TVA's direction for the future: the IRP, the 10-year financial plan, and the long-term partnership proposal. (Aug. 22, 2019 Bd. Mtg. Tr., Doc. 73-16 at PageID#5645.) Mr. Lyash explained that, while working on the 10-year financial plan, it became clear that TVA needed a more collaborative partnership with LPCs, which resulted in the long-term partnership proposal. (*Id.* at PageID##5648-649.) Mr. Lyash emphasized that the proposal would better align the decision timeframes for TVA's generation assets, "which are 20, 30, 40, year decisions, with the contract terms we have with our LPCs," and would position TVA to hold rates flat, provide more LPC engagement in TVA's power supply planning process, and enable TVA to offer more flexibility to LPCs. (*Id.* at PageID#5649.)

TVA's Chief Financial Officer, John Thomas, then updated the Board on the 10-year financial plan explaining TVA's responsibility to balance its debt and 20 to 30-year generation asset commitments with revenue commitments sufficient to satisfy those obligations, and he explained how "*this was the genesis of the long-term partner proposal*":[4]



---

[4]    Emphasis added here and throughout this brief unless otherwise noted.

(Aug. 22, 2019 Bd. Mtg. Tr. & Slides, Doc. 73-17 at PageID##5714-5717; Doc. 33-4 at PageID##3336-337.)

After the CFO's presentation, Mr. Perry presented the long-term partnership option for Board approval as an opportunity to strengthen the Valley Public Power Model; which is defined by TVA's relationships with LPCs, not shareholder interests or profits; and which utilizes the scale and resiliency of TVA's transmission system to attract economic development and to create jobs; and which, ultimately, seeks to improve the quality of life in the Tennessee Valley region. (Aug. 22, 2019 Bd. Mtg. Tr. & Slides, Doc. 73-17 at PageID##5734-738.) Mr. Perry explained that one of the key influences for the proposal was the LPCs' interest in strengthening the Valley Public Power Model through long term rate stability, flexibility to meet changing customer needs, and opportunities for LPCs to participate in TVA's strategic planning decisions. (*Id.* at PageID#5737.)

The TVA Board approved the implementation of a standard long-term agreement consistent with certain identified Standard Elements and authorized the CEO to offer the LTA to interested LPCs. (Doc. 33-5 at PageID##3400–02; Doc. 33-6 at PageID##3414–23.) In the Board's judgment, the LTA presented an opportunity to secure the long-term success of the Valley Public Power Model by ensuring that TVA has the revenue to satisfy its long-term obligations, providing TVA with more certainty in its long-term generation and financial planning decisions, sharing the benefits of that enhanced certainty with LPCs in the form of a 3.1% monthly bill credit, and helping TVA fulfill its statutory obligation to sell power at rates as low as feasible. (Doc. 33-5 at PageID##3401–02.) One of the key elements of the LTA was the amendment of the termination notice requirement in a participating LPC's existing evergreen Power Contract "to establish a 20-year term and termination notice requirement." (Doc. 33-6 at PageID#3416.)

As of October 2022, 147 out of 153 LPCs have signed the LTA. (Second Supp. AR Doc. Index, Doc. 71-2 at PageID##5389–5403.) The LTA amended the Power Contract by replacing "[t]he section of the Power Contract entitled 'Term of Contract'" to include amended automatic renewal and termination notice provisions. (SOF, Doc. 73 ¶¶ 47–48; see also Docs. 73-10, 73-18 to 73-20.) Since August 2019, there have been no changes to this amended section of the Power Contract (SOF, Doc. 73 ¶ 53), and TVA has returned over $500 million in bill credits to LPCs participating in the LTA through June 30, 2022 (id. ¶ 54).

## II.    TVA's NEPA Determinations Related to the Long-Term Agreement

### A.    The NEPA Memorandum

In June 2019, before the LTA was submitted for TVA Board consideration, TVA's Vice-President of Pricing & Contracts, Cassidy Larson, requested that TVA's Senior NEPA Specialist, Matthew Higdon, "determine whether the [long-term partnership proposal] was subject to review under NEPA." (Higdon Decl., Doc. 73-24 ¶ 5.) They discussed the proposal, and Mr. Higdon learned "that the LTP Proposal would result in 'literally no change at all' to TVA's load" and "[n]o change in [TVA's] generation mix." (Id. ¶ 7.)

In August 2019, Mr. Higdon prepared a memorandum after "discuss[ing] the proposal at length with" TVA's Pricing and Contracts organization, TVA's Enterprise Planning organization, and TVA's Office of the General Counsel ("NEPA Memo"). (Doc. 33-26 at PageID##4234–35; Higdon Decl., Doc. 73-24 ¶ 11.) As summarized in the NEPA Memo, TVA's NEPA Program determined that the proposal was "not subject to review under NEPA" because "[t]he proposal would not result in any impacts to the physical environment and would not have any effect on growth of [distributed energy resources]. In essence, the proposal would not change the

'environmental status quo.'" (Doc. 33-26 at PageID##4235–36.) Specifically, the NEPA Memo

concluded as follows:

- "[T]he proposal would have no effect on TVA's generation portfolio mix since the lengthening of the contract period (from the present 5-year term to a 20-year term) would have the effect of continuing the 'environmental status quo' for which review under NEPA is not required since current environmental conditions would continue under the proposal without change."

- "[T]he proposal would not result in any physical environmental impacts."

- TVA's IRP "already incorporate[s] the assumption of serving LPC electricity demand for 20 years regardless of the actual level of commitment under the" Power Contract.

- "[T]he lengthening of the contract to a 20-year term . . . would still be within the analytical boundaries of . . . the 2019 Integrated Resource Plan review. This further reaffirms the nature of the LTP Proposal as one that involves an 'environmental status quo' situation from a NEPA perspective."

(*Id.* at PageID#4235.) The NEPA Memo also explained that TVA's NEPA Program developed

these supporting facts as part of its effort "to gain a full understanding of the proposal and of any

potential environmental effects of the proposal" and "to learn more about its potential to affect

TVA's generation portfolio mix or to impact the environment." (*Id.* at PageID##4234–35.)

### B. The Power Supply Flexibility Option and Environmental Assessment

In February 2020, the TVA Board approved a power supply flexibility option for LPCs

that had signed the LTA, subject to completion of any applicable NEPA review. (Flexibility EA,

Doc. 33-28 at PageID#4250.) The flexibility option allows LTA signatories "to self-generate three

to five percent of their energy," and while TVA continues to supply the LPCs' full power

requirements, the flexibility option enables participating LPCs to reduce costs for their retail

customers, to address customer demands for carbon footprint reductions, and to lower the LPCs'

wholesale power costs. (*Id.* at PageID##4249–50, 4254–55.) Also, flexible generation must "be

consistent with TVA's IRP to ensure that TVA's carbon position is improved," including

renewables and other distributed energy resources ("DER"). (*Id.* at PageID#4255.) 79 LPCs had signed a Power Supply Flexibility Agreement as of August 1, 2022. (SOF, Doc. 73 ¶ 70.)

## III.    The Plaintiffs in this Lawsuit

Plaintiffs are three environmental groups, and some of their respective members who have submitted declarations to support Plaintiffs' claim to standing in this lawsuit. TVA does not sell power to any Plaintiff, and neither Plaintiffs nor their members are signatories to a Power Contract (*See* Am. Compl., Doc. 17 at PageID##1225–51; Docs. 17-7 to 17-16). And no Plaintiff organization alleges that it is a customer of a TVA LPC. (Docs. 17-7 to 17-9, 17-12, 17-13.) In fact, only Protect our Aquifer and Energy Alabama are headquartered within TVA's service territory; Appalachian Voices is headquartered in Boone, North Carolina. (Doc. 17 ¶¶ 125, 160, 193.) With the exception of Appalachian Voices' Rory McIlmoil (SOF, Doc. 73 ¶ 75), Plaintiffs' respective members claim to be customers of LPCs that, in turn, contract with TVA for their power supply. Collectively, these members are individual customers of only four of the 147 LPCs that have signed the LTA: Athens, Huntsville, Cumberland, and Powell Valley (Docs. 17-9 to 17-11, 17-14 to 17-16). Protect our Aquifer and its two members who submitted standing declarations are located in Memphis, Tennessee (Docs. 17-7, 17-8); however, Memphis Light, Gas, and Water ("MLGW") has not signed the LTA (Order, Doc. 48 at PageID#5083 n.5).

## STANDARD OF REVIEW

A federal court must determine that subject matter jurisdiction exists before making any decision on the merits. *Gross v. Hougland*, 712 F.2d 1034, 1036–37 (6th Cir. 1983). In Administrative Procedure Act ("APA") cases, the Sixth Circuit has held that "courts do not have subject matter jurisdiction to review agency actions that are 'committed to agency discretion by law.'" *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1127 (6th Cir. 1996); *accord Sheldon v. Vilsack*,

538 F. App'x 644, 649 & n.4 (6th Cir. 2013).[5] Similarly, if plaintiffs lack standing, "then the court lacks subject matter jurisdiction." *State by & through Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019). Here, because summary judgment is not the proper procedure for challenging subject matter jurisdiction, *Ogle v. Church of God*, 153 F. App'x 371, 374–76 (6th Cir. 2005),[6] and because TVA has answered, TVA has moved to dismiss for lack of subject matter jurisdiction under Rule 12(h)(3). *See generally* 5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure §§ 1350 & n.33, 1393 (3d ed. 2022).[7]

As to the merits, summary judgment is the procedural mechanism "for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Harkness v. Sec'y of the Navy*, 174 F.Supp.3d 990, 1004 (W.D. Tenn. 2016) (cleaned up), *aff'd*, 858 F.3d 437 (6th Cir. 2017). But typical summary judgment rules do not apply in APA cases because of the district court's limited role in reviewing the administrative record. *Hazlehurst v. Ctrs. for Disease Control*, No. 117CV02095STAEGB, 2017 WL 3037808, at *5 (W.D. Tenn. July 18, 2017). "[T]he district judge sits as an appellate tribunal," and "the 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

---

[5]   *But see Amezola-Garcia v. Lynch*, 846 F.3d 135, 140 n.2 (6th Cir. 2016) (Whether agency action is "'committed to agency discretion by law' . . . does "not go to the jurisdiction of the court."). Under the prior panel decision rule, however, *Madison-Hughes* is controlling. *See Laborers' Int'l Union of N. Am. v. Neff*, 29 F.4th 325, 334 (6th Cir. 2022).

[6]   Rule 56 may be used to determine the *factual basis* for standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

[7]   Plaintiffs' Declaratory Judgment Act claim also requires subject matter jurisdiction. *Heydon v. MediaOne of Se. Mich., Inc.*, 327 F.3d 466, 470 (6th Cir. 2003).

Plaintiffs seek relief under 5 U.S.C. § 706(2)(A), (C)–(D). (Doc. 17 at PageID##1255–60.) The scope of review under § 706(2)(A) "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To be in accordance with the law, the challenged agency action must not "conflict with the language of the statute relied upon by the agency." *Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018). Ultimately, it is Plaintiffs' burden to show "that the [agency] action had no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 475 (6th Cir. 2004). This same deferential standard applies to claims under § 706(2)(D). *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 370 (6th Cir. 2010). Section 706(2)(C) authorizes review of an agency's statutory interpretation, *Rebel Motor Freight, Inc. v. I.C.C.*, 971 F.2d 1288, 1291 & n.5 (6th Cir. 1992), and the Sixth Circuit follows *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984), when reviewing "an agency's interpretation of a statute which the agency has primary responsibility for administering," *Ry. Lab. Executives' Ass'n v. I.C.C.*, 930 F.2d 511, 513–14 (6th Cir. 1991).

But even where agency action is founded on an impermissible statutory construction, "[t]he APA definition of 'agency action' obliges reviewing courts to carefully limit their review" and to set aside only the part of the agency action "that exceeds statutory authority." *Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994); *accord Ascendium Educ. Sols., Inc. v. Cardona*, No. 1:19-CV-03831 (CJN), 2022 WL 558190, at *6 (D.D.C. Feb. 24, 2022). To do otherwise exceeds the scope of review under 5 U.S.C. § 706(2)(C), especially where the remaining portion of the agency action "may sensibly be given independent life." *Cath. Soc. Serv.*, 12 F.3d at 1128; *see also Franciscan All., Inc. v. Azar*, 414 F.Supp.3d 928, 945 n.7 (N.D. Tex. 2019) (same).

**ARGUMENT**

Plaintiffs' lawsuit should be dismissed for lack of subject matter jurisdiction because they lack constitutional and prudential standing to pursue both their TVA Act and NEPA claims, and their TVA Act claim is not reviewable under the APA because it necessarily challenges the "terms and conditions" of the Power Contract which Section 10 of the TVA Act commits to the TVA Board's discretion. Plaintiffs' NEPA claim also fails on the merits because the administrative record shows that the challenged agency action satisfied the requirements of the APA and did not violate NEPA.[8]

I.     **Plaintiffs' TVA Act Claim Should Be Dismissed for Lack of Subject Matter Jurisdiction Because It is Not Reviewable Under the APA. Alternatively, TVA is Entitled to Summary Judgment Because TVA's Execution of the LTA Was Lawful.**

This Court has ruled that TVA's "entry into each long-term agreement is a separate final agency action" for purposes of Plaintiffs' TVA Act claim. (Doc. 67 at PageID##5311–12.)[9] TVA has executed the LTA with 147 LPCs, and assuming *arguendo* that Plaintiffs have standing to challenge all 147 LTAs, Plaintiffs' claim is that each LTA violates Section 10 of the TVA Act, which authorizes TVA to enter into contracts for the sale of electric power "for a term not exceeding twenty years." (Doc. 17 at PageID#1259.) Having rightly conceded that the LTA *is* for an initial term of 20 years, Plaintiffs latch on to the LTA's automatic renewal and termination notice provisions to invent a violation of Section 10. (*Id.* at PageID##1217–18, 1255–56.) Plaintiffs' theory runs smack into the APA's six-year statute of limitations, *see, e.g.*, *Friends of Tims Ford v. TVA*, 585 F.3d 955, 966 (6th Cir. 2009), which precludes any challenge to TVA's

---

[8]     Although the Court should first determine whether Plaintiffs have standing, TVA discusses the substantive issues first to help contextualize the Court's standing analysis. *See infra* pp. 15-33.

[9]     TVA respectfully maintains its objection to the Court's ruling on this issue. (*E.g.*, Doc. 71-1 at PageID##5384–85 & n.3.)

use of automatic renewal and termination notice provisions because those provisions have been part of the Power Contract since the late 1980s—long before the LTA. (SOF, Doc. 73 ¶¶ 12–13.)

As the Court recognized (Doc. 51 at PageID#5137), the LTA amended the Power Contract by changing the trigger date for the automatic renewal provision and by extending the termination notice period to twenty years ("the LTA Amendments"). The TVA Board concluded that the LTA Amendments would carry out the purposes of the TVA Act by "helping fulfill TVA's statutory obligation to sell power at rates as low as are feasible." (Doc. 33-5 at PageID#3401.) Thus, the threshold jurisdictional question is whether the automatic renewal and termination notice provisions, as amended by the LTA, are part of the Power Contract's "term" or "terms and conditions" under Section 10 of the TVA Act.

## A. Section 10 Prescribes the "Term" of the Power Contract but Commits the "Terms and Conditions" of the Power Contract, Including the LTA Amendments, to the Discretion of the TVA Board.

The starting point for interpreting a statute is the language of the statute itself, *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 187 (2016), and it is a canon of statutory interpretation that the focus must be on the particular text at issue and "the language and design of the statute as a whole," *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988). Section 10 of the TVA Act empowers the TVA Board "to sell the surplus power not used in [TVA's] operations . . . to States, counties, municipalities, corporations, partnerships, or individuals," and to carry out that authority, Congress authorized the Board "to enter into contracts for such sale for a *term* not exceeding twenty years." 16 U.S.C. § 831i. And Congress further authorized the Board "to include in any contract for the sale of power *such terms and conditions . . . as in its judgment may be necessary or desirable for carrying out the purposes of [the TVA Act].*" *Id.*

Application of the whole-text cannon therefore requires interpretation of Section 10's separate use of "term" and "terms and conditions," which Congress did not define. But each word has a common law pedigree, and "it is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Sekhar v. United States*, 570 U.S. 729, 732 (2013) (cleaned up); *see also Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739–40 (1989) (undefined statutory terms with a settled common law meaning are interpreted accordingly). "In such case[s], absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." *Morissette v. United States*, 342 U.S. 246, 263 (1952).

At common law, the word "term" as applied to time denotes "a fixed period, a determined or prescribed duration." *Black's Law Dictionary* 1639 (4th ed. 1968);[10] *Black's Law Dictionary*, "Term" (11th ed. 2019) ("fixed period of time"). The plural form "terms" refers to "conditions; propositions stated or promises made which, when assented to or accepted by another, settle the contract and bind the parties." *Black's Law Dictionary* 1640 (4th ed. 1968); *Black's Law Dictionary* (11th ed. 2019) ("Provisions that define an agreement's scope; conditions or stipulations."); Restatement (Second) of Contracts Ch. 9 Intro. Note (1981) ("The *terms* of the agreement or promise to a large extent define the obligation created."). "Broadly speaking, a condition is: (1) Any operative fact that will create some new legal relationship, or that will extinguish an existing relationship, or (2) Words or other manifestations that indicate that the particular fact is to have this effect." Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 38:1 (4th ed. 2006); *Black's Law Dictionary* 1639 (4th ed. 1968) (A condition is "[a] clause in a contract or agreement which has for its object to suspend, rescind, or modify the

---

[10]   Cited materials not available on Westlaw are being submitted pursuant to LR 7.2(h).

principal obligation."); *Bouvier's Law Dictionary* 203 (Baldwin's Students Ed. 1934) (same). Or more loosely, a "condition" can be a synonym for "a term, provision, or clause in a contract." *Black's Law Dictionary*, "Condition" (11th ed. 2019).[11]

And this is where Plaintiffs' theory falls apart. They lump the automatic renewal and termination notice provisions together (Doc. 17 at PageID##1217–18, 1255–56) and contend that "*[t]he practical effect* of the automatically renewing and non-expiring contract term, coupled with TVA's onerous and punitive termination clause, is that the so-called long-term agreements, once signed, will last forever" (*id.* ¶ 86). Not so. Plaintiffs' "practical effect" argument misses the mark because the result of conflating the statutory language is Plaintiffs' atextual conclusion that "[t]he TVA Act does not authorize TVA enter into agreements for the sale of electric power that exceed twenty years." (*Id.* ¶ 243). Section 10 says no such thing. It is silent about how long TVA contracts may last; rather, it states only that contracts for the sale of power be "for a *term* not exceeding twenty years." This is a distinction with a critical difference—the length of the contract term is not the same as the duration of the contract itself (i.e., the contractual relationship).

Plaintiffs' TVA Act claim thus invites the Court to engage in an undisciplined statutory interpretation that is wrong for at least three reasons. First, by lumping provisions together to fit their practical effect theory, Plaintiffs ignore that the common law meaning of "term" is a fixed period of a prescribed or determined duration. Therefore, Plaintiffs' argument is "based on the flawed assumption that the 'term' of [a] contract[] necessarily includes any periods of renewal

---

[11]    *Black's Law Dictionary* and the Restatements are reliable sources for the common law meaning of legal terms. W. Eskridge, *Interpreting Law: A Primer on How To Read Statutes and the Constitution* 60–61 (2016) (*Black's Law Dictionary* is preferred when statutes use legal terms of art, and "*Black's* mainly reflects common law use of terms of art . . . ."); *see also McCullen v. Coakley*, 573 U.S. 464, 507 (2014) (Scalia, J., concurring in the judgment) (referring to *Black's Law Dictionary* for common-law meaning of statutory term); *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996) (relying on Restatement (Second) of Trusts for meaning of trust law terms).

following the expiration of the contracts' designated duration of a[n initial term of 20 years]." *Grant Cnty. Black Sands Irrigation Dist. v. U.S. Bureau of Reclamation*, 579 F.3d 1345, 1354–57 (Fed. Cir. 2009). Also, interpreting the word "term" to include the renewal periods or the termination notice period would render meaningless the "will continue in effect for an initial term of 20 years" clause in the LTA (Doc. 33-6 at PageID#3419). *See Grant Cnty.*, 579 F.3d at 1355; *see also Gilham v. TVA*, 488 F. App'x 80, 84 (6th Cir. 2012) ("Contract[s] must be construed to give meaning to every word or phrase.").

Second, the statutory text says nothing about TVA's ability to amend its power supply contracts nor does it prohibit TVA from renewing or extending the Power Contract. Yet, Plaintiffs would have this Court impermissibly read such limitations into Section 10's use of the word "term." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012) (discussing the omitted-case canon and stating that "a matter not covered is to be treated as not covered."). These omissions further confirm that the mechanics of contract administration (e.g., amending, supplementing, renewing, extending) are within the scope of Congress's express authorization to include "terms and conditions" in the Power Contract that the TVA Board deems "necessary or desirable for carrying out the purposes of [the TVA Act]." 16 U.S.C. § 831i.

Section 10's treatment of contract termination notice also forecloses Plaintiffs' interpretation. The statute provides "[t]hat all contracts made with private companies or individuals for the sale of power, which power is to be resold for a profit, *shall contain a provision authorizing the Board to cancel said contract upon five years' notice in writing*." 16 U.S.C. § 831i. Section 10 is otherwise silent about the termination of TVA power supply contracts. Tellingly, Congress knew how to provide contract termination instructions, but it chose to prescribe a termination notice period only for contracts with customers reselling power for profit. "The inclusion of an express

[termination notice] requirement . . . combined with the absence of anything similar" as to the non-profit LPCs "suggests that Congress did not intend to include" termination notice within the meaning of "term" in Section 10. *See Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008); *see also Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, . . . the disparate inclusion or exclusion" creates a presumption of congressional intent).

Thus, to accept Plaintiffs' interpretation would ignore Congress's textual commitment of discretion to the TVA Board to include "necessary or desirable" automatic renewal and termination notice provisions as part of the Power Contract's "terms and conditions." And even should the Court harbor any doubts about the proper construction of Section 10, TVA's interpretation is "accorded special deference" and should be upheld because it "is based on a permissible construction of the statute." *Rebel Motor Freight*, 971 F.2d at 1291; *see also Hardin v. Ky. Utils. Co.*, 390 U.S. 1, 8–9 (1968) (upholding the TVA Board's construction of Section 15d of the TVA Act as within "the range of permissible choices contemplated by the statute").

**B.    Because the Term of the Power Contract, as Amended by the LTA, Never Exceeds Twenty Years, the APA Does Not Authorize Further Judicial Review of Plaintiffs' TVA Act Claim.**

In ruling on TVA's motion to dismiss, the Court accepted Plaintiffs' atextual framing of their TVA Act claim as whether the TVA Act prohibits "contracts lasting longer than twenty years." (Doc. 48 at PageID#5077.) Although Plaintiffs' framing is wrong, the Court has concluded that it "may review whether TVA complied with the TVA Act in setting the LTA length." (*Id.* at PageID#5077.) But this scope of review is limited because the LTA Amendments are part of the Power Contract's "terms and conditions" committed to the discretionary judgment of the TVA Board. Thus, the Court may review only whether these amended provisions cause the Power

Contract to be for a "term . . . exceeding 20 years." 16 U.S.C. § 831i. Because they do not, the Court has no jurisdiction to conduct further APA review.

The APA's "basic presumption of judicial review" of agency action "is 'just' a presumption." *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993) (cleaned up). "[B]efore any review at all may be had, a party must first clear the hurdle of [5 U.S.C.] § 701(a)," *Heckler v. Chaney*, 470 U.S. 821, 828 (1985), which precludes judicial review of agency action "committed to agency discretion by law." Judicial review is not available if the relevant statute—here Section 10 of the TVA Act—"is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830. The Supreme Court generally has limited § 701(a)(2) to "preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. at 191; *accord, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020).

The Fourth Circuit, in a case involving TVA, recognized recently that "the Supreme Court has looked to a few factors" to determine whether agency action falls within a traditionally unreviewable category, the most important of which is that the agency action "enjoy[s] a tradition of nonreviewability." *Holbrook v. TVA*, _ F. 4th. _, 2022 WL 4089813, at *6 (4th Cir. Sept. 7, 2022) (citing *Heckler*). The Fourth Circuit concluded that "an unbroken practice of judicial deference that predates the APA is strong evidence of an area where judicial review is inappropriate." *Holbrook*, 2022 WL 4089813, at *6 (quoting *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987)).

Pertinent here, the TVA Board's discretionary authority to include "terms and conditions" in the Power Contract falls within just such a long tradition of nonreviewability. The Sixth Circuit

has twice concluded that Section 10 of "'the TVA Act accords the TVA a great amount of discretion in its contractual relations with municipalities,'" *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 406 (6th Cir. 2006) (quoting *Matthews v. Town of Greeneville, Tenn.*, 932 F.2d 968, 1991 WL 71414, at *3 (6th Cir. May 2, 1991)), and further has held that "the terms and conditions of TVA's power contracts . . . are part of TVA's unreviewable rate-making responsibilities." *McCarthy*, 466 F.3d at 407. Cases establishing this tradition of judicial deference are legion, dating back to 1938, "eight years before the APA was passed, which makes this tradition a part of the existing law that the APA was understood to embrace and preserve." *Holbrook*, 2022 WL 4089813, at *7 (collecting cases); *McCarthy*, 466 F.3d at 406 (same).

Courts do acknowledge that "even where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority [or] acted unconstitutionally." *Elecs. of N.C., Inc. v. Se. Power Admin.*, 774 F.2d 1262, 1267 (4th Cir. 1985). Even so, review under this standard requires "exceptional circumstances," *Turner v. U.S. Parole Comm'n*, 810 F.2d 612, 616 n.8 (7th Cir. 1987), and it does not allow review "where the challenge is only to the decision itself," *Elecs. of N.C.*, 774 F.2d at 1267. And § "701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based." *Webster v. Doe*, 486 U.S. 592, 600 (1988). Otherwise, a court's review of a claim "that an agency exceeded its legal authority" could swallow the reviewability exception in § 701(a)(2). *Angelex Ltd. v. United States*, 723 F.3d 500, 508 (4th Cir. 2013).

The Court's conclusion that it may review Plaintiffs' TVA Act claim thus presents a discrete "merits [question] of whether the statute actually . . . prohibits the specific actions [Plaintiffs'] allege[]." *Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 343 F.3d 199, 209 (3d Cir. 2003). But because Section 10 vests TVA with broad discretion, the scope of this mini-

merits review is "limited and very differential." *Raymond Proffitt Found.*, 343 F.3d at 210. Or as the Supreme Court put it in *Mach Mining, LLC v. E.E.O.C.*, it is "relatively barebones" judicial review of the statutory "requirements *(and nothing else)*." 575 U.S. 480, 494 (2015).

Applying those narrow, deferential principles here, the LTA amended "[t]he section of the Power Contract entitled 'Term of Contract'" to include amended automatic renewal and termination notice provisions. (Athens LTA (Sept. 24, 2019), Doc. 73-6 at PageID#5500.) But just as before the LTA, the amended section contemplates three separate, distinct periods of fixed duration: "an initial term of 20 years," automatic or evergreen "1-year renewal term(s)," and a termination notice period. (*Compare id.*, *with* Athens Supp. 85 (Dec. 16, 2015), Doc. 73-18 at PageID#5739, *with* Athens Supp. 38 (Oct. 1, 1997), Doc. 73-19 at PageID#5741, *and* Athens Supp. 16 (Oct. 1, 1989), Doc. 73-10 at PageID#5527.) The "initial term of 20 years" remains unchanged by the LTA. (*Compare* Athens Supp. 16 (Oct. 1, 1989), Doc.73-10 at PageID#5527, *with* Athens LTA, Doc. 73-6 at PageID#5500.) And just as it has since 1989, the automatic renewal provision continues to establish a condition the occurrence of which triggers an evergreen "1-year renewal term." (*Compare* Athens LTA, Doc. 73-6 at PageID#5500, *with* Athens Supp. 16 (Oct. 1, 1989), Doc. 73-10 at PageID#5527.) Before the LTA, "the weighted average length of the termination notice required under" the Power Contract before the LTA was "less than 7 years." (Doc. 33-5 at PageID#3401.) As amended by the LTA, the termination notice provision establishes a condition the occurrence of which would suspend the annual automatic renewals and trigger a 20-year termination notice period. (*Id.*)

To be sure, the LTA Amendments are subject to the 20-year "term" in Section 10. But they are not part of the "term." Consider the example of Athens. As amended by the LTA, the initial 20-year term expired in 2004, but by operation of the automatic renewal provision (both before

and after the LTA), Athens' Power Contract, at any given time, is for a term that does not exceed 20 years. If Athens were to give notice, the automatic renewal provision would cease to operate, and the termination notice period would be 20 years. (Athens LTA, Doc. 73-6 at PageID#5500.) Thus, there are no circumstances under which the Power Contract, as amended by the LTA, is for a "term . . . exceeding 20 years." Both the initial term and the termination notice period are limited to twenty years. (*Id.*) And no matter how you do the math, the "1-year renewal term(s)" that may arise by operation of the automatic renewal provision never exceed twenty years. (*Id.*) Therefore, Plaintiffs' allegations that TVA has "acted in a manner contrary to law are empty words." *Ness Inv. Corp. v. U.S. Dep't of Agr., Forest Serv.*, 512 F.2d 706, 717 (9th Cir. 1975).

No further judicial review is necessary or allowed. *See Mach Mining*, 575 U.S. at 494. Because Section 10 otherwise leaves it to the TVA Board's discretion to decide whether "terms and conditions," such as the LTA Amendments, are "necessary or desirable" to carry out the purposes of the TVA Act, the Court's APA jurisdiction extends no further. As explained in *Heckler*, the lack of manageable standards "for judging how and when [TVA] should exercise its discretion" under Section 10 makes "it is impossible to evaluate" the LTA Amendments for abuse of discretion. 470 U.S. at 830. Accordingly, except for the discrete merits issue on which TVA is entitled to summary judgment, Plaintiffs' TVA Act claim should be dismissed for lack of subject matter jurisdiction because it necessarily challenges the "terms and conditions" of the Power Contract.

## II.   TVA is Entitled to Summary Judgment on Plaintiffs' NEPA Claim Because TVA Reasonably Concluded That the LTA Amendments Did Not Require a NEPA Review. Alternatively, Plaintiffs' Claim is Categorically Excluded from NEPA Review.

Plaintiffs' NEPA claim is based on the LTA's amendment of the Power Contract's automatic renewal and termination notice provisions, not the 3.1% bill credit. (Doc. 59 at

PageID#5229 n.3.) However, the Court has not decided what constitutes the final agency action for purposes of the NEPA claim and has "urge[d] the parties to clarify their positions on this point." (Doc. 67 at PageID#5312 n.2.)

As an initial matter, "Plaintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of [5 U.S.C. §] 551(13)." *E.g.*, *Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000). But in TVA's view, the only NEPA-related decision that satisfies the final agency action criteria, *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), is TVA's August 19, 2019 decision that the LTA Amendments did not require a NEPA review. *See Catron Cnty. Bd. of Comm'rs, N.M. v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) ("alleged failure to comply with NEPA is a final agency action"); *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 397 F.Supp.2d 1241, 1250–51 (D. Mont. 2005) (decision not to perform a NEPA review is a final agency action). Plaintiffs' Amended Complaint confirms this point, "alleg[ing] violations of NEPA and the 1978 regulations promulgated by the Council on Environmental Quality because those regulations were in effect *in August of 2019 when the subject agency action occurred*." (Doc. 17 ¶ 39 & n.2; *see also id.* ¶ 44 ("*before* proceeding with the action" (emphasis in original)).) And Plaintiffs' NEPA claim specifically alleges that TVA violated NEPA because TVA did not "prepare an EA or an EIS *before* it adopted and implemented" the LTA. (*Id.* ¶ 227.)

### A.    The LTA Amendments Are Not Subject to NEPA.

### 1.    Agency actions that do not proximately cause a significant impact to the physical environment or that do not result in a change to the environmental status quo are not subject to NEPA.

NEPA's procedural process ensures that agencies consider the environmental impact of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §

4332; *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004). In short, NEPA "requires federal agencies to prepare an EIS for major federal actions that will affect the environment." *Nat'l Wildlife Fed'n v. Dep't of Transp.*, 960 F.3d 872, 879 (6th Cir. 2020).

But NEPA does not require an assessment of "*every* impact or effect of" a proposed agency action, just the impact or effect on the physical environment. *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983) (emphasis in original). NEPA's applicability, therefore, requires "a reasonably close causal relationship"—something akin to proximate causation—between the impact on the physical environment and the agency action. *Metro. Edison*, 460 U.S. at 774; *Nat'l Wildlife Fed'n*, 960 F.3d at 879. Thus, the NEPA process is triggered only if the agency decision at issue constitutes a major federal action that proximately causes a significant impact or effect on the physical environment. *See Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 512 (4th Cir. 1992) ("Only proposals for a 'major' federal action . . . require review by an agency under NEPA."); *Macht v. Skinner*, 916 F.2d 13, 16–17 (D.C. Cir. 1990) (same). Without such a major federal action, there is no "duty to prepare an EIS or to conduct an EA." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F.Supp.2d 9, 25 (D.D.C. 2013); *accord, e.g.*, *Min. Pol'y Ctr. v. Norton*, 292 F.Supp.2d 30, 53 n.27 (D.D.C. 2003) ("If there is no 'major Federal action,' that is the end of the inquiry; the agency need not prepare an EIS.").

Accordingly, the "threshold legal question [is] whether an action falls within NEPA in the first place." *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 n.5 (D.C. Cir. 2001). The answer depends on whether the agency decision is a major federal action that has a reasonably close causal relationship to a significant impact on the physical environment. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 64 F.Supp.3d 128, 153 (D.D.C. 2014), *aff'd*, 803 F.3d 31 (D.C. Cir. 2015). There is no litmus test for determining "what constitutes 'major Federal

25

action." *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1134 (5th Cir. 1992). Instead, the determination depends on the factual circumstances of each case. *Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 175 F.Supp.2d 755, 771 (E.D. Pa. 2001). And an "agency's determination that its actions do not constitute a 'major Federal action' is reviewed for reasonableness under the circumstances." *Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 277 (6th Cir. 2001).

Courts have recognized a few categories of agency actions that are not subject to NEPA because they are not major federal actions under 42 U.S.C. § 4332. Among those are agency actions that do not have a reasonably close causal relationship to an impact on the physical environment and agency actions that do not result in a change to the environmental status quo. *See, e.g.*, *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 680 (5th Cir. 1992) ("[T]he inquiry in NEPA cases is whether the federal action at issue is 'proximately related to a *change* in the physical environment.'" (quoting *Metro. Edison*) (emphasis in original); *Comm. for Auto Resp. (C.A.R.) v. Solomon*, 603 F.2d 992, 1002–03 (D.C. Cir. 1979) ("The duty to prepare an EIS normally is triggered when there is a proposal to change the status quo."). If it were otherwise, an agency would be required "to prepare an EIS every time it takes an action consistent with past conduct [which] would grind agency decisionmaking to a halt." *Idaho Conservation League v. Bonneville Power Admin.*, 826 F.3d 1173, 1177 (9th Cir. 2016).

The Ninth Circuit's decision in *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774 (9th Cir. 2019), is pertinent. In *Ilano*, the Forest Service "issued a two-page white paper" in which it concluded that NEPA did not apply to the designation of landscape-scale areas because the designation did "not alter future land use or otherwise foreseeably impact the environment." 928 F.3d 774, 778. Environmental groups sued alleging that evaluating the landscape-scale area

designation in a white paper "without first preparing an EA or an EIS" violated NEPA. *Id.* at 779. The Ninth Circuit affirmed summary judgment for the agency, holding that NEPA did not require the preparation of an EA or an EIS because the landscape-scale area designation did "not alter future land use or foreseeably impact the environment" and that, contrary to the environmental groups' claims, "NEPA does not require" agencies to "consider the environmental effects that speculative or hypothetical projects might have." *Id.* at 781 (cleaned up).

Similarly, in *C.A.R. v. Solomon*, the plaintiffs argued that the General Services Administration violated NEPA by leasing space to a parking management firm without first preparing an EIS "even though the leasing arrangement [was] a continuing project." 603 F.2d at 1001–02. Before executing the lease, GSA had prepared a short "environmental analysis" concluding that the lease arrangement would not be a major federal action significantly affecting the environment. *Id.* at 1001. The D.C. Circuit affirmed the dismissal of the lawsuit, holding that there was no change to the status quo ante and, thus, no major federal action. *Id.* at 1003.

*Int'l Ctr. for Tech. Assessment v. Thompson*, 421 F.Supp.2d 1 (D.D.C. 2006), and *All. for Bio-Integrity v. Shalala*, 116 F.Supp.2d 166 (D.D.C. 2000), also illustrate the point. The plaintiffs in both cases argued that the challenged agency actions violated NEPA because they were made without first preparing an EA or an EIS. *Int'l Ctr. for Tech.*, 421 F.Supp.2d at 5; *Bio-Integrity*, 116 F.Supp.2d at 170. The courts found for the agencies in both cases because "agency decisions that maintain the substantive status quo do not constitute major federal actions under NEPA." *Bio-Integrity*, 116 F.Supp.2d at 174; *Int'l Ctr. for Tech.*, 421 F.Supp.2d at 8 (same).

Also, where the result of the challenged agency decision is the continued operation of a facility, there is no change to the environmental status quo and, thus, no major federal action requiring the preparation of an EIS. *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921

F.2d 232, 235 (9th Cir. 1990) (finding continued operation of a dam did not require NEPA review because "[i]ts operation is and has been carried on and the consequences have been no different than those in years past"); *Burbank Anti-Noise Grp. v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir. 1980) ("An EIS need not discuss the environmental effects of mere continued operation of a facility.").

### 2.     TVA reasonably determined that the LTA Amendments did not require a NEPA review.

An agency's decision that a particular action "is not subject to NEPA is a question of law, subject to de novo review," *Citizens Against Rails-to-Trails*, 267 F.3d at 1150–51, and an agency's threshold decision "that certain activities are not subject to NEPA's procedures" is judged according to a "standard of 'reasonableness,'" *e.g.*, *Northcoast Env't Ctr. v. Glickman*, 136 F.3d 660, 667 (9th Cir. 1998). Under this standard, courts examine the administrative record to determine whether the agency reasonably concluded that the particular action would have no impacts that would significantly affect the physical environment. *Lower Alloways Creek Twp. v. Pub. Ser. Elec. & Gas Co.*, 687 F.2d 737, 741–42 (3d Cir. 1982).

In June 2019, TVA's Vice-President of Pricing & Contracts, Cassidy Larson, requested that TVA's Senior NEPA Specialist, Matthew Higdon, "determine whether the [long-term partnership proposal] was subject to review under NEPA." (Higdon Decl., Doc. 73-24 ¶ 5.) They discussed the proposal, and Mr. Higdon learned "that the LTP Proposal would result in 'literally no change at all' to TVA's load and "[n]o change in [TVA's] generation mix." (*Id.* ¶ 7; Doc. 33-26 at PageID#4235.)

In August 2019, Mr. Higdon prepared a NEPA Memo after "discuss[ing] the proposal at length with" TVA's Pricing and Contracts organization, TVA's Enterprise Planning organization, and TVA's Office of the General Counsel. (NEPA Memo, Doc. 33-26 at PageID##4234–35;

Higdon Decl., Doc. 73-24 ¶ 11.) As in *Ilano* and *C.A.R.*, the NEPA Memo summarized the determination of TVA's NEPA Program that the proposal was "not subject to review under NEPA" because it "would not result in any impacts to the physical environment and would not have any effect on growth of DER. In essence, the proposal would not change the 'environmental status quo.'" (Doc. 33-26 at PageID##4235–36.) Specifically, the NEPA Memo concluded that the LTA Amendments "would not result in any physical environmental impacts," "would have no effect on TVA's generation portfolio mix," and "would have the effect of continuing the 'environmental status quo' for which review under NEPA is not required since current environmental conditions would continue under the proposal without change." (*Id.* at PageID#4235.)

As referenced in the NEPA Memo, the proposed action was an amendment to the automatic renewal and termination notice provisions in the existing Power Contract. (*Id.* at PageID#4234.) Because TVA determined that the LTA Amendments would not result in any impacts to the physical environment, TVA reasonably concluded that NEPA did not require TVA to perform an environmental review. *See Metro. Edison*, 460 U.S. at 772. Moreover, if accepted by LPCs, the result of the amendments would be nothing more than a change on paper,[12] but TVA's generation facilities would continue to supply all of the LPC's power requirements just as they did before the LTAs were executed, which confirms the reasonableness of TVA's determination that the proposed action would not change the environmental status quo. *See, e.g.*, *Upper Snake River*, 921 F.2d at 235.

The LTA Amendments simply continued the "all requirements" contractual relationships that TVA has had with LPCs for nearly ninety years. (SOF, Doc. 73 ¶ 10.) These longstanding

---

[12]    (*See generally* SOF, Doc. 73 ¶¶ 47–51 (comparing, as a representative example, the relevant amendments to the Athens LTA).)

contractual relationships also reinforced the NEPA Program's conclusion that the amendments "would not change the 'environmental status quo'" because TVA's power supply planning already accounted for the need to supply power to LPCs for the full 20-year period evaluated in TVA's 2019 IRP (NEPA Mem., Doc. 33-26 at PageID#4236). The 2019 IRP "is a long-term plan that provides direction on how TVA can best meet future demand for power" for a twenty-year period (2019 IRP, Doc. 33-14 at PageID#3495), and the 2019 IRP evaluated "the minimum amount of capacity required to ensure reliable power" for all TVA customers, including all 153 LPCs, during the twenty-year planning period evaluated in the IRP. (*Id.* at PageID#3501; *see also* 2019 IRP EIS, Doc. 33-19 at PageID#3796 (The 2019 IRP and the EIS "address[ed] the demand for power in the TVA service area, the resource options available for meeting that demand, and the potential environmental, economic and operating impacts of these options.").) The Record of Decision for the EIS confirmed that the 2019 IRP is the basis for TVA's "energy resource strategies that will meet demand for electricity in its service area over a 20-year planning period." 84 Fed. Reg. 48,987 (Sept. 17, 2019).

Accordingly, as summarized in the NEPA Memo, the facts in the administrative record provide ample support and a rational connection between the facts and TVA's determination that the LTA Amendments would not result in any impacts to the physical environment and would not change the environmental status quo. And under NEPA's inherent "rule of reason," *Pub. Citizen*, 541 U.S. at 767, TVA permissibly concluded that "no purpose would be served by conducting a NEPA review." (NEPA Mem., Doc. 33-26 at PageID#4236.) In keeping with the Court's limited role "in reviewing the sufficiency of an agency's consideration of environmental factors," *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978), it likewise follows that TVA did not violate NEPA. Therefore, TVA is entitled to summary judgment on

Plaintiffs' APA claims because TVA acted in accordance with law, *see City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007), and its NEPA determination was not arbitrary or capricious, *see Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018); *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 370–71 (6th Cir. 2010).

**B.     The LTA Amendments Are Categorically Excluded From NEPA.**

Normally, a reviewing court may not affirm an agency decision on a ground other than that relied upon by the agency. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). But *Chenery* reversal is unnecessary where the agency's conclusion was legally correct, albeit not for the reason(s) articulated, and the agency's incorrect reasoning was confined to a discrete question of law. *United Video, Inc. v. F.C.C.*, 890 F.2d 1173, 1190 (D.C. Cir. 1989); *accord, e.g.*, *Penn. Dep't of Hum. Servs. v. United States*, 897 F.3d 497, 506 n.5 (3d Cir. 2018). Also, "*[w]hen an agency raises a purely legal argument for the first time in litigation*, a court may consider that argument if it is both clearly correct and would render remand pointless under the harmless error standard." *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 304 (D.C. Cir. 2022) (applying exception in a NEPA case). These exceptions are applicable here; thus, TVA is entitled summary judgment because, for the reasons summarized in the TVA's NEPA Memo, the LTA Amendments are covered under at least two categorical exclusions set forth in TVA's 1983 NEPA procedures.

The Council on Environmental Quality ("CEQ") has promulgated NEPA regulations allowing agencies to adopt "categorical exclusions" for actions that do not normally have, individually or cumulatively, a significant impact on the quality of the human environment and, therefore, do not require an EA or an EIS except in extraordinary circumstances. *Sierra Club v.*

*U.S. Forest Serv.*, 828 F.3d 402, 408 (6th Cir. 2016) (quoting 40 C.F.R. § 1508.4)).[13] In other words, a categorical exclusion is essentially a Finding of No Significant Impact that has been promulgated as a regulation.

In 1982, TVA proposed amendments to its NEPA procedures, 47 Fed. Reg. 54,586 (Dec. 3, 1982), and they became effective in 1983 with the concurrence and approval of CEQ, 48 Fed. Reg. 19,264 (Apr. 28, 1983). TVA's 1983 NEPA procedures remained in effect until 2020, 85 Fed. Reg. 17,434 (Mar. 27, 2020) (codified at 18 C.F.R. pt. 1318 (Apr. 27, 2020)), and would have applied in August 2019. *See Utah Env't Cong. v. Bosworth*, 372 F.3d 1219, 1221 n.1 (10th Cir. 2004). Two of TVA's 1983 categorical exclusions are relevant here:

6. Contracts or agreements for the sale, purchase, or interchange of electricity.

27. Any action which does not have a primary impact on the physical environment.

TVA determined that these two categories "require neither the preparation of an EA nor an EIS." 47 Fed. Reg. at 54,588. TVA's 1983 NEPA procedures did not require any supporting documentation when a proposed action fits within one of these categorical exclusions, *id.*, which was consistent with CEQ's guidance, 48 Fed. Reg. 34,263, 34,265 (July 28, 1983).

Here, TVA's NEPA Memo provides documentation from which it is reasonable to conclude that the LTA Amendments fall within Categorical Exclusion Nos. 6 and 27 and "are automatically exempted from the requirement that the environmental consequences be evaluated." *Help Alert W. Ky., Inc. v. TVA*, 191 F.3d 452, 1999 WL 775931, at * 1 (6th Cir. Sept. 24, 1999) (applying reasonableness standard). Because these categorical exclusions apply, the Court may uphold the NEPA Memo's conclusion even if the Court were to disagree with the reasoning. *See*

---

[13]     TVA agrees with Plaintiffs (Doc. 17 at PageID#1208 n.2) that the CEQ regulations in effect in 2019 are applicable here, which generally were promulgated by CEQ in 1978.

*United Video*, 890 F.2d at 1190. Alternatively, remanding Plaintiffs' NEPA claim for further environmental review would be pointless because TVA's 1983 NEPA procedures would govern, *see, e.g.*, *Utah Env't Cong.*, 372 F.3d at 1221 n.1, and it would be "clearly correct" for TVA to apply Categorical Exclusion Nos. 6 and 27, *see, e.g.*, *Oglala Sioux*, 45 F.4th at 304.

**III.    Because Plaintiffs Do Not Have Standing to Bring Their TVA Act and NEPA Claims, the Amended Complaint Should Be Dismissed for Lack of Subject Matter Jurisdiction.**

Judicial review is not available under the APA unless Plaintiffs first establish that they meet both Article III and prudential standing requirements. *Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 488 (1998). Standing requires that a plaintiff have a "personal stake" in the outcome of a dispute. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). To demonstrate standing, the plaintiff must show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* Whether Plaintiffs have standing to assert their "NEPA claims and TVA [Act] claims is an issue of law subject to *de novo* review." *Friends of Tims Ford v. TVA*, 585 at 966 (cleaned up).

Plaintiffs may establish Article III standing in two ways. First, an organization may assert organizational standing "on its own behalf [where] it has suffered a palpable injury as a result of the defendants' actions." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–33 (6th Cir. 2002). Second, an organization may *sometimes* assert associational standing as the representative of its members where "(1) its members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim requested nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 537 (6th Cir. 2021)

(questioning the validity of associational standing). In either case, an organization has standing only if it demonstrates that it or its individual members meet the three elements of constitutional standing. *Shelby Cnty. Advocs. for Valid Elections v. Hargett*, No. 2:18-CV-2706, 2019 WL 4394754, at *5, 7 (W.D. Tenn. Sept. 13, 2019).

Here, at the summary judgment stage, Plaintiffs have failed to meet their heightened burden to adduce facts demonstrating that they satisfy the requirements for either organizational or associational standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs' claims also should be dismissed because neither Plaintiffs nor their members meet the requirements for statutory (zone of interests) or prudential standing. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

### A.   Plaintiffs Lack Standing to Bring Their TVA Act Claim.

Section 10 of the TVA Act applies to TVA and the power customers with which TVA contracts. 16 U.S.C. § 831i. But TVA does not sell power to Plaintiffs, and no Plaintiff or member of a Plaintiff organization is a signatory to the Power Contract. And no Plaintiff organization even alleges it is a customer of a TVA LPC. (Docs. 17-7 to 17-9, 17-12 to 17-13.). The best Plaintiffs can do is show that *some* of their members are customers of LPCs that, in turn, contract with TVA for their power supply. Collectively, these members are customers of only four of the 147 LPCs that have signed the LTA: Athens, Huntsville, Cumberland, and Powell Valley. (Docs. 17-9 to 17-11, 17-14 to 17-16.) It is well-known to this Court that MLGW has not signed the LTA (Order, Doc. 48 at PageID#5083 n.5); thus, Plaintiff Protect our Aquifer and its members have not suffered an injury and do not have constitutional standing to assert a TVA Act claim.

Further, this is an APA case, and the predicate for the constitutional injury Plaintiffs allege is the challenged final agency action. *E.g.*, *United States v. Students Challenging Regul. Agency*

*Procs.*, 412 U.S. 669, 686 (1973). As this Court previously determined, TVA's entry into each long-term agreement is a separate final agency action for purposes of Plaintiffs' TVA Act claim. That means Plaintiffs, at best, have standing to challenge only the LTAs signed by the four LPCs of which their members are customers and that Plaintiffs have no standing to challenge the LTAs signed by the other 143 LPCs of which their members are not customers.[14]

Plaintiffs' TVA Act claim thus hangs on their ability to demonstrate standing to challenge TVA's execution of the LTAs with only four LPCs (Athens, Huntsville, Cumberland, and Powell Valley). Again, Plaintiffs fall short. Plaintiffs Energy Alabama and Appalachian Voices do not claim to be power customers of TVA or an LPC. (Docs. 17-9, 17-11, 17-12, 17-13.) And Plaintiffs' standing declarants are not third-party beneficiaries of their respective LPCs' Power Contract with TVA and have no legally protectable rights under those contracts. *Cauthen v. TVA et al.*, No. CIV 1-87-75, slip op. at 3–4 (E.D. Tenn. June 26, 1987) (LPC customer not a third-party beneficiary of the Power Contract between TVA and the LPC); *see TVA. v. Exxon Nuclear Co.*, 753 F.2d 493, 498 (6th Cir. 1985) (Unless the parties to the contract intend that the contract "be for the direct benefit of a third party, no duty to a third party is created.").

Also, establishing injury-in-fact requires Plaintiffs to demonstrate a concrete harm—an injury that "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts," such as a physical or monetary harm. *TransUnion*, 141 S. Ct. at 2203.

---

[14]    Because neither Plaintiffs nor their members claim a connection to the other 143 LPCs, they cannot show a particularized injury that affects them in a personal and individual way or, for that matter, a concrete injury that is "real and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016) (cleaned up). And the Plaintiff organizations have not alleged any connection to the other 143 LPCs, much less demonstrated that they have had to "divert resources from [their] mission" in those LPCs' service territories. *See Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020). This dooms Plaintiffs' assertion of associational and organizational standing to challenge TVA's execution of the other 143 LTAs. *See id.*

Plaintiffs have failed to show that either will result from the LTA Amendments, and mere speculation about the future risk of higher electricity prices is not the type of concrete monetary injury (i.e., money damages) required for standing. *See id.* at 2204. Instead, Plaintiffs and their standing declarants assert a hodgepodge of speculative, intangible injuries ranging from risk of future environmental harm; waste of their members' time and resources; risk of fewer clean energy jobs in the future; possible constraints to TVA's and LPCs' future investments in renewable energy; and harm to Plaintiffs' ability to advocate, to be involved in community decisions, and to stand up for their beliefs. (Doc. 17 at PageID##1236, 1241–43, 1246–51, 1254, 1257–58.)

Casting aside this unsubstantiated rhetoric, none of these alleged intangible harms has a close relationship to harms traditionally recognized under American law. *See TransUnion*, 141 S. Ct. at 2204. They also epitomize the kind of "conjectural or hypothetical" injuries that are not sufficient to establish Article III standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). "The risk of future harm" is not sufficient either. *TransUnion*, 141 S. Ct. at 2213; *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 983 (6th Cir. 2020). And while Congress may sometimes elevate a harm to constitutional status, *see TransUnion*, 141 S. Ct. at 2204–05, it has not done so here because Congress did not provide for a private right of action anywhere in the TVA Act, much less in Section 10. *See id.* at 2205–07; *see also Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014) ("[I]f the armchair observer decides that the government is violating the law, and decides to stop it by suing, that is not enough.").

Plaintiffs also allege that the LTA Amendments will stifle a competitive electricity market in the future and recite a laundry list of general "concerns" and other statements about Plaintiffs' perception of the public interest. These allegations do not cut it either. "Expressions of generalized concern are insufficient to establish the requisite injury." *Ctr. for Biological Diversity v. Lueckel*,

417 F.3d 532, 538 (6th Cir. 2005). And Plaintiffs' concerns about the public interest and the electricity market in the Tennessee Valley region should be addressed to Congress—not this Court. *See, e.g.*, *TransUnion*, 141 S. Ct. at 2220.

No concrete harm, no organizational or associational standing. Likewise, Plaintiffs have "failed to provide evidence that their organizations have expended or diverted resources—whether time, money or otherwise—as a result of TVA's conduct." *Ctr. for Biological Diversity v. TVA.*, No. 3:21-CV-319-TAV-DCP, 2022 WL 4137824, at *4 (E.D. Tenn. Sept. 12, 2022). Their inability to clear this additional hurdle required for an organizational injury makes it unnecessary to reach Plaintiffs' failure to "show actual present harm or a significant possibility" of concrete future harm to support their claims for injunctive and declaratory relief. *See Shelby Cnty. Advocs.*, 2019 WL 4394754, at *5.

But even if these injuries were sufficient—and assuming Plaintiffs could show causation—Article III standing still would elude them because Plaintiffs have not shown that a favorable ruling would redress their alleged injuries. Where, as here, the asserted injuries arise from TVA's "allegedly unlawful regulation . . . of *someone else*" (TVA's contracts with LPCs), redressability hinges on the responses of the LPCs to TVA's action or inaction. *See Lujan*, 504 U.S. at 562 (emphasis in original). Regardless of the outcome in this case, "TVA would still be free to" generate and supply power to the LPCs in exactly the same way as before the LTAs were executed. *See Ctr. for Biological Diversity v. TVA.*, 2022 WL 4137824, at *8 n.10. And the four LPCs from which some of Plaintiffs' members purchase electricity still would be required to purchase all of their power requirements from TVA. (*E.g.*, Athens LTA, Doc. 73-6 at PageID#5500.) Thus, Plaintiffs' ultimate relief depends on whether these four LPCs maintain TVA as their power supplier, but these third parties are not before the court. And Plaintiffs do not speak for these LPCs

or even claim to represent their interests. Therefore, "a favorable decision by this court is not likely to redress [Plaintiffs'] injur[ies]." *See Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345 (6th Cir. 2016) (citing *Lujan*).

Finally, Plaintiffs' have failed to establish the statutory and prudential standing requirements for their TVA Act claim. First, Plaintiffs fail the "zone of interests" test, which asks whether, using traditional statutory interpretation tools, "a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). In the APA context, this test requires a showing that Plaintiffs be "arguably within the zone of interests to be protected or regulated by the statute" under which they are suing. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Section 10 of the TVA Act serves to protect TVA and the power customers with which TVA contracts—not environmental groups or their members. *See Dean v. Herrington*, 668 F.Supp. 646, 654 (E.D. Tenn. 1987); *cf. Hardin v. Ky. Utils.*, 390 U.S. 1, 7 (1968); *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 958 (D.C. Cir. 2000) (environmental group not within zone of interests protected by ratemaking provision in the Federal Power Act).

Further, because Section 10 confers no legally protected interests on Plaintiffs or their members, they lack prudential standing to bring their TVA Act claim under "the long-recognized limit on plaintiffs asserting the rights of third parties." *See Fair Elections Ohio*, 770 F.3d at 461. In sum, Plaintiffs' disagreement with the LTAs is a nonjusticiable generalized grievance insofar as the alleged harm is based on the proper application of Section 10, and any relief granted to Plaintiffs would benefit them no more than it does the public at large. *See Ctr. for Biological Diversity v. TVA.*, 2022 WL 4137824, at \*7–8 & n.7 (finding the declaration submitted by Energy Alabama's Daniel Tait amounted to no more than a generalized grievance).

B.      **Plaintiffs Lack Article III Standing to Bring Their NEPA Claim.**

This Court indicated that Plaintiffs would have do more at the summary judgment stage to establish standing. (Doc. 48 at PageID##5091–93.) But time has not improved the weakness of Plaintiffs' claim to Article III standing. As to NEPA-related injuries, Plaintiffs and their ten standing declarants allege that TVA's decision not to review the LTA in an EIS ultimately will harm the environment; has deprived them of the opportunity to participate in a NEPA review as public commenters; and has deprived them of access to NEPA information which harmed their advocacy interests, all of which this Court recognized depend "on a bit of speculation." (Order, Doc. 48 at PageID#5091.)[15]

The fundamental defect underlying all Plaintiffs' alleged NEPA injuries is the flawed assumption that the LTA Amendments somehow guide the resource planning decisions necessary to meet TVA's system load requirements. (Doc. 17 ¶ 230.) But Plaintiffs know better. Pursuant to 16 U.S.C. § 831m-1, TVA makes these decisions through its IRP process. Daniel Tait, one of Plaintiffs' standing declarants (Doc. 17-9), represented Plaintiff Energy Alabama on the IRP Working Group (2019 IRP, Doc. 33-14 at PageID#3536). Mr. Tait and other "IRP Working Group members reviewed and commented on proposed scenarios, planning assumptions, analytical techniques, energy resource options and strategies . . . load and commodity forecasts, resource

---

[15]      Actually, Plaintiffs' alleged informational and advocacy-related injuries depend entirely on speculation. To avoid the general rule that these types of injuries alone are insufficient, Plaintiffs must show (1) deprivation of information that a statute required TVA to disclose; and (2) the non-disclosure resulted in the type of harm Congress intended to prevent. (Order, Doc. 48 at PageID#5092.) Plaintiffs fail both prongs. TVA's 1983 NEPA procedures generally did not provide for public comment or participation unless TVA determined that an EIS should be prepared, 47 Fed. Reg. at 54,589, a legal question the Court may resolve as part of the standing inquiry, *State of Utah v. Babbitt*, 137 F.3d 1193, 1207 n.20 (10th Cir. 1998). And Plaintiffs have not shown "deprivation of information under NEPA any greater than that which is suffered by the general public." *Ctr. for Biological Diversity v. Bernhardt*, No. 19-cv-02898 (APM), 2020 WL 5702087, at *6 (D.D.C. Sept. 24, 2020).

planning framework, resource options and energy efficiency and DER approach in the IRP models;" and they shared "a wide range of views on specific issues such as the value of DER and [energy efficiency] programs, environmental concerns and the costs associated with various generation technologies." (*Id.* at PageID#3535; *contra* Am. Compl. Doc. 17 ¶¶ 231, 233–34.)

Plaintiffs Energy Alabama and its standing declarants (Tait and Rossow) and Appalachian Voices and its standing declarants (Knisley, Kornrich, McIntosh, and Tobey) commented extensively on the IRP EIS, and TVA responded to those comments. (2019 IRP EIS, Doc. 33-24 at PageID##4141, 4144, 4178–79; Doc. 33-25 at PageID##4180–81, 4227–28, 4230.) TVA also provided all three Plaintiffs and all ten of their standing declarants with copies of the IRP EIS. (2019 IRP EIS, Doc. 33-22 at PageID##4022–4023, 4027–31.)

Additionally, as organizations, Plaintiffs have not shown that TVA's conduct has "perceptibly impaired [their] ability to provide services," *Tex. Low Income Housing Info. Serv. v. Carson*, 427 F.Supp.3d 43, 52 (D.D.C. 2019), nor have they shown more than a setback to their interests or that they expended resources to counteract any impairment, *id.* at 52–53; *see also Pub. Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 552 (D.C. Cir. 1993) ("[A]lthough the argument that the absence of an EIS 'directly affects' [plaintiff's] ability to lobby Congress and disseminate information seems persuasive on its face, . . . an agency's failure to prepare an EIS, by itself, is not sufficient to trigger APA review in the absence of identifiable substantive agency action putting the parties at risk.").

Worse still, Plaintiffs' NEPA claim is based on alleged "risk" of possible future environmental impacts which they attribute to the LTA Amendments (Doc. 17 at PageID##1229, 1232–33, 1238, 1246), but risk of future environmental impacts is not a concrete harm sufficient to confer Article III standing. *TransUnion*, 141 S. Ct. at 2213. Plaintiffs assert that the LTA

Amendments will harm their members because it will increase reliance on alleged "dirty" sources of electricity (e.g., coal and gas) that purportedly would not occur but-for the amendments. Even *assuming* the veracity of this assertion, where standing is concerned, "[c]ourts cannot simply presume pollution discharged in one place will affect would-be plaintiffs everywhere." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 538 (5th Cir. 2019). And as in *Ctr. for Biological Diversity v. TVA,* Plaintiffs have "failed to show the requisite geographic nexus between the alleged future pollution and their particular interests." 491 F.Supp.3d 1180, 1189 (N.D. Ala. 2020). For example, Protect our Aquifer claims that the LTA, which has not been executed by MLGW, will change the future generation pattern of TVA's Allen Combined Cycle Plant (Doc. 17 ¶ 141), but they "have pointed to no evidence that would connect the [LTA] to the increased use of a specific power plant." *Id.* Likewise, even if Plaintiffs had substantiated their claim that the LTA will lead to decreased future investments in renewables and DER and concomitant increases in fossil fuel use across TVA's seven-state service territory, "[s]uch a large geographic area cannot support Article III standing." *See id.*

Moreover, "NEPA does not require agencies to evaluate the effects of risk, *qua* risk." *Metro. Edison*, 460 U.S. at 779. As discussed *supra*, NEPA requires a reasonably close causal relationship between the impact on the physical environment and the agency action. *Nat'l Wildlife Fed'n*, 960 F.3d at 879. Thus, the Court need not accept Plaintiffs' claim that the LTA Amendments are a major federal action requiring the preparation of an EIS. *State of Utah v. Babbitt*, 137 F.3d 1193, 1214 n.33 (10th Cir. 1998) (Although intertwined with the merits, the Court may "resolve th[is] issue to the extent necessary to determine whether Plaintiffs have suffered an injury-in-fact for standing purposes.").

Yet, even assuming their NEPA-related injuries were sufficient, Plaintiffs still must "prove each link in their chain of causation." (Order, Doc. 48 at PageID#5093.) However, the speculative and attenuated chain of inferences necessary to arrive at Plaintiffs' alleged injuries is fatal to their showing of causation. *Fla. Audubon Society v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996) (en banc), holds that "an adequate causal chain" must contain "at least . . . one [link] connecting the omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an EIS and one [link] connecting that substantive decision to the plaintiff's particularized injury."

Plaintiffs' declarations fail to establish the second link because they have not shown that TVA's decision not to prepare a formal NEPA review for the LTA Amendments caused their alleged procedural injury or will lead to future environmental harm. To establish future environmental harm, Plaintiffs must demonstrate that TVA's decisions would disincentivize third parties from adopting DER without regard to external forces (e.g., tax incentives, rates of innovation driving solar prices, consumer preferences for solar). These actions must also increase demand for energy from fossil plant generation without regard to increased generation capacity from non-fossil sources and irrespective of changes in economic growth, population growth, and weather patterns. TVA's actions must *then* increase pollution independent of other sources (e.g., industrial activity, transportation, other sources of greenhouse gas-emitting activities). And that pollution must emanate from a plant that is within geographic proximity to one of the declarants. "Such a protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury." *Bentsen*, 94 F.3d at 670. Indeed, "the presence and number of third-party links in this causal chain independently corroborate that

42

[plaintiffs'] claim of causation is 'entirely speculative' and insufficient for standing." *Id.* This is the precise causal link that the court recently found lacking in *Ctr. for Biological Diversity v. TVA*, 491 F.Supp.3d at 1186–89.

More fundamentally, Plaintiffs concede that the 2019 IRP and accompanying EIS "assume that TVA will continue to provide power for all of its 153 distributors for the next twenty years." (Doc. 17 ¶ 120.) The EIS stated that, under every alternative strategy evaluated, "TVA would continue to operate most of its existing generation units for the duration of the 20-year planning period," except for the coal plants/units and older gas units that would be *retired*. (2019 IRP EIS, Doc. 33-22 at PageID#3994.) Plaintiffs' undisputed knowledge of TVA's power supply planning process and the IRP's contemplated shift toward more renewable generation means that Plaintiffs' NEPA claim is not credible and that this lawsuit is either an attempted end-run around a challenge to the sufficiency of the IRP EIS or a misuse of NEPA as "a vehicle for the airing of general policy objections to federal action." *Olmstead Citizens for a Better Cmty. v. United States*, 793 F.2d 201, 204 (8th Cir. 1986).

Finally, although redressability sometimes is a low bar when it comes to NEPA standing (Order, Doc. 48 at PageID##5093–94), here the opposite is true. The redressability inquiry is "quintessentially predictive," *Food & Water Watch v. U.S. Dep't of Agric.*, 1 F.4th 1112, 1118 (D.C. Cir. 2021), and it requires the Court to determine whether TVA's decision not to conduct a formal NEPA review for the LTA Amendments "would, as a practical matter, significantly increase the likelihood that [Plaintiffs or their] members would be relieved of their asserted environmental harms," *id.* at 1116. In the absence of the LTAs, however, TVA still would have a contractual obligation to supply all the power requirements for the four LPCs from which some of Plaintiffs' members purchase their electricity. And TVA would be free to meet those requirements

with its existing generation assets. Plaintiffs cannot show otherwise, nor have they attempted to do so, which renders their claim of redressability wholly speculative. *See id.* at 1117. Thus, because no level of environmental review will alter the foundational contractual obligations between TVA and its LPC customers, Plaintiffs have failed to demonstrate redressability. *See id.* at 1118 (dismissing NEPA claims for lack of redressability).

## CONCLUSION

For the reasons stated and upon the authorities cited above, TVA's motion should be granted because TVA is entitled to dismissal of Plaintiffs' Amended Complaint for lack of subject matter jurisdiction or, alternatively, summary judgment on Plaintiffs' TVA Act and/or NEPA claims.

Respectfully submitted,

*s/David D. Ayliffe*
David D. Ayliffe, (TN BPR 024297)
Director, Litigation
Steven C. Chin (TN BPR 030011)
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.8964
ddayliffe@tva.gov
scchin@tva.gov

Attorneys for Tennessee Valley Authority

114743379

44

## CERTIFICATE OF SERVICE

I certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

*s/Steven C. Chin*
Attorney for Tennessee Valley Authority

# ADDENDUM OF STATUTES AND REGULATIONS

## TABLE OF CONTENTS

**STATUTES**

5 U.S.C. § 702..................................................................................................1a

5 U.S.C. § 703..................................................................................................2a

16 U.S.C. § 831i..............................................................................................4a

16 U.S.C. § 831m............................................................................................6a

42 U.S.C. § 4332.............................................................................................8a

**REGULATIONS**

47 Fed. Reg. 54586.......................................................................................11a

48 Fed. Reg. 19264.......................................................................................28a

84 Fed. Reg. 48987.......................................................................................30a

### CHANGE OF NAME

Committee on Small Business of Senate changed to Committee on Small Business and Entrepreneurship of Senate. See Senate Resolution No. 123, One Hundred Seventh Congress, June 29, 2001.

### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–121 effective on expiration of 90 days after Mar. 29, 1996, but inapplicable to interpretative rules for which a notice of proposed rulemaking was published prior to Mar. 29, 1996, see section 245 of Pub. L. 104–121, set out as a note under section 601 of this title.

### EFFECTIVE DATE

Section effective Jan. 1, 1981, see section 4 of Pub. L. 96–354, set out as a note under section 601 of this title.

### TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of reporting provisions in subsec. (a) of this section, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and page 191 of House Document No. 103–7.

## CHAPTER 7—JUDICIAL REVIEW

Sec.
701.   Application; definitions.
702.   Right of review.
703.   Form and venue of proceeding.
704.   Actions reviewable.
705.   Relief pending review.
706.   Scope of review.

### SHORT TITLE

The provisions of sections 551 to 559 of this title and this chapter were originally enacted by act June 11, 1946, ch. 423, 60 Stat. 237, popularly known as the "Administrative Procedure Act". That Act was repealed as part of the general revision of this title by Pub. L. 89–554 and its provisions incorporated into sections 551 to 559 of this title and this chapter.

### § 701. Application; definitions

(a) This chapter applies, according to the provisions thereof, except to the extent that—
(1) statutes preclude judicial review; or
(2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter—
(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—
(A) the Congress;
(B) the courts of the United States;
(C) the governments of the territories or possessions of the United States;
(D) the government of the District of Columbia;
(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;
(F) courts martial and military commissions;
(G) military authority exercised in the field in time of war or in occupied territory; or
(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix;[1] and

---

[1] See References in Text note below.

(2) "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 103–272, §5(a), July 5, 1994, 108 Stat. 1373; Pub. L. 111–350, §5(a)(3), Jan. 4, 2011, 124 Stat. 3841.)

### HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (a) ............. | 5 U.S.C. 1009 (introductory clause). | June 11, 1946, ch. 324, §10 (introductory clause), 60 Stat. 243. |

In subsection (a), the words "This chapter applies, according to the provisions thereof," are added to avoid the necessity of repeating the introductory clause of former section 1009 in sections 702–706.

Subsection (b) is added on authority of section 2 of the Act of June 11, 1946, ch. 324, 60 Stat. 237, as amended, which is carried into section 551 of this title.

In subsection (b)(1)(G), the words "or naval" are omitted as included in "military".

In subsection (b)(1)(H), the words "functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947" are omitted as executed. Reference to the "Selective Training and Service Act of 1940" is omitted as that Act expired on Mar. 31, 1947. Reference to the "Sugar Control Extension Act of 1947" is omitted as that Act expired on Mar. 31, 1948. References to the "Housing and Rent Act of 1947, as amended" and the "Veterans' Emergency Housing Act of 1946" have been consolidated as they are related. The reference to former section 1641(b)(2) of title 50, appendix, is retained notwithstanding its repeal by §111(a)(1) of the Act of Sept. 21, 1961, Pub. L. 87–256, 75 Stat. 538, since §111(c) of the Act provides that a reference in other Acts to a provision of law repealed by §111(a) shall be considered to be a reference to the appropriate provisions of Pub. L. 87–256.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

### REFERENCES IN TEXT

Sections 1884 and 1891–1902 of title 50, appendix, referred to in subsec. (b)(1)(H), were a part of the various Housing and Rent Acts which were classified to section 1881 et seq. of the former Appendix to Title 50, War and National Defense, and had been repealed or omitted from the Code as executed prior to the elimination of the Appendix to Title 50. See Elimination of Title 50, Appendix note preceding section 1 of Title 50. Section 1641 of title 50, appendix, referred to in subsec. (b)(1)(H), was repealed by Pub. L. 87–256, §111(a)(1), Sept. 21, 1961, 75 Stat. 538.

### AMENDMENTS

2011—Subsec. (b)(1)(H). Pub. L. 111–350 struck out "chapter 2 of title 41;" after "title 12;".

1994—Subsec. (b)(1)(H). Pub. L. 103–272 substituted "subchapter II of chapter 471 of title 49; or sections" for "or sections 1622,".

### § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal author-

ity shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, § 10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

### § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, § 10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United

States, the agency by its official title, or the appropriate officer as defendant.

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, § 10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, § 10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............ | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

### §801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

thorized, whenever an opportunity is afforded, to provide and operate facilities for the generation of electric energy in order to avoid the waste of water power, to transmit and market such power as in this chapter provided, and thereby, so far as may be practicable, to assist in liquidating the cost or aid in the maintenance of the projects of the Authority.

(May 18, 1933, ch. 32, §9a, as added Aug. 31, 1935, ch. 836, §5, 49 Stat. 1076.)

### § 831h–2. Repealed. Pub. L. 86–137, § 1, Aug. 6, 1959, 73 Stat. 280

Section, act July 30, 1947, ch. 358, title II, §201, 61 Stat. 574, placed a limitation on use of power revenues of the Tennessee Valley Authority. See section 831n–4 of this title.

### § 831h–3. Recreational access

#### (a) Definition of floating cabin

In this section, the term ''floating cabin'' means a watercraft or other floating structure—

(1) primarily designed and used for human habitation or occupation; and

(2) not primarily designed or used for navigation or transportation on water.

#### (b) Recreational access

The Board may allow the use of a floating cabin if—

(1) the floating cabin is maintained by the owner to reasonable health, safety, and environmental standards, as required by the Board;

(2) the Corporation has authorized the use of recreational vessels on the waters; and

(3) the floating cabin was located on waters under the jurisdiction of the Corporation as of December 16, 2016.

#### (c) Fees

The Board may levy fees on the owner of a floating cabin on waters under the jurisdiction of the Corporation for the purpose of ensuring compliance with subsection (b) if the fees are necessary and reasonable for such purpose.

#### (d) Continued recreational use

##### (1) In general

With respect to a floating cabin located on waters under the jurisdiction of the Corporation on December 16, 2016, the Board—

(A) may not require the removal of the floating cabin—

(i) in the case of a floating cabin that was granted a permit by the Corporation before December 16, 2016, for a period of 15 years beginning on such date; and

(ii) in the case of a floating cabin not granted a permit by the Corporation before December 16, 2016, for a period of 5 years beginning on such date; and

(B) shall approve and allow the use of the floating cabin on waters under the jurisdiction of the Corporation at such time and for such duration as—

(i) the floating cabin meets the requirements of subsection (b); and

(ii) the owner of the floating cabin has paid any fee assessed pursuant to subsection (c).

##### (2) Savings provisions

(A) Nothing in this subsection restricts the ability of the Corporation to enforce reasonable health, safety, or environmental standards.

(B) This section applies only to floating cabins located on waters under the jurisdiction of the Corporation.

#### (e) New construction

The Corporation may establish regulations to prevent the construction of new floating cabins.

(May 18, 1933, ch. 32, §9b, as added Pub. L. 114–322, title IV, §5003, Dec. 16, 2016, 130 Stat. 1886.)

### § 831i. Sale of surplus power; preferences; experimental work; acquisition of existing electric facilities

The Board is empowered and authorized to sell the surplus power not used in its operations, and for operation of locks and other works generated by it, to States, counties, municipalities, corporations, partnerships, or individuals, according to the policies hereinafter set forth; and to carry out said authority, the Board is authorized to enter into contracts for such sale for a term not exceeding twenty years, and in the sale of such current by the Board it shall give preference to States, counties, municipalities, and cooperative organizations of citizens or farmers, not organized or doing business for profit, but primarily for the purpose of supplying electricity to its own citizens or members: *Provided,* That all contracts made with private companies or individuals for the sale of power, which power is to be resold for a profit, shall contain a provision authorizing the Board to cancel said contract upon five years' notice in writing, if the Board needs said power to supply the demands of States, counties, or municipalities. In order to promote and encourage the fullest possible use of electric light and power on farms within reasonable distance of any of its transmission lines the Board in its discretion shall have power to construct transmission lines to farms and small villages that are not otherwise supplied with electricity at reasonable rates, and to make such rules and regulations governing such sale and distribution of such electric power as in its judgment may be just and equitable: *Provided further,* That the Board is authorized and directed to make studies, experiments, and determinations to promote the wider and better use of electric power for agricultural and domestic use, or for small or local industries, and it may cooperate with State governments, or their subdivisions or agencies, with educational or research institutions, and with cooperatives or other organizations, in the application of electric power to the fuller and better balanced development of the resources of the region: *Provided further,* That the Board is authorized to include in any contract for the sale of power such terms and conditions, including resale rate schedules, and to provide for such rules and regulations as in its judgment may be necessary or desirable for carrying out the purposes of this chapter, and in case the purchaser shall fail to comply with any such terms and conditions, or

violate any such rules and regulations, said contract may provide that it shall be voidable at the election of the Board: *Provided further*, That in order to supply farms and small villages with electric power directly as contemplated by this section, the Board in its discretion shall have power to acquire existing electric facilities used in serving such farms and small villages: *And provided further*, That the terms "States", "counties", and "municipalities" as used in this chapter shall be construed to include the public agencies of any of them unless the context requires a different construction.

(May 18, 1933, ch. 32, §10, 48 Stat. 64; Aug. 31, 1935, ch. 836, §6, 49 Stat. 1076.)

AMENDMENTS

1935—Act Aug. 31, 1935, inserted last three provisos.

### § 831j. Equitable distribution of surplus power among States and municipalities; improvement in production of fertilizer

It is declared to be the policy of the Government so far as practical to distribute and sell the surplus power generated at Muscle Shoals equitably among the States, counties, and municipalities within transmission distance. This policy is further declared to be that the projects herein provided for shall be considered primarily as for the benefit of the people of the section as a whole and particularly the domestic and rural consumers to whom the power can economically be made available, and accordingly that sale to and use by industry shall be a secondary purpose, to be utilized principally to secure a sufficiently high load factor and revenue returns which will permit domestic and rural use at the lowest possible rates and in such manner as to encourage increased domestic and rural use of electricity. It is further declared to be the policy of the Government to utilize the Muscle Shoals properties so far as may be necessary to improve, increase, and cheapen the production of fertilizer and fertilizer ingredients by carrying out the provisions of this chapter.

(May 18, 1933, ch. 32, §11, 48 Stat. 64.)

### § 831k. Transmission lines; construction or lease; sale of power over other than Government lines; rates when sold for resale at profit

In order to place the Board upon a fair basis for making such contracts and for receiving bids for the sale of such power, it is expressly authorized, either from appropriations made by Congress or from funds secured from the sale of such power, or from funds, secured by the sale of bonds hereafter provided for, to construct, lease, purchase, or authorize the construction of transmission lines within transmission distance from the place where generated, and to interconnect with other systems. The Board is also authorized to lease to any person, persons, or corporation the use of any transmission line owned by the Government and operated by the Board, but no such lease shall be made that in any way interferes with the use of such transmission line by the Board: *Provided*, That if any State, county, municipality, or other public or cooperative organization of citizens or farmers, not organized or doing business for profit, but primarily

for the purpose of supplying electricity to its own citizens or members, or any two or more of such municipalities or organizations, shall construct or agree to construct and maintain a properly designed and built transmission line to the Government reservation upon which is located a Government generating plant, or to a main transmission line owned by the Government or leased by the Board and under the control of the Board, the Board is authorized and directed to contract with such State, county, municipality, or other organization, or two or more of them, for the sale of electricity for a term not exceeding thirty years; and in any such case the Board shall give to such State, county, municipality, or other organization ample time to fully comply with any local law now in existence or hereafter enacted providing for the necessary legal authority for such State, county, municipality, or other organization to contract with the Board for such power: *Provided further*, That all contracts entered into between the Corporation and any municipality or other political subdivision or cooperative organization shall provide that the electric power shall be sold and distributed to the ultimate consumer without discrimination as between consumers of the same class, and such contract shall be voidable at the election of the Board if a discriminatory rate, rebate, or other special concession is made or given to any consumer or user by the municipality or other political subdivision or cooperative organization: *And provided further*, That as to any surplus power not so sold as above provided to States, counties, municipalities, or other said organizations, before the Board shall sell the same to any person or corporation engaged in the distribution and resale of electricity for profit, it shall require said person or corporation to agree that any resale of such electric power by said person or corporation shall be made to the ultimate consumer of such electric power at prices that shall not exceed a schedule fixed by the Board from time to time as reasonable, just, and fair; and in case of any such sale, if an amount is charged the ultimate consumer which is in excess of the price so deemed to be just, reasonable, and fair by the Board, the contract for such sale between the Board and such distributor of electricity shall be voidable at the election of the Board: *And provided further*, That the Board is authorized to enter into contracts with other power systems for the mutual exchange of unused excess power upon suitable terms, for the conservation of stored water, and as an emergency or breakdown relief.

(May 18, 1933, ch. 32, §12, 48 Stat. 65; Pub. L. 108–447, div. C, title VI, §603(a)(2), Dec. 8, 2004, 118 Stat. 2966.)

AMENDMENTS

2004—Pub. L. 108–447 substituted "Board" for "board" wherever appearing.

EFFECTIVE DATE OF 2004 AMENDMENT

Amendment by Pub. L. 108–447 effective on the later of the date on which at least three persons nominated under section 604(a) of Pub. L. 108–447 take office or May 18, 2005, see section 604(b) of Pub. L. 108–447, set out in an Appointments; Effective Date; Transition note under section 831a of this title.

The Corporation shall, not later than January 1, 1945, submit to the Congress a report on the operation of the provisions of this section, including a statement of the distribution to the various States and counties hereunder; the effect of the operation of the provisions of this section on State and local finances; an appraisal of the benefits of the program of the Corporation to the States and counties receiving payments hereunder, and the effect of such benefits in increasing taxable values within such States and counties; and such other data, information, and recommendations as may be pertinent to future legislation.

(May 18, 1933, ch. 32, § 13, 48 Stat. 66; June 26, 1940, ch. 432, § 39, 54 Stat. 626; Pub. L. 108–447, div. C, title VI, § 603(a)(2), Dec. 8, 2004, 118 Stat. 2966.)

AMENDMENTS

2004—Pub. L. 108–447 substituted ''Board'' for ''board'' in first and second pars.

1940—Act June 26, 1940, amended section generally.

EFFECTIVE DATE OF 2004 AMENDMENT

Amendment by Pub. L. 108–447 effective on the later of the date on which at least three persons nominated under section 604(a) of Pub. L. 108–447 take office or May 18, 2005, see section 604(b) of Pub. L. 108–447, set out in an Appointments; Effective Date; Transition note under section 831a of this title.

### § 831m. Allocation and charge of value and cost of plants to particular objects; cost accounting; reports of costs of operation; sale of surplus power at profit

The Board shall make a thorough investigation as to the present value of Dam Numbered 2, and the steam plants at nitrate plant numbered 1, and nitrate plant numbered 2, and as to the cost of Cove Creek Dam, for the purpose of ascertaining how much of the value or the cost of said properties shall be allocated and charged up to (1) flood control, (2) navigation, (3) fertilizer, (4) national defense, and (5) the development of power. The findings thus made by the Board, when approved by the President of the United States, shall be final, and such findings shall thereafter be used in all allocation of value for the purpose of keeping the book value of said properties. In like manner, the cost and book value of any dams, steam plants, or other similar improvements hereafter constructed and turned over to said Board for the purpose of control and management shall be ascertained and allocated. The Board shall, on or before January 1, 1937, file with Congress a statement of its allocation of the value of all such properties turned over to said Board, and which have been completed prior to the end of the preceding fiscal year, and shall thereafter in its annual report to Congress file a statement of its allocation of the value of such properties as have been completed during the preceding fiscal year.

For the purpose of accumulating data useful to the Congress in the formulation of legislative policy in matters relating to the generation, transmission, and distribution of electric energy and the production of chemicals necessary to national defense and useful in agriculture, and to the Federal Power Commission and other Federal and State agencies, and to the public, the Board shall keep complete accounts of its costs of generation, transmission, and distribution of electric energy and shall keep a complete account of the total cost of generating and transmission facilities constructed or otherwise acquired by the Corporation, and of producing such chemicals, and a description of the major components of such costs according to such uniform systems of accounting for public utilities as the Federal Power Commission has, and if it have none, then it is empowered and directed to prescribe such uniform system of accounting, together with records of such other physical data and operating statistics of the Authority as may be helpful in determining the actual cost and value of services, and the practices, methods, facilities, equipment, appliances, and standards and sizes, types, location, and geographical and economic integration of plants and systems best suited to promote the public interest, efficiency, and the wider and more economical use of electric energy. Such data shall be reported to the Congress by the Board from time to time, with appropriate analyses and recommendations, and, so far as practicable, shall be made available to the Federal Power Commission and other Federal and State agencies which may be concerned with the administration of legislation relating to the generation, transmission, or distribution of electric energy and chemicals useful to agriculture. It is declared to be the policy of this chapter that, in order, as soon as practicable, to make the power projects self-supporting and self-liquidating, the surplus power shall be sold at rates which, in the opinion of the Board, when applied to the normal capacity of the Authority's power facilities, will produce gross revenues in excess of the cost of production of said power and in addition to the statement of the cost of power at each power station as required by section 831h of this title, the Board shall file with each annual report, a statement of the total cost of all power generated by it at all power stations during each year, the average cost of such power per kilowatt hour, the rates at which sold, and to whom sold, and copies of all contracts for the sale of power.

(May 18, 1933, ch. 32, § 14, 48 Stat. 66; Aug. 31, 1935, ch. 836, § 8, 49 Stat. 1077.)

AMENDMENTS

1935—Act of Aug. 31, 1935, inserted provision requiring the Board to report to Congress on the allocation of the value of the properties turned over to the Board and paragraph requiring the Board to keep complete accounts on the cost of generation, transmission and distribution of electric energy and production of chemicals necessary to national defense and useful to agriculture and to report to Congress the total cost of all power generated by all power stations and authorized the sale of surplus power.

TRANSFER OF FUNCTIONS

Federal Power Commission terminated and its functions, personnel, property, funds, etc., transferred to Secretary of Energy (except for certain functions transferred to Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

## § 831m–1. Tennessee Valley Authority least-cost planning program

**(a) In general**

The Tennessee Valley Authority shall conduct a least-cost planning program in accordance with this section.

**(b) Conduct of program**

**(1) In general**

In conducting a least-cost planning program under subsection (a), the Tennessee Valley Authority shall employ and implement a planning and selection process for new energy resources which evaluates the full range of existing and incremental resources (including new power supplies, energy conservation and efficiency, and renewable energy resources) in order to provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest system cost.

**(2) Planning and selection process**

The planning and selection process referred to in paragraph (1) shall—

(A) take into account necessary features for system operation, including diversity, reliability, dispatchability, and other factors of risk;

(B) take into account the ability to verify energy savings achieved through energy conservation and efficiency and the projected durability of such savings measured over time; and

(C) treat demand and supply resources on a consistent and integrated basis.

**(3) "System cost" defined**

As used in paragraph (1), the term "system cost" means all direct and quantifiable net costs for an energy resource over its available life, including the cost of production, transportation, utilization, waste management, environmental compliance, and, in the case of imported energy resources, maintaining access to foreign sources of supply.

**(c) Participation by distributors**

**(1) In general**

In conducting a least-cost planning program under subsection (a), the Tennessee Valley Authority shall—

(A) provide an opportunity for distributors of the Tennessee Valley Authority to recommend cost-effective energy efficiency opportunities, rate structure incentives, and renewable energy proposals for inclusion in such program; and

(B) encourage and assist such distributors in the planning and implementation of cost-effective energy efficiency options.

**(2) Assistance**

The Tennessee Valley Authority shall provide appropriate assistance to distributors under paragraph (1)(B). Such assistance shall, where cost effective, be provided by the Tennessee Valley Authority acting through, or in cooperation with, an association of distributors. Such assistance may include publications, workshops, conferences, one-on-one assistance, financial assistance, equipment loans, technology assessment studies, marketing studies, and other appropriate mechanisms to transfer information on energy efficiency and renewable energy options and programs to customers.

**(d) Public review and comment**

Before the selection and addition of a major new energy resource on the Tennessee Valley Authority system, the Tennessee Valley Authority shall provide an opportunity for public review and comment and shall include a description of any such action in an annual report to the President and Congress.

**(e) Exemption from certain requirements**

The Tennessee Valley Authority shall not be subject to the least-cost planning requirements contained in section 2621(d) of this title or any similar requirement which might arise out of the Tennessee Valley Authority's electric power transactions with the Southeastern Power Administration.

(Pub. L. 102–486, title I, § 113, Oct. 24, 1992, 106 Stat. 2798.)

CODIFICATION

Section was enacted as part of the Energy Policy Act of 1992, and not as part of the Tennessee Valley Authority Act of 1933 which comprises this chapter.

## § 831n. Bonds for future construction; amount, terms, and conditions

In the construction of any future dam, steam plant, or other facility, to be used in whole or in part for the generation or transmission of electric power the Board is authorized and empowered to issue on the credit of the United States and to sell serial bonds not exceeding $50,000,000 in amount, having a maturity not more than fifty years from the date of issue thereof, and bearing interest not exceeding 3½ per centum per annum. Said bonds shall be issued and sold in amounts and prices approved by the Secretary of the Treasury, but all such bonds as may be so issued and sold shall have equal rank. None of said bonds shall be sold below par, and no fee, commission, or compensation whatever shall be paid to any person, firm, or corporation for handling, negotiating the sale, or selling the said bonds. All of such bonds so issued and sold shall have all the rights and privileges accorded by law to Panama Canal bonds, authorized by section 8 of the Act of June 28, 1902, chapter 1302, as amended by the Act of December 21, 1905 (ch. 3, sec. 1, 34 Stat. 5). All funds derived from the sale of such bonds shall be paid over to the Corporation.

(May 18, 1933, ch. 32, § 15, 48 Stat. 66; Pub. L. 108–447, div. C, title VI, § 603(a)(2), Dec. 8, 2004, 118 Stat. 2966.)

REFERENCES IN TEXT

Section 8 of the Act of June 28, 1902, chapter 1302, as amended by the Act of December 21, 1905 (ch. 3, sec. 1, 34 Stat. 5), referred to in text, was classified to sections 743, 744, and 744 note of former Title 31 and was repealed in part by Pub. L. 97–258, § 5(b), Sept. 13, 1982, 96 Stat. 1068, the first section of which enacted Title 31, Money and Finance, and in part by Pub. L. 97–452, § 4(b), Jan. 12, 1983, 96 Stat. 2480.

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

(Pub. L. 91–190, title I, § 101, Jan. 1, 1970, 83 Stat. 852.)

COMMISSION ON POPULATION GROWTH AND THE AMERICAN FUTURE

Pub. L. 91–213, §§ 1–9, Mar. 16, 1970, 84 Stat. 67–69, established the Commission on Population Growth and the American Future to conduct and sponsor such studies and research and make such recommendations as might be necessary to provide information and education to all levels of government in the United States, and to our people regarding a broad range of problems associated with population growth and their implications for America's future; prescribed the composition of the Commission; provided for the appointment of its members, and the designation of a Chairman and Vice Chairman; required a majority of the members of the Commission to constitute a quorum, but allowed a lesser number to conduct hearings; prescribed the compensation of members of the Commission; required the Commission to conduct an inquiry into certain prescribed aspects of population growth in the United States and its foreseeable social consequences; provided for the appointment of an Executive Director and other personnel and prescribed their compensation; authorized the Commission to enter into contracts with public agencies, private firms, institutions, and individuals for the conduct of research and surveys, the preparation of reports, and other activities necessary to the discharge of its duties, and to request from any Federal department or agency any information and assistance it deems necessary to carry out its functions; required the General Services Administration to provide administrative services for the Commission on a reimbursable basis; required the Commission to submit an interim report to the President and the Congress one year after it was established and to submit its final report two years after Mar. 16, 1970; terminated the Commission sixty days after the date of the submission of its final report; and authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such amounts as might be necessary to carry out the provisions of Pub. L. 91–213.

EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, eff. Feb. 4, 1970, 35 F.R. 2573, which related to prevention, control, and abatement of air and water pollution at federal facilities was superseded by Ex. Ord. No. 11752, eff. Dec. 17, 1973, 38 F.R. 34793, formerly set out below.

EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, which related to the prevention, control, and abatement of

environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has state-wide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub. L. 91–190, title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424.)

AMENDMENTS

1975—Subpars. (D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

CERTAIN COMMERCIAL SPACE LAUNCH ACTIVITIES

Pub. L. 104–88, title IV, § 401, Dec. 29, 1995, 109 Stat. 955, provided that: ''The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§ 50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the Na-

tional Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if—

''(1) the Department of the Army has issued a permit for the activity; and

''(2) the Army Corps of Engineers has found that the activity has no significant impact.''

EX. ORD. NO. 13352. FACILITATION OF COOPERATIVE CONSERVATION

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Purpose.* The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

SEC. 2. *Definition.* As used in this order, the term ''cooperative conservation'' means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

SEC. 3. *Federal Activities.* To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

(i) facilitates cooperative conservation;

(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

(iii) properly accommodates local participation in Federal decisionmaking; and

(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

SEC. 4. *White House Conference on Cooperative Conservation.* The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

SEC. 5. *General Provision.* This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH.

---

[1] So in original. The period probably should be a semicolon.

**§ 4332a. Repealed. Pub. L. 114–94, div. A, title I, § 1304(j)(2), Dec. 4, 2015, 129 Stat. 1386**

Section, Pub. L. 112–141, div. A, title I, § 1319, July 6, 2012, 126 Stat. 551, related to accelerated decision-making in environmental reviews.

#### EFFECTIVE DATE OF REPEAL

Repeal effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as an Effective Date of 2015 Amendment note under section 5313 of Title 5, Government Organization and Employees.

**§ 4333. Conformity of administrative procedures to national environmental policy**

All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.

(Pub. L. 91–190, title I, § 103, Jan. 1, 1970, 83 Stat. 854.)

**§ 4334. Other statutory obligations of agencies**

Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

(Pub. L. 91–190, title I, § 104, Jan. 1, 1970, 83 Stat. 854.)

**§ 4335. Efforts supplemental to existing authorizations**

The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of Federal agencies.

(Pub. L. 91–190, title I, § 105, Jan. 1, 1970, 83 Stat. 854.)

### SUBCHAPTER II—COUNCIL ON ENVIRONMENTAL QUALITY

**§ 4341. Omitted**

#### CODIFICATION

Section, Pub. L. 91–190, title II, § 201, Jan. 1, 1970, 83 Stat. 854, which required the President to transmit to Congress annually an Environmental Quality Report, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, item 1 on page 41 of House Document No. 103–7.

**§ 4342. Establishment; membership; Chairman; appointments**

There is created in the Executive Office of the President a Council on Environmental Quality (hereinafter referred to as the ''Council''). The Council shall be composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. The President shall designate one of the members of the Council to serve as Chairman. Each member shall be a person who, as a result of his training, experience, and attainments, is exceptionally well qualified to analyze and interpret environmental trends and information of all kinds; to appraise programs and activities of the Federal Government in the light of the policy set forth in subchapter I of this chapter; to be conscious of and responsive to the scientific, economic, social, esthetic, and cultural needs and interests of the Nation; and to formulate and recommend national policies to promote the improvement of the quality of the environment.

(Pub. L. 91–190, title II, § 202, Jan. 1, 1970, 83 Stat. 854.)

#### COUNCIL ON ENVIRONMENTAL QUALITY; REDUCTION OF MEMBERS

Provisions stating that notwithstanding this section, the Council was to consist of one member, appointed by the President, by and with the advice and consent of the Senate, serving as chairman and exercising all powers, functions, and duties of the Council, were contained in the Department of the Interior, Environment, and Related Agencies Appropriations Act, 2006, Pub. L. 109–54, title III, Aug. 2, 2005, 119 Stat. 543, and were repeated in provisions of subsequent appropriations acts which are not set out in the Code. Similar provisions were also contained in the following prior appropriations acts:

Pub. L. 108–447, div. I, title III, Dec. 8, 2004, 118 Stat. 3332.

Pub. L. 108–199, div. G, title III, Jan. 23, 2004, 118 Stat. 408.

Pub. L. 108–7, div. K, title III, Feb. 20, 2003, 117 Stat. 514.

Pub. L. 107–73, title III, Nov. 26, 2001, 115 Stat. 686.

Pub. L. 106–377, § 1(a)(1) [title III], Oct. 27, 2000, 114 Stat. 1441, 1441A–45.

Pub. L. 106–74, title III, Oct. 20, 1999, 113 Stat. 1084.

Pub. L. 105–276, title III, Oct. 21, 1998, 112 Stat. 2500.

Pub. L. 105–65, title III, Oct. 27, 1997, 111 Stat. 1375.

**§ 4343. Employment of personnel, experts and consultants**

(a) The Council may employ such officers and employees as may be necessary to carry out its functions under this chapter. In addition, the Council may employ and fix the compensation of such experts and consultants as may be necessary for the carrying out of its functions under this chapter, in accordance with section 3109 of title 5 (but without regard to the last sentence thereof).

(b) Notwithstanding section 1342 of title 31, the Council may accept and employ voluntary and uncompensated services in furtherance of the purposes of the Council.

(Pub. L. 91–190, title II, § 203, Jan. 1, 1970, 83 Stat. 855; Pub. L. 94–52, § 2, July 3, 1975, 89 Stat. 258.)

#### REFERENCES IN TEXT

The last sentence of section 3109 of title 5, referred to in subsec. (a), probably means the last sentence of section 3109(b) of title 5, which was the last sentence of that section when the reference was enacted. Since then, section 3109 of title 5 has been amended to add subsecs. (c) to (e) at the end.

#### CODIFICATION

In subsec. (b), ''section 1342 of title 31'' substituted for ''section 3679(b) of the Revised Statutes (31 U.S.C.

47 FR 54586-01, 1982 WL 154787(F.R.)

NOTICES

TENNESSEE VALLEY AUTHORITY

Proposed Revisions to Procedures Implementing the National Environmental Policy Act (NEPA) and Executive Order Nos. 11988 (Floodplain Management) and 11990 (Protection of Wetlands)

Friday, December 3, 1982

**\*54586**  AGENCY: Tennessee Valley Authority (TVA).

ACTION: Notice.

SUMMARY: TVA is proposing to amend its procedures implementing NEPA to, among other things, incorporate special review requirements relating to floodplain management and protection of wetlands. TVA's separate Floodplain Management and Protection of Wetlands procedures would then be eliminated except for a modified form of the policy statement presently contained in the procedures.

DATE: To be considered, comments must be received on or before January 3, 1983.

ADDRESS: Comments should be sent to Mohamed T. El-Ashry, Director of Environmental Quality, Office of Natural Resources, Tennessee Valley Authority, TVA Mailroom, Knoxville, Tennessee 37902.

FOR FURTHER INFORMATION CONTACT: John R. Thurman, Tennessee Valley Authority, TVA Mailroom, Knoxville, Tennessee 37902; (615) 632–2004 or FTS 856–2004.

SUPPLEMENTARY INFORMATION: On August 2, 1979, TVA issued procedures implementing Executive Order Nos. 11988 (Floodplain Management) and 11990 (Protection of Wetlands) at 44 FR 45513–17 (1979). On August 15, 1980, TVA amended its procedures implementing NEPA at 45 FR 54511–15 (1980) in response to a request made by the Council on Environmental Quality (CEQ) to all Federal agencies to issue procedures supplementing CEQ's NEPA regulations (40 CFR, parts 1500 et seq. (1980)).

Subsequently, TVA received a memorandum from CEQ, dated August 6, 1981, encouraging TVA to evaluate its existing procedures with the objective of making changes which would improve the environmental review process; specifically, to make better decisions and reduce paperwork and delay. A copy of this memorandum, addressed to all Federal agencies, was published by CEQ at 46 FR 41131–32 (1981). In response TVA evaluated its environmental review process and identified certain changes which would improve the overall effectiveness and efficiency of TVA's environmental review process while fully complying with NEPA and TVA environmental policies.

The most significant proposed revision is the incorporation of TVA's floodplain and wetlands review process into the NEPA procedures. TVA's experience with floodplain and wetlands reviews indicated that such reviews are a specialized form of environmental reviews and can easily be accommodated in the general NEPA procedures thereby eliminating a substantially duplicative review process. This would not only decrease review costs in some instances but would also decrease delays in the decisionmaking process. TVA's policy on floodplain management and protection of wetlands (44 FR 45514–15 (1979)), however, would be retained separate from TVA's NEPA procedures and overall environmental policy. Minor modifications to this policy statement are proposed and the statement, with the proposed modifications incorporated, is included in this notice for comment.

Numerous other changes to TVA's NEPA procedures, primarily of a housekeeping nature, are also proposed and are incorporated in the version of TVA's NEPA procedures published here for comment. All of the proposed revisions have been reviewed and informally concurred in by CEQ.

Frank R. Holland,

Assistant General Manager, Tennessee Valley Authority.


## IX. Floodplain Management and Protection of Wetlands

### *Floodplain Management and Protection of Wetlands*

The Board of Directors approved the following policy on August 13, 1982. It supersedes the policy adopted by the Board on July 12, 1979. It provides guidance for implementing the policies contained in Executive Order Nos. 11988 (Floodplain Management) and 11990 (Protection of Wetlands). The procedures to implement this policy are contained in TVA **\*54587** Instruction IX ENVIRONMENTAL REVIEW.


### *Policy*

TVA provides leadership and takes actions to reduce the risk of flood loss; to minimize the impacts of floods on human safety, health, and welfare; and to restore and preserve the natural and beneficial values served by floodplains.

TVA provides leadership and takes actions to minimize the destruction, loss, or degradation of wetlands and to preserve and enhance the natural and beneficial values of wetlands. It works closely with States and local organizations to provide information and guidance to promote sound floodplain and wetland management practices at the non-Federal level. In its own activities, TVA applies this commitment to broad Agency program reviews, as well as direct or indirect support or approval of individual project or program actions, from their initial planning stages through postimplementation monitoring and evaluation.

To that end, TVA establishes procedures to avoid to the extent practical the long- and short-term adverse impacts associated with the occupancy and modification of floodplains and with the destruction or modification of wetlands, and to avoid to the extent practical the direct or indirect support of floodplain development or wetland alteration. These procedures are implemented as part of the environmental review for a TVA action under the National Environmental Policy Act (NEPA) and TVA Instruction IX ENVIRONMENTAL REVIEW. Consistent with TVA's NEPA procedures, TVA provides early public review of plans or proposals for action in floodplains and wetlands as set forth in those procedures (see TVA Instruction IX ENVIRONMENTAL REVIEW).

Flood hazards, floodplain management, and wetlands protection will be taken into account when formulating proposals for actions. The use of resources and the construction of TVA facilities and structures will be consistent with the flood hazard involved; the standards and criteria promulgated under the National Flood Insurance Program of the Federal Insurance Administration, unless the standards of the program are demonstrably inappropriate for the given type of structure or facility; the Unified National Program for Floodplain Management of the Water Resources Council; and Executive Order No. 11988. For activities for which even a 1 percent chance of flooding would be too great, a lesser degree of flood hazard should be considered, e.g., location outside the 0.2 percent chance floodplain or elevation or protection of the use to a level at or above this level of flooding. For those actions for which even a slight degree of flooding would be too great, consideration should be given to a much higher level of flood protection by elevating or protecting the site, or by location in a flood-free site. Use of land in the floodplain for other than open space, or use of land for new construction in wetlands will be avoided to the extent practicable. Where new structures or facilities are to be located in a floodplain, floodproofing and other flood protection measures will be utilized as necessary. Raising such structures above the base flood levels will, when practicable, be preferred to filling.

If TVA property used by the general public has suffered flood damage or is located in an identified flood hazard area, TVA will provide on such structures, and other places where appropriate, conspicuous delineation of past and probable flood height in order to enhance public awareness of and knowledge about flood hazards.

### Reservations

The General Manager approves guidelines for general application within TVA issued under the policy. The General Manager approves, or refers to the Board of Directors as appropriate, the determination to take an action resulting in siting in a floodplain or construction in a wetland if the Environmental Quality Staff, after consulting with the Office of the General Counsel, does not concur with the determination to do so by the initiating office or division.

### Delegations

*Offices and divisions* initiating actions or proposals covered by the policy use all practical means to avoid actions impacting floodplains and wetlands and carefully evaluate alternative sites or actions. In order to accomplish this objective, offices and divisions initiating actions or proposals covered by this policy:

1. Seek flood hazard or wetland information at the earliest feasible stage of planning when alternative sites are being identified and evaluated.

2. Obtain assistance as necessary from other offices and divisions in accordance with their interests and expertise to evaluate the proposed action and to recommend and evaluate alternatives to siting in a floodplain or wetland.

3. Identify and evaluate impacts of alternative sites or alternative actions, obtaining assistance as necessary.

4. Determine, obtaining assistance as necessary through an environmental assessment or an environmental impact statement where appropriate, if an action which affects floodplain or wetland values is the only practicable one and seek the concurrence of the Environmental Quality Staff.

5. Refer to the General Manager such determinations if the Environmental Quality Staff does not concur.

The Office of Natural Resources determines whether a proposed action or any part of it will occur in the base floodplain or, where exposure to a lesser degree of flood hazard is desired, a great floodplain; assists in the evaluation of alternatives and measures to minimize adverse impacts on floodplains; and assists in the final determination of what action should be taken. It marks flood height information on TVA property used by the general public as provided in this policy.

It also determines whether a proposed action will affect or support new construction in a wetland, assists in the evaluation of alternatives and measures to minimize adverse impacts on wetlands, and assists in the final determination of what action should be taken.

The Office of Natural Resources, Environmental Quality Staff, reviews and evaluates, in consultation with the Office of the General Counsel, the determination of the initiating office or division that location in a floodplain or wetland is the only practicable alternative; and approves monitoring plans, if any, for such actions. It is generally responsible for overseeing implementation of the policy within TVA, relying on the technical expertise of the Divisions of Air and Water Resources and Land and Forest Resources. It assists offices and divisions in determining whether more detailed guidelines are necessary.

The Office of Economic and Community Development assists offices in determining whether a proposed action is consistent with local floodplain regulations and in determining what action should be taken if the proposed action is inconsistent with those regulations.

The Office of the General Counsel advises on the legal aspects of the evaluation of impacts and determination of the final action to be taken. It assists in the preparation and review of guidelines to this code.

**Procedures for Compliance With the National Environmental Policy Act**
Title

1.0 Purpose

2.0 Policy

3.0 Abbreviations

4.0 Definitions

5.0 Procedures

5.1 Action Formulation and NEPA Determination

5.2 Categorical Exclusions

5.3 Environmental Assessments

5.4 Environmental Impact Statements

5.5 Mitigation Commitment Identification, Auditing, and Reporting

5.6 Emergency Action

5.7 Floodplains and Wetlands

5.8 Miscellaneous Procedures

**Environmental Review Procedures**

**1.0 Purpose**
These procedures provide guidance for compliance by the Tennessee Valley Authority (TVA) with the National Environmental Policy Act (NEPA), 42 U.S.C. 4321, et seq. (1976) and other applicable guidelines, regulations, and Executive orders implementing NEPA. It is intended to incorporate concepts and implement policies in the regulations promulgated by the Council on Environmental Quality at 40 CFR, parts 1500–1508 (1981).

**2.0 Policy**
TVA, to the fullest extent possible, incorporates environmental considerations into its decisionmaking processes. In carrying out this policy, these procedures assure that actions are viewed in a manner to encourage productive and enjoyable harmony between man and the environment. Commencing at the earliest possible point and continuing through implementation, appropriate and careful consideration of the environmental aspects of proposed actions is built into the decisionmaking process in order that **\*54588** adverse environmental effects may be avoided or minimized, consistent with the requirements of NEPA.

**3.0 Abbreviations**

3.1 CEQ—Council on Environmental Quality

3.2 EA—Environmental Assessment

3.3 EIS—Environmental Impact Statement—D, Draft; F, Final

3.4 NEPA—National Environmental Policy Act

3.5 TVA—Tennessee Valley Authority

**4.0 Definitions**

The following definitions shall apply throughout these procedures. All other applicable terms shall be given the same meaning as set forth in CEQ's currently effective regulations (see 40 CFR regulations, Part 1508) unless otherwise inconsistent with the context in which they appear.

4.1 "Floodplain" refers to the lowland and relatively flat areas adjoining flowing inland waters and reservoirs or to those areas inundated by the unusual or rapid accumulation or runoff of surface waters from any source. Floodplain generally refers to the base floodplain, i.e., that area subject to a 1 percent or greater chance of flooding in any given year. A flood having a 1 percent chance of occurring in any given year is usually referred to as a 100–year flood.

4.2 "Natural and beneficial floodplain and wetland values" refer to such attributes as the capability of floodplains and wetlands to provide natural moderation of floodwaters, water quality maintenance, fish and wildlife habitat, plant habitat, open space, natural beauty, scientific and educational study areas, and recreation.

4.3 "Practicable" refers to the capability of an action being done within existing constraints. The test of what is practicable depends on the situation involved and should include an evaluation of all pertinent factors, such as environmental impact, economic costs, technological achievability, and public benefit.

4.4 "Wetlands" are those areas inundated by surface or ground water with a frequency sufficient to support, and under normal circumstances do or would support, a prevalence of vegetation or aquatic life that requires saturated or seasonally saturated soil conditions for growth and reproduction. Wetlands generally include swamps, marshes, bogs, and similar areas such as sloughs, potholes, wet meadows, mud flats, and natural ponds. Wetlands do not include temporary human-made ponds, sloughs, etc., resulting from construction activities.

4.5 "Important farmland" includes prime farmland, unique farmland, and farmland of State-wide importance as defined in 7 CFR Part 657 (1981).

**5.0 Procedures**

*5.1 Action Formulation and NEPA Determination*

Each office within TVA is responsible for integrating environmental considerations into its planning and decisionmaking process at the earliest possible time to ensure that potential environmental effects are appropriately considered to avoid potential delays and to minimize potential conflicts. Environmental analyses are to be included in or circulated with and reviewed at the same time as other planning documents. This responsibility is to be carried out in accordance with the environmental review procedures contained herein.

The General Manager and Board of Directors are the major decision points within the Agency for TVA's principal programs that are likely to have a significant effect on the quality of the human environment. Alternatives considered by the General Manager and Board of Directors shall be encompassed by the range of alternatives discussed in relevant environmental documents, and the General Manager and Board of Directors shall consider the alternatives described in relevant EISs.

At the earliest possible time the office proposing to initiate an action will initially determine the level of environmental review required for a specific action. The level of review will be in one of the following categories:

```
--------------------------------------------------
Procedure
--------------------------------------------------
Categorical Exclusions ........................ 5.2
Environmental Assessments ..................... 5.3
Environmental Impact Statements ............... 5.4
--------------------------------------------------
```

## 5.2 Categorical Exclusions

Categories of actions listed in this section are those which do not normally have, either individually or cumulatively, a significant impact on the quality of the human environment and require neither the preparation of an EA nor an EIS. The office proposing to initiate an action shall determine, in consultation with the Environmental Quality Staff as appropriate, whether or not the proposed action is categorically excluded. An action which would normally qualify as a categorical exclusion shall not be so classified if: (1) the proposed action could have a potentially significant impact on a threatened or endangered species, wetland or floodplain, cultural or historical resource, important farmland, or other environmentally significant resource; or (2) substantial controversy over the significance of the environmental impacts associated with the proposed action has developed or is likely to develop. Categorical exclusion action are:

1. Routine operation, maintenance, and minor upgrading of existing TVA facilities.

2. Technical and planning assistance to State and local organizations.

3. Personnel actions.

4. Procurement activities.

5. Accounting, auditing, financial reports, and disbursement of funds.

6. Contracts or agreements for the sale, purchase, or interchange of electricity.

7. Activities related to the promotion and maintenance of employee health.

8. Activities of TBA's Equal Employment Opportunity staff.

9. Administrative actions consisting solely of paperwork.

10. Communication, transportation, computer service, and other office services.

11. Property protection, law enforcement, and other legal activities.

12. Emergency preparedness.

13. Preliminary planning, studies, or reviews consisting of only paperwork.

14. Exploration for uranium, including hydrologic investigations.

15. Preliminary onsite engineering and environmental studies for future power generating plants and other energy-related facilities.

16. Establishment of environmental quality monitoring programs and field monitoring stations.

17. Transmission line relocation, tap ins, or modifications or substation alterations fue to conflicts such as new highway projects and projects requiring acquisition of minor amounts of additional substation property or transmission line right-of-way easements.

18. Construction and operation of communication facilities (i.e., powerline carrier, insulated overhead ground wire, VHF radio, and microwave).

19. Backslope agreements involving properties on which TVA holds an interest between operators and other adjacent mining companies.

20. Purchase, exchange, lease or sale, or lease purchase of stepdown facilities, transmission lines, and transmission line rights of way by distributors or customers directly served by TVA.

21. Minor research, development, and joint demonstration projects.

 **\*54589**  22. Construction of visitor reception centers.

23. Development of minor TVA public use areas and stream access points.

24. Minor non-TVA activities on TVA property authorized under contract or license, permit and covenant agreements, including utility crossings, encroachments, agricultural uses, rental of structures, and sale of miscellaneous structures and materials from TVA land.

25. Purchase, sale, abandonment or exchange of minor tracts of land, mineral rights, or landrights.

26. Approvals under Section 26a of the TVA Act of minor structures, boat docks, and shoreline facilities.

27. Any action which does not have a primary impact on the physical environment.

28. Actions which were the subject of an EA which concluded that the category of such actions should be treated as a categorical exclusion.

## 5.3 Environmental Assessments

### 5.3.1 Purpose and Scope

An EA will be prepared for any appropriate action not qualifying as a categorical exclusion to determine whether an EIS is necessary or a Finding of No Significant Impact should be reached. An EA is not necessary if it has been determined that an EIS will be prepared.

### 5.3.2 Public Participation in EA Preparation

The Environmental Quality Staff or the initiating office, in consultation with the Environmental Quality Staff, Citizen Action Office, and other interested offices, may request public involvement in the preparation of the EA or a revision or supplement thereof. The type of and format for public involvement would be selected as appropriate to best facilitate timely and meaningful public input to the EA process.

### 5.3.3 EA Preparation

The initiating office is responsible for the preparation of the EA. As soon as practical after the decision to prepare an EA is made, the initiation office in consultation with the Environmental Quality Staff shall determine the need for a coordination meeting to define (1) reasonable alternatives, (2) permit requirements, (3) coordination with other agencies, (4) environmental issues, and (5) a schedule for EA preparation.

The EA will include the identification and, as appropriate, discussion of questions and concerns raised during the public input period, if any. The EA will describe the proposed action and will include brief discussions of the need for the proposed action, reasonable alternatives, the environmental impacts of the proposed action and alternatives, measures (if any) to minimize or mitigate such impacts, and a listing of the agencies and persons consulted. A list of required permits and environmental commitments will be circulated with the EA.

The EA will briefly provide sufficient data and analysis for determining whether to prepare an EIS or Finding of No Significant Impact. The EA will be reviewed by the Environmental Quality Staff and other interested offices. After completion of the review, the Environmental Quality Staff will, in consultation with the Office of the General Counsel, make one of the following determinations: (1) The action does not require the preparation of an EIS, (2) the action will require the preparation of an EIS, or (3) the EA is incomplete or the decision will be deferred until a later stage in the planning process. Measures (if any) to minimize or mitigate impacts committed to in the EA will be implemented as described in section 5.5 (Mitigation Commitment Identification, Auditing, and Reporting).

### 5.3.4 Finding of No Significant Impact

If it is concluded, based on an EA, that a proposed action does not require the preparation of an EIS, the Environmental Quality Staff, in consultation with the Office of the General Counsel and the initiating office, will prepare a Finding of No Significant Impact.

Appropriate notice of Findings of No Significant Impact shall be made available to the public by the Environmental Quality Staff.

In the following circumstances, the Environmental Quality Staff, in consultation with the Office of the General Counsel and the initiating office, will make a Finding of No Significant Impact available for public review and comment (including, if appropriate, State and regional A–95 clearinghouses or other designated State/local coordination points) for a period of time (normally 30 days) before a final determination is made as to whether or not to prepare an EIS and before the proposed action may begin:

1. The proposed acttion is, or is closely similar to, an action listed in section 5.4.1.

2. TVA has previously announced that the proposed action would be the subject of an EIS.

3. The nature of the proposed action is one without precedent.

### 5.3.5 Generic EAs

18a

For any category of actions not described in section 5.2 (Categorical Exclusions), the initiating office may prepare a generic EA. The generic EA will be prepared, reviewed, and approved as would any other EA. Upon completion of review, the Environmental Quality Staff, in consultation with the Office of the General Counsel, will determine whether or not the category of actions may normally be treated as if listed in section 5.2 as a categorical exclusion.

### 5.3.6 Revisions and Supplements

If new information concerning action modifications, alternatives, or probable environmental effects becomes available, the initiating office, in consultation with the Environmental Quality Staff and the Office of the General Counsel, will consider preparing a revision or supplement to the EA based on the significance of the new information.

## 5.4 Environmental Impact Statements

### 5.4.1 Purpose and Scope

The following actions normally will require an environmental impact statement:

1. Large water resource development and water control projects.

2. Major power generating facilities.

3. Uranium mining and milling complexes.

4. Any major action, the environmental impact of which is expected to be highly controversial.

5. Any other major action which will have a significant effect on the quality of the human environment.

An EIS should include a description and an analysis of the proposed action; alternatives to the proposed action, including the no-action alternative; probable environmental impacts associated with the proposed action and measures (if any) to minimize impacts; and a list of the major preparers of the EIS. The scope and detail of the EIS should be reasonably related to the scope and the probable environmental impacts of the proposed action and alternative actions (see 40 CFR Parts 1502.10–1502.18).

### 5.4.2 Lead and Cooperating Agency Determinations

As soon as possible after the decison is made to prepare an EIS, the Environmental Quality Staff, in consultation with the initiating office and the Office of the General Counsel, shall consider requesting other Federal, State, or local agencies to participate in **\*54590** the preparation of the EIS as lead, joint lead (see 40 CFR 1501.5), or cooperating agencies (see 40 CFR 1501. 6). If TVA is requested to participate in the preparation of another Federal agency's EIS, the General Manager will determine if TVA will become a cooperating agency.

### 5.4.3 Scoping Process

As soon as possible after the decision to prepare an EIS is made, the initiating office will organize a scoping committee to tentatively identify action alternatives, probable environmental issues and environmental permits, and a schedule for EIS preparation. The scoping committee will consist of representatives of the Environmental Quality Staff, the initiating office, the Office of the General Counsel, Citizen Action Office, and other interested or affected offices.

The scoping process may include interagency scoping sessions to coordinate an action with and obtain inputs from other interested agencies, and public scoping sessions to obtain input from interested members of the general public. The scoping committee will determine the need, nature, and format for the various scoping sessions. Session type and format will be selected to facilitate timely and meaningful input into the EIS process.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

As soon as practicable in the scoping process, the initiating office will prepare and the Environmental Quality Staff, in consultation with the Office of the General Counsel, will review and make available a Notice of Intent to Prepare an EIS. This notice will briefly describe the action, reasonable alternatives thereto, and potential environmental impacts associated with the action. In addition, those issues which have tentatively been determined to be insignificant and which will not be discussed in detail in the EIS may be identified. The scoping process will be described and, if a scoping meeting will be held, the notice should state where and when the meeting is to occur. The notice will identify the person in TVA who can supply additional information about the action and to whom comments should be sent. There will normally be a public input period of 30 days from the date of publication of the Notice of Intent in the Federal Register to allow other interested agencies and the public an opportunity to review the action alternatives and probable environmental issues identified by the scoping committee. On the basis of input received, the Environmental Quality Staff, in consultation with the scoping committee, may determine what, if any, additions or modifications in the scoping process of schedule are required and establish the scope in the EIS.

At the close of the scoping process, the Environmental Quality Staff, in consultation with the scoping committee, will identify in writing the following EIS components:

1. Key action alternatives.

2. Significant environmental issues to be addressed in detail.

3. Probable nonsignificant environmental issues that should be mentioned but not addressed in detail.

4. Lead and cooperating agency assignments, if any.

5. Related environmental documents.

6. Other environmental review and consultation requirements.

7. Delegation of DEIS work assignments to interested offices.

### 5.4.4. DEIS Preparation

Based on information obtained and decisions made during the scoping process, the initiating office, in consultation with the Environmental Quality Staff and other interested offices, will prepare the preliminary DEIS using an appropriate format (see 40 CFR 1502.10). In addition, a list of required permits and an environmental commitment list will be prepared and circulated with the DEIS. The preliminary DEIS will be circulated by the initiating office to th Environmental Quality Staff, the Office of the General Counsel, and other interested offices for review and comment. All reviewing offices will, as soon as practical and normally within 30 days, supply comments on the preliminary DEIS to the initiating office, the Environmental Quality Staff, and the Office of the General Counsel. These comments will include lists of agencies, A–95 contacts or other State/local coordination points, and groups and individuals (both proponents and opponents, if any, of the proposed action) who should receive a copy of the DEIS. After the preliminary DEIS is revised, the initiating office will transmit it to other interested offices for their final approval. The Environmental Quality Staff will, in consultation with the Office of the General Counsel, review the document and transmit it and the commitment list to the General Manager for approval.

### 5.4.5 DEIS Transmittal and Review

Upon notification of approval from the General Manager, TVA will transmit the DEIS and appropriate notices to the Environmental Protection Agency (EPA) and other interested Federal, State, and local agencies (including State and regional A–95 clearinghouses or other State/local coordination points). The Citizen Action Office will coordinate overall DEIS distribution and will maintain a master list of those to whom the DEIS is sent. The length of the DEIS public comment period, normally

no less than 45 days from publication of the notice of availability in the Federal Register, will be determined by the scoping committee. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including CEQ.

At any time in the DEIS process the initiating office, in consultation with Environmental Quality Staff, the Citizen Action Office, and other interested offices, may provide for additional public involvement to supplement EIS preparation. The type of and format for public involvement will be selected as appropriate to best facilitate timely and meaningful public input into the EIS process.

### 5.4.6 FEIS Preparation

At the close of the DEIS public review period, the Environmental Quality Staff will, in consultation with the initiating office and other interested offices, determine what is needed for the preparation of an FEIS. If the requisite changes in the DEIS are limited to making minor factual corrections and explaining why the comments received do not warrant further response, an errata sheet containing only DEIS comments, responses, and factual corrections in the DEIS may be prepared by the initiating office. If other more extensive modifications are required, the initiating office will, in consultation with the Environmental Quality Staff and other interested offices, prepare a preliminary FEIS utilizing an appropriate format (see 40 CFR 1502.10). The errata sheet or preliminary FEIS will be prepared and circulated by the initiating office to the Environmental Quality Staff, Office of the General Counsel, and other interested offices for review and comment. All reviewing offices will supply written comments concerning the errata sheet or preliminary FEIS to the initiating office with copies to the Environmental Quality Staff and Office of the General Counsel.

The initiating office, with the assistance of the Environmental Quality Staff, will review all comments received and modify, as appropriate, the errata sheet or the preliminary FEIS. After the errata sheet or preliminary FEIS is revised, the initiating office will transmit it to other interested offices for their **\*54591** final approval. The Environmental Quality Staff will, in consultation with the Office of the General Counsel, review the document and transmit it to the General Manager for approval along with a list of environmental commitments made in the EIS. Measures (if any) to minimize or mitigate impacts committed to in the FEIS will be identified and implemented as described in section 5.5 (Mitigation Commitment Identification, Auditing, and Reporting).

### 5.4.7 FEIS Transmittal

Upon notification of approval from the General Manager, TVA will transmit the FEIS and appropriate notices to EPA and other Federal, State, and local agencies (including State and regional A–95 clearinghouses or other State/local coordination points) to whom copies of the DEIS were sent. The FEIS will also be sent to every person and organization to whom copies of the DEIS were sent or from whom comments were received.

### 5.4.8 Commencement of Action

Except in emergency circumstances, an action for which an EIS has been approved will not commence until 30 days after notice of availablity of the final statement has been published in the Federal Register or 90 days after a notice of availability of the DEIS has been published in the Federal Register, whichever is later.

### 5.4.9 Record of Decision

After release of the FEIS, a Record of Decision shall be prepared for the General Manager by the Environmental Quality Staff, in consultation with the Office of the General Counsel and the initiating office. The record will normally include the following: (1) What the decision was; (2) what alternatives were considered; (3) which alternative(s) was considered to be environmentally preferable; (4) the alternatives' associated environmental considerations (which may include a discussion of measures to be

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

taken to mitigate or minimize adverse environmental impacts (see 40 CFR 1505.2); and (5) what monitoring, reporting, and administrative arrangements have been made (see 40 CFR 1505.2). Records of decision will be made available to the public.

### 5.4.10 Revisions and Supplements

If significant new information concerning action modifications, alternatives, or probable environmental effects becomes available, TVA will make such information available to the public. The initiating office shall consider preparing a revision or a supplement to the EIS. The Envíornmental Quality Staff will, in consultation with the initiating office, Office of the General Counsel, Citizen Action Office, and other interested offices, determine the method of making such information available to the public.

### 5.4.11 EIS Adoption

TVA may adopt as its final EIS another EIS or any portion thereof whether or not TVA participated in its preparation. The Environmental Quality Staff and the Office of the General Counsel, in consultation with the initiating office, will determine if the EIS proposed for adoption adequately assesses the TVA action and is still generally available to the public.

If it is determined that the EIS proposed for adoption or the relevant portion thereof is adequate and still available, TVA will circulate its written finding of this determination and advise that copies of the EIS will be sent to any person or agency requesting it. If the EIS is not available, TVA will then circulate, along with its written finding, the adopted EIS (or relevant portion) or a summary thereof (see 40 CFR 1502.12).

If the EIS is generally available and TVA determines that significant supplementary information is needed, TVA will prepare and circulate a supplement to the EIS and advise that copies of the adopted EIS will be sent to any person or agency requesting it. If the EIS is not generally available, TVA will circulate its supplement along with either the adopted EIS or a summary thereof (see 40 CFR 1502.12). The above findings or documents shall be approved and circulated in accordance with section 5.4.5. or 5.4.7, as appropriate.

### 5.5 Mitigation Commitment Identification, Auditing and Reporting

All significant measures planned to minimize or mitigate expected environmental impacts shall be identified in the EA or EIS (or, as appropriate, in a memorandum documenting the Environmental Quality Staff's determination or concurrence that a proposed action is a categorical exclusion) and compiled in a commitment list. The commitment list will include, to the extent parcticable, the estimated cost of each commitment. The commitment list is prepared for both the draft and final EA or EIS and should be developed in cooperation with the Environmental Quality Staff and all interested offices.

Each such commitment in the commitment list will be tentatively assigned by the initiating office of the appropriate responsible office and such assignments shall be transmitted to the Environmental Quality Staff and affected offices at the time the draft EA or EIS is sent out for review. The initiating office should consult with the assigned offices to resolve assignment conflicts, indentify supporting offices, and determine commitment schedules. Prior to finalization of the commitment list, the initiating office shall obtain Environmental Quality Staff concurrence that commitments can be monitored for compliance. At the time of finalizing the EA or EIS, the initiating office shall submit to the Environmental Quality Staff a finalized commitment list.

The initiating office shall report, periodically and upon request to the Environmental Quality Staff the status of a commitment. The Environmental Quality Staff will ensure that commitments are met and will, as it deems appropriate, audit commitment progress. Circumstances may arise which warrant modifying or deleting previously made commitments. When such circumstances occur, the office desiring the change shall submit to the Environmental Quality Staff and the initiating office a request which shall include the basis for changing or deleting the commitment and an evaluation of the environmental significance of the requested change. The decision to modify or delete the commitment will be made by the Environmental Quality Staff in consultation with the Office of the General Counsel and the initiating office.

22a

### 5.6 Emergency Action

Because of unforeseen situations or emergencies, or through inadvertence, or for other reasons, some of the steps outlined in these procedures may be consolidated, modified, or omitted. The Environmental Quality Staff and the Office of the General Counsel shall be promptly notified and asked to approve any such consolidation, modification, or omission, and may do so if such change would conform to legal requirements and substantially comply with the intent of these procedures. The Environmental Quality Staff, in consultation with the Office of the General Counsel, will consult with CEQ when appropriate before such changes are approved.

### 5.7 Floodplains and Wetlands

#### 5.7.1 Purpose and Scope

Consistent with Executive Order Nos. 11988 (Floodplain Management) and 11990 (Protection of Wetlands), and TVA Code IX Floodplain Management and Protection of Wetlands, the review of a proposed action undertaken in **\*54592** accordance with sections 5.2, 5.3, or 5.4 of these procedures that potentially may affect floodplains or wetlands shall include a floodplain or wetlands evaluation as required by this section. A wetland evaluation is not required for (1) the issuance of permits, licenses, or allocations to private parties for activities involving wetlands on non-Federal lands: (2) projects or programs under construction or in operation as of May 24, 1977; (3) projects for which all funds were appropriated through June 1977; or (4) projects for which a draft or final EIS was filed before October 1, 1977. Moreover, no reevaluation of floodplain or wetland impacts is required for projects, programs, and policies approved by TVA before July 23, 1979.

#### 5.7.2 Evaluation Process

#### 5.7.2.1 Area of Impact

If a proposed action will potentially occur in or affect wetlands or floodplains, the initiating office, as soon as practicable in the planning process, will request the Office of Natural Resources to determine whether the proposed action will occur in or affect a wetland or floodplain and the level of impact, if any, on the wetland or floodplain. If the Office of Natural Resources determines that the proposed action (1) is outside the floodplain or wetland, (2) has no identifiable impacts on a floodplain or wetland, and (3) does not directly or indirectly support floodplain development or wetland alteration, further floodplain or wetland evaluation shall be unnecessary.

#### 5.7.2.2 Actions That Will Affect Floodplains or Wetlands

When a proposed action can otherwise be categorically excluded under section 5.2, no additional floodplain or wetland evaluation is required if (1) the initiating office determines that there is no practicable alternative that will avoid affecting floodplains or wetlands and that all practical measures to minimize impacts to floodplains or wetlands are incorporated, and (2) the Office of Natural Resources determines that impacts on the floodplain or wetland would be minor.

If the action requires an EA or an EIS, the ensuing evaluation shall consider (1) the effect of the proposed action on natural and beneficial floodplain and wetland values, and (2) alternatives that would eliminate or minimize such effects. The initiating office shall determine if there is no practicable alternative to siting in a floodplain or constructing in a wetland. If the Environmental Quality Staff in consultation with the Office of the General Counsel concurs, this determination shall be final. If a determination of no practicable alternative is made, all practical measures to minimize impacts on the floodplain or wetland shall be implemented.

If at any time prior to commencement of the action it is determined that there is a practicable alternative that will avoid affecting floodplains or wetlands, the proposed action shall not proceed.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

### 5.7.2.3 Public Notice

Public notice of actions affecting floodplains or wetlands is not required if the action is categorically excluded under section 5.2. If an EA or EIS is prepared and a determination of no practicable alternative is made in accordance with section 5.7.2.2, the initiating office shall notify the public of a proposed action's potential impact on the floodplain or wetland.

Public notice of actions affecting floodplains or wetlands may be combined with any notice published by TVA or another Federal agency if such a notice generally meets the minimum requirements set forth in this section. Issuance of a draft or final EA or EIS for public review and comment will satisfy this notice requirement.

Public notices shall at a minimum (1) briefly descrie the proposed action and the potential impact on the floodplain or wetland; (2) birefly identify alternative actions considered and explain why a determination of no practicable alternative has been proposed; (3) briefly discuss measures that would be taken to minimize or mitigate floodplain or wetland impacts; (4) state when appropriate whether the action conforms to applicable State or local floodplain protection standards; (5) specify a reasonable period of time within which the public can comment on the proposal; and (6) identify the TVA official who can provide additional information on the proposed action and to whom comments should be sent.

Such notices shall be issued in a manner designed to bring the proposed action to the attention of those members of the public likely to be interested in or affected by the action's potential impact on the floodplain or wetland. The initiating office, in consultation with the Environmental Quality Staff and the Citizen Action Office, shall determine the manner in which the notice will be made available to the public. Typical ways of providing public notice include direct mailing, posting in appropriate places in the vicinity of the proposed action, publication in the Federal Register, or publication in newspapers of general circulation in the area of the proposed action. If a floodplain public notice is required, a copy of such notice shall be included in information sent to State and regional clearinghouses for those actions subject to Office of Management and Budget Circular A–95 or other State/local coordination points.

TVA shall consider all relevant comments recived in response to a notice and shall reevaluate the action as appropriate to take such comments into consideration. The Environmental Quality Staff, in consultation with the initiating office, shall determine if response is necessary and the initiating office, in coordination with other interested offices, shall prepare comment responses. The Environmental Quality Staff, in consultation with the Office of the General Counsel, shall approve all comment responses before release.

A proposed action may not be implemented before publication of any required public notice and appropriate consideration of any relevant comments received in a timely manner.

### 5.7.2.4. Disposition of Real Property

When TVA property in a floodplain or wetland is proposed for lease, easement, license, right of way, or disposal to non-Federal public or private parties and the action will not result in distrubance of the floodplain or wetland, floodplain or wetland evaluation is not required. The conveyance document, holwever, shal specify:

1. Appliclable restricted uses under Federal, State, or local floodplain and wetland regulations.

2. Other appropriate restrictions to minimize destruction, loss, or degradation of floodplains and wetlands and to preserve and enhance their natural and beneficial values, except when prohibited by low or uneforceable by TVA or, otherwise, the property shall otherwise be witheld from conveyance or use.

If the disposition of TVA property rights in a floodplain or wetland potentially will result in disturbance to the floodplain or wetland, the proposed action shall be reviewed in accordance with sections 5.7.2.1.–5.7.2.3.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

## 5.8 Miscellaneous Procedures

### 5.8.1. Proposals for Legisaltion

Proposals for congressional legislation significantly affecting the quality of the human environment will require the preparation of an EIS (see 40 CFR 1506.8).

### *54593  5.8.2. Private Applicants

In those cases when private applicants or other non-Federal entities propose to undertake an action that will require TVA's approval or involvement and fall within the scope of these procedures, the contacted office will as soon as possible notify the Environmental Quality Staff. Each office will maintain information to advise potential applicants of studies or other data that may be required in connection with applications and will take reasonable steps to publicize accessibility of such informatin. The office charged with initiating action, upon the applicant's request, will in consultation with the Environmental Quality Staff when practicable advise the applicant of the information or studies (including the preparation of environmental documents, if necessary) that will be required in order to fulfill its responsibilities hereunder. The appliciant must provide TVA sufficient information to allow an accurate determination of the environmental impacts of the poposed action. TVA may require that this information be submitted in the form of a written environmental report. If TVA is required to make investigations or otherwise incur additional expenses, the applicant may be charged for TVA's service. The Environmental Quality Staff, in consultation with the Office of the General Counsel, will also determine the need to consult early with appropriate Federal, State, and local agencies (including State and regional A–95 clearinghouses or other State/local coordination points);Indian tribes; and other interested persons regarding TVA's involvement in or approval of the applicant's proposed action and, where appropriate, should commence such consultation at the earliest practicable time.

### 5.8.3. Non-TVA EISs

The Environmental Quality Staff, in consultation with other interested offices, will coordinate the review of EISs provided to TVA for review by other Federal agencies. The Environmental Quality Staff, in consultation with the Office of the General Counsel, will prepare comments on such EISs and transmit any TVA comments to the initiating agency (see 40 CFR 1503.2–1503.3).

### 5.8.4 Supplemental Instruction

The Environmental Quality Staff, in consultation with interested offices and with concurrence of the Office of the General Counsel, may issue supplemental or explanatory instructions to these procedures.

### 5.8.5 Modifications of These Procedures

The assignments to offices in these procedures can be modified by agreement of the offices involved or by instructions from the General Manager.

### 5.8.6 Tiering

An initiating office may consider tiering the environmental review of a proposed action. Tiering involves coverage of general matters in broader environmental documents and subsequent narrower analyses need only incorporate by reference the broader analyses (see 40 CFR 1508.28).

### 5.8.7 Combining Documents

Any environmental document may be combined with any other document to reduce duplication and paperwork.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.                15

### 5.8.8 Applicability to Ongoing Actions

These procedures shall not apply to those actions which have been approved under applicable procedures prior to the effective date of these procedures or for which an EA or a DEIS has already been prepared. No environmental documents need be redone by reason of the adoption of these revised procedures.

### 5.8.9 Consolidation of Reviews

Review of proposed actions under these procedures may be consolidated with other reviews where such consolidation would reduce duplication or increase efficiency.

### 5.8.10 Documents

The Environmental Quality Staff shall keep on file all final and approved environmental documents.

### 5.8.11 Substantial Compliance

Minor deviations from these procedures will be permitted, but in all respects substantial compliance must be achieved. Flexibility is the key to implementing these procedures and reviewing proposed actions.

### 5.8.12 Reducing Paperwork and Delay

These procedures are to be interpreted and applied with the aim of reducing paperwork and the delay associated with both assessment and implementation of a proposed action. In this regard, data and analyses shall be commensurate with the importance of associated impacts. Less important material should be summarized, consolidated, or referenced.

### 5.8.13 Office Responsible for NEPA Compliance Efforts

The Director of the Environmental Quality Staff is designated as that person responsible for overall NEPA compliance.

### 5.8.14 Status Reports

Information or status reports on EISs and other related NEPA compliance activities and doucments may be obtained by writing to the Director of Environmental Quality, Tennessee Valley Authority, Knoxville, Tennessee 37902.

### 5.8.15 Public Participation

TVA's policy is to encourage public participation in all of its decisionmaking. This policy is implemented through various mechanisms. TVA has open meetings of the Board of Directors. These Board meetings are widely publicized and include a question and answer session between the public and Board of Directors. TVA has established a Citizen Action Office whose responsibility is to maximize to the extent practicable the interchange of ideas between TVA and the public in the full range of TVA activities. In addition, TVA has set up a "Citizen Action Line" which allows members of the public to call in on toll-free lines to ask questions and make suggestions or comments to TVA. In line with TVA's broad policies, TVA intends to encourage and actively seek public participation in its NEPA review process. The type of and format for public participation will be selected as appropriate to best facilitate timely and meaningful public input into the review process.

[FR Doc. 82–33051 Filed 12–2–82; 8:45 am]

BILLING CODE 8120–01–M

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   16

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

48 FR 19264-01, 1983 WL 141995(F.R.)

NOTICES

TENNESSEE VALLEY AUTHORITY

# Revisions to Procedures Implementing the National Environmental Policy Act (NEPA) and Executive Order Nos. 11988 (Floodplain Management) and 11990 (Protection of Wetlands)

Thursday, April 28, 1983

**\*19264**  AGENCY: Tennessee Valley Authority (TVA).

ACTION: Notice.

SUMMARY: TVA has adopted amendments to its internal procedures for compliance with the National Environmental Policy Act originally published at 45 FR 54511–15 (1980) and its "Floodplain Management and Protection of Wetlands" procedures originally published at 44 FR 45513–17 (1979). Revisions of these procedures incorporate, among other things, special review requirements relating to floodplain management and protection of wetlands. TVA's separate procedures for floodplain management and protection of wetlands are eliminated except for a modified form of TVA's policy of floodplain management and protection of wetlands.

FOR FURTHER INFORMATION CONTACT: Mohamed T. El-Ashry, Tennessee Valley Authority, TVA Mailroom, Knoxville Tennessee 37902; (615) 632–2007 or FTS 856–2007.

SUPPLEMENTARY INFORMATION: TVA published the proposed amendments for comment on December 3, 1982, at 47 FR 54586–93, and the comment period closed on January 3, 1983. The amendments as proposed have been adopted with one minor change noted herein, and the December 3 notice is hereby integrated.

During the comment period only one comment was received. The Soil Conservation Service (SCS) recommended that for important farmland TVA utilize the special evaluation process TVA has established for floodplains and wetlands in section 5.7 of the procedures. SCS correctly notes that in addition to wetlands, floodplains, and other identified resources. "important farmland" is listed as an environmentally significant resource requiring special consideration in section 5.2 of the procedures. Under section 5.2, an action which could have a potentially significant impact on important farmland is precluded from being categorically excluded, thereby requiring prepartion of an environmental assessment or environmental impact statement.

TVA has decided against adopting SCS's suggestion at this time. If experience with important farmland impact evaluation shows that TVA's overall environmental impact evaluations process would be made more effective by incorporating a specialized farmland-impact evaluation process into its NEPA procedures, an appropriate revision will be made. In the interim, potential impacts on important farmland will continue to be evaluated in the context of TVA's general NEPA review process.

TVA's procedures, as amended, were reviewed and concurred in by the Council on Environmental Quality (CEQ) on February 17, 1983. CEQ suggested that a reference to 40 CFR 1502.19(d) be inserted in section 5.4.11 of the revised procedures after the reference to 40 CFR 1502.12. TVA agrees with this suggestion and section 5.4.11 has been amended accordingly.

TVA's policy on floodplain management and protection of wetlands, as published in the December 3 Federal Register notice, has been adopted with three minor changes. The first part of the last sentence of the third paragraph of the policy is revised as follows: In its own activities, TVA applies this commitment to its own facilities and to broad agency program reviews, as well as * * * .

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

The second sentence of the fifth paragraph is revised by inserting "and acquisition" after "construction."

Finally, the first sentence of the last paragraph before the Reservations subsection is revised by inserting "and if their continued use in such location is deemed necessary and of low risks," before "TVA will."

Frank R. Holland,

Assistant General Manager, Tennessee Valley Authority.

[FR Doc. 83–11386 Filed 4–27–83; 8:45 am]

BILLING CODE 8120–01–M

**End of Document**                                                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.                    2

Township, Lancaster County, Pa.; Well 1; Issue Date: July 10, 2019.

3. West Manchester Township Authority, GF Certificate No. GF–201907038, West Manchester Township, York County, Pa.; Wells 2, 3, 4, 5, and 6; Issue Date: July 10, 2019.

4. Village of Greene, GF Certificate No. GF–201907039, Village of Greene, Chenango County, N.Y.; Wells 1 and 2; Issue Date: July 29, 2019.

5. Selinsgrove Municipal Authority, GF Certificate No. GF–201907040, Selinsgrove Borough, Snyder County, Pa.; Wells 1 and 2; Issue Date: July 29, 2019.

6. Shrewsbury Borough, GF Certificate No. GF–201907041, Shrewsbury Borough and Shrewsbury Township, York County, Pa.; the Thompson Well and the Lutheran Home Well; Issue Date: July 29, 2019..

**Authority:** Pub. L. 91–575, 84 Stat. 1509 *et seq.*, 18 CFR parts 806 and 808.

Dated: August 20, 2019.

**Jason E. Oyler,**

*General Counsel and Secretary to the Commission.*

[FR Doc. 2019–20078 Filed 9–16–19; 8:45 am]

**BILLING CODE 7040–01–P**

## TENNESSEE VALLEY AUTHORITY

### Integrated Resource Plan

**AGENCY:** Tennessee Valley Authority.

**ACTION:** Issuance of record of decision.

**SUMMARY:** The Tennessee Valley Authority (TVA) has decided to adopt the preferred alternative in its final environmental impact statement (Final EIS) for the Integrated Resource Plan (IRP). The TVA Board of Directors approved the IRP and authorized staff to implement the preferred alternative at its August 22, 2019 meeting. This alternative, identified as the Target Power Supply Mix in the Final EIS, will guide TVA's selection of energy resource options to meet the energy needs of the Tennessee Valley region over the next 20 years. The energy resource options include continued investment in TVA's hydroelectric resources, license renewal for nuclear resources, expansion of solar and natural gas-fired generation, increased energy efficiency, demand response, and energy storage, and decreased coal-fired generation.

**FOR FURTHER INFORMATION CONTACT:** Hunter Hydas, IRP Project Manager, Tennessee Valley Authority, 1101 Market Street, Chattanooga, Tennessee 37402; telephone 423–751–2453, or email *jhhydas@tva.gov.* Matthew

Higdon, NEPA Project Lead, Tennessee Valley Authority, 400 West Summit Hill Drive, Knoxville, Tennessee 37902–1499; telephone 865–632–8051; or email *mshigdon@tva.gov.*

**SUPPLEMENTARY INFORMATION:** This notice is provided in accordance with the Council on Environmental Quality's regulations (40 CFR 1500 to 1508) and TVA's procedures for implementing the National Environmental Policy Act (NEPA).

TVA is an agency and instrumentality of the United States, established by an act of Congress in 1933, to foster the social and economic welfare of the people of the Tennessee Valley region and to promote the proper use and conservation of the region's natural resources. One component of this mission is the generation, transmission, and sale of reliable and affordable electric energy. TVA operates the nation's largest public power system, providing electricity to nearly 10 million people in an 80,000-square mile area comprised of most of Tennessee and parts of Alabama, Georgia, Kentucky, Mississippi, North Carolina, and Virginia. It provides wholesale power to 154 independent local power companies and 58 directly-served large industries and federal facilities. The TVA Act requires the TVA power system to be self-supporting and operate on a nonprofit basis and directs TVA to sell power at rates as low as feasible.

Dependable generating capability on the TVA power system is approximately 37,500 megawatts (MW). TVA generates most of the power it distributes with 3 nuclear plants, 6 coal-fired plants, 9 natural gas-fired combustion turbine plants, 8 natural gas-fired combined-cycle plants, 29 hydroelectric plants, a pumped-storage hydroelectric plant, a diesel-fired facility, and 14 small solar photovoltaic facilities. TVA has gas-co-firing potential at one coal-fired site as well as biomass co-firing potential at its coal-fired sites. A portion of this delivered power is provided through long-term power purchase agreements. In fiscal year 2018, TVA efficiently delivered 163 billion kilowatt-hours of electricity to customers from a power supply that was 39 percent nuclear, 26 percent natural gas-fired, 21 percent coal-fired, 10 percent hydroelectric, and 3 percent wind and solar. The remaining one percent results from TVA programmatic energy efficiency efforts. TVA transmits electricity from generating facilities over 16,200 circuit miles of transmission lines. Like other utility systems, TVA has power interchange agreements with utilities surrounding its service territory and

purchases and sells power on an economic basis almost daily.

TVA completes IRPs to determine the most effective energy resource strategies that will meet demand for electricity in its service area over a 20-year planning period. The recently completed IRP updates TVA's 2015 IRP. Consistent with Section 113 of the Energy Policy Act of 1992, codified within the TVA Act, TVA employs a least-cost system planning process in developing its IRPs. This process takes into account the demand for electricity, energy resource diversity, flexibility, reliability, costs, risks, environmental impacts, and the unique attributes of different energy resources.

**Future Demand for Energy**

TVA uses state-of-the-art energy forecasting models to predict future demands on its system. Because of the uncertainty in predicting future demands, TVA developed high, medium, and low forecasts for both peak load (in MW) and annual net system energy (in gigawatt-hours, GWh) through 2038. Peak load is predicted to change at average annual rates of +0.3 percent in the medium-load forecast (Current Outlook Scenario), −0.7 percent in the low-load forecast, and +1.7 percent in the high-load forecast. Net system energy is predicted to remain flat in the medium-load forecast, decline at an average annual rate of 1.5 percent in the low-load forecast, and grow at an average annual rate of 2.0 percent in the high-load forecast.

Based on these load forecasts, TVA's current firm capacity (TVA generation, energy efficiency and demand response measures, and power purchase agreements), and including planning reserve margins of 17 percent for the summer peak season and 25 percent for the winter peak season, TVA would need additional energy resources in the future. The medium-load case needs are about 2,700 MW of additional capacity and effectively no additional energy by 2028, growing to about 5,600 MW and 1,700 GWh by 2038.

**Alternatives Considered**

Five alternative energy resource strategies were evaluated in the Draft EIS and IRP. These resource planning strategies were identified as potential alternative means of serving future electrical energy demands on the TVA system while meeting least-cost system planning requirements. These alternative strategies were:

*Strategy A—Base Case (No Action Alternative):* This strategy represents the continued implementation of the 2015 IRP, but also reflects subsequent

48988      **Federal Register** / Vol. 84, No. 180 / Tuesday, September 17, 2019 / Notices

decisions made by the TVA Board of Directors. This alternative incorporates TVA's current assumptions for resource costs and applies a planning reserve margin constraint, which also applies in every other strategy.

*Strategy B—Promote Distributed Energy Resources (DER):* This strategy is similar to the Base Case, but focuses on increasing the pace of DER adoption by incentivizing distributed solar and storage, combined heat and power, energy efficiency, and demand response.

*Strategy C—Promote Resiliency:* This strategy promotes higher adoption of small, agile capacity to increase the operational flexibility of TVA's power system, while also improving the ability to respond locally to short-term disruptions.

*Strategy D—Promote Efficient Load Shape:* This strategy promotes targeted electrification, demand response, and energy management to optimize load shape, including energy efficiency programs targeting low-income populations.

*Strategy E—Promote Renewables:* This strategy promotes renewables at all scales to meet growing prospective or existing customer demands for renewable energy.

The alternative strategies were analyzed in the context of six scenarios or future "worlds" that were determined to be reasonably possible to occur. The scenarios were TVA's Current Outlook, Economic Downturn, Valley Load Growth, Decarbonization, Rapid DER Adoption, and No Nuclear Extensions. Each scenario incorporates a set of uncertainties relevant to power system planning that include plausible future economic, financial, regulatory and legislative conditions, as well as social trends and adoption of technological innovations. Potential 20-year capacity expansion plans or resource portfolios were developed for each combination of alternative strategy and scenario using a capacity planning model. The model built each portfolio from a range of potential energy resource options that included TVA's existing energy resources and new nuclear, coal, natural gas, hydroelectric, wind, solar, and biomass generation, energy storage, energy efficiency, demand response, and electrification as well as facility retirement options. Each portfolio was optimized for the lowest Present Value of Revenue Requirements (PVRR) while meeting energy balance, reserve, operational, and other requirements. The portfolios were then evaluated using an hourly production costing program to determine detailed revenue requirements and near- and long-term

system average costs. Recognizing the uncertainty in long-range planning studies, extensive stochastic analyses were also conducted to identify risk exposure within each scenario. Metrics were developed to rank the portfolios and included financial risk, carbon dioxide emissions, water consumption, land use, coal waste generation and changes in regional personal income. These metrics were used to compare the alternative strategies and their associated portfolios.

Strategies A and B had similar scores for most metrics with the exception of total resource cost and environmental impacts. Higher total resource cost and lower environmental impacts for these two strategies is driven by the promotion of distributed resources.

Strategy C had slightly higher PVRR and system average costs than Strategies A and B and had moderate financial risk compared to other strategies. Strategy C had the lowest environmental impact overall, due to the largest amount of coal retirements across scenarios, but had high land use impacts due to the large amount of solar expansion. Flexibility scores were comparable to Strategies D and E.

Strategy D had the highest PVRR and system average cost due to the promotion of storage, was mid-range among the strategies in total resource cost, and had the highest risk exposure across all strategies. Strategy D had low environmental impact overall, but high land use impacts due to large solar expansion. Flexibility scores were comparable to Strategies C and E.

Strategy E had slightly higher PVRR and system average costs than Strategies A and B. Similar to Strategy C, Strategy E had moderate financial risk compared to other strategies. Strategy E had low environmental impact overall, but higher land use impacts due to large solar expansion. Flexibility scores were comparable to Strategies C and D.

These results were released in the Draft IRP and EIS for public review to solicit input and to better inform the development of the preferred alternative. In response to public comments received on the Draft IRP and EIS, TVA conducted additional sensitivity analyses that varied key resource assumptions involving natural gas prices, capital costs, energy efficiency and demand response market depth, integration costs and flexibility benefits, pace and magnitude of solar additions, higher operating costs for coal plants, more stringent carbon constraints, and variation in climate. The results of these analyses supported the energy resource ranges identified in the initial portfolios.

TVA then developed a preferred alternative, the Target Power Supply Mix. In developing it, TVA took into account its least-cost planning requirement and customer priorities of power cost and reliability, as well as comments it received during the public comment on the Draft IRP and EIS. The Target Power Supply Mix establishes ranges of resource additions and retirements by the end of the first 10 years of the study (2028) and by the end year of the study (2038) in megawatts (MW). The recommended ranges are based on all scenarios and sensitivities evaluated, expressed over the 20-year planning period, with more specific direction over the first 10 years. The recommendation also highlights expectations under the Current Outlook Scenario based on TVA's current projections for key drivers such as electricity demand and commodity prices. Shifts in resource additions within the ranges would be based on key input variables, including changing market conditions, more stringent regulations, and technology advancements. The Target Power Supply Mix is described in detail in Section 3.8 of the Final EIS and in Section 9.4 of the Final IRP. Chapter 10 of the Final IRP describes near-term actions that TVA will take to implement the IRP and policy considerations that will guide the implementation of the IRP.

## Public Involvement

TVA published a notice of intent to prepare the IRP EIS in the **Federal Register** on February 14, 2018 (83 FR 6668). TVA then actively engaged the public through public scoping and public briefings during the development of the IRP and EIS. TVA also established an IRP Working Group to more actively engage stakeholders. Group members included representatives of local power companies (distributors of TVA power), state agencies, direct-served customers, academia, and energy and environmental non-governmental organizations. Members of the group met frequently with TVA IRP staff to review and provide input during the development of the plan. In addition, the Regional Energy Resource Council, a Federal Advisory Committee, provided review and advice periodically throughout the process.

The Notice of Availability (NOA) of the Draft IRP and EIS was published in the **Federal Register** by the U.S. Environmental Protection Agency (USEPA) on February 22, 2019 (84 FR 5760). TVA accepted comments on the Draft IRP and EIS until April 8, 2019. During the comment period, TVA held

seven public meetings and a public webinar to describe the project and accept comments. TVA received about 300 comment submissions signed by about 1,270 individuals and organizations. After considering and responding to these comments, further evaluating the alternative strategies, and developing the Target Power Supply Mix, TVA issued the Final IRP and EIS. The NOA for the Final IRP and EIS was published in the **Federal Register** on July 5, 2019 (84 FR 31268).

Following the publication of the NOA for the Final IRP and EIS, TVA received about 1,000 public comments via a form email through a Sierra Club campaign. These comments reiterated comments received on the Draft IRP and EIS and urged TVA to adopt the greatest amount of DER and renewable energy in the Target Power Supply Mix. Over 400 of these messages included statements added by the commenters. These statements did not raise issues of relevance to this IRP that were not previously raised in the comments on the Draft IRP and EIS and addressed by TVA in Appendix F of the Final EIS.

**Environmentally Preferable Alternative**

All of the alternative strategies, as well as the Target Power Supply Mix, have several common features that affect their anticipated environmental impacts. No baseload generation is added, but there is a need for new capacity in all scenarios to replace expiring or retiring capacity. Solar expansion plays a substantial role in all scenarios, and gas, storage and demand response additions provide reliability and/or flexibility. Emissions of air pollutants, including carbon dioxide, the intensity of carbon dioxide emissions, water use and consumption, and generation of coal waste decrease under all strategies. Although the differences between Strategies A through E are small, the impacts to most environmental resources are greatest for Strategy A (the No Action alternative) and least for Strategy C (Promote Resiliency), followed closely by Strategies B, D and E. The impacts of the Target Power Supply Mix span the range of Strategies A through E for most environmental and socioeconomic resources. An exception is the impact to land use, quantified as the land area needed to accommodate new generating and storage facilities, which is potentially greatest under the Target Power Supply Mix with the addition of up to 14,000 MW of solar capacity occupying up to about 103,000 acres (in a high-load forecast scenario). Under all strategies and the Target Power Supply Mix, at least 97 percent of the land area

required for new generating and storage facilities would be occupied by solar facilities. Compared to other types of generation, the impacts of solar facilities to land-based resources are relatively small and of shorter duration as described in Sections 5.2.3 and 5.5.5 of the Final EIS. Given these conditions, Strategy C is the environmentally preferable alternative.

**Decision**

On August 22, 2019, the TVA Board of Directors adopted the preferred alternative, the Target Power Supply Mix. The Board also directed staff to monitor future developments to help determine when deviations from the recommended resource ranges should be made and to initiate an update to the IRP no later than 2024 and earlier if future developments make this appropriate.

**Mitigation Measures**

The reduction of environmental impacts was an important goal in TVA's integrated resource planning process and all of the alternatives assessed by TVA do that. Because this is a programmatic review, measures to reduce potential environmental impacts on a site-specific level were not identified. As TVA deploys specific energy resources, it will review and take measures to reduce their potential environmental impacts as appropriate. TVA's siting process for generation and transmission facilities, as well as processes for modifying these facilities, are designed to avoid and/or minimize potential adverse environmental impacts.

Potential impacts will also be reduced through pollution prevention measures and environmental controls such as air pollution control systems, wastewater treatment systems, and thermal generating plant cooling systems. Other potentially adverse unavoidable impacts will be mitigated by measures such as compensatory wetlands mitigation, payments to in-lieu stream mitigation programs and related conservation initiatives, enhanced management of other properties, documentation and recovery of cultural resources, and infrastructure improvement assistance to local communities.

**Authority:** 40 CFR 1505.2.

Dated: September 9, 2019.

**John M. Thomas III,**

*Executive Vice President and Chief Financial Officer.*

[FR Doc. 2019–20104 Filed 9–16–19; 8:45 am]

**BILLING CODE 8120–08–P**

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

[Docket No. FAA–2019–0748]

## Agency Information Collection Activities: Requests for Comments; Clearance of a Renewed Approval of Information Collection: Helicopter Air Ambulance, Commercial Helicopter, and Part 91 Helicopter Operations

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Notice and request for comments.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, FAA invites public comments about our intention to request the Office of Management and Budget (OMB) approval to renew an information collection. The collection involves the collection of information related to rules governing Helicopter Air Ambulance, Commercial Helicopter, and Part 91 Helicopter Operations. The information to be collected supports the Department of Transportation's strategic goal of safety. Specifically, the goal is to promote the public health and safety by working toward the elimination of transportation-related deaths and injuries.

**DATES:** Written comments should be submitted by November 18, 2019.

**ADDRESSES:** Please send written comments:

*By Electronic Docket: www.regulations.gov* (Enter docket number into search field).

*By Mail:* Sandra Ray, Federal Aviation Administration, Policy Integration Branch AFS–270, 1187 Thorn Run Road, Suite 200, Coraopolis, PA 15108.

*By Fax:* 412–239–3063.

**FOR FURTHER INFORMATION CONTACT:** Thomas Luipersbeck by email at: *Thomas.A.Luipersbeck@faa.gov;* phone: 615–202–9683.

**SUPPLEMENTARY INFORMATION:**

*Public Comments Invited:* You are asked to comment on any aspect of this information collection, including (a) Whether the proposed collection of information is necessary for FAA's performance; (b) the accuracy of the estimated burden; (c) ways for FAA to enhance the quality, utility and clarity of the information collection; and (d) ways that the burden could be minimized without reducing the quality of the collected information. The agency will summarize and/or include your comments in the request for OMB's clearance of this information collection.

*OMB Control Number:* 2120–0756.