**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| PROTECT OUR AQUIFER, ENERGY ALABAMA, and APPALACHIAN VOICES, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:20-cv-02615-TLP-atc |
| TENNESSEE VALLEY AUTHORITY, | ) ) | |
| Defendant. | ) ) ) | |

---

**PLAINTIFFS' RESPONSE TO TVA'S MOTION TO DISMISS THE AMENDED
COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION OR FOR
SUMMARY JUDGMENT ON PLAINTIFFS' ADMINISTRATIVE PROCEDURE ACT
CLAIMS**
**(Oral Argument Requested)**

---

Amanda Garcia, BPR#033773
George Nolan, BPR#014974
Stephanie Biggs, BPR#036734
O. W. "Trey" Bussey, BPR#037814
Chelsea Bowling, BPR#037812
Southern Environmental Law Center
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Facsimile: (615) 921-8011
agarcia@selctn.org
gnolan@selctn.org
sbiggs@selctn.org
tbussey@selctn.org
cbowling@selctn.org

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

ARGUMENT ........................................................................................................ 1

   I.   TVA's motion to dismiss for lack of standing should be denied. ...................... 1

      A.  Conservation Groups have standing to prosecute their TVA Act claim. ....................... 3

         1.  Conservation Groups have suffered injuries in fact. .................................... 3

            a.  The Contracts injure Conservation Groups' legally protected interests. ................. 3

                i.  Environmental interests. .................................................................... 5

                ii.  Economic interests. .......................................................................... 7

                iii. Organizational interests. ................................................................... 9

            b.  Conservation Groups' harms are concrete and particularized. ............................. 10

            c.  Conservation Groups' injuries are actual or imminent. ........................................ 13

         2.  Conservation Groups' injuries are fairly traceable to TVA. ............................. 15

         3.  Conservation Groups' injuries are redressable by this Court. ........................... 16

         4.  TVA improperly seeks to relitigate meritless prudential standing arguments. ......... 17

      B.  Conservation Groups have standing to prosecute their NEPA claim. ......................... 18

         1.  Conservation Groups' informational injuries are not speculative. ......................... 20

         2.  Conservation Groups show that their injuries are fairly traceable to the Never-ending Contracts. ........................................................................................ 23

  II.  TVA's motion to dismiss and for summary judgment on the TVA Act claim should be denied. .......................................................................................... 24

      A.  The Court should reject TVA's improper attempt to relitigate whether the TVA Act claim is committed to agency discretion. .................................................... 25

      B.  TVA's motion fails because the TVA Act affords the agency no discretion to enter Contracts exceeding twenty years. ...................................................... 26

      C.  The Never-ending Contract "term" violates the TVA Act's twenty-year limit. ........... 28

  III. TVA's motion for summary judgment on the NEPA claim should be denied. ................ 32

      A.  The final agency actions at issue in the NEPA claim include both adoption and execution of the Contracts. ........................................................................ 33

      B.  TVA's determination that NEPA does not apply to the Never-ending Contracts is unreasonable. ......................................................................................... 34

         1.  The Never-ending Contracts change the environmental status quo. ......................... 36

            a.  The Flexibility Provision both alters and constrains the future source and location of distributors' power supply. ................................................................ 37

            b.  The Perpetual Term prolongs and increases TVA's reliance on fossil fuel-powered plants. ........................................................................................... 39

i

C.    No categorical exclusions apply to the Never-ending Contracts. ................................. 43

CONCLUSION ............................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abraugh v. Altimus*,
   26 F.4th 298 (5th Cir. 2022) ...................................................................................17

*Aluminum Co. of Am. v. Bonneville Power Admin.*,
   903 F.2d 585 (9th Cir. 1989) ....................................................................................7

*Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*,
   389 F.3d 536 (6th Cir. 2004) ....................................................................................4

*Amezola-Garcia v. Lynch*,
   846 F.3d 135 (6th Cir. 2016) ..................................................................................26

*Assoc. of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*,
   13 F.4th 531 (6th Cir. 2021) .................................................................................2, 3

*Barrios Garcia v. U.S. Dep't of Homeland Security*,
   25 F.4th 430 (6th Cir. 2022) ..................................................................................26

*Bennett v. Spear*,
   520 U.S. 154 (1997)...........................................................................................33, 34

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020).............................................................................................30

*Burbank Anti-Noise Grp. v. Goldschmidt*,
   623 F.2d 115 (9th Cir. 1980) ..................................................................................37

*California Energy Comm'n v. Bonneville Power Admin.*,
   909 F.2d 1298 (9th Cir. 1990) ..................................................................................7

*California v. Norton*,
   311 F.3d 1162 (9th Cir. 2002) ....................................................................43, 44, 45

*Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*,
   75 F.3d 1429 (10th Cir. 1996) ................................................................................34

*Center for Biological Diversity v. Ilano*,
   928 F.3d 774 (9th Cir. 2019) ............................................................................41, 42

*Center for Biological Diversity v. TVA*,
   No. 18-cv-01446 (N.D. Ala. Sept. 6, 2018)............................................................23

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
   868 F.3d 104 (2d Cir. 2017) ........................................................................................9

*Chevron U.S.A. Inc. v. Nat. Res. Defense Council, Inc.*,
   467 U.S. 837 (1984) ...................................................................................................29

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
   341 F.3d 961 (9th Cir. 2003) ...............................................................................19, 24

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ...................................................................................................13

*Clinton v. City of New York*,
   524 U.S. 417 (1998) .....................................................................................................8

*Cnty. of Maui v. Hawai'i Wildlife Fund*,
   140 S. Ct. 1462 (2020) ...............................................................................................31

*Comm. for Auto Resp. v. Solomon*,
   603 F.2d 992 (D.C. Cir. 1979) ...................................................................................37

*Commodity Futures Trading Comm'n v. Erskine*,
   512 F.3d 309 (6th Cir. 2008) ......................................................................................29

*Ctr. for Biological Diversity v. TVA*,
   491 F. Supp. 3d 1180 (N.D. Ala. 2020) ...............................................................12, 23

*Dean v. Herrington*,
   668 F. Supp. 646 (E.D. Tenn. 1987) ..........................................................................18

*Env't Def. Fund v. Andrus*,
   596 F.2d 848 (9th Cir. 1979) ......................................................................................34

*Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*,
   47 F.4th 408 (5th Cir. 2022) .........................................................................................2

*Fed. Election Comm'n v. Akins*,
   524 U.S. 11 (1998) ................................................................................................12, 17

*Focus on the Family v. Pinellas Suncoast Transit Auth.*,
   344 F.3d 1263 (11th Cir. 2003) ..................................................................................15

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
   397 F.Supp.2d 1241 (D. Mont. 2005) .........................................................................34

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) ....................................................................................21

iv

*Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................2, 4, 5

*Friends of Tims Ford v. TVA*,
   585 F.3d 955 (6th Cir. 2009) ...........................................19, 20, 24

*Galaria v. Nationwide Mutual Insurance Company*,
   663 F. App'x 384 (6th Cir. 2016) ..........................................13, 14

*Blackwell ex rel. Gary Blackwell Revocable Living Tr. v. TVA*,
   No. 22-CV-19, 2022 WL 3569020 (W.D. Ky. Aug. 18, 2022) ...........26

*Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*,
   491 F.3d 320 (6th Cir. 2007) ......................................................20

*Alabama ex rel. Graddick v. TVA*,
   636 F.2d 1061 (5th Cir. 1981) ...................................................27

*Grant Cnty. Black Sands Irrigation Dist. v. Bureau of Reclamation*,
   579 F.3d 1345 (Fed. Cir. 2009) .................................................31

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ...................................................................9

*Hodgkins v. Fudge*,
   850 F. App'x 423 (6th Cir. 2021) ..............................................25

*Holbrook v. TVA*,
   48 F.4th 282 (4th Cir. 2022) .....................................................28

*Home Base Litter Control, LLC v. Claiborne Cnty.*,
   183 So.3d 94 (Miss. Ct. App. 2015) ..........................................32

*HTH Corp. v. NLRB*,
   823 F.3d 668 (D.C. Cir. 2016) ..................................................30

*Jama v. U.S. Dep't of Homeland Sec.*,
   760 F.3d 490 (6th Cir. 2014) ....................................................26

*Ka Makani 'O Kohala Ohana Inc. v. Water Supply*,
   295 F.3d 955 (9th Cir. 2002) ....................................................32

*Kennedy v. Allera*,
   612 F.3d 261 (4th Cir. 2010) ....................................................28

*Klein v. U.S. Dep't of Energy*,
   753 F.3d 576 (6th Cir. 2014) ....................................................19

*Lake Cumberland Trust, Inc. v. Env't Prot. Agency*,
    954 F.2d 1218 (6th Cir. 1992) ........................................................................31

*Laufer v. Acheson Hotels, LLC*,
    50 F.4th 259 (1st Cir. 2022) ............................................................................2

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .......................................................................................17

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................. *passim*

*Mach Mining, LLC v. E.E.O.C.*,
    575 U.S. 480 (2015) .......................................................................................28

*Madison-Hughes v. Shalala*,
    80 F.3d 1121 (6th Cir. 1996) ........................................................................26

*Meister v. U.S. Dep't of Agric.*,
    623 F.3d 363 (6th Cir. 2010) ........................................................................33

*Metcalf v. Daley*,
    214 F.3d 1135 (9th Cir. 200) ........................................................................33

*Mitchell v. TVA*,
    No. 3:14-cv-360-TAV-HBG, 2015 WL 1962203 (E.D. Tenn. Apr. 30, 2015) ........................8

*Morales v. Trans World Airlines*,
    504 U.S. 374 (1992) .......................................................................................27

*Orangeburg v. Fed. Energy Regul. Comm'n*,
    862 F.3d 1071 (D.C. Cir. 2017) ......................................................................7

*Parsons v. U.S. Dep't of Justice*,
    801 F.3d 701 (2015) .......................................................................................16

*Port of Astoria v. Hodel*,
    595 F.2d 467 (9th Cir. 1979) ....................................................................33, 39

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) .......................................................................................27

*Robbins v. Cleburne Cnty. Comm'n*,
    300 So. 3d 573 (Ala. 2020) ...........................................................................32

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .......................................................................................21

*Save the Yaak Committee v. Block,*
   840 F.2d 714 (9th Cir. 1988) ......................................................................32, 33

*Sec. & Exch. Comm'n v. Chenery Corp.,*
   332 U.S. 194 (1947) ............................................................................................45

*Shelby Advocs. for Valid Elections v. Hargett,*
   947 F.3d 977 (6th Cir. 2020) .............................................................................13

*Sheldon v. Vilsack,*
   538 F. App'x 644 (6th Cir. 2013) ......................................................................26

*Sherwood v. TVA,*
   590 F. App'x 451 (6th Cir. 2014) ......................................................................44

*Sierra Club v. Marsh,*
   872 F.2d 497 (1st Cir. 1989) .............................................................................20

*Sierra Club v. Morton,*
   405 U.S. 727 (1972) ..............................................................................................5

*Sierra Club v. U.S. Forest Serv.,*
   828 F.3d 402 (6th Cir. 2016) .............................................................................43

*Southwest Williamson Cnty. Cmty. Ass'n v. Slater,*
   243 F.3d 270 (6th Cir. 2001) .............................................................................32

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) ........................................................................................2, 10

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ..............................................................................................17

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ............................................................................................13

*Tenn. Coal, I. & R. Co. v. Pratt Consol. Coal Co.,*
   47 So. 337 (Ala. 1908) ........................................................................................31

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) .............................................................................. *passim*

*Turner v. Parole Commission,*
   810 F.2d 612 (7th Cir. 1987) .............................................................................28

*U.S. Berry v. Dep't of Labor,*
   832 F.3d 627 (6th Cir. 2016) .............................................................................26

*U.S. v. Sanford*,
    476 F.3d 391 (6th Cir. 2007) ....................................................................26

**Statutes and Rules**

5 U.S.C. § 704 ..........................................................................................................25

5 U.S.C. § 706 ..........................................................................................................34

16 U.S.C. § 831g ......................................................................................................27

16 U.S.C. § 831i ............................................................................................ *passim*

16 U.S.C. § 831j .......................................................................................................18

42 U.S.C. § 4332 ......................................................................................................23

43 U.S.C. § 485h-1 ...................................................................................................31

Fed. R. Civ. P. 56 .......................................................................................................3

Tenn. Code Ann. § 68-221-702 .................................................................................6

**Regulations**

18 C.F.R. § 1318.101 ....................................................................................36, 37, 39

40 C.F.R. §1508.4 (1978) ........................................................................................43

40 C.F.R. § 1508.7 (1978) .......................................................................................35

40 C.F.R. § 1508.8 (1978) .......................................................................................35

46 Fed. Reg. 18026 (Mar. 23, 1981) .......................................................................37

87 Fed. Reg. 56048 (Sept. 13, 2022) .......................................................................15

**Other Authorities**

K. Davis & R. Pierce, *Administrative Law Treatise* (3d ed. 1994).............................8

Oxford English Dictionary (2d ed. 1989) ................................................................31

Restatement (Second) of Torts...................................................................................6

Webster's New International Dictionary (1925)...................................................30, 31

Webster's Unabridged Dictionary (2001)................................................................31

**INTRODUCTION**

The Tennessee Valley Authority ("TVA") willfully ignored the TVA Act and the National Environmental Policy Act ("NEPA") when it adopted and implemented new power supply contracts that bind its electric distribution customers to the federal utility forever. TVA now asks this Court to do the same.

In its Motion to Dismiss or for Summary Judgment, TVA again insists that it is above the law, arguing that neither this Court nor Conservation Groups (Protect Our Aquifer, Energy Alabama, and Appalachian Voices) can hold TVA accountable. Alternatively, TVA offers a tortured reading of a clear statutory limit and insists that its perpetual Contracts do nothing: they don't commit resources, influence generation decisions, or have any effect on the people and places in TVA's service territory.

TVA is wrong. This Court has the authority and obligation to determine whether TVA complied with the TVA Act and NEPA. As the record amply demonstrates, the Never-ending Contracts dramatically alter the relationship between TVA and its distribution utility customers and harm Conservation Groups and their members by locking in demand for TVA's power and insulating TVA completely from all market forces. The eternal agreements prolong TVA's heavy reliance on fossil fuels and stymie Conservation Groups' efforts to influence TVA's power supply decisions both directly and through their municipal and member-owned utilities. TVA unreasonably ignored these impacts, as well as the TVA Act's straightforward twenty-year term limit, when it rushed to execute more than 130 perpetual Contracts. Accordingly, TVA's motion should be denied.

**ARGUMENT**

**I.      TVA's motion to dismiss for lack of standing should be denied.**

Conservation Groups have standing to prosecute their claims. To establish Article III

1

standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Conservation Groups have "associational standing" to bring this case on behalf of their members because (1) the interests at stake are germane to Conservation Groups' purposes, (2) the members themselves have standing, and (3) neither the claims nor the relief requested requires the participation of individual members. *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

TVA suggests that *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) silently overruled decades of precedent and revolutionized standing analysis. (Def.'s Br., Doc. 75, PageID#6700–01.) Not so. "*TransUnion* merely reaffirmed the well-established rule that a violation of a federal law alone is not an Article III injury." *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 47 F.4th 408, 416 (5th Cir. 2022); *see also Laufer v. Acheson Hotels, LLC*, 50 F.4th 259, 268 (1st Cir. 2022) ("In all, [*TransUnion*] just means that we judges must still 'independently decide whether a plaintiff has suffered a concrete harm under Article III,' even if Congress adamantly says they do.") (quoting *TransUnion*, 141 S. Ct. at 2205). As discussed below, and contrary to TVA's claims, *TransUnion* does not hold any of the following: that a risk of future injury does not confer standing (Doc. 75, PageID#6701); that intangible injuries, including informational injuries, are not cognizable (Doc. 75, PageID#6701); or that *only* injuries "traditionally recognized" in courts remain viable (Doc. 75, PageID#6700–01). *TransUnion* does not even mention associational or organizational standing. *See TransUnion*, 141 S. Ct. at 2190–2214.[1]

---

[1] TVA cites the discussion of *TransUnion*'s effect on associational standing in *Assoc. of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 537–42 (6th Cir. 2021).

Addressing class action claims for damages pursuant to the Fair Credit Reporting Act, *TransUnion* bears little resemblance to this case and does not support the narrow view of standing TVA advances. On summary judgment, plaintiffs must "'set forth' by affidavit or other evidence 'specific facts'" showing that they have standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citing Fed. R. Civ. P. 56(e)). Here, Conservation Groups have adduced facts demonstrating that TVA's Never-ending Contracts have caused or imminently will cause Conservation Groups and their members concrete, particular injuries to their legally protected interests that are redressable by this Court. (*See* Pls.' Br., Doc. 74-1, PageID#5839–47.)

## A. Conservation Groups have standing to prosecute their TVA Act claim.

### 1. Conservation Groups have suffered injuries in fact.

Conservation Groups' members have suffered or imminently will suffer concrete harms to their environmental and economic interests because TVA has adopted, executed, and implemented the Never-ending Contracts in violation of the TVA Act. An "injury in fact" is the "invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. at 560.

#### a. The Contracts injure Conservation Groups' legally protected interests.

Conservation Groups' members have suffered actual or imminent concrete harms to their environmental and economic interests because TVA adopted and implemented the Never-ending Contracts. By enabling TVA to continue to rely on and invest in fossil fuel-powered plants indefinitely (Pls.' Statement of Undisputed Facts, Doc. 74-2, PageID#5885–88 ¶¶ 36–49), the Contracts create an imminent risk of environmental harm that directly and particularly harms

---

(Doc. 75, PageID#6698–99.) That discussion was dicta and, as the concurrence pointed out, "unnecessary to the resolution of the case." 13 F.4th at 547 (Siler, J., concurring).

Conservation Group members' recreational, aesthetic, and health interests (Doc. 74-1, PageID#5840–42). By forever blocking competition, resulting in costlier, dirtier energy, the Contracts have economically injured Conservation Group members. (Doc. 74-1, PageID#5841–42.)

TVA insists that Conservation Groups' injuries are not cognizable because they are intangible and do not resemble "harms traditionally recognized as providing a basis for lawsuits in American courts." (Doc. 75, PageID#6701.) As a preliminary matter, Conservation Groups' members' economic harm tied to their environmental interests are not "intangible." Higher fuel costs caused spikes in members' bills this summer. (*See* Doc. 74-8, PageID#6282 ¶ 36; Doc. 74-6, PageID#6152 ¶ 20; Doc. 74-9, PageID#6332 ¶ 14.) Lack of access to renewable energy exacerbates those costs and deprives members of the opportunity to purchase a product on their desired terms. (Doc. 17-8, PageID#1340 ¶ 18; Doc. 17-9, PageID#1344–45 ¶ 12; Doc. 17-16, PageID#1377 ¶ 5.)

Contrary to TVA's assertion (Doc. 75, PageID#6701), intangible injuries remain valid bases for courts to find standing. *See TransUnion*, 141 S. Ct. at 2204 ("Various intangible harms can also be concrete."). TVA's suggestion that Plaintiffs' injuries cannot be heard because they allegedly are not harms traditionally heard in American courts overstates *TransUnion*'s reach. (Doc. 75, PageID#6701.) Courts have long recognized a range of intangible interests in environmental law cases, including recreational, aesthetic, and health interests. *See, e.g.*, *Friends of the Earth, Inc.*, 528 U.S. at 183–88 (holding environmental groups had standing based on injuries to aesthetic and recreational interests); *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540–42 (6th Cir. 2004) (same). As of the date of this filing, no court has held that *TransUnion* forecloses a plaintiff's standing to pursue a NEPA claim.

4

<strong>i.  Environmental interests.</strong>

By enabling TVA to prolong its reliance on and invest in fossil fuel-powered plants (Doc. 74-1, PageID#5865–66; Doc. 74-2, PageID#5886–88 ¶¶ 37–49), the Contracts create an imminent risk of environmental harm that directly and particularly injures Conservation Group members' recreational and aesthetic interests, as well as their right to clean drinking water (Doc. 74-1, PageID#5840–42; Docs. 17-7–17-16; Docs. 74-6–74-11). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc.*, 528 U.S. at 169 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

Energy Alabama member Mr. Rossow enjoys swimming in the Tennessee River downstream of the Kingston coal plant. (Doc. 17-10, PageID#1349 ¶ 11.) An injury in fact may be adequately documented when declarants aver that pollution and the declarants' "reasonable concerns about the effects of" that pollution directly affect the declarant's "recreational, aesthetic, and economic interests." *Friends of the Earth, Inc.*, 528 U.S. at 169. The Kingston coal plant's pollution impairs Mr. Rossow's recreational use and enjoyment of the river. TVA has proposed to retire the Kingston Fossil Plant, but not until 2027. (Doc. 74-10, PageID#6373.) Evidence in the record shows that the plant's operation and its life—and therefore its pollution—likely have been increased and prolonged by the Contracts. (Doc. 74-2, PageID#5885–88, 92–95.) Specifically, the load loss anticipated in the absence of the Never-ending Contracts would result in reducing capital investments in new gas builds and "dispatching lower in your fleet," resulting in "fuel savings" (AR001640–41), as well as additional coal retirements (Doc. 74-2, PageID#5893).

5

Appalachian Voices member and trained biologist Angela Mummaw regularly observes wildlife near her home, where she can also see the Cumberland Plant coal stacks. (Doc. 74-6, PageID#6150–52 ¶¶ 6–7, 13–14.) "It is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm . . . ." *Lujan*, 504 U.S. at 566. Ms. Mummaw reasonably believes that TVA's plans to construct a gas plant on the Cumberland site and a pipeline to serve it, financed by the Never-ending Contracts, will harm the rare wildlife she enjoys observing. (Doc. 74-6, PageID#6151–52 ¶¶ 13–14.) Harm to wildlife will occur by disturbing habitat, causing water pollution during construction, and exacerbating the effects of climate change on wildlife. *Id.* In turn, that harm will diminish Ms. Mummaw's aesthetic enjoyment of the natural areas she visits in her community. *Id.*

TVA's illegal Contracts threaten Protect Our Aquifer supporters' legally protected interest in clean drinking water. The impairment of water rights is a traditionally cognizable injury, *see* Restatement (Second) of Torts §§ 832 (Pollution of Waters), 821B (Public Nuisance) (1979), and in Tennessee, "the people" have a "right to both an adequate quantity and quality of drinking water." Tenn. Code Ann. § 68-221-702. TVA's operations in Memphis have a significant impact on the quality and quantity of the Memphis Sand Aquifer, as TVA's Allen gas plant uses roughly 3.5 million gallons of Aquifer water per day. In addition, arsenic has been discovered in groundwater adjacent to the TVA Allen site at levels that far exceed safe drinking water standards. (Doc. 74-7, PageID#6201 ¶ 15.) Even if Memphis Light, Gas & Water ("MLGW") does not sign a Never-ending Contract, contracts signed elsewhere forever lock in higher levels of load on TVA's system, increasing and prolonging its reliance on the Allen gas plant. (*See* AR001640–41 (load loss would result in "dispatching lower in your fleet," resulting in "fuel savings").)

Protect Our Aquifer supporter Ward Archer relies on the Memphis Sand Aquifer for drinking water. The conflict between TVA's Memphis operations and Mr. Archer's drinking water is far from speculative. In 2021, Mr. Archer lost access to drinking water for eight days during a severe winter storm. (Doc. 74-8, PageID#6286 ¶ 38.) Because TVA's use of limited Aquifer water is so substantial and conflicts with residents' need for drinking water, MLGW asked TVA to stop using Aquifer water to operate the Allen plant. (Doc. 74-8, PageID#6325–27.) Mr. Archer's legally protected interest in clean drinking water is impaired by TVA's Contracts, which prolong and intensify operations at the Allen site. (Doc. 74-2, PageID#5885–88, 92–95.)

### ii.     Economic interests.

By placing a harsh cap on distributed renewable energy while financing TVA's massive gas buildout (Doc. 74-1, PageID#5865–66), the Never-ending Contracts have economically injured Conservation Group members. Depriving consumers of the opportunity to purchase a product, including power on their desired terms, is a concrete economic injury. *Orangeburg v. Fed. Energy Regul. Comm'n*, 862 F.3d 1071, 1077 (D.C. Cir. 2017). So too is paying excessive electricity bills. *Aluminum Co. of Am. v. Bonneville Power Admin.*, 903 F.2d 585, 590 (9th Cir. 1989) ("There is harm in paying rates that may be excessive . . . ."); *accord California Energy Comm'n v. Bonneville Power Admin.*, 909 F.2d 1298, 1306 (9th Cir. 1990).

TVA's Never-ending Contracts injure Conservation Group members by depriving them of the opportunity to buy power on their desired terms. The Contracts require Conservation Group members to buy at least 95% of their power from TVA, which produces most of its electricity from coal, gas, and nuclear plants. Conservation Group members want the chance to buy renewable, distributed, consistently affordable energy (*see, e.g.*, Doc. 17-8, PageID#1340 ¶

7

17; Doc. 17-9, PageID#1345–46; Doc. 17-16, PageID#1376–77), but the Contracts limit this opportunity by imposing a harsh cap on local renewable generation, perpetually limiting members' options.

By passing on high fuel costs and limiting opportunities for more affordable renewable energy, the Never-ending Contracts economically injure Conservation Group members. Residential ratepayers cover TVA's "fuel costs" for gas and coal, which are subject to market volatility. (Doc. 74-9, PageID#6331–32.) When gas prices increased dramatically in 2022, Conservation Group members paid higher electricity bills than usual. (Doc. 74-9, PageID#6332 ¶ 14; Doc. 74-8, PageID#6285–86 ¶ 36.) By financing TVA's proposal to increase reliance on gas, the Never-ending Contracts only increase the substantial, imminent risk that Conservation Group members will again pay higher and more volatile electricity bills to cover TVA's fossil fuel costs. *See* TVA Board Meeting Slide Deck 43 (Aug. 31, 2022) ("As natural gas becomes a larger portion of the portfolio, the volatility of natural gas prices becomes a greater risk[.]").[2]

Finally, the Never-ending Contracts injure Conservation Group members by impairing the value of their investments in distributed energy systems like rooftop solar. A "petitioner who is likely to suffer economic injury as a result of governmental action that changes market conditions satisfies" the injury-in-fact requirement. *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (cleaned up) (quoting K. Davis & R. Pierce, *Administrative Law Treatise* 13–14 (3d ed. 1994)). Energy Alabama member Jonathan Rossow and Appalachian Voices member JoAnn McIntosh have invested in rooftop solar systems. (Doc. 17-10, PageID#1348 ¶ 5; Doc. 17-16,

---

[2] Available at https://www.tva.com/about-tva/our-leadership/board-of-directors/meetings-archive/2022/08/31/default-calendar/tva-board-meeting---august-31-2022. The Court may take judicial notice of the information on TVA's website. *See* Doc. 73, PageID#5417 n. 2; *Mitchell v. TVA*, No. 3:14-cv-360-TAV-HBG, 2015 WL 1962203, at *4 n.2 (E.D. Tenn. Apr. 30, 2015) (taking judicial notice of TVA's website).

PageID#1377 ¶ 6.) The Never-ending Contracts and their caps on local renewable generation limit the market for solar power by allowing distributors to purchase only a limited amount of local generation, including from residential rooftop solar installations. (Doc. 17-10, PageID#1349 ¶ 6; Doc. 17-16, PageID#1377 ¶ 7.) Constraining the market for local generation impairs the value of DER investments like Mr. Rossow's and Ms. McIntosh's by restricting their ability to sell power at a reasonable price in the future.

### iii.    Organizational interests.

TVA's Never-ending Contracts have injured Conservation Groups as organizations. The perceptible impairment of an organization's activities "with the consequent drain on the organization's resources" constitutes an organizational injury. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Those resources may include "attention, time, and personnel" diverted in response to a defendant's unlawful conduct. *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110–11 (2d Cir. 2017). Conservation Groups' core activities includes direct advocacy to TVA and local power companies to protect the environment and promote renewable, distributed energy. (Doc. 17-9, PageID#1344–45; Doc. 17-13, PageID#1361–63; Doc. 74-7, PageID#6200–01.) By insulating TVA from democratic pressure and constraining distributors' energy portfolios forever, the Contracts have fundamentally undermined Conservation Groups' core activities. (*See* Doc. 74-1, PageID#5842–43.)

Contrary to TVA's assertion (Doc. 75, PageID#6702), Conservation Groups have diverted substantial resources in response to TVA's unlawful Never-ending Contracts. To focus on TVA's proposed gas projects, funded by the Never-ending Contracts, Appalachian Voices has hired two new staff members and diverted staff time away from its core energy democracy work.

(Doc. 74-10, PageID#6348 ¶¶ 16–17.) Foregoing other Aquifer-related work, Protect Our Aquifer staff have attended numerous public meetings and used their limited communications budget to raise awareness about the Never-ending Contract MLGW staff has recommended signing. (Doc. 74-7, PageID#6201–04.) Energy Alabama spent staff time and attention attending public meetings, drafting comments, and researching alternatives to the Never-ending Contracts. (Doc. 17-9, PageID#1344–45.) Because the Contracts have substantially impaired Conservation Groups' activities and drained their limited resources, Conservation Groups have standing as organizations to prosecute their TVA Act claim.

### b.  Conservation Groups' harms are concrete and particularized.

Conservation Groups have adduced facts demonstrating that they and their members have been particularly injured by TVA's unlawful Contracts. An injury-in-fact must be "concrete and particularized," *Lujan*, 504 U.S. at 560, meaning the injury must be "personal" and "real," *Spokeo*, 578 U.S. at 339–40. Conservation Group members' declarations demonstrate how TVA's actions affect them in personal, real ways: they impair Ms. Mummaw's aesthetic interest in viewing wildlife near her home (Doc. 74-6, PageID#6150–52); Mr. Rossow's recreational interest in swimming in the Tennessee River (Doc. 17-10, PageID#1349 ¶ 11); and Mr. Archer's right to clean drinking water (Doc. 74-8, PageID#6284 ¶ 38). The Contracts devalue Ms. McIntosh and Mr. Rossow's personal rooftop solar investments (Doc. 17-10, PageID#1349 ¶ 6; Doc. 17-16, PageID#1377 ¶ 7), and force Conservation Group members to cover TVA's increasingly volatile fuel costs on their own personal utility bills (Doc. 74-9, PageID#6332 ¶ 14; Doc. 74-8, PageID#6285–86 ¶ 36). As individual ratepayers, Conservation Group members want the chance to buy cleaner, more distributed, less volatile energy. (Doc. 17-8, PageID#1340 ¶ 17; Doc. 17-9, PageID#1345–46 ¶ 18; Doc. 17-16, PageID#1377 ¶ 5.) Organizations diverted their

10

own limited resources to educate their members and communities about TVA's illegal Contracts and their consequences. (Doc. 74-10, PageID#6348; Doc. 74-7, PageID#6201–04; Doc. 17-9, PageID#1344–45.) Conservation Groups and their members do not allege abstract violations of others' legally protected interests but real injuries to their own.

TVA insists that Conservation Groups' members could only be harmed by TVA's unlawful Contracts with their own distributors. (Doc. 75, PageID#6699.) That misconstrues Conservation Groups' injuries and standing law. Each Never-ending Contract, wherever signed, inflates and locks in load on TVA's system forever. *See* Section III.B.1.b. That increased load affects TVA's operations, particularly injuring Conservation Groups' members. For example, TVA executives explained that the Never-ending Contracts—not a particular Contract but *all* of them—finance TVA's capital investments, including new gas plants. (Doc. 74-2, PageID#5885–88.) By financing TVA's gas buildout, including a new plant at Cumberland, *all* of TVA's Never-ending Contracts impair Ms. Mummaw's interest in viewing wildlife near her home. (Doc. 74-6, PageID#6151–52 ¶¶ 13–14.) Similarly, for Energy Alabama member Jonathan Rossow (Doc. 17-10, PageID#1348), it is not just his distributor's illegal contract, but all Never-ending Contracts that lock in elevated levels of load, increasing and prolonging TVA's reliance on the Kingston coal plant. *See* Section III.B.1.b.

Protect Our Aquifer's supporters are injured by the Never-ending Contracts TVA has already signed throughout its service area. Protect Our Aquifer supporter Ward Archer relies on the Memphis Sand Aquifer for drinking water. (Doc. 74-8, PageID#6284 ¶ 19.) Even if MLGW refuses to sign one, the Never-ending Contracts signed elsewhere particularly and concretely harm Protect Our Aquifer supporters. TVA's operations in Shelby County do not exclusively serve MLGW (Doc. 74-7, PageID#6201 ¶ 16), so increased load elsewhere in the Valley

11

prolongs or increases operation of TVA facilities within Shelby County, including the Allen gas plant. TVA's operations deplete and threaten to contaminate the Memphis Sand Aquifer that Protect Our Aquifer supporters rely on, and the Contracts heighten that imminent threat to Protect Our Aquifer supporters' drinking water. (Doc. 74-8, PageID#6281–87; Doc. 74-7, PageID#6200–05; Doc. 17-7, PageID#1331–35.)

TVA argues that Conservation Group members' injuries are not cognizable because they fail to establish a "geographic nexus" and that any harm it inflicts across its entire service territory cannot support standing. (Doc. 75, PageID#6706 [quoting *Ctr. for Biological Diversity v. TVA*, 491 F. Supp. 3d 1180, 1190 (N.D. Ala. 2020)].) For environmental injuries, Conservation Groups' interests are harmed near particular TVA facilities including Allen (Doc. 74-8, PageID#6281–87; Doc. 74-7, PageID#6200–05; Doc. 17-7, PageID#1331–35), Kingston (Doc. 17-10, PageID#1349), and the proposed Cumberland gas plant (Doc. 74-6, PageID#6150–53). Conservation Groups' economic and organizational injuries do not require such a narrow geographic nexus. "[W]here a harm is concrete, though widely shared, the [Supreme] Court has found 'injury in fact.'" *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998). As discussed, Conservation Groups and their members are concretely, particularly injured by TVA's illegal Contracts.

TVA nevertheless argues that Conservation Groups "have pointed to no evidence" the Never-ending Contracts will change the future generation from their coal- and gas-fired power plants. (Doc. 75, PageID# 6706 [quoting *Ctr. for Biological Diversity*, 491 F. Supp. 3d at 1190].) Not so. Article III does not require plaintiffs "to demonstrate that it is literally certain that the harms they identify will come about." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). Instead, plaintiffs may offer evidence showing a "substantial risk that the harm will

occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (finding standing based on "a credible threat")[3]; *see also Galaria v. Nationwide Mutual Insurance Company*, 663 F. App'x 384, 388 (6th Cir. 2016) (drawing a "reasonable inference" from the record to find a substantial risk of harm). Plaintiffs have done so here. TVA's own analysis demonstrates that there is a substantial risk the Contracts will increase TVA's reliance on its existing fossil fuel plants. The Never-ending Contracts prevent load loss, one of the "billion-dollar risks" TVA's CFO identified when the Board adopted the Contracts. (Doc. 74-2, PageID#5886 ¶ 38.) At that Board meeting, Mr. Thomas explained that losing 10% load would reduce the amount of new gas capital investments and would save on fuel costs by "dispatching lower in your fleet," meaning running fewer high-cost fossil fuel-fired peaking units. (AR001640–41.) In the most analogous scenario in the 2019 Integrated Resource Plan, TVA relies more on renewables, avoids gas plant investments, and increases coal retirements. (Doc. 74-2, PageID#5893.) By perpetually locking in elevated demand for TVA power, the Contracts create a substantial risk that TVA will operate its fossil fuel plants, including Allen and Kingston, more and longer and invest in new gas plants.

### c.  Conservation Groups' injuries are actual or imminent.

TVA argues that Conservation Groups' injuries are speculative and therefore not cognizable. (Doc. 75, PageID#6701.) However, Conservation Groups have already suffered actual harms. Members whose distributors signed the illegal Contract have lost the opportunity to buy cleaner, more distributed energy (Doc. 17-9, PageID#1345–46 ¶ 18; Doc. 17-16,

---

[3] Contrary to TVA's assertion (Doc. 75, PageID#6701), the Sixth Circuit recognizes that a substantial risk of harm can constitute an injury in fact. In *Shelby Advocs. for Valid Elections v. Hargett*, the court held that plaintiffs had not met that burden because they pointed only to "past occurrences of unlawful conduct" with no evidence of a risk of future harm. 947 F.3d 977, 981 (6th Cir. 2020). Here, plaintiffs point to TVA's own analysis of projected changes to its generation system (*see* Doc. 74-2, PageID#5885–88, 92–95), as well as pending and finalized proposals for new TVA gas plants and associated pipelines (*see* Doc. 74-10, PageID#6351–73).

PageID#1377 ¶ 5), and the Contracts have impaired the value of individuals' investments in distributed solar (Doc. 17-10, PageID#1379 ¶ 6; Doc. 17-16, PageID#1377 ¶ 7). Conservation Groups have already suffered organizational injuries because the Contracts have impaired their core activities and diverted their resources. (Doc. 74-10, PageID#6348; Doc. 74-7, PageID#6201–04; Doc. 17-9, PageID#1344–45.)

For Protect Our Aquifer and its members, additional injuries are imminent. MLGW staff has recommended that MLGW sign a Never-ending Contract, which would eliminate members' opportunities to buy cheaper, cleaner, less-Aquifer-dependent energy and would substantially frustrate the organization's core advocacy activities by insulating MLGW and TVA from democratic accountability. As of this filing, the MLGW Board has not voted on the staff recommendation. (Doc. 74-8, PageID#6284.) To avoid the substantial risk of harm, Protect Our Aquifer has reasonably incurred mitigation costs by spending limited resources to advocate against the Never-ending Contract. *See Galaria*, 663 F. App'x at 388 (finding "allegations of a substantial risk of harm, coupled with reasonably incurred mitigation costs," sufficient to establish injury-in-fact).

Conservation Groups' other injuries are imminent. *TransUnion* does not hold (as TVA claims) that a risk of future injury does not confer standing. (Doc. 75, PageID#6701.) Instead, the Court was clear that "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion*, 141 S. Ct. at 2210. TVA is using the perpetual Contracts to finance its already-proposed Cumberland gas plant (*see* Doc. 74-2, PageID#5885–88), which would require a new proposed pipeline for which the federal certification process is underway, *see* 87 Fed. Reg. 56048 (Sept. 13, 2022). Ms. Mummaw's

14

aesthetic interest in viewing rare wildlife near the published pipeline route is imminently threatened. (Doc. 74-6, PageID#6150–51.) TVA's more than 4700 MW of new gas—roughly 12% of its capacity—make it imminently likely Conservation Group ratepayers will pay higher bills when covering TVA's volatile fossil fuel costs. (Doc. 74-9, PageID#6332 ¶ 14; Doc. 74-8, PageID#6284–85 ¶ 26); s*ee also* TVA, Board Meeting Slide Deck at 43 (Aug. 31, 2022).[4]

### 2.  Conservation Groups' injuries are fairly traceable to TVA.

These injuries are fairly traceable to the Never-ending Contracts. Injuries are fairly traceable when there is a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. Standing does not require proximate causation. *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003). "Instead, even harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Id.* There is a close causal connection between the Contracts and the resulting environmental, economic, and organizational harms. By design, the Never-ending Contracts lock in TVA's load forever. TVA consistently identifies load loss, whether from departing distributors or end-use customers adopting distributed energy resources, such as rooftop solar, as one of the biggest risks facing TVA. (*See, e.g.,* AR001616; Doc. 33-28, PageID#4256 [AR001037] (discussing risk of revenue erosion).) For TVA, the Never-ending Contracts permanently solve that problem by locking in customers and harshly limiting local distributed generation.

TVA's generation portfolio, mostly composed of coal, gas, and nuclear, has enormous impacts on the environment. (Doc. 74-2, PageID#5879.) Perpetually locking in higher levels of

---

[4] Available at https://www.tva.com/about-tva/our-leadership/board-of-directors/meetings-archive/2022/08/31/default-calendar/tva-board-meeting---august-31-2022.

demand requires TVA to generate more electricity from its existing generation assets, including the Kingston coal plant and Allen gas plant. *See* Section III.B.1.b. According to TVA's own executives, the Never-ending Contracts finance TVA's investments in new gas plants (Doc. 74-2, PageID#5886 ¶ 40), which include a proposed gas plant at the Cumberland site (Doc. 74-10, PageID#6368). Because the perpetual Contracts prolong and increase TVA's reliance on fossil fuels, while forever eliminating opportunities for democratic engagement with local power companies, Conservation Groups' injuries are fairly traceable to TVA's unlawful actions.

TVA asserts that only its Integrated Resource Planning process determines its generation decisions. (Doc. 75, PageID#6704.) But its own statement of facts contradicts this assertion. According to TVA, a key purpose of the Never-ending Contract is to "better align the decision timeframes for TVA's generation assets, 'which are 20, 30, 40, year decisions, with the contract terms [TVA has] with [] LPCs.'" (Def.'s Statement of Undisputed Facts, Doc. 73, PageID#5423 [quoting TVA CEO Jeff Lyash]; *see also* Pls.' Am. Compl., Doc 17, PageID#1220 ¶ 99; Def.'s Answer, Doc. 50, PageID#5108 ¶ 99 [without Never-ending Contracts, "TVA's long-term planning decisions would continue to be subject to significant risk"].) And, as Conservation Groups explain in their Motion for Summary Judgment, by locking in TVA's load forever, the Contracts are the fulcrum on which the capacity expansion plan in the Integrated Resource Plan rests. (Doc. 74-1, PageID#5865–69.) The fact that a defendant's action "was one of multiple contributors to a plaintiff's injuries does not defeat causation." *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 714 (2015). Even if the 2019 Integrated Resource Plan provides general guidance to TVA, the Contracts also influence TVA's generation portfolio by locking in load, limiting local generation, and financing new gas plants.

### 3. Conservation Groups' injuries are redressable by this Court.

Because the Contracts have caused Conservation Groups' actual or imminent injuries, an

order vacating or reforming those Contracts is likely to redress Conservation Groups' injuries.

TVA argues that Conservation Groups' injuries would not be redressed because TVA could

make the same power generation decisions even without its Never-ending Contracts. (Doc. 75,

PageID#6702.) In APA cases, injuries are redressable "even though the agency . . . might later,

in the exercise of its lawful discretion, reach the same result for a different reason." *Akins*, 524

U.S. at 25. Further, TVA's argument that it would run its power system in the same way belies

the justification its executives offer for the Contracts: the utility needs the Contracts, and in

particular their perpetual term and harsh caps on local renewables, in order to pay for TVA's gas

buildout. (Doc. 74-2, PageID#5885–88.) It stands to reason that if TVA had not adopted and

executed the Contracts across its service territory, it would have considered changing its capacity

expansion plans. (AR001640–41 [TVA's CFO projecting that, with less load, "you would avoid

capital costs," including gas plants].)

### 4. TVA improperly seeks to relitigate meritless prudential standing arguments.

TVA's attempt to relitigate Conservation Groups' prudential standing is improper. TVA

cites subject matter jurisdiction as the basis for its renewed motion to dismiss on "standing."

(Doc. 75, PageID#6677.) But *prudential* standing is not a question of subject matter jurisdiction.

In APA cases, prudential standing asks whether "a legislatively conferred cause of action

encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components,

Inc.*, 572 U.S. 118, 127 (2014). Because the absence of a valid "cause of action does not

implicate subject-matter jurisdiction," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89

(1998), "prudential standing does not present a jurisdictional question," *Abraugh v. Altimus*, 26

F.4th 298, 304 (5th Cir. 2022).

The Court has already determined that Conservation Groups have prudential standing to

bring their TVA Act claim. (Ct. Order Den. Mot. to Dismiss, Doc. 48, PageID#5088.) TVA may

not renew and disguise its 12(b)(6) motion to relitigate a settled question. As this Court has

correctly ruled, Conservation Groups' and their members' injuries fall within the zone of

interests protected by Section 10. (Doc. 48, PageID#5088.) TVA says Section 10 serves "to

protect TVA and the power customers with which TVA contracts—not environmental groups or

their members." (Doc. 75, PageID#6703.) TVA's limited authorization to enter into power

supply "contracts for a term not exceeding twenty years" is the fundamental statutory basis of its

entire power supply program, which TVA consistently describes as the "Public Power Model."

(*See, e.g.*, Doc. 73, PageID#5423.) Yet TVA now cuts the public—including municipal

ratepayers and cooperative member-owners—out of its vision of the "Valley Public Power"

model.

Congress provided TVA with *limited* authority to sell power. That limit is not just to

"protect TVA" or even the distributors qua distributors.[5] Congress made clear TVA's power

program is "primarily as for the benefit of the people of the section as a whole and particularly

the domestic and rural consumers." 16 U.S.C. § 831j. Conservation Groups' members are among

the very same people that TVA's projects must benefit and that the twenty-year limit serves to

protect. By allowing democratically accountable distributors to reconsider their power supply

options at least every twenty years, Section 10 protects Conservation Groups' and their

members' democratic and economic interests.

**B.  Conservation Groups have standing to prosecute their NEPA claim.**

TVA asserts that "time has not improved" Conservation Groups' ability to show standing

---

[5] TVA again relies on *Dean v. Herrington*, 668 F. Supp. 646 (E.D. Tenn. 1987). (Doc. 75, PageID#6703.) As this Court has already found, that case—which "involved a third party essentially bringing a breach claim on another party's behalf"—is inapposite because Conservation Groups do not seek to enforce the contractual rights of third parties. (Doc. 48, PageID#5087.)

to pursue the NEPA claim. (Doc. 75, PageID#6704.) To the contrary, Conservation Groups adduce evidence in the record and in the declarations filed in support of their Motion for Summary Judgment that meets their burden to show standing. (*See generally* Docs. 74-2, 74-6 to -11.) In the year since the Court denied TVA's Motion to Dismiss (Doc. 48), Conservation Groups' injuries have become even more concrete, and the probability of future harm even more reasonably likely, as more distributors have signed the Contracts and TVA has begun implementing its power supply plans based on the load and accompanying revenue it has locked in through the Contracts, including investing in new gas plants.

"To show a cognizable injury in fact in a procedural injury case, a plaintiff must allege that the agency violated certain procedural rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that the challenged action will threaten these concrete interests." *Friends of Tims Ford v. TVA*, 585 F.3d 955, 968 (6th Cir. 2009) (citation omitted). In procedural rights cases, "the causation and redressability requirements are relaxed." *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 579 (6th Cir. 2014). In NEPA cases, plaintiffs are procedurally injured when deprived of the opportunity to comment on environmental reviews. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003).

Because TVA performed no public NEPA review whatsoever before adopting and executing the Never-ending Contracts, TVA deprived Conservation Groups of the opportunity to comment on the required environmental reviews. *See id.* This violation "added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment." *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) (emphasis in original).

19

TVA raises many of the same arguments regarding injury, causation, and redressability regarding both the TVA Act and NEPA claims. As discussed above, and contrary to TVA's assertions: (1) the Contracts, not the Integrated Resource Plan, harm Conservation Groups (*see* Section I.A.2, above; *see also* Doc. 74-2, PageID#5885–88, 92–97); (2) Conservation Groups *have* diverted resources in response to TVA's unlawful actions (*see* Section I.A.1, above; s*ee also* Doc. 74-10, PageID#6348; Doc. 74-7, PageID#6201–04; Doc. 17-9, PageID#1344–45); (3) the risk of environmental harm is cognizable and is substantial here (*See* Section I.A.1, above); (4) Conservation Groups' environmental injuries demonstrate a tight geographic nexus while their economic and organizational injuries do not require one (*see* Section I.A.1; *see also* Doc. 74-2, PageID#5885–88, 92–97); (5) the injuries are redressable, even if TVA could reach the same results for legally defensible reasons in the future (*See* Section I.A.3). Conservation Groups' arguments apply in at least equal force to their standing to prosecute the NEPA claim.[6] In the remainder of this section, Conservation Groups address TVA's NEPA-specific assertions that (1) Conservation Groups' informational injuries are "speculative" (Doc. 75, PageID#6704 n.15); and (2) the chain of causation for Conservation Groups' injuries is "attenuated" (Doc. 75, PageID#6707–08).

### 1. Conservation Groups' and their members' informational injuries are not speculative.

Conservation Groups adduce facts establishing standing based on informational injury. Plaintiffs show a concrete and particularized informational injury when (1) they have been

---

[6] In a procedural injury claim, including a NEPA claim, plaintiffs need only show that it is "reasonably probable" that the agency's actions will threaten their interests. *Friends of Tims Ford*, 585 F.3d at 968. Further, to the extent that TVA's Article III standing arguments challenge the factual predicate of Conservation Groups' NEPA claim, the Court should "'find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's claim.'" *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citations omitted).

deprived of information the agency was required to disclose, and (2) without that information, they have suffered the type of harm Congress sought to prevent by requiring disclosure. *See Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016); *see also TransUnion*, 141 S. Ct. at 2214 (acknowledging plaintiffs' ability to assert informational standing based on public-disclosure and sunshine laws). In denying TVA's Motion to Dismiss, the Court correctly found that Conservation Groups had alleged facts establishing informational standing. (Doc. 48, PageID#5092–93.) Conservation Groups have now satisfied their burden to set forth specific facts showing they have standing. *Lujan*, 504 U.S. at 561.

NEPA required TVA to analyze and disclose the potential environmental effects of the Never-ending Contracts before adopting and executing them, *see* Section III, but TVA failed to do so. (*See also* Doc. 74-1, PageID#5858–75.) Conservation Groups' members were deprived of the opportunity to review and comment in the NEPA process and will suffer related environmental and economic harm. *See* Sections I.A, I.B; (*see also* Doc. 74-1, PageID#5840–47). Congress intended that community members who may suffer environmental harm from agency decisions have the chance to participate in the NEPA process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

Conservation Groups have identified concrete and particularized "'downstream consequences' from failing to receive the required information." *TransUnion*, 121 S. Ct. at 2214. Conservation Group set forth facts showing that their members would have used information from NEPA reviews to inform distributors, local elected officials, and the public about the environmental and economic harm posed by the Never-ending Contracts. (*See* Doc. 74-1, PageID#5845–46; *see also* Doc. 17-14, PageID#1368; Doc. 74-8; PageID#6287 ¶ 44.)

TVA's failure to conduct the required NEPA review has also injured Conservation

21

Groups as organizations by depriving them of the information that would have been included in that review. As a science-based organization, Protect Our Aquifer relies on scientific studies, including NEPA publications, to inform its advocacy. (Doc. 74-7, PageID#6200 ¶ 12.) Protect Our Aquifer has consistently advocated—to MLGW, local elected officials, and the public—against signing the Never-ending Contracts. *Id.* Protect Our Aquifer's activities have been impaired by the deprivation of NEPA-required information that the organization would have used to inform its advocacy. Similarly, Appalachian Voices and Energy Alabama regularly review TVA's NEPA publications and would have used information from a NEPA review to advocate to distributors, local elected officials, and ratepayers against signing the Never-ending Contracts. (Doc. 74-10, PageID#6346 ¶ 4; Doc. 74-9, PageID#6332 ¶ 17.) All three organizations have expended and diverted resources as a result of TVA's failure to provide the information required by NEPA and TVA's subsequent adoption and execution of the Contracts. (*See* Doc. 74-10, PageID#6348; Doc. 74-7, PageID#6201–04; Doc. 17-9, PageID#1344–45.)

TVA's only argument that specifically targets Conservation Groups' informational injuries is that the injuries are "speculative" because TVA's 1983 NEPA procedures only require public comment and participation when TVA prepares an EIS. (Doc. 75, PageID#6704, n.15.) Conservation Groups dispute TVA's characterization of its procedures, which also state that "TVA's policy is to encourage public participation in all of its decisionmaking" and "TVA intends to encourage and actively seek public participation in its NEPA review process." (Doc. 75, PageID#6738.) Further, in their Motion, Conservation Groups show that TVA should have prepared an environmental impact statement because there are substantial questions regarding whether the Contracts may have significant environmental effects. (Doc. 74-1, PageID#5871–72.) Not only TVA's 1983 regulations, but also NEPA itself requires public participation for an

environmental impact statement. *See* 42 U.S.C. § 4332 (environmental impact statement "shall be made available to . . . the public"); *see also* (Doc. 75, PageID#6732–33). In short, both the law and the record support Conservation Groups' informational injury. NEPA requires TVA to provide the public with information related to the Never-ending Contracts.

### 2.   Conservation Groups show that their injuries are fairly traceable to the Never-ending Contracts.

The Court found that Conservation Groups successfully alleged that the Never-ending Contracts caused their injuries, and noted that on summary judgment, "Plaintiffs will have to prove each link in their chain of causation." (Doc. 48, PageID#5093.) TVA contends that Conservation Groups cannot do so because they have to show that "TVA's decisions would disincentivize third parties from adopting DER." (Doc. 75, PageID#6707.)[7] TVA's inapt argument appears to have been taken verbatim from its brief in *Center for Biological Diversity v. TVA*, No. 18-cv-01446 (N.D. Ala. Sept. 6, 2018). (*Compare id.* Doc. 44 at 15–16 *with* Doc. 75, PageID#6707). But the facts of this case are very different from those in *Center for Biological Diversity v. TVA*. In that case, plaintiffs alleged that a rate change would disincentivize end-use customers from investing in distributed energy resources like rooftop solar and would therefore result in TVA burning more fossil fuels. 491 F.Supp.3d at 1187. On summary judgment, the court found that plaintiffs failed to put forward evidence showing that lower adoption of rooftop solar would cause more reliance on coal, and instead "merely state, *ipse dixit*, that a decrease in DER investment will necessarily lead to the increased use of fossil fuels." *Id.* at 1188.

In contrast, Conservation Groups have adduced evidence establishing that it is "reasonably probable" that the Never-ending Contracts will threaten their interests. *Friends of*

---

[7] TVA tries yet again to pin Conservation Groups' injuries on the 2019 Integrated Resource Plan. (Doc. 75, PageID#6708.) Conservation Groups address this argument in Section I.A.2.

*Tims Ford*, 585 F.3d at 968; *accord Citizens for Better Forestry*, 341 F.3d at 975 (applying "reasonably probable" standard to causation analysis). Here, the chain of causation is premised on the predictable effects of TVA's own actions in adopting, executing, and implementing the Contracts, not the actions of third parties like end-use customers. *See* Section I.A.2, above. And far from asserting *ipse dixit* that the Contracts will increase the use of fossil fuels, Conservation Groups show that TVA's own executives acknowledge that the Contracts will facilitate its investments in new gas plants and that locking their customers through the Contracts will avoid load loss that would result in additional coal retirement, less new gas, and less reliance on fossil fuels. (Doc. 74-2, PageID#5885–88.) TVA's own executives also explain that the harsh 5% cap on distributor flexibility (and therefore on Conservation Groups' members' access to local solar) is necessary to "avoid higher revenue erosion." (*Id.* at PageID#5896–97.) That revenue erosion would derive from load loss, again illustrating how the Contracts' perpetual guarantee of a captive customer base predictably (and intentionally) ensures a steady level of demand for TVA's electricity—forever. That level is higher than it would be if TVA had retained its previous contracts. (Doc. 74-2, PageID#5885–88; 5892–95.) The resulting operation of TVA's power system at a perpetually artificial level of demand caused by unlawful Contracts, in turn, causes Conservation Groups' injuries. *See* Section I.A.2. The chain of causation in this case, while indirect, is not attenuated because all of the links in the chain are in TVA's control.  TVA has left no room for conjecture regarding its plans. *Cf. Citizens for Better Forestry*, 341 F.3d at 974–75 (chain of causation not attenuated when challenged rulemaking would dictate actions of agency implementing the rule).

## II.    TVA's motion to dismiss and for summary judgment on the TVA Act claim should be denied.

Conservation Groups' TVA Act claim is straightforward: TVA's adoption and execution

of perpetual Contracts violates Section 10 of the TVA Act, which authorizes TVA to enter into Contracts to sell surplus power "for a term not exceeding twenty years." 16 U.S.C. § 831i. The Never-ending Contracts automatically extend themselves each year so that the Contracts never erode or expire with the passage of time. If a local distributor attempts to terminate, the Contract requires the distributor to provide TVA with twenty-years' advance written notice, during which period the distributor would be subject to severe penalties. The practical effect is that, once signed, the agreements last forever, contravening a clear limit Congress imposed. No amount of procedural gamesmanship or empty gestures to canons of statutory interpretation can change that simple fact. In its motion, TVA wrongly asserts that this Court lacks subject matter jurisdiction over the TVA Act claim, improperly attempts to relitigate an issue the Court has already decided, offers a wildly contorted reading of Section 10 of the TVA Act, and attempts to shoehorn Conservation Groups' claim into a line of cases that do not apply.[8] TVA's arguments fail to overcome the plain statutory command of Section 10.

### A. The Court should reject TVA's improper attempt to relitigate whether the TVA Act claim is committed to agency discretion.

In its Memorandum, TVA insists that this Court is powerless to decide whether TVA has violated a clear statutory limit on the agency's authority. (Doc. 75, PageID#6680–84.) TVA repeats the argument it made in its Motion to Dismiss: whether the Never-ending Contracts include a "term [] exceeding twenty years" is "committed to agency discretion by law" and

---

[8] TVA also makes the meritless argument that Conservation Groups' claim is barred because TVA adopted a different automatic extension provision in the past. (Doc. 75, PageID#6679.) Conservation Groups' TVA Act claim is not barred by the statute of limitations. APA claims are governed by a six-year statute of limitations and "the limitations period is triggered by a 'final agency action.'" *Hodgkins v. Fudge*, 850 F. App'x 423, 426 (6th Cir. 2021) (quoting 5 U.S.C. § 704)). Conservation Groups challenge the Never-ending Contract amendments, first signed in August 2019, one year before this suit began and well within the six-year statute of limitations.

therefore unreviewable. (*Id.*; *see also* Doc. 20-1, PageID#1395–97.) TVA's attempt to relitigate this question should be rejected. The Court has already determined that Conservation Groups' TVA Act claim states a claim for relief. (*See* Doc. 48, PageID#5076–-77; *see id.* at 5077 ["[T]he Court finds that it may review whether TVA complied with the TVA Act in setting the LTA length"].)") TVA contends that its argument goes to this Court's subject matter jurisdiction and may be raised again under Rules 12(b)(1) and 12(h)(3). TVA is wrong.

The Sixth Circuit consistently considers reviewability under section 701 of the APA to be a question of whether a plaintiff states a claim under Rule 12(b)(6). *See Barrios Garcia v. U.S. Dep't of Homeland Security*, 25 F.4th 430, 439–40 (6th Cir. 2022); *U.S. Berry v. Dep't of Labor*, 832 F.3d 627, 632 (6th Cir. 2016); *Amezola-Garcia v. Lynch*, 846 F.3d 135, 140 n.2 (6th Cir. 2016); *Jama v. U.S. Dep't of Homeland Sec.*, 760 F.3d 490, 494 (6th Cir. 2014).[9] TVA should be aware that its argument is not a question of this Court's subject matter jurisdiction because just months ago another district court in this Circuit corrected the agency on this point. *Blackwell ex rel. Gary Blackwell Revocable Living Tr. v. TVA*, No. 22-CV-19, 2022 WL 3569020, at *3 n.3 (W.D. Ky. Aug. 18, 2022). TVA has not properly moved this Court—let alone met its burden—for reconsideration of that question. The Court should leave its previous ruling on reviewability undisturbed.

**B. TVA's motion fails because the TVA Act affords the agency no discretion to enter Contracts exceeding twenty years.**

Regardless of the procedural vehicle in which it is presented, TVA's argument that it has

---

[9] TVA relies on *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1127 (6th Cir. 1996) and *Sheldon v. Vilsack*, 538 F. App'x 644, 649 & n.4 (6th Cir. 2013) to argue against the weight of authority in the Sixth Circuit. (Doc. 75, PageID#6676.) *Madison-Hughes* did not address whether the issue is properly analyzed under 12(b)(1) or 12(b)(6). *See* 80 F.3d at 1127–30. *Sheldon v. Vilsack* is not published and therefore lacks precedential authority. *U.S. v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007).

unfettered discretion to violate a plain statutory command lacks merit. The limit in Section 10 of the TVA Act could not be stated more clearly: TVA is authorized to enter into Contracts to sell power "for a term not exceeding twenty years." 16 U.S.C. § 831i.

In its effort to evade this clear limit, TVA offers a tortured reading of Section 10, asserting that the general grant of discretion to include in its Contracts "terms and conditions" necessarily includes any specific "term"—even a term exceeding twenty years. (Doc. 75, PageID#6680–82.) TVA has it backwards. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines*, 504 U.S. 374, 384 (1992). "The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

While Congress gave the Board discretion to adopt general "terms and conditions" in its Contracts, Congress made a specific, unambiguous exception: TVA has *no* discretion to enter contracts for a term that exceeds twenty years. (Doc. 48, PageID#5077–78.) That decision is "chiseled in stone" at 16 U.S.C. § 831i. *Cf. Alabama ex rel. Graddick v. TVA*, 636 F.2d 1061, 1064 (5th Cir. 1981) ("Congress did not commit to the TVA's judgment the location of its principal office; that decision is chiseled in stone at 16 U.S.C. § 831g(a)"). In the order denying TVA's motion to dismiss, this Court explained, "[E]ven though TVA has broad *rate-making* authority, it would seem inconsistent for Congress both to forbid TVA from entering into contracts longer than 20 years, while also giving TVA unlimited discretion to set its own contract length." (Doc. 48, PageID#5077.)

Even if the "term not exceeding twenty years" were part of the "terms and conditions"

27

left to TVA's judgment—it is not—courts may *always* review allegations that an agency's action "exceeded its legal authority." *Kennedy v. Allera*, 612 F.3d 261, 266 (4th Cir. 2010). TVA concedes this point, as it must. (Doc. 75, PageID#6686.)[10] Regardless of whether a claim arises in a "quintessentially insulated" arena, "plain statutory commands will provide meaningful standards for judicial review." *Holbrook v. TVA*, 48 F.4th 282, 293 (4th Cir. 2022). As this Court correctly found, Congress has "given TVA a clear directive—its contracts cannot exceed twenty years." (Doc. 48, PageID#5077–78.) This Court can review whether the Never-ending Contracts comply with that plain statutory command.

TVA cites *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480 (2015), to insist on a narrow, "mini-merits" scope of review of whether the Never-ending Contracts exceed TVA's legal authority. (Doc. 75, PageID#6687.) In *Mach Mining*, the Supreme Court declined to assess the "reasonableness" of the agency's actions, but held that courts can review whether those actions complied with clear statutory requirements. 575 U.S. at 484, 489. Here, Plaintiffs do not ask the Court to assess the *reasonableness* of TVA's Never-ending Contracts, only whether those Contracts are for a "term not exceeding twenty years." Such review respects TVA's discretion "while still ensuring that [the agency] follows the law." *Mach Mining*, 575 U.S. at 489.

**C.  The Never-ending Contract "term" violates the TVA Act's twenty-year limit.**

TVA next tries to argue that no matter their effect on the Contract's length, the automatic extension and termination provisions are not part of the "term" that is subject to the TVA Act's twenty-year limit. (Doc. 75, PageID#6682,87.) This argument is nonsensical. TVA recognized

---

[10] Citing *Turner v. Parole Commission*, 810 F.2d 612, 616 n.8 (7th Cir. 1987), TVA argues that this review requires "exceptional circumstances." (Doc. 75, PageID#6686.) The court's statement, in dicta, does not require anything *beyond* allegations that an agency exceeded its statutory authority. Unusual or not, the allegation here is that TVA exceeded its statutory authority. Nothing more is required for this Court to decide the claim.

and labeled the initial term, automatic extension, and termination provisions as part of the "Term of Contract." (Doc. 33-6, PageID#3419 [AR000200].)[11] The record makes clear that the primary intent of the Never-ending Contract is to perpetually extend the contract term. (AR0001630–31 [TVA's strategic financial plan "equation works as long as it's a 20 year commitment and it's a 20 year commitment that carries on every year"].) Amendments to the automatic extension trigger date and termination provision are what TVA prescribed and demanded in order to achieve the perpetual length of contract term the agency desired. (*See, e.g.*, AR009542 [TVA executive Dan Pratt confirming that "the evergreen provision is a non-negotiable aspect of the long-term contract"].) In fact, TVA itself refers to the Contract as a "long-*term* agreement." (Doc. 75, PageID#6666 [emphasis added].)

TVA cannot avoid a plain statutory command through clever drafting.[12] The mere fact that TVA included a twenty-year "initial term" in the "Term of Contract" section of the Never-ending Contracts does not absolve the agency of ensuring that those Contracts comply with Section 10. The "Term of Contract" provides for an "initial term of 20 years," also provides that the "contract shall be extended automatically without further action by the parties for an additional 1-year renewal term," and requires "not less than 20 years' prior written notice" to

---

[11] The "Term of Contract" provides for an "initial term of 20 years," also provides that "shall be extended automatically without further action by the parties for an additional 1-year renewal term" and requires "not less than 20 years' prior written notice" to terminate. (Doc. 33-6, PageID#3419 [AR000200].)

[12] Contrary to TVA's assertion (Doc. 75, PageID#6678), the agency's litigation position does not trigger *Chevron* deference. *See Commodity Futures Trading Comm'n v. Erskine*, 512 F.3d 309, 314 (6th Cir. 2008) (merely asserting a "preferred definition during the course of litigation . . . does not result in a definition entitled to *Chevron* deference"). Even if *Chevron* deference applied—it doesn't—courts do not defer to an agency's interpretation where, as here, the statutory language is clear. *Chevron U.S.A. Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

terminate. (Doc.33-6, PageID#3419 [AR000200].) The "Term of Contract," and indeed the Contract as a whole, must comply with the TVA Act's twenty-year limit.

TVA suggests that, because the "Term of Contract" is not "a fixed period" but continually extends, it cannot be a "term" under Section 10. (Doc. 75, PageID#6682–83.) But that's the problem: the "Term of Contract" violates the TVA Act's twenty-year term limit *because* it is perpetual. *Term* means a "limited or definite extent of time." *Term*, Webster's New International Dictionary 2130 (1925); *see Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020) (Courts construe statutes "in accord with the ordinary public meaning of its terms at the time of its enactment"). Therefore, Congress "authorized [TVA] to enter into contracts for such sale for a [limited or definite extent of time] not exceeding twenty years." 16 U.S.C. § 831i. As a creature of statute, TVA has no authority Congress hasn't granted it. *See HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016) ("As a creature of statute the [agency] has only those powers conferred upon it by Congress."). TVA has no authority to enter into contracts of perpetual duration.

TVA argues that because Congress addressed termination for some contracts, a "term" under Section 10 necessarily excludes *any* termination period. (Doc. 75, PageID#6684.) Similarly, TVA says that because contract extensions are not expressly addressed, they are both permissible and excluded from the twenty-year term limit. (Doc. 75, PageID#6683.) But in statutory interpretation, "a matter not covered is to be treated as not covered." (Doc. 75, PageID#6683.) This does not mean, as TVA contends, that TVA is free to disregard clear limits that *are* covered by the statute. Congress expressly limited TVA's authority to enter into power supply contracts to a "term not exceeding twenty years," 16 U.S.C. § 831i. The TVA Act has no textual indication that a "term not exceeding twenty years," 16 U.S.C. § 831i, excludes the length of time added by a termination period, an "initial term," an extension term, or any other period

30

TVA can devise.[13]

TVA cannot use what Congress did *not* say to ignore what Congress did say. Courts must "interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Lake Cumberland Trust, Inc. v. Env't Prot. Agency*, 954 F.2d 1218, 1222 (6th Cir. 1992). Courts avoid reading statutory language to create "such a large and obvious loophole." *Cnty. of Maui v. Hawai'i Wildlife Fund*, 140 S. Ct. 1462, 1473 (2020) (rejecting an interpretation that would facilitate evasion of the law). Under TVA's reading, a "Term of Contract" for an infinite succession of twenty-year extension "terms" and no means of termination would pass muster. That renders Section 10's twenty-year limit meaningless, allowing easy evasion of a clear statutory command.

Applying general principles of contract law, courts across the TVA region have refused to allow renewal or extension terms to evade statutory limits on the "term" or "period"[14] of a contract. *See, e.g.*, *Tenn. Coal, I. & R. Co. v. Pratt Consol. Coal Co.*, 47 So. 337, 338 (Ala. 1908) (holding that a renewal "period of 20 years" exceeded a statutory prohibition against leasehold estates "for a longer term than 20 years"); *see also Home Base Litter Control, LLC v. Claiborne Cnty.*, 183 So.3d 94, 97 (Miss. Ct. App. 2015); *Robbins v. Cleburne Cnty. Comm'n*, 300 So. 3d

---

[13] TVA relies on *Grant Cnty. Black Sands Irrigation Dist. v. Bureau of Reclamation*, 579 F.3d 1345 (Fed. Cir. 2009), to argue that a contract "term" necessarily excludes any renewal term. (Doc. 75, PageID#6682–83.) But unlike the TVA Act provision here, the Reclamation Act provision there expressly addressed that question. The Reclamation Act expressly authorized contract renewal and referred separately to "the term of the contract and of any renewal thereof." 43 U.S.C. § 485h-1(4).

[14] *Period* and *term* are largely synonymous. *Compare Term*, Webster's New International Dictionary 2130 (1925) ("limited or definite extent of time") *with Period*, 11 Oxford English Dictionary 558 (2d ed. 1989) ("A course or extent of time."); *see also Period*, Webster's Unabridged Dictionary 1440 (2001) ("any specified division or portion of time").

573, 576 (Ala. 2020).

Like the TVA Act overall, Section 10's twenty-year term limit preserves an important role for local decision-making. *See* 16 U.S.C. §§ 831i (requiring TVA to "give preference to States, counties, municipalities, and cooperative organizations"), 831c(*l*) (directing TVA to cooperate with state and local agencies), 831d(c) (authorizing TVA to cooperate with districts, counties, farmers, and landowners), 831m-1(c) (requiring TVA to collaborate with distributors on energy efficiency). Congress intended that at least every twenty years, democratically accountable municipal electric boards and member-owned cooperatives will make their own decisions about doing business with TVA.

### III.    TVA's motion for summary judgment on the NEPA claim should be denied.

TVA and Conservation Groups agree that the Court evaluates TVA's determination that NEPA does not apply to the Never-ending Contracts for "reasonableness under the circumstances." *Southwest Williamson Cnty. Cmty. Ass'n v. Slater*, 243 F.3d 270, 277 (6th Cir. 2001); (Doc. 74-1, PageID#5859; Doc. 75, PageID#6693). Because the "reasonableness" standard applies to an agency's threshold determination of whether NEPA applies to a proposed action, it is less deferential to the agency than arbitrary and capricious review. *Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 959 (9th Cir. 2002); *see also Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) (courts should defer to an agency's decision not to prepare an EIS only if that decision is "fully informed and well-considered").

The record shows that prior to adopting and executing the Contracts, TVA failed to consider important aspects of the Contracts' potential to result in direct and indirect changes to the environmental status quo and offered explanations that run counter to the evidence before the agency. The relevant changes include environmental impacts associated with the Flexibility Provision and the Perpetual Term. (*See* Doc. 74-1, PageID#5858–75.) TVA's analysis in the

record with respect to these provisions of the Contracts is so paltry and deficient that it could not

withstand arbitrary and capricious review, let alone be upheld for its "reasonableness." *See*

*Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010) (reciting arbitrary and

capricious standard). TVA's Motion therefore fails.

A. **The final agency actions at issue in the NEPA claim include both adoption and execution of the Contracts.**

TVA contends that the only final agency action relevant to the NEPA claim is its

conclusory NEPA Memorandum. (Doc. 75, PageID#6689; *see also* Doc. 33-26.) TVA is wrong.

Both the Board's adoption of the form Never-ending Contract and TVA's subsequent entry into

the Contracts constitute final agency actions for purposes of the NEPA claim. To be final, (1)

"the action must mark the consummation of the agency's decisionmaking process," and (2) "the

action must be one by which rights or obligations have been determined or from which legal

consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotations

omitted). The Board's adoption of and TVA's entry into the Contracts satisfy both prongs of the

*Bennett* test.

As this Court has already held with respect to the TVA Act claim, "both prongs of the

*Bennett* test are met when TVA signs a long-term agreement with a LPC." (Doc. 67,

PageID#5312.) There is no reason to conclude otherwise with respect to the NEPA claim. *See,*

*e.g.*, *Metcalf v. Daley*, 214 F.3d 1135, 1143–44 (9th Cir. 200). (agency made an "irreversible and

irretrievable commitment of resources" upon signing a contract); *Save the Yaak*, 840 F.2d at

718–19 (agency violated NEPA by awarding contracts prior to preparation of environmental

assessments); *Port of Astoria v. Hodel*, 595 F.2d 467, 477 (9th Cir. 1979) (execution of a

contract is a "major federal action" because "it creates a new commitment of BPA's energy

resources"); *Env't Def. Fund v. Andrus*, 596 F.2d 848, 853 (9th Cir. 1979) (NEPA required

33

preparation of an EIS for industrial water marketing program and each individual water option contract). Both the Board's decision and the Contracts are final agency actions reviewable by this Court under the Administrative Procedure Act and can be vacated as unlawful as a result. *See* 5 U.S.C. § 706(2) (the reviewing court is required to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

The cases cited by TVA support Conservation Groups on this point. (Doc. 75, PageID#6689.) In *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 397 F.Supp.2d 1241 (D. Mont. 2005), for example, the court found that the agency's violation of NEPA was itself a final agency action, but also found that the agency's underlying substantive decision to use chemical fire retardant in forests likely met the *Bennett* test. *Id.* at 1252. The court then held that the agency's "decision not to consult NEPA in the annual dumping of millions of gallons of chemical fire retardant on the national forests is unreasonable." *Id.* at 1255. Similarly, in *Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429 (10th Cir. 1996), the court upheld a preliminary injunction against agency implementation of a final critical habitat designation under the Endangered Species Act where agency had not complied with NEPA. *Id.* at 1439. By narrowly and wrongly defining the relevant "final agency action," TVA attempts to constrain the Court's ability to review and remedy TVA's NEPA violations. But decades of precedent confirm that under the Administrative Procedure Act, the Court's review and remedial power extend to *all* relevant final agency action that is "not in accordance with the law." 5 U.S.C. § 706(2).

**B.  TVA's determination that NEPA does not apply to the Never-ending Contracts is unreasonable.**

TVA asserts that NEPA does not apply to the Never-ending Contracts because they

purportedly do not have a "close causal relationship" to environmental impacts or otherwise change the environmental status quo. (Doc. 75, PageID#6689–96.) Citing inapposite case law, TVA implies that the Contracts must *directly* cause environmental impacts in order to trigger NEPA review. (*Id.* at PageID#6690.) But to determine whether NEPA applies, the 1978 CEQ regulations require an agency to consider "reasonably foreseeable" direct *and* indirect effects of its proposed action, as well as cumulative effects. 40 C.F.R. §§ 1508.7–.8 (1978). Direct effects are effects "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Indirect effects "may include growth inducing effects." *Id.* A cumulative impact is "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions." *Id.* § 1508.7. Either direct or indirect effects can be individually or cumulatively significant, requiring review in an environmental impact statement.

The reasonably foreseeable environmental impacts of the Never-ending Contracts are primarily indirect and cumulative. For example, the Perpetual Term locks in demand for electricity generated by TVA for a longer period than its previous contracts. As described in Conservation Groups' Motion, locking in demand prolongs generation by TVA's existing fossil fuel plants and induces growth by facilitating TVA's investment in new gas plants. (Doc. 74-1, PageID#5865–72.) The Flexibility Provision's foreseeable indirect impacts are twofold. First, by allowing distributors to purchase up to 5% of their power from non-TVA sources, the Flexibility Provision induces changes in the pattern of land use for siting of energy facilities. (Doc. 74-2, PageID#5896.). Second, by imposing the harsh 5% cap, the Flexibility Provision (like the

35

Perpetual Term) prolongs generation by existing fossil fuel plants and induces growth by facilitating investment in new gas plants. (Doc. 74-1, PageID#5861–64.) These indirect impacts are cumulatively significant because the more distribution utilities are locked in, the more load TVA commits to serve in perpetuity, with all of the accompanying significant environmental impacts of its power supply system. (Doc. 74-1, PageID#5872.) The record shows that the Contracts indirectly and cumulatively affect the environment, and TVA concedes that it exercised discretion to adopt and execute them. (Doc 75, PageID#6679.) Accordingly, to deny TVA's Motion, the Court need only find that TVA was unreasonable in determining that the Contracts do not change the environmental status quo.

### 1.   The Never-ending Contracts change the environmental status quo.

TVA contends that the Contracts do not change the environmental status quo and "would be nothing more than a change on paper." (Doc. 75, PageID#6694.) The threshold question is whether the Never-ending Contracts will result in a non-trivial change to the environmental status quo, requiring some level of review under NEPA. *See* 18 C.F.R. § 1318.101(a); (Doc. 74-1, PageID#5859).[15] Agency actions that change the environmental status quo require analysis in an environmental assessment or an environmental impact statement, unless the agency properly invokes a categorical exclusion. (*Compare* Doc. 75, PageID#6727–28 [§5.1] *with* 18 C.F.R. §

---

[15] In its Motion, TVA contends that its 1983 NEPA-implementing procedures, rather than its current NEPA regulations, apply in this case. (Doc. 75, PageID#6696.) Assuming without conceding that TVA is correct, its 1983 NEPA procedures do not expressly address the environmental status quo. (*Id.* at PageID#6727–28 [§5.1].) Nevertheless, TVA's 1983 procedures state that they are "intended to incorporate concepts and implement policies in the regulations promulgated by the Council on Environmental Quality." (*Id.* at PageID#6726 [§1.0].) Case law interpreting NEPA from the late 1970s and early 1980s, cited by TVA, confirm that courts applied the "no change in status quo" inquiry at that time. (Doc. 75, PageID#6691–93 [citing *Comm. for Auto Resp. v. Solomon*, 603 F.2d 992, 1002–03 (D.C. Cir. 1979) and *Burbank Anti-Noise Grp. v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir. 1980)].) It is therefore reasonable to infer that long-standing judicial precedent as codified in TVA's 2020 regulations applies in this case.

1318.101(a)–(c).) To determine whether the Contracts *change* the environmental status quo, the Court must first define the status quo. Long-standing CEQ guidance requires agencies to analyze a "no action" alternative that, in the case of a program, evaluates "continuing with the present course of action until that action is changed;" or, in the case of a project, evaluates not undertaking the proposed action. Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981). "Where a choice of 'no action' by the agency would result in predictable actions by others, this consequence of the 'no action' alternative should be included in the analysis." *Id.*

Applying this guidance to TVA's power supply contracts, the "no action" alternative is the power supply contracts in place before TVA adopted and executed the Never-ending Contracts. Whether the Contracts are considered a program or project, the environmental status quo is the impacts associated with the projected level of operation of TVA's power supply system under the prior power supply contracts. Those contracts (1) required distributors to purchase all their power from TVA; and (2) included termination provisions with a weighted average length of seven years. (Doc. 33-6, PageID#3415 [AR000196].) These provisions result in predictable consequences: (1) distributors generally do not purchase power from non-TVA sources; and (2) distributors can leave the TVA system with an average of seven years' notice if they want to purchase power from non-TVA sources. The Never-ending Contracts dramatically change these provisions, resulting in indirect and cumulative changes to the environmental status quo.

### a. The Flexibility Provision both alters and constrains the future source and location of distributors' power supply.

As it did in the NEPA Memorandum (Doc. 33-26, PageID#4235 [AR001016]), in its Memorandum TVA completely ignores an important aspect of the problem: the non-trivial

environmental impacts caused by the Flexibility Provision. (*See* Doc. 75, PageID#6688–89

[asserting that Conservation Groups' NEPA claim is based solely on the "automatic renewal and

termination notice provisions]; *see also* Doc. 74-1, PageID#5862 [evidence shows the Contracts

depart from "full requirements"].) On its face, the Flexibility Provision of the Never-ending

Contract is a dramatic break from the environmental status quo because it allows distributors to

serve a portion of their load from non-TVA power supply. Indeed, *after* TVA had executed more

than 130 Never-ending Contracts with distributors (Doc. 50, PageID#5109 ¶ 108), TVA

effectively conceded that the Flexibility Provision had potentially significant environmental

effects by preparing a belated environmental assessment under NEPA, (Doc. 33-28,

PageID#4242 [AR001023]; *see also* Doc. 50, PageID#5110 ¶ 124).[16] Among the potentially

significant environmental effects TVA identified in its post-hoc environmental assessment were

energy production and use, socioeconomics, air, water, and land resources, and waste generation.

(Doc. 33-28, PageID#4257–58 [AR001038–39].)

Although in the NEPA Memorandum TVA claimed that the Never-ending Contract

"would not change" the "full requirements" aspect of the wholesale contract (Doc. 33-26,

PageID#4235 [AR001016]) the plain language of the Never-ending Contract bound TVA to

provide 3–5% flexibility to distributors, and the record further shows that TVA indeed *did* bind

itself in the Contracts to provide that flexibility (Doc. 33-6, PageID#3417, 3420 [AR000198,

AR000201; AR009282, 86; AR009317, 21]).21].) The indirect effects caused by the Flexibility

Provision include potential changes in the types and locations of power generation facilities, as

---

[16] For the reasons set forth in Conservation Groups' Memorandum in Support of Summary
Judgment, TVA's failure to prepare an environmental assessment to evaluate the Flexibility
Provision until after it had executed the Contracts constitutes unlawful segmenting and
precommitment. (*See* Doc. 74-1, PageID#5861–66 and 5872–75.)

smaller gas or renewable facilities are sited in distributors' service territories. (Doc. 33-6, PageID#3417 [AR000198]; Doc. 33-28, PageID#4254 [AR001035].) Like the contract at issue in *Port of Astoria v. Hodel*, the Contracts change the environmental status quo by allowing distributors to site (and here, select the type of) facilities to be constructed. 595 F.2d at 477 ("In terms of environmental consequences, this change in location initiates what is, in effect, an entirely new project affecting an area not contemplated in earlier contracts . . . .").

The record, including TVA's subsequent preparation of an environmental assessment under NEPA, demonstrates that the Flexibility Provision would result in a "non-trivial change to the status quo." 18 C.F.R. § 1318.101(a). On this basis alone, TVA's determination that NEPA does not apply to the Never-ending Contracts is arbitrary, and it was unreasonable for TVA to adopt and execute the Contracts without preparing an environmental review under NEPA.[17]

### b. The Perpetual Term prolongs and increases TVA's reliance on fossil fuel-powered plants.

TVA's NEPA Memorandum unreasonably concluded that "lengthening of the contract period . . . would have the effect of continuing the 'environmental status quo.'" (Doc. 33-26, PageID#4235 [AR001016].) TVA repeats this argument in its Memorandum, leaning heavily on the fact that the base case in the 2019 Integrated Resource Plan assumed TVA would continue to provide power to all of its distributors. (Doc. 75, PageID#6694–95.) But as explained below, the record shows that assumption in the Integrated Resource Plan is premised on the Never-ending Contracts locking in TVA's load for decades beyond the average of seven years under its existing contracts. In contrast, the environmental status quo for TVA's evaluation of whether

---

[17] In addition, the Flexibility Provision arbitrarily imposes a harsh 5% cap on distributors' non-TVA generation with no explanation or environmental analysis, contributing to prolonged and increased reliance on TVA's existing fossil fuel power plants and purported need to construct new gas plants. (Doc. 74-1, PageID#5863–64.)

39

NEPA applies to the Never-ending Contracts properly includes the very real risk of load loss caused by distributors exercising their right to terminate.

As TVA describes in its Memorandum, the Never-ending Contract proposal grew out of TVA's desire to "better align the decision timeframes for TVA's generation assets, 'which are 20, 30, 40 year decisions, with the contract terms we have with our LPCs.'" (Doc. 75, PageID#6672 [quoting TVA's Chief Executive Officer]; *see also* Doc. 17, PageID#1220; Doc. 50, PageID#5108.) In other words, TVA devised the Never-ending Contracts in order to prolong the amount of time it could count on its existing level of load, forecast an increase in load based on that level, and develop a capacity expansion plan based on that load forecast. In his presentation to the TVA Board on August 22, 2019, TVA Chief Financial Officer John Thomas explains that in order to fund the capital investments contemplated in TVA's plans, the Contracts' twenty-year commitment cannot erode over time: "[W]e also add about another billion dollars of capital every year so that equation works as long as it's a 20 year commitment and it's a 20 year commitment that carries on every year." (AR001630–31.) Mr. Thomas further explains that from 2020 to 2030, TVA's capacity expansion plans primarily include new gas builds. (AR001627; AR001633.) Implicit in TVA's rationale for the Never-ending Contracts is the predictable action taken by others if it maintains its no-action or status quo power contract: load loss due to distributors terminating their contracts. (AR001640–41.)

In its Memorandum, TVA explains that in its 2019 Integrated Resource Plan it relied on its current level of load for all 153 distributors to forecast load growth over the next twenty years in the base case. (Doc. 75, PageID#6670.) What TVA does not explain is that its ability to finance the gas builds in its preferred capacity plan associated with the 2019 Integrated Resource Plan and its ten-year financial plan relies on the success of the Never-ending Contracts in locking

in a significant percentage (88%) of TVA's load in perpetuity. (AR001640–41.)

TVA attempts to artificially separate its power supply planning process from the length of commitment of its Contracts, but the record shows that the Never-ending Contract assures that the base case load assumptions in the 2019 Integrated Resource Plan will be maintained in real life. As Conservation Groups explain in detail in their Memorandum, TVA's own analysis of the Rapid DER scenario in the 2019 Integrated Resource Plan, along with its Chief Financial Officer's statements at the August 2019 Board meeting, show that no Never-ending Contracts would mean earlier coal- and gas-fired plant retirements, fewer new gas builds, and less reliance on generation from TVA's existing fossil fuel fleet. (Doc. 74-1, PageID#5866–69.)[18] TVA itself has admitted that the analysis it performed for the 2019 Integrated Resource Plan informed the agency's understanding of how load loss, including the potential load loss associated with Memphis Light, Gas & Water or other distributors leaving its service territory, would affect its resource plans.[19]

TVA tries to dress up its argument that the Perpetual Term doesn't change the environmental status quo by citing to several cases that are not on point. In *Center for Biological Diversity v. Ilano*, for example, the court found that designating certain landscape-scale areas for

---

[18] TVA admits that the 2019 Integrated Resource Plan was finished before the Never-ending Contracts, so the Court can infer that TVA understood the consequences of load loss on its power operations at the time it was developing the Never-ending Contracts. (Doc. 50, PageID#5110 ["TVA admits that the IRP and EIS were completed before the Long Term Partnership Agreement."].)

[19] TVA, 2019 IRP Frequently Asked Questions 14, available at https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/default-document-library/site-content/environment/environmental-stewardship/irp/2019-documents/faqs-updatedfinal.pdf?sfvrsn=ed8d8716_4 (last accessed November 4, 2022); *see also* Pls. Statement of Additional Facts in Support of Motion for Summary Judgment, ¶ 5, filed concurrently with this brief.

possible bark beetle treatment did not change the environmental status quo. 928 F.3d 774, 780 (9th Cir. 2019). The statute at issue in *Ilano* contemplated a speedy designation process and a second phase of agency action in which particular treatment projects would be defined and be subject to NEPA (potentially through the use of a categorical exclusion). *Id.* at 778–80. The court therefore found that requiring NEPA at the designation stage would require the agency to engage in speculation about potential impacts. *Id.* at 781. In contrast, here the evidence in the record makes clear that TVA understood the environmental consequences of increasing its contract length and prolonging and increasing its committed level of load. The agency's Chief Financial Officer was able to recite those consequences by memory at the August 2019 Board meeting. (AR001640–41 [if TVA lost 10% of its load, it would reduce the amount of new gas (and solar) capital investments and would save on fuel costs by "dispatching lower in your fleet," meaning running fewer high-cost fossil fuel-fired peaking units].) And in fact, the environmental consequences of locking in TVA's load—being able to implement the agency's base case capacity expansion plans—are a significant *raison d'être* for the Never-ending Contracts. (*See generally* Doc. 74-2, PageID#5888–97.)

TVA's fallacious argument that its adoption of the Never-ending Contracts does not change the status quo begs an obvious question: If the Contracts don't change anything, then why did TVA adopt them? The answer is obvious: The perpetual agreements are designed to insulate TVA from likely load loss associated with competing with renewable energy. Thus, by attempting to control the future in perpetuity, TVA dramatically changed the environmental status quo by changing how the future will likely unfold. That changed future is now unfolding before our very eyes as TVA, secure in its position of having locked up most of its customers forever, undertakes a massive gas-fired power plant build-out.

42

**C.  No categorical exclusions apply to the Never-ending Contracts.**

In its Memorandum, TVA for the first time raises an argument that its decision should be upheld on the alternative ground that the Never-ending Contracts are categorically excluded from NEPA under TVA's 1983 regulations. (Doc. 75, PageID#6696–98.) TVA raises this unfounded argument in a last-ditch effort to evade compliance with NEPA. No categorical exclusion applies to the Contracts.

A categorical exclusion is "a category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. §1508.4 (1978). The record shows that TVA determined NEPA did not apply at all, and never asserted that the Never-ending Contracts are categorically excluded. Neither the NEPA Memorandum nor the Higdon Declaration invoke any categorical exclusion for the Contracts. (Doc. 33-26, PageID#4234–36 [AR001015–17]; Doc. 73-24, PageID#5784–89 [AR001653–59].) In fact, TVA expressly disclaimed application of any categorical exclusion to the Contracts in response to a comment on the environmental assessment for the so-called "Flexibility Option" in June 2020:

> TVA did not apply a categorical exclusion for the Board's decision in 2019 to approve the terms of a standard long-term agreement to be entered into between TVA and interested LPCs. This was because, for the reasons provided above under responses to Comments 26 and 27, the Board's decision to approve the terms of a standard long-term agreement was not subject to NEPA review.

(Doc 33-28, PageID#4304 [AR001805].) Only now, in the context of litigation, has TVA suddenly decided that a categorical exclusion may apply to the Contracts.

This Court should reject TVA's attempt to paper over its failure to consider the environmental consequences of the Contracts before committing hundreds of millions of dollars to implementing them. (Doc. 73, PageID#5427 ¶ 54 [TVA has returned $500 million in bill credits to distributors under the Contracts].) "Post hoc invocation of a categorical exclusion does

not provide assurance that the agency actually considered the environmental effects of its action before the decision was made." *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002); *cf. Sierra Club v. U.S. Forest Serv.*, 828 F.3d 402, 412 (6th Cir. 2016) (acknowledging the *Norton* standard). Post hoc invocation is particularly suspect where there is evidence that suggests the exclusion cannot be applied by the agency. *See Norton*, 311 F.3d at 1176–77 (refusing to uphold agency action based on post hoc assertion of categorical exclusion where evidence showed off-shore oil drilling leases would cause significant environmental impacts); *see also Sherwood v. TVA*, 590 F. App'x 451, 459–60 (6th Cir. 2014) (rejecting TVA's post hoc attempt to rely on categorical exclusions to justify failure to prepare NEPA documentation for change in tree-cutting policy).

TVA now claims "it would be 'clearly correct' for TVA to apply Categorical Exclusion Nos. 6 and 27 to the Never-ending Contracts." (Doc. 75, PageID#6698.) Evidence in the record severely undermines TVA's argument. TVA first asserts with no analysis that Exclusion 6 for "Contracts or agreements for the sale, purchase, or interchange of electricity" applies. (Doc. 75, PageID#6697.) Evidence in the record shows that TVA NEPA staff understand that Exclusion 6 does not apply to "transactions that spur expansion or development of facilities." (Doc 33-29, PageID#4353 [AR001134 ].) As described in Sections III.B.1.a–b, the Never-ending Contracts spur expansion or development of power generation facilities through both the Flexibility Provision and the Perpetual Term. (*See generally* Doc. 74-2, PageID#5885–97.) Accordingly, it would arbitrary and capricious for TVA to apply Exclusion 6 to the Contracts.

TVA also asserts with no analysis that Exclusion 27 for "Any action which does not have a primary impact on the physical environment" applies. (Doc. 75, PageID#6697.) TVA eliminated Exclusion 27 when it adopted its 2020 NEPA regulations. (Doc 33-29, PageID#4681

[AR001462].) TVA's rationale for eliminating Exclusion 27 was that "the CE's definition has caused confusion over the years." *Id.* As TVA itself further noted, it is unclear what the agency intended to constitute a "primary impact on the physical environment." *Id.* However, as discussed in Section III.B., NEPA requires agencies to consider reasonably foreseeable indirect and cumulative impacts. The record shows that the Never-ending Contracts will foreseeably, indirectly, and cumulatively result in different types and locations for new power generating facilities, prolonged generation by existing fossil fuel power plants, and new gas plants. (Doc. 74-2, PageID#5885–97.) Accordingly, it would be arbitrary and capricious to apply Exclusion 27 to the Contracts.

TVA asks this Court to uphold the agency's failure to consider the environmental impacts of the Contracts based on theories that TVA's own NEPA staff expressly disclaimed, presumably because they knew no categorical exclusion could be lawfully applied. Courts must judge agency action "solely by the grounds invoked by the agency" at the time. *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Like the court in *Norton*, this Court should reject TVA's unjustified post hoc invocation of inapplicable categorical exclusions.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Conservation Groups' Memorandum and Statement of Undisputed Facts (Doc. 74-1 and 74-2), TVA's Motion should be denied in its entirety.

Respectfully submitted,

s/Amanda Garcia
Amanda Garcia, BPR#033773
George Nolan, BPR#014974
Stephanie Biggs, BPR#036734
O. W. "Trey" Bussey, BPR#037814

45

Chelsea Bowling, BPR#037812
Southern Environmental Law Center
1033 Demonbreun Street, Suite 205
Nashville, TN 37203
Telephone: (615) 921-9470
Facsimile: (615) 921-8011
agarcia@selctn.org
gnolan@selctn.org
sbiggs@selctn.org
tbussey@selctn.org
cbowling@selctn.org

*Attorneys for Protect Our Aquifer, Energy Alabama,
and Appalachian Voices*

46