UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

PROTECT OUR AQUIFER,
ENERGY ALABAMA, and
APPALACHIAN VOICES,
Plaintiffs,

v.                                             No.2:20-cv-02615-TLP-atc
                                               (Oral Argument Requested)

TENNESSEE VALLEY AUTHORITY,
Defendant.

---

**TENNESSEE VALLEY AUTHORITY'S REPLY IN FURTHER SUPPORT OF
ITS MOTION TO DISMISS THE AMENDED COMPLAINT FOR LACK OF
SUBJECT MATTER JURISDICTION OR FOR SUMMARY JUDGMENT
ON PLAINTIFFS' ADMINISTRATIVE PROCEDURE ACT CLAIMS**

---

David D. Ayliffe
Director, Litigation
Steven C. Chin
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.8964
ddayliffe@tva.gov
scchin@tva.gov

Attorneys for Tennessee Valley Authority

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................1

    I.      Plaintiffs Lack Standing Because Their Alleged Economic Harms Are Not Cognizable Article III Injuries. ...........................................................................1

    II.     Plaintiffs' TVA Act Claim Fails the Zone of Interest Test.......................................4

    III.    TVA is Entitled to Summary Judgment on Plaintiffs' TVA Act Claim. .................5

          A.      Plaintiffs' Erroneous Interpretation of Section 10 is Based on a Misreading of the LTA Amendments. ...........................................................7

          B.      The LTA Amendments Balance the Flexibility Delegated to TVA by Section 10 with Adherence to the Statute's 20-Year Term Limitation.......................................................................................................10

    IV.    TVA is Entitled to Summary Judgment on Plaintiffs' NEPA Claim....................12

          A.      TVA Made Its Final NEPA Determination for the LTA on August 19, 2019................................................................................................................12

          B.      The Administrative Record Confirms the Reasonableness of TVA's Final NEPA Determination. ......................................................................15

          C.      Plaintiffs' NEPA Position Has No Limiting Principle, and the LTA Amendments Are Nevertheless Categorically Excluded. ..........................19

CONCLUSION...................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*Amezola-Garcia v. Lynch*,
    846 F.3d 135, 140 n.2 (6th Cir. 2016) ............................................................................. 7

*Ariz. v. Biden*,
    40 F.4th 375 (6th Cir. 2022) .......................................................................................... 3

*Barrios Garcia v. U.S. Dep't of Homeland Sec.*,
    25 F.4th 430 (6th Cir. 2022) .......................................................................................... 7

*Bennett v. Spear*,
    520 U.S. 154 (1997)............................................................................................... *passim*

*Berry v. United States Dep't of Lab.*,
    832 F.3d 627 (6th Cir. 2016) .......................................................................................... 7

*Blackwell v. TVA*,
    No. 5:22-CV-19-BJB, __F.Supp.3d__, 2022 WL 3569020 (W.D. Ky. Aug. 18, 2022) .... 6

*Bostock v. Clayton Cnty., Ga.*,
    140 S. Ct. 1731 (2020).................................................................................................. 10

*Burbank Anti-Noise Grp. v. Goldschmidt*,
    623 F.2d 115 (9th Cir. 1980) ........................................................................................ 18

*Catron Cnty. Bd. of Comm'rs, N.M. v. U.S. Fish & Wildlife Serv.*,
    75 F.3d 1429 (10th Cir. 1996) ...................................................................................... 14

*Ctr. for Biological Diversity v. Ilano*,
    928 F.3d 774 (9th Cir. 2019) ........................................................................................ 17

*Ctr. for Biological Diversity v. Lueckel*,
    417 F.3d 532 (6th Cir. 2005) .......................................................................................... 4

*Ctr. for Native Ecosystems v. Cables*,
    509 F.3d 1310 (10th Cir. 2007) .................................................................................... 15

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)....................................................................................................... 2

*Cleveland Branch, N.A.A.C.P. v. City of Parma, Ohio*,
    263 F.3d 513 (6th Cir. 2001) .......................................................................................... 2

*Coal. for Mercury-Free Drugs v. Sebelius*,
    671 F.3d 1275 (D.C. Cir. 2012) ..................................................................................... 2

*CSL Plasma Inc. v. U.S. Customs & Border Prot.*,
    33 F.4th 584 (D.C. Cir. 2022)........................................................................................ 4

*Cure Land, LLC v. United States Dep't of Agric.*,
    833 F.3d 1223 (10th Cir. 2016) .................................................................................... 13

*Defs. of Wildlife v. Andrus*,
   627 F.2d 1238 (D.C. Cir. 1980) ............................................................... 19

*Fair Elections Ohio v. Husted*,
   770 F.3d 456 (6th Cir. 2014) ..................................................................... 5

*Fin. Strategy Grp., PLC v. Cont'l Cas. Co.*,
   No. 14-2154, 2014 WL 11515524 (W.D. Tenn. Sept. 23, 2014) .................... 8

*Fla. Audubon Soc. v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) ..................................................................... 4

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
   397 F.Supp.2d 1241 (D. Mont. 2005) ....................................................... 14

*Friends of Tims Ford v. TVA*,
   585 F.3d 955 (6th Cir. 2009) ................................................................... 13

*Gilham v. TVA*,
   488 F. App'x 80 (6th Cir. 2012) ................................................................. 8

*Grant Cnty. Black Sands Irrigation Dist. v. U.S. Bureau of Reclamation*,
   579 F.3d 1345 (Fed. Cir. 2009) ................................................................. 9

*Hardin v. Ky. Utils. Co.*,
   390 U.S. 1 (1968) ................................................................................... 12

*Hoke Co. v. TVA*,
   854 F.2d 820 (6th Cir. 1988) ................................................................... 10

*Holbrook v. TVA*,
   48 F. 4th. 2825 (4th Cir. 2022) ................................................................. 5

*Ill. Cent. R. Co. v. TVA*,
   445 F.2d 308 (6th Cir. 1971) ................................................................... 10

*Integrated Design Eng'g & Analysis Servs., Inc. v. Giddy Holdings, Inc.*,
   No. 21-3433, 2022 WL 874310 (6th Cir. Mar. 24, 2022) ............................. 8

*Jama v. Dep't of Homeland Sec.*,
   760 F.3d 490 (6th Cir. 2014) ..................................................................... 7

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*,
   746 F.3d 698 (6th Cir. 2014) ................................................................... 17

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ................................................................................. 4

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ............................................................................... 12

*Madison-Hughes v. Shalala*,
   80 F.3d 1121 (6th Cir. 1996) ..................................................................... 7

*Mach Mining, LLC v. E.E.O.C.*,
  575 U.S. 480, 489 (2015) .......................................................................... 7

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) .................................................................................. 5

*McCarthy v. Middle Tenn. Elec. Membership Corp.*,
  466 F.3d 399 (6th Cir. 2006) ................................................................ 3, 5

*Metro. Edison Co. v. People Against Nuclear Energy*,
  460 U.S. 766 (1983) ............................................................................ 12, 16

*Nat'l Wildlife Fed'n v. Dep't of Transp.*,
  960 F.3d 872 (6th Cir. 2020) ................................................................... 13

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
  45 F.4th 291 (D.C. Cir. 2022) .................................................................. 20

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998) .................................................................................. 13

*Patel v. U.S. Citizenship & Immigr. Servs.*,
  732 F.3d 633 (6th Cir. 2013) ..................................................................... 4

*Preston v. Ky. Consular Ctr.*,
  No. 6:22-CV-015-CHB, 2022 WL 3593052 (E.D. Ky. Aug. 22, 2022) ............................ 7

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) .................................................................................. 12

*Robinson v. Fed. Hous. Fin. Agency*,
  876 F.3d 220 (6th Cir. 2017) ..................................................................... 5

*Sabine River Auth. v. U.S. Dep't of Interior*,
  951 F.2d 669 (5th Cir. 1992) .................................................................... 17

*Shoreline All. v. TVA*,
  961 F.Supp.2d 890 (W.D. Tenn. 2013) ......................................................... 4

*Sierra Club v. Slater*,
  120 F.3d 623 (6th Cir. 1997) ................................................................... 13

*Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*,
  173 F.3d 1033 (6th Cir. 1999) ................................................................. 13

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .................................................................................... 1

*Telespectrum, Inc. v. Pub. Serv. Comm'n of Ky.*,
  227 F.3d 414 (6th Cir. 2000) ................................................................... 15

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ...................................................................... *passim*

*Trustees of B.A.C. Loc. 32 Ins. Fund v. Fantin Enter., Inc.*,
    163 F.3d 965 (6th Cir. 1998) ................................................................ 8

*Upper Snake River Chapter of Trout Unlimited v. Hodel*,
    921 F.2d 232 (9th Cir. 1990) .............................................................. 18

*Young v. TVA*,
    606 F.2d 143 (6th Cir. 1979) .............................................................. 10

**Statutes**                                        **Page**

5 U.S.C. § 701(a)(2) ............................................................................ 6, 7

5 U.S.C. § 702 ....................................................................................... 12

16 U.S.C. § 831a .................................................................................... 12

16 U.S.C. § 831i .................................................................................... 4, 6

16 U.S.C. § 831j ...................................................................................... 5

16 U.S.C. § 831dd .................................................................................. 10

42 U.S.C. § 4332(C) .............................................................................. 12

**Regulations**                                       **Page**

40 C.F.R. §§ 1508.7–.8 (2019) ............................................................. 16

47 Fed. Reg. 54,586, 54,588–89 (Dec. 3, 1982) ................................... 19

**Other Authorities**                                 **Page**

*Black's Law Dictionary* (11th ed. 2019) ............................................ 8, 9

## INTRODUCTION

As explained in TVA's opening and response briefs, the Amended Complaint should be dismissed for lack of subject matter jurisdiction because Plaintiffs have not satisfied their heightened burden to demonstrate standing for their TVA Act and National Environmental Policy Act ("NEPA") claims; alternatively, TVA is entitled to summary judgment because the August 2019 decision by the TVA Board ("Board") to approve the implementation of the Long-Term Agreement ("LTA") as an amendment to the standard 20-year wholesale power contract ("Power Contract") between TVA and local power companies ("LPCs") complied with the TVA Act and NEPA and is fully supported by the administrative record. (TVA Br., Doc. 75; TVA Resp. Br., Doc. 82.) Rather than repeat those arguments, TVA incorporates them and limits this reply brief to the additional points that merit further discussion.

## ARGUMENT

### I.   Plaintiffs Lack Standing Because Their Alleged Economic Harms Are Not Cognizable Article III Injuries.

Article III requires the "invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up). The concrete injury requirement applies to tangible and intangible harms, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021), and to claims seeking "forward-looking, injunctive relief," *id.* at 2210. Plaintiffs argue that the LTAs have harmed them economically by "blocking competition, resulting in costlier, dirtier energy;" subjecting Plaintiffs' members to higher electricity bills in the summer of 2022; limiting access to renewable energy; preventing their members from purchasing electricity on their desired terms; and "by impairing the value of their investments in . . . rooftop solar." (Pls.' Resp., Doc. 80, PageID##6926, 6929,

6930.) And they say that, in 2022, their "injuries have become even more concrete, and the probability of future harm more reasonably likely." (*Id.*, PageID#6941.)

For starters, Plaintiffs' standing depends on the concreteness of the alleged injuries when the Amended Complaint was filed in November 2020—not 2022. *See e.g.*, *Cleveland Branch, N.A.A.C.P. v. City of Parma, Ohio,* 263 F.3d 513, 526 (6th Cir. 2001). And the test is not reasonable likelihood of harm but demonstrating that the threatened injury is "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), or at a minimum, "proving concrete facts showing that the" LTAs have caused a "substantial risk of harm," *id.*, 414 n.5.

By any metric, Plaintiffs' alleged economic harms fail this test. They have not shown a legally protected interest in electricity market competition or access to renewable energy (before or after the LTAs were executed) or that their alleged injury bears a close relationship to harms traditionally recognized under American law. *See TransUnion*, 141 S. Ct. at 2204. And even if Plaintiffs' "desired products theory" of injury were recognized in the Sixth Circuit, there is no allegation, much less a showing, that the LTAs have made their desired product (electricity or renewable electricity) "not readily available" or "unreasonably priced." *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1283 (D.C. Cir. 2012) (Kavanaugh, J.) (rejecting argument that "any alleged discrepancy in price between a preferred product and a more widely available one, no matter how small, confers Article III standing"). Similarly deficient are the speculative "concerns" of Plaintiffs' members that the value of their rooftop solar systems *might* be diminished at some undetermined point in the future (Rossow Decl., Doc. 17-10 ¶ 7; McIntosh Decl., Doc. 17-16 ¶ 8.) Nor can Plaintiffs establish a concrete injury by relying (Doc. 80, PageID#6930) on their members' allegations about TVA's Green Power Providers program (Doc. 17-10 ¶ 5; Doc. 17-16 ¶ 6), which the Board voted to close in February 2019 (Add. SOF, Doc. 85 ¶ 17.)

Further, even assuming "excessive electricity bills" qualify as a cognizable *type* of harm (Doc. 80, PageID#6929), Plaintiffs' members have not shown a legally protectable interest in a retail electricity rate of their choice (before or after the LTAs were executed). The two Ninth Circuit cases Plaintiffs cite do not establish such an interest because neither case involved alleged harm based on speculation about potential future rates. (*Id.*) And as retail ratepayers, Plaintiffs cannot challenge TVA's rates. *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 405 (6th Cir. 2006). Also, speculation abounds over whether and how Plaintiffs are injured by trying to connect allegedly higher electricity bills *in 2022* with *possible* TVA capacity investments *over the next decade* (Doc. 80, PageID##6926, 6930, 6937). *See Ariz. v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022). TVA has not made those investments. And even if 2022 electricity bills could supply retroactive standing for a November 2020 lawsuit, Plaintiffs have told the Court nothing about how much they paid in 2022 (or previous years), their own electricity consumption, their LPCs' revenue requirements, or the percentage of their power bill attributable to TVA's fuel cost and to other LPC pass through costs. Moreover, the LPCs from which Plaintiffs' members purchase electricity have reported that, from 2019 to 2021, the cost of TVA power *has remained stable or has gone down.* (Add. SOF, Doc. 85 ¶¶ 2–16.)

Thus, Plaintiffs have not shown any certainly impending injury or substantial risk of harm, and these failures underscore their lack of any "personal stake" in challenging the execution of the LTAs by the other 143 LPCs that do not supply electricity to Plaintiffs or their members. *See TransUnion*, 141 S. Ct. at 2203. And to the extent Plaintiffs now contend that their asserted economic interests are at issue in their NEPA Claim (Doc. 80, PageID#6942), they have failed to establish causation and redressability because they cannot show that the LTA Amendments have altered TVA's power supply obligations or power generation decisions. *See Ctr. for Biological*

*Diversity v. Lueckel*, 417 F.3d 532, 539 (6th Cir. 2005) ("[T]he redressability element of standing [applies] in cases involving 'procedural rights.'" (quoting *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996))); *cf. Shoreline All. v. TVA*, 961 F.Supp.2d 890, 899 (W.D. Tenn. 2013) (economic harms are not within NEPA's zone of interests).

## II.    Plaintiffs' TVA Act Claim Fails the Zone of Interest Test.

The zone of interest test asks whether Plaintiffs have "a cause of action under the statute," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014), and therefore "is a merits issue, not a jurisdictional one," *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 586 (D.C. Cir. 2022).[1] Contrary to this authority, Plaintiffs wrongly assert that the Court's ruling on the sufficiency of their pleading was a merits determination that they have satisfied the zone of interests test for their TVA Act claim (Doc. 80, PageID#6939). Here, "to bring their APA claims," Plaintiffs must show that their alleged economic and environmental interests are arguably protected by "the particular provision of law upon which" they rely, and "*not by reference to the overall purpose of the Act in question.*" *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997) (cleaned up).[2] For their TVA Act claim, the particular provision is Section 10's "term not exceeding twenty years," 16 U.S.C. § 831i, and "using traditional tools of statutory interpretation," *Lexmark*, 572 U.S. at 127, there is no arguable textual basis for concluding that Plaintiffs' economic or environmental interests are within Section 10's zone of interest.

Even beyond the twenty-year term provision, *Patel v. U.S. Citizenship & Immigr. Servs.*, 732 F.3d 633, 635 (6th Cir. 2013), the statutory text references only the interests of TVA and its

---

[1]    TVA's opening brief inadvertently failed to clarify that summary judgment is the procedural basis for the challenge to Plaintiffs' statutory and prudential standing.

[2]    Emphasis added here and throughout this brief unless otherwise noted.

contract power customers. Environmental considerations are not implicit anywhere in Section 10. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012). Nor does Section 10 implicitly protect Plaintiffs' one-sided view of democratic accountability, which is a smokescreen for the "armchair observer [who] decides that the government is violating the law, and decides to stop it by suing." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014). And while Section 10 references supplying "farms and villages" with "electricity at reasonable rates," this language addresses only TVA's discretionary power to construct transmission lines; "[i]t does not concern [ratepayers], much less protect" the economic interests of Plaintiffs' members. *Robinson v. Fed. Hous. Fin. Agency*, 876 F.3d 220, 233 (6th Cir. 2017). What is more, "TVA rates are not judicially reviewable."[3] *McCarthy*, 466 F.3d at 405. Therefore, because Plaintiffs' interests are not marginally related to the purpose of Section 10, there is no doubt from which Plaintiffs can benefit. *See Patchak*, 567 U.S. at 225.

## III.   TVA is Entitled to Summary Judgment on Plaintiffs' TVA Act Claim.

Despite Plaintiffs' attempt to distort TVA's argument (Doc. 80, PageID##6947–48), TVA is not seeking "to relitigate an issue the Court has already decided" (*id.*, PageID#6947). Rather, TVA's argument is directed to the sole issue left open by the Court's earlier ruling—"review [of] whether TVA complied with the TVA Act in setting the LTA length" (Doc. 48, PageID#5077). TVA's position is straightforward—the LTA amended the Power Contract by changing the trigger date for the automatic renewal provision and by extending the termination notice period to twenty years ("the LTA Amendments"). The question remains whether the LTA Amendments are

---

[3]   Plaintiffs' reliance on 16 U.S.C. § 831j is misplaced (Doc. 80, PageID#6940), because it is not "the statutory provision whose violation forms the legal basis for [their] complaint, *Bennett*, 520 U.S. at 176, and the policy goals of that section are likewise committed to agency discretion by law, *Holbrook v. TVA*, 48 F. 4th. 282, 293–95 (4th Cir. 2022).

consistent with Section 10, and the answer depends on the text that prescribes the "term" of the Power Contract but commits the "terms and conditions" to the discretion of the TVA Board. (Doc. 75, PageID##6680–82.) As stated in TVA's opening brief, "the LTA Amendments are subject to the 20-year 'term.' But they are not part of the "'term.'" (*Id.*, PageID#6687.) Accordingly, the Court has jurisdiction to "review only whether these amended provisions cause the Power Contract to be for a "term . . . exceeding 20 years." (*Id.*, PageID##6684–85). Because the LTA Amendments do not have that effect, "the Court has no jurisdiction to conduct further APA review." (*Id.*, PageID##6685, *see also id.*, PageID#6686–88.)

The procedural vehicle for this review is important. Assuming the Court limits its review to whether the LTA Amendments, though "terms and conditions," respect Section 10's requirement that the Power Contract be "for a *term* not exceeding twenty years," 16 U.S.C. § 831i, TVA agrees (and argued) that summary judgment is the appropriate procedure. (Doc. 75, PageID##6686–88.) However, because Plaintiffs insist that the Court also should review "[t]he practical effect[s]" of the LTA Amendments (*e.g.*, Doc. 80, PageID#6947), the APA's prohibition against judicial review of agency action "committed to agency discretion by law" applies.[4] 5 U.S.C. § 701(a)(2). While TVA agrees that "judicial review under the APA is better conceptualized as a merits question," *Blackwell v. TVA*, No. 5:22-CV-19-BJB, __F.Supp.3d__, 2022 WL 3569020, at *3 n.3 (W.D. Ky. Aug. 18, 2022), TVA is not free to ignore its obligation to cite the controlling law. Not only has "the Sixth Circuit referred to questions of agency review as jurisdictional," *id.*, the holding in *Madison-Hughes v. Shalala*, that "courts do not have subject

---

[4]    Plaintiffs concede that Congress committed the terms and conditions of the Power Contract to the Board's discretion (Doc. 80, PageID#6949), and they do not dispute the unbroken line of precedent holding that the Board's discretionary authority in setting these terms and conditions is not reviewable (Doc. 75, PageID##6685–86).

matter jurisdiction to review agency actions that are 'committed to agency discretion by law,'" still controls. 80 F.3d 1121,1127 (6th Cir. 1996); *accord, e.g.*, *Preston v. Ky. Consular Ctr.*, No. 6:22-CV-015-CHB, 2022 WL 3593052, at *10–15 (E.D. Ky. Aug. 22, 2022).[5] But this procedural uncertainty is irrelevant if the Court heeds *Mach Mining, LLC v. E.E.O.C.* and conducts a "limited review" of the statutory "requirements *(and nothing else)*." 575 U.S. 480, 489, 494 (2015).

A. **Plaintiffs' Erroneous Interpretation of Section 10 is Based on a Misreading of the LTA Amendments.**

As noted *supra*, TVA did not make the straw man arguments that Plaintiffs' sophistry ascribes to TVA. (Doc. 80, PageID##6950, 6952.) Instead, TVA's position is that the Court should not accept Plaintiffs' atextual conclusion that "[t]he TVA Act does not authorize TVA to enter into agreements for the sale of electric power that exceed twenty years" (Am. Compl., Doc. 17 ¶ 243), because it is a non sequitur. (Doc 75, PageID#6682.) The Section 10 question is whether the contract "term" exceeds twenty years—not whether the contract document or the contractual relationship with LPCs lasts longer than twenty years. (*Id.*)

Plaintiffs' insistence (Doc. 80, PageID##6950–52) that the Court should lump together the "initial term of 20 years," the automatic or evergreen "1-year renewal term(s)," and the termination notice period simply because they fall under the section heading entitled "Term of Contract" does not answer this question. (*Compare* Athens LTA (Sept. 24, 2019), Doc. 73-6, PageID#5500, *with* Athens Power Contract (Aug. 13, 1984), Doc. 73-20, PageID#5751.) The Power Contract states expressly that "*[t]he section headings in this contract are only for convenience of reference and*

---

[5]    The Sixth Circuit cases cited by Plaintiffs are not controlling authority on this point. *Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430, 445 (6th Cir. 2022) (finding that § 701(a)(2) inapplicable and thereby avoiding the "jurisdictional" issue); *Amezola-Garcia v. Lynch*, 846 F.3d 135, 140 n.2 (6th Cir. 2016) (citing a non-binding concurrence); *Berry v. United States Dep't of Lab.*, 832 F.3d 627, 632 (6th Cir. 2016) (APA final agency action requirement not jurisdictional); *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 494 & n.4 (6th Cir. 2014) (same).

*are not a part of the contract between the parties*" (*e.g.*, Doc. 73-20, PageID#5769). Courts do not consider captions or section headings when interpreting contracts, especially where the parties have agreed not to be bound thereby. *Integrated Design Eng'g & Analysis Servs., Inc. v. Giddy Holdings, Inc.*, No. 21-3433, 2022 WL 874310, at *3 (6th Cir. Mar. 24, 2022); *Fin. Strategy Grp., PLC v. Cont'l Cas. Co.*, No. 14-2154, 2014 WL 11515524, at *4 (W.D. Tenn. Sept. 23, 2014).

Nor is the Section 10 question answered by ignoring the well-settled rule that courts "interpret contracts according to their plain meaning" and "give meaning to every word or phrase." *Gilham v. TVA*, 488 F. App'x 80, 84 (6th Cir. 2012) (cleaned up). Although Plaintiffs acknowledge the plain meaning rule (Doc. 74-1, PageID#5848), they disregard it to argue that the automatic renewal provision is really an "automatic *extension*" provision and, therefore, unlawful because it "perpetually *extend[s]* the contract term." (Doc. 80, PageID##6950–51.) But the LTA's plain language exposes Plaintiffs' clear error because the automatic renewal provision triggers an evergreen "1-year *renewal term*" that is separate from the "initial term" and separate from the termination notice period. (*E.g.*, Athens LTA, Doc. 73-6, PageID#5500.) And an evergreen contract is "[a] contract that *renews itself from one term to the next* in the absence of contrary notice by one of the parties." *Black's Law Dictionary*, "Evergreen Contract" (11th ed. 2019); *see also Trustees of B.A.C. Loc. 32 Ins. Fund v. Fantin Enter., Inc.*, 163 F.3d 965, 968–69 (6th Cir. 1998) (evergreen clause is a valid contract *renewal* mechanism.). Therefore, Plaintiffs' attempt to conflate these separate provisions to support their "perpetual duration" argument fails (Doc. 80, PageID#6952), because the operation of each provision should be analyzed independently so as to give meaning to every word or phrase.

The decision in *Grant Cnty. Black Sands Irrigation Dist. v. U.S. Bureau of Reclamation*, 579 F.3d 1345 (Fed. Cir. 2009), is closely on point. There, the "central issue" was whether

appellants were entitled to the benefits "accorded to holders of . . . 'long-term' water service contracts" under the Reclamation Act. 579 F.3d at 1350. The statute defined a long-term contract as any contract "the term of which is more than ten years." *Id.* at 1354 (cleaned up). The term provision stated in pertinent part that the contracts "*shall continue for a period of 10 years . . . and shall be extended . . . for an additional like period* without further notice." *Id.* "Despite the explicit 10-year term," appellants argued "that the 'term' of the contract should be interpreted to include the renewal periods, *in which case the contract 'term' would be indefinite or perpetual*." *Id.* at 1354–55. The court rejected appellants' interpretation as "contrary to the most natural reading of the word 'term,' as it is used in the contracts," and "contrary to the ordinary meaning of the word 'term,' which is 'a period of time with some definite termination.'" *Id.* at 1355 (quoting *Black's Law Dictionary*). The court also concluded that "interpreting the word 'term' . . . to include the renewal periods would render meaningless the 'shall continue for a period of 10 years' clause." *Id.*

Plaintiffs' attempt to distinguish *Grant Cnty.* because the Reclamation Act, unlike the TVA Act, used the word "renewal" (Doc. 80, PageID#6953 n.13), actually supports TVA's position. As discussed in TVA's opening brief, Section 10 says nothing about TVA's ability to amend or renew the Power Contract; therefore, the word "term" in Section 10 cannot be read to prohibit the LTA's separate renewal term(s). (Doc. 75, PageID#6683 (discussing the omitted case canon).) Plaintiffs insist that it must. (Doc. 80, PageID#6953 (citing inapposite state law contract cases).) And they go a step further, arguing that Congress intended that every twenty years TVA and the LPCs must go through some unspecified process to decide whether to continue contracting with one another. Even assuming that were the intent of Section 10, "Congress could have written the law differently" to accomplish that objective. *See Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1740 (2020).

"But, once again, that is not the law we have." *See id.* at 1741. And such a cramped reading cannot be squared with the text and structure of Section 10, especially given the broad contracting discretion Congress delegated to the Board in Section 10. Plaintiffs' construction also runs afoul of "the sweeping mandate of Sec. 31 of the [TVA] Act," *Ill. Cent. R. Co. v. TVA*, 445 F.2d 308, 312 (6th Cir. 1971), which requires the TVA Act to "be liberally construed to carry out the purposes of Congress," *Young v. TVA*, 606 F.2d 143, 145 (6th Cir. 1979), and includes the "broad authority [given] by Congress to enter into contracts to carry out TVA's powers," *Hoke Co. v. TVA*, 854 F.2d 820, 826 (6th Cir. 1988). *See also* 16 U.S.C. § 831dd.

## B.   The LTA Amendments Balance the Flexibility Delegated to TVA by Section 10 with Adherence to the Statute's 20-Year Term Limitation.

Plaintiffs argue that "[t]he TVA Act has no textual indication that a 'term not exceeding twenty years' excludes the length of time added by a termination period, an 'initial term,' an extension term, or any other period TVA can devise." (Doc. 80, PageID##6952–53 (citation omitted).) Plaintiffs are wrong. The textual indication is Section 10's use of "term" as it was understood at common law. (Doc. 75, PageID##6681–82.) As Plaintiffs acknowledge: "[t]erm means a 'limited or definite extent of time.'" (Doc. 80, PageID#6952.) And the LTA Amendments do not *add* any of these limited extents of time to another. Plaintiffs' misreading is the result of basing their entire argument on a template version of the LTA. (Doc. 80, PageID##6951–52 & n.11.)

In contrast, the executed LTAs show that the term of the Power Contract, as amended by the LTA, is for a definite period of time, never exceeding twenty years. Consider the example of Cumberland. Before the LTAs were executed, the amended section of the Power Contract contemplated three separate, distinct periods of fixed duration: "an initial term of 20 years," automatic or evergreen "1-year renewal term(s)," and a termination notice period. (*Compare*

Cumberland LTA, Doc. 73-7, PageID#5506, *with* Cumberland Supp. 45 (Oct. 1, 1989), Doc. 73-11, PageID#5548.) Specifically, the executed Cumberland LTA provides that:

> This contract is effective as of December 19, 1977, and will continue in effect for an *initial term of 20 years* from December 19, 1977, provided, however, that beginning on the first anniversary of said effective date, and on each subsequent anniversary thereof (whether falling during said initial term or *any renewal term* as provided for herein), this contract shall be extended automatically without further action of the parties for *an additional 1-year renewal term* beyond its then-existing time of expiration. Notwithstanding any other provision of this section, *Cooperative may terminate this contract at any time upon not less than 20 years' prior written notice,* and TVA may terminate this contract upon not less than 20 years' prior written notice.

(Doc. 73-7, PageID#5506.) As amended by the LTA, the initial 20-year term expired in 1997, but by operation of the automatic renewal provision (both before and after the LTA), Cumberland's Power Contract, at any given time, is for a fixed term that does not exceed 20 years. Cumberland "may terminate this contract at any time," and if it does, the automatic renewal provision would cease to operate, and the termination notice period would be 20 years. (*Id.*) The "1-year renewal term(s)" that may arise by operation of the automatic renewal provision never exceed(s) twenty years, and the termination notice period is limited to twenty years. (*Id.*) Thus, there are no circumstances under which the Power Contract, as amended by the LTA, is for a "term . . . exceeding 20 years." (*Id.*)[6]

It is therefore clear that the executed LTA Amendments do not create a "perpetual" term (*contra* Doc. 80, PageID#6952), nor is their "practical effect" a Power Contract that "last[s] forever" (*contra id.*, PageID#6947). Thus, because LPCs may exercise their termination right at any time and the term of the Power Contract does not exceed twenty years (now or at any point in

---

[6]     The same is true for Athens, Huntsville, and Powell Valley, except that Athens' initial term of 20 years expired in 2004, Huntsville's expired in 2000, and Powell Valley's expired in 2007. (Athens LTA, Doc. 73-6, PageID#5500; Huntsville LTA, Doc. 73-8, PageID#5514; Powell Valley LTA, Doc. 73-9, PageID#5519.)

the future), the LTA Amendments are within the boundary established by Section 10. What is more, the Board's determination that the LTA Amendments would "support TVA's mission to make life better for the people of the Valley by helping fulfill TVA's statutory obligation to sell power at rates as low as are feasible" (Doc. 33-5, PageID#3401) necessarily satisfies the Board's obligation to ensure that all of TVA's activities "are carried out in compliance with applicable law." 16 U.S.C. § 831a. Contrary to Plaintiffs' assertion, that determination is the antithesis of a "litigation position." (80, PageID#6951 n.12.) So, even if the Court were to find Section 10 ambiguous, the Board's determination is "entitled to acceptance" because it is within "the range of permissible choices contemplated by the statute." *Hardin v. Ky. Utils. Co.*, 390 U.S. 1, 8 (1968).

**IV.    TVA is Entitled to Summary Judgment on Plaintiffs' NEPA Claim.**

 **A.    TVA Made Its Final NEPA Determination for the LTA on August 19, 2019.**

 Plaintiffs must show that they have been injured by a final agency action "'within the meaning of a relevant statute.'" *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (quoting 5 U.S.C. § 702). Under *Bennett v. Spear*, agency action is "final" if it (1) marks "the *consummation* of the agency's *decisionmaking process*" and is not "merely tentative or interlocutory in nature;" and (2) is "one by which rights or obligations have been determined or from which legal consequences will flow." 520 U.S. at 178 (cleaned up). Here, NEPA is the relevant statute, and *a fortiori* it supplies the relevant decisionmaking process. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("[I]t is now well settled that NEPA . . . *simply prescribes the necessary process.*"). NEPA applies to impacts of proposed action on the *physical* environment, *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983) (citing 42 U.S.C. § 4332(C)), and it "requires federal agencies to prepare an EIS for major federal actions that will affect th[at] environment." *Nat'l Wildlife Fed'n v. Dep't of Transp.*, 960 F.3d 872, 879 (6th Cir.

2020). Thus, the Sixth Circuit has held repeatedly that final NEPA decisions are final agency actions. *Friends of Tims Ford v. TVA*, 585 F.3d 955, 964 (6th Cir. 2009) (A final EIS or a record of decision "'issued thereon constitutes final agency action.'" (quoting *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir. 1997))); *Sw. Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 173 F.3d 1033, 1037 (6th Cir. 1999) ("Issuance of a FONSI is final agency action . . . .").

Accordingly, an agency's decision regarding NEPA's application to a proposed federal action *is* the APA final agency action where it meets both prongs of the *Bennett* finality test: (1) "it is the final step in the agency's *NEPA decision-making process*" and no indication that the NEPA conclusion "is tentative or interlocutory in nature;" and (2) where it establishes which federal actions "the agency may implement immediately." *See Cure Land, LLC v. United States Dep't of Agric.*, 833 F.3d 1223, 1231 (10th Cir. 2016); *cf. Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998) ("[A] person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.").

In this case, the only NEPA decision that satisfies the first *Bennett* requirement is TVA's August 19, 2019 decision that the LTA Amendments were "not subject to review under NEPA" because it was the final step in TVA's NEPA process and there was no indication that it was tentative or interlocutory in nature. (NEPA Mem., Doc. 33-26, PageID##4235–36.) And legal consequences flowed from this final NEPA determination because TVA began executing the LTA after the Board approved its implementation on August 22, 2019. Indeed, Plaintiffs' operative complaint alleges that "*August of 2019 [was] when the subject agency action occurred*" (Doc. 17 ¶ 39 & n.2), and they claim that TVA's final NEPA determination "is the source of the[ir] procedural injury," *Cure Land*, 833 F.3d at 1231, the source of their informational injuries, and

the source of their organizational injuries (Doc. 74-1, PageID#5844–46). Now, however, Plaintiffs want to backtrack, making the incoherent argument that the issue for review is the "agency's threshold legal determination that NEPA does not apply" (*Id.*, PageID#5859; *see also* Doc. 80, PageID#6954), but that the final agency action is both the Board's approval to implement the LTAs and TVA's subsequent execution of the LTAs (*id.*, PageID#6955).

Plaintiffs' position makes no sense because they confuse TVA's final NEPA determination (LTA not subject to NEPA) with the *proposed* TVA action at issue (approval and implementation of the LTA). *See Catron Cnty. Bd. of Comm'rs, N.M. v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434–35 (10th Cir. 1996) (The agency's final NEPA decision was the determination that NEPA did not apply, but the proposed federal action was the designation of critical habitat under the ESA).[7] Plaintiffs' core contention is that "TVA violated NEPA by failing to prepare an EIS" (Doc. 74-1, PageID#5871), which is just another way of saying TVA's final NEPA determination was incorrect. Nevertheless, Plaintiffs' final agency action argument fails the first prong of the *Bennett* test—what step marked the consummation of TVA's *NEPA decisionmaking process*. Plaintiffs do not dispute that the NEPA Memo documents TVA's final NEPA determination, nor do they contend that the NEPA Memo was tentative or interlocutory in nature. Certainly, the NEPA Memo preceded the Board's decision to authorize TVA to execute the LTAs; however, those actions were not part of the NEPA decisionmaking process, and Plaintiffs have not shown otherwise. Further, "agency action may be final even when the challenged decision is not the last step the agency will

---

[7]     *Catron Cnty.* does not support Plaintiffs' final agency action argument (Doc. 80, PageID#6956), because the issue is the NEPA final agency action the court analyzed, not the remedy it imposed. *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, does not support Plaintiffs' position either because, unlike here, the agency did not complete its NEPA decisionmaking process, which was the reason for the lawsuit. 397 F.Supp.2d 1241, 1246–48 (D. Mont. 2005).

take in the case." *Telespectrum, Inc. v. Pub. Serv. Comm'n of Ky.*, 227 F.3d 414, 423 (6th Cir.

2000) (cleaned up); *accord, e.g., Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1329 (10th

Cir. 2007) ("Agency action is final notwithstanding the possibility of further proceedings in the

agency on related issues . . . ." (cleaned up)).

> **B.     The Administrative Record Confirms the Reasonableness of TVA's Final
> NEPA Determination.**

Again, misrepresenting TVA's position, Plaintiffs say "TVA implies" that the LTA

Amendments "must directly cause environmental impacts in order to trigger NEPA review." (Doc.

80, PageID#6957.) Not so. TVA argued that NEPA's applicability requires a reasonably close

causal relationship—something akin to proximate causation—between the impact on the physical

environment and the agency action and that NEPA is not triggered where that causal relationship

does not exist or where the agency action does not result in a change to the environmental status

quo. (Doc. 75, PageID##6689–93.) As explained in TVA's opening brief, the administrative record

supports TVA's final NEPA determination, as documented in the NEPA Memo (Doc. 33-26), that

that the LTA Amendments would not result in any impacts to the physical environment and would

not change the environmental status quo. (Doc. 75, PageID##6693–96.)

Plaintiffs attempt to resist that conclusion by arguing that TVA's final NEPA determination

was unreasonable because, in their view, the LTA changes the environmental status quo and will

have reasonably foreseeable indirect and cumulative environmental impacts in the future. (Doc.

80, PageID##6957–64.) Pointing to the same speculation as support for both arguments, Plaintiffs

claim that the LTA Amendments "lock[] in demand [that] prolongs generation by TVA's existing

fossil fuel plants and induce[] growth by facilitating TVA's investment in new gas plants" and that

the LTA's flexibility negotiation provision "induces changes in the pattern of land use for siting

of energy facilities" and imposes a 5% cap that "prolongs generation by existing fossil fuel plants

and induces growth by facilitating investment in new gas plants." (*Id.*, PageID##6957–58.) Plaintiffs likewise contend that the LTA changed the environmental status quo because the flexibility negotiation provision will "alter[] and constrain[] the future source and location of distributors' power supply" (*id.*, PageID#6959), and the LTA Amendments will "prolong[] and increase[] TVA's reliance on fossil fuel-powered plants" (*id.*, PageID#6961).

But Plaintiffs miss the mark all the way around. First, their argument is internally inconsistent. Even accepting Plaintiffs' supposition that such "primarily indirect" environmental impacts are "reasonably foreseeable" (Doc. 80, PageID#6957), those impacts did not occur in August 2019 when the Board approved implementation of the LTA (nor had they occurred when Plaintiffs filed this lawsuit in November 2020). Logically, the environmental status quo cannot change if the environmental impact that allegedly caused the change did not happen (indeed, has not happened).

Second, Plaintiffs are wrong about the analysis NEPA requires for reasonably foreseeable indirect and cumulative environmental impacts. The NEPA regulations cited by Plaintiffs (Doc. 80, PageID#6957), make clear that it is physical environmental impacts that must be reasonably foreseeable, 40 C.F.R. §§ 1508.7–.8 (2019), and they do not allow Plaintiffs to bypass the required showing "of a reasonably close causal relationship between a change in the physical environment and the effect at issue." *Metro. Edison*, 460 U.S. at 774. Here, TVA reasonably concluded that, the LTA Amendments "would not result in *any* physical environmental impacts." (Doc. 33-26, PageID#4235.) Neither Plaintiffs nor the administrative record show otherwise. Rather, the administrative record shows that TVA considered the LTA's "potential to have a physical effect on the environment" in the future and concluded "that any consideration of potential impacts on the environment would involve substantial speculation, given that the chain of impact causation

associated with the [LTA] proposal would be long and requires actions by entities over which TVA has limited control, and the associated impacts could occur absent the proposed action." (*Id.*) The propriety of this determination is underscored by NEPA's rule of reason, "which support[s] a reasonable delimitation of the proper NEPA scope of review," *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 710 (6th Cir. 2014), and by the well-settled principle that NEPA does not require the preparation of an EA or and EIS to "consider the environmental effects that speculative or hypothetical projects might have," *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 781 (9th Cir. 2019).

Plaintiffs also mistake the contractual status quo for the environmental status quo. (Doc. 80, PageID##6959, 6964.) The LTA amended the Power Contract that governs TVA's relationship with LPCs. The NEPA question, however, is whether the LTA Amendments changed the *environmental status quo*. *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 680 (5th Cir. 1992) ("[T]he inquiry in NEPA cases is whether the federal action at issue is 'proximately related to a *change* in the physical environment.'" (quoting *Metro. Edison*). The administrative record provides ample support for the reasonableness of TVA's final NEPA determination that the LTA Amendments "would not change the 'environmental status quo'" because they "would not result in any impacts to the physical environment and would not have any effect on the growth of DER." (Doc. 33-26, PageID#4236.)

Specifically, the NEPA Memo found that the LTA Amendments would not change the "full requirements" contractual relationships between TVA and LPCs (*id.*, PageID#4235), and as discussed in TVA's response brief, this finding is also fully supported by the administrative record

(Doc. 82, PageID##7251–52).[8] The NEPA Memo concluded that the LTA Amendments "would have no effect on TVA's generation portfolio mix," and "would have the effect of continuing the 'environmental status quo' for which review under NEPA is not required since current environmental conditions would continue under the proposal without change." (Doc. 33-26, PageID#4235.) In August 2019, no LPC had given notice to terminate its Power Contract, and TVA continued to rely on its power generation facilities to supply the LPCs' full power requirements. And as explained in TVA's response brief, Plaintiffs' risk of load loss argument is not supported by the administrative record, and it is a red herring because it is based on Plaintiffs' speculation about the future rather than the actual August 2019 environmental status quo. (Doc. 82, PageID##7255–58.) Further, where the result of the challenged agency decision is the continued operation of a facility, there is no change to the environmental status quo and, thus, no major federal action requiring the preparation of an EIS. *E.g., Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990); *Burbank Anti-Noise Grp. v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir. 1980).

Moreover, the administrative record fully supports TVA's final NEPA determination that TVA's 2019 IRP and accompanying EIS "already incorporate the assumption of serving LPC electricity for 20 years regardless of the actual level of commitment under the" Power Contract. (Doc. 33-26, PageID#4235.) As detailed in TVA's opening and response briefs, TVA studied that base case scenario as the NEPA No-Action Alternative in the 2019 IRP EIS because NEPA requires the current level of activity (i.e., August 2019) to be used as a benchmark. (Doc. 75,

---

[8]     As explained in TVA's response to Plaintiffs' motion, Plaintiffs' belated attempt to challenge the LTA's flexibility negotiation provision and to collaterally attack the Flexibility EA is procedurally improper, fails to state a claim under the APA, and is undermined by NEPA's harmless error rule. (Doc. 82, PageID##7249–54.)

PageID##6693–95); therefore, the IRP base case is the appropriate benchmark for assessing whether the LTA Amendments would change the environmental status quo, which is *exactly* what TVA analyzed in the 2019 IRP EIS and in the NEPA Memo (Doc. 82, PageID##7258–66).

### C.   Plaintiffs' NEPA Position Has No Limiting Principle, and the LTA Amendments Are Nevertheless Categorically Excluded.

Implicit in Plaintiffs' NEPA claim is the flawed notion that NEPA requires an EIS for any TVA action that might have some relationship, no matter how attenuated, on future demand for TVA power or on TVA's future efforts to meet its power supply obligations. But "Plaintiffs have not suggested a limiting principle to their logic. . . . NEPA does not require an annual EIS on routine operation and maintenance of every program with significant environmental ramifications. Its rule of reason does not demand rethinking of everything all the time." *Defs. of Wildlife v. Andrus*, 627 F.2d 1238, 1246 (D.C. Cir. 1980).

Nor can Plaintiffs' view of NEPA be squared with TVA's published categorical exclusions. These categories of actions "require neither the preparation of an EA nor an EIS" because they do not normally have, individually or cumulatively, a significant impact on the physical environment. 47 Fed. Reg. 54,586, 54,588. (Dec. 3, 1982). Plaintiffs all but concede that TVA's 1983 NEPA procedures applied in August 2019 (Doc 80, PageID#6958 n.15), and those procedures categorically excluded "[c]ontracts . . . for the sale . . . of electricity and "[a]ny action which does not have a primary impact on the physical environment." 47 Fed. Reg. at 54,588–89.

It is no secret that TVA "did not apply a categorical exclusion for the Board's decision in 2019 to approve the terms of a standard long-term agreement" (Doc. 33-28, PageID#4304) for the simple reason that, based on TVA's final NEPA determination, the Board's decision "was not subject to NEPA review" at all (*id.*, PageID##4302–04). So, there is nothing improper about invoking those categorical exclusions for the first time in litigation to show that remand would be

pointless. *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 304 (D.C. Cir. 2022).

And contrary to Plaintiffs' claims, the administrative record shows that both categorical exclusions would apply. As to Categorical Exclusion No. 6, the LTA amends a contract for the sale of electricity, and TVA determined that the LTA Amendments "would have no effect on TVA's generation portfolio mix." (Doc. 33-26, PageID#4235.) Therefore, it is not a transaction "that spur[s] expansion or development of facilities" (Doc. 33-29, PageID#4353), and Plaintiffs have not identified a single example in the administrative record (or anywhere else) of the LTA Amendments proximately causing the expansion or development of a facility. And although TVA eliminated Categorical Exclusion No. 27 in 2020 (Doc. 33-29, PageID#4681), it applied in August 2019, to any TVA action that "does not have a primary impact on the physical environment." No analysis is necessary to conclude that this straightforward categorical exclusion would apply where, as discussed *supra*, the administrative record shows that the LTA Amendments "would not result in *any* physical environmental impacts." (Doc. 33-26, PageID#4235.) Thus, the Court may uphold the NEPA Memo's conclusion even if the Court were to disagree with the reasoning. (Doc. 75, PageID##6696–98.)

## CONCLUSION

For the reasons stated and upon the authorities cited above and in TVA's opening and response briefs (Docs. 75, 82), TVA's motion should be granted because TVA is entitled to dismissal of Plaintiffs' Amended Complaint for lack of subject matter jurisdiction or, alternatively, summary judgment on Plaintiffs' TVA Act and NEPA claims.

Respectfully submitted,

_s/David D. Ayliffe_
David D. Ayliffe, (TN BPR 024297)
Director, Litigation
Steven C. Chin (TN BPR 030011)
Office of the General Counsel
Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.8964
ddayliffe@tva.gov
scchin@tva.gov

Attorneys for Tennessee Valley Authority

115494111

21

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer. Notice of this filing will be sent by operation of the Court's ECF system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's ECF system.

*s/David D. Ayliffe*
Attorney for Tennessee Valley Authority
