**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| PROTECT OUR AQUIFER, ENERGY ALABAMA, Doing Business as Energy Alabama, and APPALACHIAN VOICES, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 2:20-cv-02615-TLP-atc |
| v. | ) | |
| | ) | |
| TENNESSEE VALLEY AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This case is a legal challenge under the Administrative Procedure Act concerning long-term contracts between Defendant Tennessee Valley Authority ("Defendant" or "TVA") and local power companies ("LPCs"). Plaintiffs are conservation groups who are not parties to those contracts. Yet they allege that the length and adoption of the contracts violate both the Tennessee Valley Authority Act ("TVA Act") and the National Environmental Protection Act ("NEPA"). The Court held a hearing on the Parties' cross-motions for summary judgment. Because the Court finds that Plaintiffs lack standing to bring the TVA Act claim, and that Defendant acted reasonably under NEPA, the Court **GRANTS** summary judgment for Defendant

## BACKGROUND

**I.    Defendant Tennessee Valley Authority and the Long-Term Contracts**

During the depths of the Depression in 1933, Congress created the Tennessee Valley Authority through the TVA Act. 16 U.S.C. § 831. First envisioned to aid agricultural and

industrial development along the Tennessee River, Defendant has grown to be the largest federally-owned power company in the United States.  Defendant identifies the provision of "low-cost, reliable electricity to ten million people in TVA's seven-state service area," as one of its statutory objectives.  (ECF No. 20-1 at PageID 1390.)  Defendant generates power and sells it to local power companies, which in turn sell and distribute the power to individual consumers like some of Plaintiffs' members.  As a creature of congressional statute, Defendant must operate within the bounds of the TVA Act.  In terms of contract length, Section 10 of the TVA Act ("Section 10") authorizes Defendant to enter into contracts with LPCs "for a term not exceeding twenty years."  16 U.S.C. § 831i.

Fast forward to 2019 when Defendant began offering two contractual provisions germane to this suit.  The first is a long-term provision.  As part of a twenty-year contract, this new provision extends the contracts' termination notice to twenty years also.  (ECF No. 75 at PageID 6671.)  Several of Defendant's contracts with its LPCs already have an initial term of twenty years, and an "evergreen provision" that renews the contract—absent a termination notice— every year.  (*Id.*)  The second is a flexibility proposal.  Defendant's contracts with LPCs have been "requirements contracts," meaning that LPCs have to buy all their power exclusively from Defendant.  (ECF No. 75 at PageID 6671.)  The flexibility proposal commits Defendant to "collaborating with [signatory LPCs] to develop and provide enhanced power supply flexibility." (ECF No. 17-1 at PageID 1264.)  The resulting flexibility provisions allowed LPC signatories "to self-generate three to five percent of their energy."  (ECF No. 33-28 at PageID 4250.)

LPCs that agree to both provisions accrue a monthly 3.1% rate credit from TVA.  (ECF No. 74-1 at PageID 5833.)  Defendant characterizes this bill credit as its way of sharing the financial benefits from the contracts' enhanced long-term certainty with LPCs.  (ECF No. 17-4 at

PageID 1310.)  Defendant maintains that these contracts advance its goal of fulfilling its "statutory obligation to sell power at rates as low as feasible."  (ECF No. 92 at PageID 7669 (citing ECF No. 33-6 at PageID 3415).)  To date, about 143 LPCs have signed the long-term contracts.  (ECF No. 92 at PageID 7684, 7732.)

## II.    Plaintiff Organizations and Their Claims

Plaintiffs are three environmental conservation groups: Protect Our Aquifer from Memphis, Tennessee; Energy Alabama from Huntsville, Alabama; and Appalachian Voices from Boone, North Carolina.  (ECF No. 17.)  Their members or supporters are customers of at least four of the 143 LPCs that have signed the long-term contracts[1].  (ECF No. 17-9–16; ECF No. 92 at PageID 7731).  They challenge the contracts through the Administrative Procedure Act ("APA"), based on Defendant's alleged violations of the TVA Act and NEPA.  (ECF No. 74-1 at PageID 5831–32.)

Plaintiffs' TVA Act claims arise from the long-term provision.  They claim that the combination of the initial twenty-year term of the contract, the evergreen provision, and the twenty-year notice requirement results in a perpetual term, which they call a "Never-ending contract."  (ECF No. 74-1 at PageID 5847 ("The Never-ending Contracts automatically extend themselves each year so that the Contracts never erode or expire with the passage of time.") Because the 3.1% rate credit, among other benefits, is available only to LPCs who agree to the long-term provisions, Plaintiffs suggest that Defendant pushes LPCs "into contracts that bind them forever rather than hewing to the twenty-year limit in the Act."  (*Id.* at PageID 5832.)  So

---

[1] The record shows Plaintiffs' members are customers of the following LPCs that signed the contracts: Huntsville Utilities (ECF 17-9 at PageID 1343), Athens Utilities (ECF No. 17-11 at PageID 1353), Powell Valley Electric Cooperative (ECF No. 17-14 at PageID 1366) and Cumberland Electric Membership Cooperative (ECF No. 74-6 at PageID 6152).

they claim that Defendant's contracts exceed Section 10's twenty-year limit.  (*Id.* at PageID 5847 ("The practical effect of that contract structure is that, once signed, the agreements last forever.").)

Plaintiffs' NEPA claim arises from both the long-term and the flexibility provisions. Under NEPA, a federal agency must complete prescribed environmental reviews before undertaking major actions that "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332.  Plaintiffs' claim that Defendant violated NEPA in two ways.  First, TVA failed to perform the required NEPA review before adopting and executing the long-term provisions with the LPCs.  (ECF No. 74-1 at PageID 5859.)  Second, TVA belatedly performed a NEPA review for its flexibility provisions.  (*Id.* at PageID 5872.)  According to Plaintiffs, TVA performed the required NEPA review on its flexibility provisions in July 2020 but began incorporating them into contracts with the LPCs as early as August 2019.  (*Id.* at PageID 5874; *see also* ECF No. 92 at PageID 7639–41.)

## III.    Procedural Posture

This APA suit began in August 2020 when Plaintiffs filed the original complaint against Defendant.  (ECF No. 1.)  Defendant moved to dismiss Plaintiffs' suit for lack of standing, which the Court denied in August 2021.  (ECF No. 48.)  In doing so, the Court emphasized that Plaintiffs' burden to sustain standing will increase at summary judgment because it will have access to the administrative record.  (*Id.* at PageID 5085.)  The Court permitted Plaintiffs to conduct extensive discovery for more than a year, denying Defendant's motion for reconsideration, and ordering Defendant to complete an expanded administrative record.  (ECF No. 67.)  The Parties cross-moved for summary judgment, for which the Court held a hearing in December 2022.  (ECF No. 92.)  The Court will now turn to those competing motions.

**LEGAL STANDARD**

**I.      Standard for Summary Judgment on the Administrative Record**

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But in an APA case involving the review of an agency action, the normal standards set forth under FRCP 56 do not apply because of the Court's limited role in reviewing the administrative record. *See Oak Ridge Env't Peace All. v. Perry*, 412 F.Supp.3d 786, 808 (E.D. Tenn. 2019).

A court conducting judicial review under the APA does not resolve factual questions but determines whether "as a matter of law the evidence in the administrative record permitted the agency to make the decision that it did." *Harkness v. Sec'y of the Navy*, 174 F.Supp.3d 990, 1004 (W.D. Tenn. 2016), *aff'd*, 858 F.3d 437 (6th Cir. 2017) (citations omitted). *See also Florida Power & Light Co. v. Lorton*, 470 U.S. 729, 743 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). So the APA renders summary judgment "the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Harkness*, 174 F.3d at 1004; *see also Oak Ridge*, 412 F.Supp.3d at 808 ("Instead, under the APA, the agency resolves factual issues to arrive at a decision that should be supported by the administrative record.") The APA directs the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right [or] . . . without observance of procedure required by law[.]" 5 U.SC. § 706(2)(C)–(D). Plaintiffs' APA suit challenges Defendant's actions under both the TVA Act and the NEPA. The Court will now offer an overview of these two statutes.

5

## II.    Overview of the Tennessee Valley Authority Act

With the TVA Act, Congress created Defendant as a federally-owned electric utility

company in 1933.  16 U.S.C. § 831.  Defendant acts through its board of directors ("Board"),

who are nominated by the President of the United States and confirmed by the Senate.  *Id.*

Section 10 of the TVA Act limits the Board's authority to manage Defendant's contracts:

> The Board is empowered and authorized to sell the surplus power not used in its operations, and for operation of locks and other works generated by it, to States, counties, municipalities, corporations, partnerships, or individuals, according to the policies hereinafter set forth; and to carry out said authority, *the Board is authorized to enter into contracts for such sale for a term not exceeding twenty years*, and in the sale of such current by the Board it shall give preference to States, counties, municipalities, and cooperative organizations of citizens or farmers, not organized or doing business for profit, but primarily for the purpose of supplying electricity to its own citizens or members: Provided, That all contracts made with private companies or individuals for the sale of power, which power is to be resold for a profit, shall contain a provision authorizing the Board to cancel said contract upon five years' notice in writing, if the Board needs said power to supply the demands of States, counties, or municipalities. . . . That the Board is authorized to include in any contract for the sale of power such terms and conditions, including resale rate schedules, and to provide for such rules and regulations as in its judgment may be necessary or desirable for carrying out the purposes of this chapter.

16 U.S.C. § 83i (emphasis added).

The Parties do not dispute that Defendant is subject to Section 10's limitations.

Plaintiffs' TVA Act claim therefore turns on one question: Do the long-term contracts—which

start with an initial term of twenty years, contain an evergreen provision, and require a twenty-

year termination notice—violate Section 10 of the TVA Act?

## III.    Overview of the National Environmental Policy Act

Enacted by Congress in 1969, NEPA declares a national policy to "to create and maintain

conditions under which man and nature can exist in productive harmony, and fulfill the social,

economic, and other requirements of present and future generations of Americans."  42 U.S.C. §

4331(a).  To that end, NEPA requires federal agencies to take a "'hard look' at the

environmental effects of their planned action" before implementing them.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989).  While NEPA requires federal agencies to follow the necessary process in assessing their projects' environmental impact, it does not mandate a specific result.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (describing NEPA's twin aims of requiring an agency both to consider all aspects of a proposed action's environmental impact and to ensure that the agency inform the public that it has taken environmental concerns into account in its decision-making process).

The Council on Environmental Quality ("CEQ"), a division of the Executive Office of the President, provides regulations that guide federal agencies in determining the proper level of NEPA review for their proposed actions.  *See* 42 U.S.C. § 4342; *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004).  NEPA reviews generally operate through three tiers: a Categorical Exclusion ("CE"), an Environmental Assessment ("EA"), and an Environmental Impact Statement ("EIS").  A CE is a category of action that the agency, through its own NEPA-implementing regulations, has determined does not normally have a substantial effect on the environment.  40 C.F.R. § 1508.1(d).  So if a proposed action falls under a CE, it requires no NEPA review before execution.

At the same time, an EA is a concise public document prepared by a federal agency that delves into the need for the proposed action, its environmental impact, possible alternatives, and a list of agencies and persons consulted.  40 C.F.R. § 1508.9.  After carrying out an EA, an agency could find one of two things: a finding of no significant impact ("FONSI"), which means there will be no further NEPA review, or a finding of significant impact, which triggers the need for an EIS.  *Id.*

7

Finally, an Environmental Impact Statement ("EIS") is a NEPA requirement for major federal actions that significantly affect "the quality of the human environment."  42 U.S.C. § 4332(2)(C).  CEQ regulations apply to the content, format, and timing for preparing an EIS.  *See* 40 C.F.R. § 1502.1.  It is the "most detailed and comprehensive level of review under NEPA regulations."  *Tenn. Env't Council v. Tenn. Valley Auth.*, 32 F.Supp.3d 876, 883 (E.D. Tenn. 2014).

Plaintiffs' two NEPA claims turn on two corresponding questions.  First, did NEPA require TVA to perform an EIS over its long-term provisions?  Second, did TVA timely perform an EA over its flexibility provisions?

Neither the TVA Act or NEPA provide Plaintiffs a private right of action.  So Plaintiffs sue under the APA, seeking judicial review of Defendant's actions.  The APA allows a plaintiff to seek injunctive relief when it is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.  While the APA provides Plaintiffs a mechanism for judicial review, they must still show both constitutional and prudential standing.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) ("Article III standing requires a concrete injury even in the context of a statutory violation."); *Gross v. Hougland*, 712 F.2d 1034, 1036 (6th Cir. 1983) ("[T]he proper practice is to resolve all questions regarding subject matter jurisdiction prior to ruling upon merits of the claim.").  And so the Court will begin with a discussion on standing.

## STANDING

Federal courts have limited jurisdiction.  Article III of the Constitution cabins federal jurisdiction to "Cases" or "Controversies."  Without this limitation, the judiciary runs the risk of reaching responsibilities that the Constitution commits to the executive and legislative branches. *See TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021) ("The 'law of Art. III standing is

built on a single basic idea—the idea of separation of powers.'").  Courts have interpreted Article III's case-or-controversy "requirement" as demanding plaintiffs to show that they have standing to sue.  The standing doctrine limits the category of federal court litigants to those whose disputes are appropriately resolved through the judicial process—preventing courts from "being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  Simply put, standing preserves the "proper—and properly limited—role of the courts in a democratic society."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

With that in mind, to establish standing, Plaintiffs must show that (1) they suffered an injury in fact—a legally-protected interest that is concrete, particularized, and actual or imminent, (2) that Defendant likely caused the injury, and (3) that judicial relief would likely redress the injury.  *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992).  The party invoking federal jurisdiction has the burden of establishing these elements.  *Id.* at 561 (citations omitted). The Court will now discuss whether Plaintiffs have standing to assert their TVA and NEPA claims in turn.

## I.      TVA Act Claim

Plaintiffs argue that Defendant's long-term provisions with LPCs violate the text and purpose of TVA Act's Section 10.  16 U.S.C. § 831(i).  They claim standing on two grounds. First, Plaintiffs argue that they have associational standing, meaning that they have standing to bring their members' claims of environmental and economic injuries.  Second, Plaintiffs argue that they have organizational standing, meaning that as organizations, Plaintiffs have standing to litigate about their own injury.  The Court will now discuss these standing theories.

###### A.      Associational Standing

A plaintiff organization has standing to sue on its members' behalf when (1) its members would otherwise have standing to sue in their own right, (2) the interests at stake are germane to the organization's purpose, and (3) neither the claim nor relief requested requires the participation of the individual members in the suit.  *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 254–55 (6th Cir. 2018) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  The Court begins with the first element—Plaintiffs must establish that at least one of their members would have standing to sue on her own.  *Id.* at 255 (citing *Warth*, 422 U.S. at 511).  Thus, Plaintiffs must show that at least one of their members (1) suffered an injury in fact (2) that is fairly traceable to the defendant's challenged conduct, and (3) that is likely to be redressed by a favorable judicial decision.  *Lujan*, 504 U.S. at 560–61. Plaintiffs submit declarations from their members asserting various individual injuries that are categorized into environmental and economic harms.

###### i.      Environmental Harms

Plaintiff Energy Alabama member Jonathan Rossow ("Rossow") enjoys swimming in part of the Tennessee river, downstream from the TVA-operated Kingston coal plant, and he is "concerned about the effects of its pollution on his health."  (ECF No. 74-1 at PageID 5840 (citing ECF No. 17-10 at PageID 1349).)  Likewise, Plaintiff AV member Angela Mummaw ("Mummaw") loves watching "rare wildlife whose habitat is threatened by a pipeline proposed to serve the gas plant TVA has proposed to replace the coal plant near her home," close to the Cumberland River.  *Id.* (citing ECF No. 74-6 at 6151–62).  As for Plaintiff POA executive director, Sarah Houston ("Houston"), who moved to Memphis because of the "uniqueness of the Memphis Sand Aquifer as a drinking water source," (ECF No. 74-7 at PageID 6200) is worried

that "TVA's increased and prolonged reliance on fossil fuels imminently threaten" POA

members' right to clean drinking water.  (ECF No. 74-1 at PageID 5840.)  POA supporter Ward

Archer ("Archer") also declares that he relies on the aquifer for his drinking water and that

TVA's extensive use of water to operate the Allen Plant "conflicts" with his need for drinking

water—which he lost for eight days during a winter storm in 2021.  (ECF No. 80 at PageID

6930.)

    Defendant begins with a general point that Plaintiffs' TVA Act claim under the APA

asserts that TVA's final agency action is its entry into each long-term agreement.  (ECF Nos. 75

at PageID 6705; 67 at PageID 5314.)  Defendant argues therefore that Plaintiffs' injury for that

claim can only arise—at most—from "only the LTAs signed by the four LPCs of which their

members are customers, and that Plaintiffs have no standing to challenge the LTAs signed by the

other 143 LPCs of which their members are not customers."  (ECF No. 75 at PageID 6700

(identifying Athens, Huntsville, Cumberland, and Powell Valley as LPCs from which Plaintiffs'

member-declarants buy their power).)

    Next, Defendant contends that Plaintiffs lack associational standing because their

members' speculative concerns are not cognizable Article III injuries.  For example, Defendant

argues that Rossow's concerns about "future risk to his health from his voluntary decision to run

and swim near Kingston Fossil Plant" are speculative and violate the ban against generalized

grievances for standing analysis.  (ECF No. 82 at PageID 7230.)  And it argues that Mummaw's

claim is based on a hypothetical future harm as TVA's proposed gas pipeline for a gas plant is

just that—a proposed project still undergoing preconstruction review.  (*Id.* at PageID 7229.)  As

for POA members who are concerned about the Memphis Sands Aquifer, Defendant argues that

"[i]t strains credulity for [POA]" to blame their operation of the Allen Plant for the 2021 winter

storm or any future risk to the aquifer.  (ECF No. 82 at PageID 7229.)  Besides, Defendant notes

that Plaintiffs admit that it purchases the aquifer water it uses from MLGW.  (*Id.*)

### a.  Injury in Fact

The core of Article III's requirement for a case or controversy is that litigants must have

alleged that they have suffered or will imminently suffer a concrete, particularized injury from

the challenged action.  *See Spokeo*, 578 U.S. at 339.  An injury in fact is the invasion of a

legally-protected interest that is neither conjectural nor hypothetical.  *See Lujan*, 504 U.S. at 560;

*see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) ("Abstract injury is not enough.").

The Court said that imminence is a "somewhat elastic concept," but that "it cannot be stretched

beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III

purposes[.]"  *Lujan*, 504 U.S. at 565 n.2.  The Parties' dispute over Plaintiffs' alleged

environmental injuries here hinges on one question: Are Plaintiffs' members' injuries too

speculative under Article III?  Having reviewed the extensive record and considered the Parties'

arguments, the Court finds the answer is yes.  Plaintiffs lack associational standing because they

have not shown that their members have suffered or will imminently suffer a concrete or

particularized injury in fact.

Without question, aesthetic, and recreational harms are cognizable injuries under standing

jurisprudence.  The leading case on this point is *Friends of the Earth v. Laidlaw Environmental*

*Services (TOC), Inc.*, where the Supreme Court ruled that "environmental plaintiffs adequately

allege injury in fact when they aver that they use the *affected areas* and are persons 'for whom

the aesthetic and recreational values of the area' will be lessened by the challenged activity."

528 U.S. 167, 173 (2000) (emphasis added) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735

(1972)).

In *Laidlaw*, like this case, the Court addressed associational standing.  There, a plaintiff organization brought a citizen suit under the Clean Water Act against Laidlaw Environmental Services ("Laidlaw"), a wastewater treatment plant operator.  *Id.* at 173.  Plaintiff's basis for associational standing—through member declarations similar to this case—is that Laidlaw violated its Clean Water Act permit by discharging mercury into the river that the plaintiff's members enjoyed for various aesthetic and recreational purposes.  *Id.* at 182.

But the similarities end there.  In *Laidlaw*, the plaintiff's suit is founded on its members' alleged environmental injuries *arising directly* from their use of the river that the defendant allegedly contaminated with mercury discharge in violation of the Clean Water Act.  So, their "aesthetic and recreational" injuries from the allegedly poisoned river were particularized.  No speculation was necessary to link the environmental injuries to the "affected area," the river where Laidlaw discharged its wastewater.  But here, one must speculate to find Plaintiffs' alleged environmental injuries.

Plaintiffs' argument goes like this: Defendant's long-term contractual provisions violate the TVA Act's twenty-year limitation on power contracts, this violation "incentivized generation from fossil fuel over renewables," which then creates an "imminent risk of environmental degradation," which finally causes Plaintiffs' environmental injuries.  Plaintiffs' reasoning here departs from that in *Laidlaw*.  The *Laidlaw* plaintiff's harm is directly tied to the Clean Water Act, while Plaintiffs here claim a harm that has, at best, an attenuated link to the TVA Act.

A closer look at the member declarations highlights the difference between this case and *Laidlaw*.  In *Laidlaw*, a member claimed that he would like "to fish, hike, and picnic," along the river but refrained from doing so out of fear of the plant's discharged mercury.  *Id.* at 182.  His concrete, not conjectural, injuries were directly tied to the "affected area"—that is the river

allegedly contaminated by discharges from Laidlaw's plant in violation of the Clean Water Act. *Id.* Meanwhile, Rossow does not link his injury while swimming in the Tennessee River to TVA's alleged violation of the Clean Water Act or a similar statute prohibiting water pollution. Rather, he asserts a series of events tied to the alleged violation of the TVA Act that will result in pollution to the river he enjoys. This guesswork—connecting contract entry to environmental pollution through a series of possible circumstances—is anathema to Article III's requirement of injury in fact. *See Lujan*, 504 U.S. at 560 ("First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is . . . actual or imminent, not 'conjectural' or 'hypothetical.'") (citations omitted).

And Mummaw's declaration about her aesthetic injury fares no better. *Lujan* is unequivocal: "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing." *Id.* at 562–63. But in *Lujan*, wildlife conservation groups challenged the application of the Endangered Species Act of 1973. *Id.* It is hardly surprising for the Supreme Court to find that observing endangered species is a cognizable, aesthetic injury in a suit under the Endangered Species Act. But arguing that a person suffers aesthetic injury from Defendant exceeding its statutory authority through its contracts with LPCs, which finances a proposed pipeline, which may someday destroy the habitat of wildlife she would like to observe, impermissibly stretches Article III injury under *Lujan* and cases applying it.

Plaintiff POA's associational standing through their members' declarations claiming injury from their "right to clean drinking water," suffers from the same defect. For starters, Plaintiffs cite no federal case in support of standing from injury to a general right to clean

14

drinking water.[2]  (*See* ECF No. 74-1 at PageID 5841; 80 at PageID 6928; 87 at PageID 7512.);
*cf. Guertin v. State*, 912 F.3d 907, 921 (6th Cir. 2019) (noting there is "no fundamental right to
water service" nor is there a "guarantee for a right to live in a contaminant-free, healthy
environment").  But even if the Court were to construe POA members' injuries as aesthetic or
recreational, they share the same flaws of the other Plaintiffs' injuries in that they are
speculative.  Plaintiffs try to connect TVA's "Never-ending" contracts to the perpetuation of the
use of fossil fuels, which then finances the continued use of the Memphis-based Allen Plant,
which will prolong the use of Memphis Sand Aquifer Water for power generation,[3] which will
then harm Plaintiffs' drinking water.  Plaintiffs' assumptions are not inevitable or immediate.
And they have not produced evidence that dispels the need for speculation in their assumptions.

 At oral argument, the Court asked Plaintiffs' counsel why POA—whose members
purchase their power from MLGW, an LPC that has not signed Defendant's contracts—has
standing to enjoin the existing contracts with 143 LPCs.  Plaintiffs' counsel began by stressing
"imminence" is not about temporal proximity.  (ECF No. 92 at PageID 7650.)  Rather, she
argued, it is about the "substantial risk that the harm will occur."  (*Id.* (referring to ECF No. 87 at
PageID 7515 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014))).)  She then
made two arguments: First, when it filed its complaint in August 2020—the appropriate period
for assessing standing—there was a substantial risk that MLGW would sign the contract because

---

[2] The Court recognizes the importance of clean drinking water for our citizens.  While drinking
water is subject to various federal and state regulations, Plaintiffs have not proven that it is
protected by their predicate for this APA suit—Section 10 of the TVA Act.
[3] Plaintiffs' own declarations note that TVA "purchases approximately 3.5 million gallons of
water per day from MLGW for use in the cooling system at TVA's Allen Gas Plant."  (ECF 74-7
at PageID 6201; 17-7 at PageID 1333.)  Even if Plaintiffs have a colorable claim for a right to
pure drinking water, MLGW, not TVA, is the one drawing and selling the aquifer water for
Defendant's use.

it was "the lowest cost offer from the incumbent utility."  (ECF No. 92 at PageID 7650.)

Second, POA alleges environmental harm from Defendant's contracts with all the other

signatory LPCs locking in "a level of load that will affect the way that TVA operates the gas

plant and causes it to draw more water from the Memphis Sand Aquifer."  (*Id.* at 7651–52.)

The Court agrees with Plaintiffs' legal standard.  Standing jurisprudence has treated

"imminence" as both a temporal and probabilistic concept.  *See Lujan*, 504 U.S. at 566 ("Such

'some day' intentions—without any description of concrete plans, or indeed even any

specification of *when* the some day will be—do not support a finding of the 'actual or imminent'

injury that our cases require."); *Lyons*, 461 U.S. at 101–02 ("[T]he challenged official conduct

and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or

'hypothetical.'").  But as for Plaintiffs' first point, imminence for standing purposes here is not

about determining whether there was a substantial risk that MLGW would sign Defendant's

contracts.  Instead, the imminence test asks whether the contracts created a substantial risk of

inflicting environmental injury on POA members, who purchase their power from MLGW.  In

other words, signing the contracts is not an environmental harm that can confer standing to POA.

To have standing, POA's members—despite not buying their power from an LPC that signed the

contracts—must show an environmental harm tied to Defendant's contracts.

And they try to do so with their second argument.  They claim environmental injury from

Defendant's use of a gas plant that draws water from the Memphis Sand Aquifer, arguing that

the 143 contracts with other LPCs enable Defendant to operate the plant.  This argument merely

restates POA members' claim for environmental injury from a right to clean drinking water.  The

Court rejected that argument above for being too speculative as it makes assumptions that are

neither inevitable nor immediate from a reading of the record.  The Court rejects that argument again here.

In short, Plaintiffs have failed to show that at least one of their members have suffered an injury in fact that is concrete and particularized, actual and imminent—not merely speculative.[4] So on that basis alone, they lack standing.  As an independent and alternate basis for ruling against Plaintiffs' associational standing argument, the Court also finds that Plaintiffs failed to show that their injuries are "fairly traceable to the challenged conduct of the defendant." *Spokeo*, 528 U.S. at 338.  In other words, Plaintiffs failed to meet their burden of showing that their injury must have been "likely caused by the defendant." *TransUnion*, 141 S.Ct. at 2203.  The Court will next consider causation.

### b.  Causation

All of Plaintiffs' environmental claims are flawed—they are not fairly traceable to Defendant's actions.  Plaintiffs allege that their environmental injuries come from the length of Defendant's contracts, not the building of a nuclear powerplant or amassing a new fleet of carbon-emission-belching power plants in the region.  This claim is about whether Defendant exceeded its statutory authority to enter into contracts with its distributors "for a term not

---

[4] That said, *Massachusetts v. E.P.A.* is a modern case in which the Supreme Court found that the plaintiffs have standing to sue based on government inaction leading to global warming.  549 U.S. 497 (2007).  There, Massachusetts challenged the Environmental Protection Agency's failure to regulate greenhouse gases under the Clean Air Act.  *Id.* at 504.  One harm that it proffered is that the "rising seas have already begun to swallow" its coastal land.  *Id.* at 523. While the Supreme Court conferred standing to the state based on this injury, the Court notes that the Supreme Court did so stressing "the special position and interest of Massachusetts.  It is of considerable relevance that the party seeking the review here is a sovereign State[.]"  *Id.* at 518.  In contrast, Plaintiffs here are environmental groups—not a city, nor a county, let alone a sovereign state.

exceeding twenty years."  As already discussed above, the connection between Defendant's action of entering into contracts to Plaintiffs' environmental injuries is speculative.

The same logic applies to the tortured causation chain between Plaintiffs' asserted injuries and TVA's purported violation of its statutory authority.  Plaintiffs allege TVA proposes perpetual contracts with LPCs that lead to prolonged generation of fossil fuel, which results in environmental degradation that results in Plaintiffs' environmental harms.  The Court finds this chain of causation is far too hypothetical to sustain standing.  It requires assumptions and leaps of logic, without which, Plaintiffs' injury would not be "fairly traceable" to Defendant's actions.

Also critical to Plaintiffs' argument is the contention that "*all* of the 134 Never-ending Contracts TVA had entered into . . . locked in enough revenue in perpetuity to create a substantial risk that TVA would finance new investments in methane gas plants with their accompanying fuel cost volatility, and imposed harsh 5% caps on the amount of local renewable energy accessible" to Plaintiffs' members.  (ECF No. 94. at PageID 7824–25.)  In support, Plaintiffs point to the TVA Board's August 2019 meeting where Defendant's own Chief Financial Officer John Thomas ("CFO") purportedly "connected TVA's ability to finance [investing in new gas combustion turbines] to the perpetual nature of the Contracts."  (ECF 73-17 at PageID 5711–16, 5717 ("But we also add another billion dollars of capital every year so that equation works as long as it's a 20 year commitment and it's a 20 year commitment that carries on every year.").)

But Defendant counters that one should not read their CFO's statements in isolation. Context is key—with its expansion of natural gas assets, Defendant says it aims to achieve energy security for its customers, while also adding solar power over time.  (*See* ECF No. 92 at PageID 7674–75 (referring to ECF No. 73-17 at PageID 5719–20).)  Defendant maintains that its

investment in new gas-powered plants is fueled by a need to repair and replace older assets while ensuring that it has "the reliable access to peaking capacity." (ECF No. 73-17 at PageID 5698.) And the proven, reliable energy from these gas builds is meant to balance "with solar and the intermittency of the solar resources." (*Id.* at PageID 5719; 5713 ("[W]e have some more combustion turbines that come in really to support all the solar growth that would be added.").)[5]

The Court agrees with Defendant. Plaintiff's citations to the August 2019 meeting—when read with the rest of the minutes and the accompanying 2019 IRP—do not show that Plaintiffs environmental injuries are fairly traceable to Defendant's contractual provisions. Plaintiffs' citations do not fill the logical leaps necessary to link Defendant's contracts to the construction of gas plants, which would lead to the polluted world that causes Plaintiffs' environmental injuries. Rather, the citations refer to the mechanics of Defendant's debt financing and do not necessarily show that the contracts encourage fossil fuel generation. Besides, Defendant has shown that their power generation portfolio, which predates the execution of any long-term contract, is not dependent on the length of the contracts. (ECF No. 33-14 at PageID 2615 ("[The 2019 IRP] is a long-term plan that provides direction on how TVA can best meet future demand for power.").)

And the record shows that Defendant's position here fits with its 2019 IRP which recommends the addition of "between 1,500 and 8,000 MW of solar by 2028 and up to 14,000 MW by 2038 if a high level of load growth materializes." (*Id.* at PageID 3498.) It also aligns

---

[5] At oral argument, Defendant highlighted the importance of capacity for peak events—maintaining power during periods of high demand—in understanding its CFO's comments. (ECF No. 92 at PageID 7674–75 ("[T]he Winter of 2021 drove that home for Memphis when we needed to have reliable peaking capacity, because it just doesn't exist in a way to bring power up right when you need it, and to meet those demands . . . whereas across the Mississippi, there were outages and blackouts and we were fortunate not have those here in the TVA service territory.").)

with its new offering of the flexibility provisions, signaling a movement towards alternate energy

sources.  These provisions—which are recent innovations in Defendant's ninety-year history—

permit the exploration of self-generated, presumably renewable energy, while maintaining a

manageable level for Defendant's requirements contracts.  (ECF No. 33-27.)  The Court finds

therefore that Plaintiffs' factual allegations about causation here cannot sustain standing.

### c.  Redressability

The Court likewise finds that Plaintiffs have not met their burden of proving

redressability.  During oral argument for the cross-motions for summary judgment, Plaintiffs'

counsel remarked that the "sky is not going to fall," if the Court vacates the contracts because the

status quo will largely remain the same.  (ECF No. 92 at PageID 7657.)  The Court agrees.

Nullifying the allegedly unlawful contractual provisions will mean more of the same.

Defendant's requirements contracts with its distributors will continue—so will the Allen Plant's

use of Memphis Aquifer water, Kingston Coal Plant's alleged pollution of the Tennessee River,

and consideration of the proposed pipeline construction through the Cumberland River.  Simply

put, even if the Court were to reform the allegedly offending provisions of Defendant's contracts

with 143 LPCs—none of whom are parties here—doing so would unlikely cure Plaintiffs'

environmental injuries as alleged in their amended complaint.

Plaintiffs have not shown that a change in the contractual length will redress their

environmental injuries.  And the LPCs that have adopted the long-term provisions with

Defendant are bound, at a minimum, to maintain their contractual status quo with Defendant for

at least twenty years.  Defendant has also proffered evidence showing that their power generation

portfolio, a necessary link in Plaintiffs' redressability argument, is not dependent on the length of

the contracts.  (ECF No. 33-14.)  In sum, this Court finds that, without impermissibly significant

speculation, a favorable ruling for Plaintiffs here is unlikely to remedy the environmental harms that they claim.

### d. Ban Against Generalized Grievances

Finally, the Court notes that the ban against generalized grievances precludes Plaintiffs' claim. *See Lujan*, 504 U.S. at 573–74 ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."). Federal courts are not a forum to litigate the legality of governmental conduct at large. *See TransUnion*, 141 S.Ct. at 2203 ("Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities."). Our Constitution opens the federal courts to those who have suffered a particularized, imminent injury. If you are injured, come to court. But when you only have a generalized grievance, go to the legislature.

The Court finds that Plaintiffs' members' injuries are generalized grievances. While their declarations furnish different environmental predicates—river water, drinking water, rare animal habitat—they all share one common complaint: TVA's contracts are too long, and this length will create a world that will cause them harm. As already discussed above, these declarations do not meet Article III's standing requirements. They are also policy choices that are better suited for debate and discussion with LPCs. This advocacy and negotiation with LPCs are particularly important considering these LPCs have far wider constituencies than just Plaintiffs' members. The LPCs, not Plaintiffs, represent their customers at the negotiation table with Defendant. In managing the delicate balance among the competing interests inherent in energy selection—

price, reliability, quality, and environmental effects—these LPCs negotiated to broker a contract with Defendant.

The Court underscores that the grievances, while general, may be genuine. In ruling against Plaintiffs on standing, the Court acknowledges the gravity and relevance of Plaintiffs' environmental concerns. But the Court is a forum of law, not policy. And here, the heart of the issue arises from a statute that is ninety years old. The TVA Act bestowed powers upon Defendant for a time—the 1930s—to address challenges much different from those we have today, with energy resources dissimilar to those we have now. TVA is using that statute to its long-term advantage. Even still, the upshot is that Plaintiffs have not shown a particularized, imminent environmental injury—so their contentions, no matter how compelling, must be resolved not in this Court but in Congress. The Court finds Plaintiffs have not met Article III standing requirements for their environmental injuries.

### ii.   Economic Harms

Plaintiffs also submit several declarations asserting economic injury under three theories. First, the "Never-ending Contracts have deprived the groups' members of the opportunity to purchase affordable, renewable energy on a competitive market." (ECF No. 74-1 at PageID 5841.) The idea is that the contracts require LPCs to purchase at least 95–97% of their power from TVA, so they hamper Plaintiffs' members' ability to purchase renewable energy on their own terms. (ECF No. 80 at PageID 6930.) Second, Plaintiffs argue that the "Never-ending Contracts have impaired the value of [Plaintiffs' members'] investment in distributed energy systems," because the caps on non-TVA energy production would "diminish[] the value of their investment." (ECF No. 74-1 at PageID 5842.) Finally, Plaintiffs' members are harmed by Defendant "passing on high fuel costs" to consumers as they had to pay higher electricity bills

than usual when "gas prices increased dramatically in 2022."  (ECF No. 80 at PageID 6930.)
Because Defendant's contracts "increase reliance on gas," they will only "increase the
substantial, imminent risk that [Plaintiffs'] members will again pay higher and more volatile
electricity bills to cover TVA's fossil fuel costs."  (*Id.*)

Defendant counters that all of Plaintiffs' arguments are generalized grievances
insufficient to establish injury in fact.  (ECF No. 75 at PageID 6701.)  As for Plaintiffs' alleged
right to buy energy on their own terms, Defendant argues that the claims are imagined because
Plaintiffs have not shown that "in the absence of the [flexibility provisions], Plaintiffs' members
would have had the 'opportunity to purchase affordable, renewable energy on a competitive
market.'"  (ECF No. 82 at PageID 7230.)  They also contend that the contracts increased, rather
than restricted, opportunity for Plaintiffs' members to delve into renewable energy because the
earlier contracts with Defendant precluded the LPCs from producing any energy on their own.
(*Id.* at PageID 7230–31.)

As to Plaintiffs' members' concerns about "paying more for dirtier energy," and the value
diminishment of their private solar power systems, Defendant contends that these are speculative
claims that fall short of the Article III injury requirement.  (*Id.* at PageID 7231.)  Finally, even if
these economic injuries are cognizable, Defendant contends that Plaintiffs' argument fails the
causation and redressability prongs of standing.  In short, Defendant says these alleged injuries
are not fairly traceable to the contracts, and even a favorable court ruling would not affect
Defendant's ability to "generate and supply power to the LPCs in exactly the same way as before
the [long term and flexibility provisions] were executed."  (ECF No. 75 at PageID 6702.)

### a.  Injury in Fact

The Court agrees with Defendant.  Plaintiffs have not met their burden of proving concrete, not conjectural, injury to sustain standing.  For starters, Plaintiffs' members do not buy power from TVA.  Defendant generates and sells power to LPCs, who then sell that power to individuals like Plaintiffs' member-declarants.  (*See e.g.*, ECF No. 17-8, 17-9, 17-16.) Defendant is not a federal agency that determines citizens' ability to purchase power.  In that regard, it is not as if Defendant issued a regulation that prevents Jane Doe from purchasing and installing a solar panel on her roof if she so chooses.  To the contrary, Plaintiffs' second economic injury argument—that their purchased solar power systems will reduce in value because of the flexibility caps—shows that Plaintiffs' members can buy and install their own solar panels.  So their economic injury from an inability to "buy power on their desired terms," stems not from TVA itself.  Instead, it arises from TVA's contracts with LPCs—who were free to accept or reject TVA's contractual terms in negotiation.[6]  And not all Plaintiffs' member-declarants are directly tied to these contracts.  POA member Ward Archer stated he purchases power from the Memphis-area LPC, MLGW, which, at the time of the amended complaint, had not agreed to these long-term provisions.  (ECF No. 17-8 at PageID 1340.)

Plaintiffs cite *Orangeburg v. Federal Energy Regulatory Commission*, for the proposition that they have standing to sue a federal agency by "depriving it of the opportunity to purchase 'wholesale power on its desired terms.'"  (ECF No. 74-1 at PageID 5841 (citing 862 F.3d 1071, 1077 (D.C. Cir. 2017).)  In *Orangeburg*, a city sued the Federal Energy Regulation Commission ("FERC") for violating the Federal Power Act, which separates regulatory authority over power

---

[6] As Plaintiffs pointed out, the MLGW Board of Commissioners—representing TVA's largest customer—voted unanimously to reject Defendant's long-term provisions in December 2022. (ECF No. 94 at PageID 7827.)

sales: retail sales belong to the state agency while wholesale sales belong to the FERC.  *Id.* at 273.  For our purposes, the complex dispute can be distilled into a single question: is the city eligible for wholesale pricing under the Federal Power Act?  *Id.* at 1074.  If it is, then it could pay a lower rate, but if it is not, it must pay up to $10 million per year.  *Id.*  On the standing issue, the United States Court of Appeals for the D.C. Circuit found that the city suffered an injury-in-fact because it could not purchase wholesale power on its desired terms.  *Id.* at 1077.

The Court finds that *Orangeburg* is materially different from this case in two important ways.  First, the economic injury in *Orangeburg* is concrete and particularized.  The *Orangeburg* plaintiff proved an annual economic loss of about $10 million because of the higher rate it pays from FERC's violation of the Federal Power Act.  But here Plaintiffs members' alleged financial loss is conjectural.  Their declarations express desires without defining a concrete and particularized harm.  (*See e.g.*, ECF No. 17-8 at PageID 1340 ("I want the opportunity to buy [cleaner, cheaper energy].  I think that it is grossly unfair for TVA to shield itself from competing with [cleaner, cheaper energy.]"); 17-9 at PageID 1345–46 ("I want the opportunity to buy cleaner, cheaper, renewable energy, and I am concerned [Defendant's contracts] will ultimately result in north Alabama ratepayers, including me, being required to pay more for dirtier power.")

But more importantly, Plaintiffs have not presented evidence showing that their desired electricity market exists.  The administrative record does not support the existence of a "cleaner, cheaper, renewable energy," source that is presently, or would shortly be, available to meet the region's needs.  Plaintiffs ask the Court to rely on Defendant's own statements in its EA on the flexibility provisions as evidence that Plaintiffs' economic injury is not speculative.  (ECF 33-28 at PageID 4256.)  The EA showed that TVA considered offering more than 5% flexibility to

LPCs until it settled on the 3–5% range, citing concerns of revenue erosion and customer load loss. (*Id.* at PageID 4252–56.) Plaintiffs argue that Defendant's concerns about these effects show that their economic injuries are not speculative.

At the same time, Defendant's projections in the EA are also speculative. These projections lay out several possible scenarios for an uncertain future. Plaintiffs cannot rely on Defendant's speculation to disprove Plaintiffs' own speculation to establish standing. It fails to meet the very standard set by the case Plaintiffs cite here—*Orangeburg*. Unlike *Orangeburg* where the city's annual $10 million obligation was tied to a pricing differential based on FERC's violation of the Federal Power Act, here Plaintiffs' members' reliance on the EA does not show a concrete economic injury from Defendant's purported TVA Act violation.

As the Court already discussed in the environmental injury portion of this order (*see supra* pp. 18–19), the record shows that TVA—tasked with generating power for the region—had to balance demands for lessening its carbon footprint with meeting the need for energy security. (*See id.* at PageID 4256 ("Introducing flexible generation at a level of three to five percent would allow TVA to implement this new concept at a lower financial risk before contemplating to higher levels of self-generation.").) While Plaintiffs may demand an opportunity to buy more renewable energy at their preferred rate, the record does not show that their desired power market exists. Their concerns may be valid policy points. But without more, they fall short of the required federal standard for a litigable claim.

Second, *Orangeburg*'s plaintiff is not an environmental advocacy group but the city of Orangeburg, South Carolina. As a wholesale buyer of power, the city's ability to challenge whether FERC violated the Federal Power Act's divided regulatory authority for retail and wholesale power needs is not conjectural. In other words, finding concrete injury from the

deprivation of its ability to buy "wholesale power on its desired terms," requires no speculation: it is a wholesale buyer of that power, and its ability to do so is inescapably tied to the FERC's actions.  But here, Plaintiffs are not wholesale buyers of power from TVA.  They are end customers of the LPCs.  Under the reasoning of *Orangeburg*, LPCs—not Plaintiffs—would have standing to sue to buy "wholesale power on [their] desired terms."  Perhaps this case would take a different path if an LPC sued Defendant here.[7]  But that case is not before the Court.

Next, the Court finds that Plaintiffs' economic injury based on the flexibility provision's diminishing effects on their solar investments cannot sustain standing.  At the motion to dismiss phase, the Court ruled for Plaintiffs because, at that early stage in the process, the standard permitted their attenuated allegations to sustain standing.  (ECF No. 48 at PageID 5083–85.)  But the Court noted that Plaintiffs' burden to show standing will increase as the case progresses into the summary judgment phase.  (*Id.*)  In fact, the Court quoted *Lujan*, 504 U.S. at 561, saying "[i]n response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true.  And at the final stage, those facts, (if controverted) must be 'supported adequately by the evidence adduced at trial.'" (*Id.* at PageID 5085.)

The Parties here have engaged in several months of discovery to produce an administrative record spanning thousands of pages.  Yet Plaintiffs' basis for its economic injury

---

[7] Whether a constitutional or prudential doctrine, the Supreme Court has held that a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights of interests of third parties."  *Warth v. Seldin*, 422 U.S. 490 (1975).  Plaintiffs' economic injury claim fails because it is not a concrete and particularized injury.  But the Court also notes that this claim conflicts with the long-recognized prohibition against "plaintiffs asserting the rights of third-parties."  *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014).

has not grown much, if at all.  There is still no concrete showing that Plaintiffs' members suffered an economic loss that would be cognizable under their own cited precedent.  Their alleged injuries require considerable speculation through a series of possible—not inevitable—outcomes from Defendant's contracts.  They say Defendant's long-term provisions violate the TVA Act and impose a cap on LPCs' ability to generate non-TVA power, which harms Plaintiffs' members by devaluing their investment in renewable energy assets—whether or not their LPCs signed the long-term provisions.  To allow standing on such attenuated logic is to stretch imminence beyond its purpose of halting litigation for plaintiffs with alleged injuries that are too speculative for Article III.  *See Lujan*, 504 U.S. at 565 n.2.  And even if Plaintiffs' members' investment in solar energy depreciated because of Defendant's actions, *Clapper*'s prohibition against Plaintiffs spending their way into gaining standing—as discussed below—will apply.

The Court notes that the gist of Plaintiffs' economic injuries—inability to buy energy on their own terms, diminishment of their investments in renewable power—arises from a contractual bargain between Defendant and LPCs.  Plaintiffs' pleadings express disagreement with this deal.  But Plaintiffs are not parties to those contracts.  And Plaintiffs overlook the LPCs' responsibility to their entire customer base—not just Plaintiffs' members.  The LPCs, which represent all their customers, negotiated with TVA.  And a product of that negotiation is the previously unavailable 3–5% flexibility provisions/caps. (*See* ECF No. 33-27 at PageID 4237.)

Some of the LPCs' customers may not object to these contracts, accepting the long-term provisions to avail of the 3.1% rate credit, and ability to self-generate 3–5% more of their own energy.  Still, others may be willing to pay the price of foregoing the credit to purchase market

independence on their own terms.  What makes pragmatic economic sense for one LPC may spell unacceptable environmental concerns for another.  And given the diversity in geography, population, industry, and policy preferences across TVA's region, these different opinions are hardly surprising, if not expected.  The LPCs represented their constituents when they entered into contracts with Defendant.  To confer standing to Plaintiffs here would let the preferences of a few—no matter how compelling—override the LPCs' contractual bargain.  The Court will not permit this bid to shoehorn a nonjusticiable policy issue into a litigable Article III claim.

**b.  Ban Against Generalized Grievances**

Finally, Plaintiffs' alleged economic injuries are all generalized grievances.  And their third argument—that Defendant's TVA Act violation prolongs reliance on fossil fuels which then leads to Plaintiffs "paying more for dirtier energy,"—exemplifies the generality of their grievances.  The entire United States, along with most of the world, dealt with increased gas prices in 2022.  So Plaintiffs' claims about the injury caused by gas price volatility are hardly unique to them.  *Warth*, 422 U.S. 490 at 499 ("The Court has held that when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction.")  They have not proven that their economic injury is fairly traceable to the TVA Act violation, and not a mere result of the vagaries of volatility from gas prices.  This economic injury is so general that all LPC customers—no matter if these LPCs signed the long-term contracts—would have been affected by it.  The purported injury lacks the specificity and concreteness necessary to confer standing.

In the end, Plaintiffs' string of economic injuries demonstrates that this suit is a policy preference masquerading as a litigable claim.  The Court declines Plaintiffs' invitation to confer

them standing based on their alleged economic injuries.  The Court will next address their claims of organizational standing.

### B.      Organizational Standing

Plaintiffs claim organizational standing to bring their TVA Act claim.  A plaintiff organization may assert organizational standing "on its own behalf because it has suffered a palpable injury as result of the defendants' actions."  *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 332–33 (6th Cir. 2002).  To establish organizational standing, a plaintiff organization must also meet the three elements of standing: injury in fact, causation, and redressability.  *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014).  But an organization's "mere interest in a problem" cannot confer standing.  *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).  It must show that its "ability to further its goals has been 'perceptively impaired' so as to constitute far more than simply a setback to the organization's abstract social interests." *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710 (6th Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).)  And it "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending."  *Clapper v. Amnesty International USA*, 568 U.S. 398, 402 (2013).

Plaintiffs' organizational standing theory here proceeds from the "perceptible impairment" on their activities.  (ECF No. 80 at PageID 6931–32.)  They argue that TVA's long-term contractual provisions have injured them through the "consequent drain on the organization's resources."  (*Id.* at 6931 (quoting *Havens Realty*, 455 U.S. at 379 (1982).)  In other words, Plaintiffs' purported injury arises from moving their "substantial resources in response to TVA's unlawful Never-ending contracts."  (*Id.* at PageID 6931–32 (claiming Plaintiff AV had to hire new staff members, Plaintiff POA had to forgo other Aquifer-related

30

work, and Plaintiff EA spent staff time advocating against the long-term and flexibility

provisions).)  They argue that the contracts increase and extend TVA's "reliance on fossil fuels,"

directly conflicting with "the primary goals of each group, which include promoting a clean

energy transition and conserving natural resources."  (ECF No. 74-1 at PageID 5842.)

Plaintiffs claim that this organizational injury is concrete and particularized because there

is a "substantial risk that the harm will occur."  (ECF No. 80 at PageID 6934–35 (citing *Susan B.*

*Anthony v. Driehaus*, 573 U.S. 149, 158 (2014)).)  In support, Plaintiffs point to Defendant's

own assessments as evidence because "[t]he Never-ending contracts prevent load loss, one of the

'billion-dollar risks' TVA's CFO identified when the [TVA] Board adopted the contracts." (*Id.*

at PageID 6935.)  Plaintiffs also claim that the injury is sufficiently imminent and substantial

because they have already suffered organizational injuries as "the Contracts have impaired

[Plaintiffs'] core activities and diverted their resources." (*Id.* at 6936.)

Plaintiffs argue that they have also met their burden for causation and redressability.

They claim that their injuries are traceable to the contracts, which "lock in TVA's load forever,"

and thus "increase TVA's reliance on fossil fuels, while forever eliminating opportunities for

democratic engagement with local power companies."  (*Id.* at 6937–38 (citing *Lujan*, 504 U.S. at

5260.)  They contend that their injuries are redressable by this Court because a vacatur or

reformation of the contracts "would reinstate democratic accountability and allow distributors to

pursue alternative supply options that include more distributed energy, decreasing reliance on

TVA's existing fleet."  (ECF No. 87 at PageID 7517.)

For starters, Defendant again points out that Plaintiffs' TVA Act claim under the APA

contemplates, as final agency action, TVA's entry into each long-term agreement.  (ECF No. 75

at PageID 6700.)  Defendant therefore argues that Plaintiffs' injury for their TVA claim can

arise—at most—from "only the [contracts] signed by the four LPCs of which their members are customers, and that Plaintiffs have no standing to challenge the [contracts] signed by the other 143 LPCs of which their members are not customers." (*Id.*)

As to the remaining four contracts at issue, Defendant argues that Plaintiffs have failed to meet their burden of showing organizational standing for two reasons. First, Defendant argues that Plaintiffs' "diversion of resources theory" is a narrow basis for conferring standing, which Plaintiffs failed to satisfy. (ECF No. 82 at PageID 7233.) Defendant contends that Plaintiffs' alleged harm to abstract social interests is not enough to gain standing under Sixth Circuit case law. (*Id.* (identifying "voter registration," "ballot access," and "enforceable right to truthful information concerning the availability of housing," as examples of interests sufficient as injuries for organizational standing under Sixth Circuit precedent).)

Second, Defendant emphasizes that "organizations 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical harm that is not certainly impending.'" (*Id.* at PageID 7232 (citing *Clapper*, 598 U.S. at 416).) In other words, even if Plaintiffs could make out a cognizable Article III injury through a self-inflicted resource diversion, Defendant contends that Plaintiffs' alleged harms are not sufficiently imminent. And so the claims fall short of Article III's injury in fact requirement.

The Court finds that Plaintiffs failed to meet their burden to show organizational standing. Plaintiffs rely on *Havens Realty Corp. v. Coleman* for the proposition that "consequent drain on the organization's resources" constitutes an organizational injury. 455 U.S. 363, 379 (1982). In *Havens*, plaintiff Housing Opportunities Made Equal ("HOME")—a Virginia-based public interest organization, which aimed "to make equal opportunity in housing a reality" in the Richmond area—claimed organizational standing to challenge an apartment complex owner's

allegedly discriminatory renting practices under the Fair Housing Act of 1968.  455 U.S. at 378.

The *Havens* defendant allegedly performed "racial steering"—preserving patterns of racial

segregation by "steering members of racial and ethnic groups" to housing occupied by members

of those groups.  *Id.* at 366.  HOME, which provided housing counseling service and

investigated housing discrimination complaints, challenged the defendant's alleged racial

steering.  *Id.*  The Supreme Court conferred HOME organizational standing because HOME

"had to devote significant resources to identify and counteract the defendant's racially

discriminatory steering practices."  *Id.* at 379.  The Court found that this injury is "more than

simply a setback to the organization's abstract social interests[.]"  *Id.*

       The Court acknowledges Plaintiffs' organizational standing claim is like *Havens* in that

both Plaintiffs claim a drain on their resources as their injury in fact.  But where the *Havens*

plaintiff pleaded an impending, congressionally-recognized statutory right as grounds for the

drain on its resources, the Plaintiffs here pleaded no similar statutory basis for the alleged drain

on their resources.  In *Havens*, the Fair Housing Act of 1968 supplied the statutory basis for

plaintiff's organizational injury.  455 U.S. at 366.  The Supreme Court declared that Congress,

through the Fair Housing Act, "conferred on all 'persons' a legal right to truthful information

about available housing."  *Id.* at 373.  Because the Fair Housing Act defines "persons" entitled to

truthful housing information as "one or more individuals, corporations, partnerships,

associations," federal law effectively vested a housing advocacy group like HOME with a

statutory right to truthful, nondiscriminatory housing information.  42 U.S.C. § 3602(d).

       The Sixth Circuit recognized as much in *Fair Elections Ohio v. Husted*, 770 F.3d 456

(6th Cir. 2014).  In denying organizational standing to a voter outreach group challenging state

election laws, the Sixth Circuit noted that a reliance on *Havens* is "misplaced" because unlike

*Husted*, *Havens* involved an "enforceable right" under the Fair Housing Act to truthful housing information.  *Id.* at 460 n.1.  The Sixth Circuit then underscored the link between the *Havens* defendant's alleged misinformation with plaintiff HOME's injury as defendant "directly interfered with [HOME's] ability to provide truthful counseling and referral services."  *Id.*  The Sixth Circuit noted that tying an organization's injury to a legally-recognized right is an important standing limitation because otherwise "an advisor or organization can be deemed to have Article III standing merely by . . . virtue of its efforts and expense to change the law."  *Id.* at 460.

Plaintiffs here plead no similar legally-recognized right as basis for organizational standing.  Plaintiffs' APA suit challenges Defendant's contracts with LPCs, which purportedly violate the TVA Act's statutory limitation on "contracts for such sale [of power] for a term no exceeding twenty years."  16 U.S.C. § 83li.  Plaintiff's legal theory for organizational standing is that the contracts injure them by "[i]ncreasing and extending reliance on fossil fuels" which conflicts with the groups' goals of "promoting a clean energy transition and conserving natural resources."  (ECF No. 74-1 at PageID 5842.)  So Plaintiffs claim that their response to the long-term contracts—spending "significant amounts of staff time and budget advocating against and educating stakeholders about the Never-ending Contracts"—is a drain on their resources that is enough to confer standing.  (*Id.* at PageID 5843.)

Plaintiffs' TVA Act injury lacks the particularized nature of the congressionally-recognized Fair Housing Act injury in *Havens*.  While the APA provides a vehicle for Plaintiffs' action, Article III standing is a separate requirement that Plaintiffs must meet to maintain their suit.  *Spokeo*, 578 U.S. at 341.  And Plaintiffs have not shown that Congress, through the TVA Act, conferred them with a legal right that constitutes a "distinct and palpable injury" sufficient

34

to challenge the length of TVA's contracts. *Husted*, 770 F.3d at 460. The standing analysis may turn out differently if the LPCs, not conservation groups, challenge the TVA Act's contractual limitation. But as already discussed above, that is not the case here.

What is more, Plaintiffs' organizational standing argument suffers from imminence concerns absent in *Havens*. Like HOME, Plaintiffs assert a drain on their resources as basis for injury in fact. But unlike HOME, whose causal connection to the injury directly stems from defendant's alleged violations of the Fair Housing Act, here, Plaintiffs allege an injury that requires much of the speculation already discussed above. Plaintiff HOME's injury in *Havens* needs no speculation because that defendant allegedly practiced racial steering in violation of the Fair Housing Act, this violation impaired HOME's ability to assist its clients without devoting (and draining) HOME's resources which is a concrete and actual injury per the *Havens* court.

This case is distinguishable from *Havens* because the chain of causation here requires speculation. Defendant's long-term contracts allegedly violate the TVA Act's twenty-year limitation on power contracts. Plaintiffs claim this violation locks in Defendant's load with the LPCs forever which prolongs its reliance on fossil fuels, and that continued reliance on fossil fuels conflicts with Plaintiffs' goals of clean energy transition and natural resource conservation. And so Plaintiffs must then drain their resources constituting a concrete and actual injury. For the reasons below, the Court finds that Plaintiffs' theories are an impermissible expansion of the imminence requirement.

Without asserting imminent harm to a legally-protected right, Plaintiffs may not "bootstrap their way into standing by 'inflicting harm on themselves based on their fears of a hypothetical future harm.'" *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 983 (6th Cir. 2020) (quoting *Clapper*, 235 U.S. at 416). In *Clapper*, the Supreme Court clarified that

plaintiffs may not simply spend their way to gaining standing without a fairly traceable, imminent injury.  568 U.S. at 401–02.

The plaintiffs in *Clapper* challenged the constitutionality of the Foreign Intelligence Surveillance Act of 1978 ("FISA").  568 U.S. at 401.  The *Clapper* plaintiffs claim standing based on "costly and burdensome measures," they have undertaken to avoid FSIA-authorized surveillance.  *Id.* at 415.  These measures that purportedly confer standing include actions such as avoiding certain electronic communications and spending on "travel so that they can have in-person conversations."  *Id.*  The Supreme Court held that these costs are "simply the product of their fear of surveillance . . . and such fear is insufficient to create standing."  *Id.* at 417.  In other words, plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is certainly not impending."  *Id.* at 402.

The Court finds that *Clapper*'s limitation against Plaintiffs draining their own resources to generate jurisdiction applies here.  Their choices to hire more staff members, forego other advocacy projects, or spend money advocating against Defendant, without more, cannot manufacture Article III standing.  And so the Court declines Plaintiffs' bid to transform this nonjusticiable issue into a litigable claim.  To do so would confer Article III standing to any organization with a budget.

With that in mind, the doctrine of standing has fair-weather friends.  And its friends turn easily into foes depending on the substantive right at issue.  When courts find lack of standing, it can seem that federal courts are closing their doors to The People for reasons that only a few lawyers could love.  But the Court did not close its doors here.  When the Court ruled in Plaintiffs' favor on an earlier motion to dismiss by Defendant, it noted that "Plaintiffs' burden to show standing will increase at each successive stage of litigation."  (ECF No. 48 at PageID 5085

(citing *Lujan*, 504 U.S. at 561) ("At the pleading stage, general factual allegations of injury from the defendant's conduct may suffice . . . . In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'").) The Court also afforded Plaintiffs' leeway during discovery by agreeing to expand the administrative record, to include correspondence among the TVA Board members and TVA's correspondence with LPCs after it adopted the long-term provisions. (ECF No. 67.)

The upshot is that Plaintiffs' position—bolstered by an expanded discovery order (ECF No. 67)—fails to sustain standing at this stage. As discussed above, the naked assertions of Plaintiffs' member-declarants fall short of the standard at summary judgment. Despite months of discovery, Plaintiffs still rely heavily on the TVA Board's August 2019 meeting. And while their citations to the record (ECF No. 73-17 at PageID 5711–17), in a vacuum, might support their claim, the full picture portrays a different story. To find Plaintiffs' alleged injuries, one must speculate. Indeed, they also fail to establish a concrete link that would tie their injuries to Defendant's purported TVA Act violation.[8] While the Court doubts neither the sincerity of

---

[8] The Court notes that Defendant's contractual regime—with a twenty-year initial term, twenty-year termination notice requirement, and an evergreen provision—is a deliberate attempt at maximizing TVA's Congressional authority under Section 10. Defendant's push for these contractual provisions may be zealous, extravagant, and some might say excessive. But they are not unlawful. Section 10 permits Defendant to "include in any contract of the sale of power such terms and conditions . . . as in its judgment may be necessary or desirable for carrying out the purposes of this chapter[.]" 16 U.S.C. § 831i. The statute confers Defendant wide discretion in designing its contractual terms subject to a twenty-year term limit. But Section 10 is silent on evergreen provisions, which are legally valid under federal common law of contracts. *See Trustees of B.A.C. Local 32 Insurance Fund v. Fantin Enter. Inc.*, 163 F.3d 965, 968–969 (6th Cir. 1998.) And as for termination, Section 10 expressly requires five-year's notice for contracts made with private companies. *See* 16 U.S.C. § 831i ("[C]ontracts made with private companies . . . shall contain a provision authorizing the Board to cancel said contract upon five years' notice in writing."). It has no explicit notice requirement for contracts for the sale of power to public entities. *See id.* And so, termination notice in contracts for the sale of public power falls within

Plaintiffs' advocacy nor the importance of their causes, the inescapable fact is that Plaintiffs plead their case in the wrong forum.  Our form of government will not permit them to shoehorn their policy preferences, which are suited quite well for congressional action, into a lawsuit in federal court.

## II.     NEPA Claim

Plaintiffs plead at least two instances of TVA's NEPA violations: (1) TVA did not perform an EIS prior to adopting the "Never-ending contracts," and (2) TVA belatedly performed an EA on the flexibility provisions after adopting them.  (ECF No. 74-1 PageID 5858–72.)  They contend that Defendant's failure to comply with NEPA before adopting and executing the long-term and flexibility provisions deprived them of the "opportunity to comment on the required environmental reviews."  (ECF No. 80 at PageID 6941.)  This deprivation leads to two theories of associational standing for Plaintiffs.[9]  First, Plaintiffs claim procedural injury, meaning TVA's failure to follow NEPA procedure resulted in the same, purportedly concrete injuries that Plaintiffs asserted in their TVA Act claim.  (*Id.*)  Second, Plaintiffs claim informational injury in that Plaintiffs would have used the deprived information "to inform distributors, local elected officials, and the public about the environmental and economic harm posed by the Never-ending Contracts."  (*Id.* at PageID 6943.)

_____

Defendant's discretion—so long as the contract's length is for a term of twenty years.  *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[I]t is a general principle of statutory construction that when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations omitted).

[9]  Plaintiffs also claim organizational standing for their NEPA claim.  For the same reasons discussed above in denying Plaintiffs' organizational standing for their TVA Act claim, the Court finds Plaintiffs' organizational standing claim here also fails.

Defendant maintains Plaintiffs lack standing under both theories.  Defendant argues that
Plaintiffs' procedural injury fails because a "NEPA procedural right *in vacuo*—unconnected to
any cognizable concrete interest—cannot establish Article III standing."  (ECF No. 82 at PageID
7235.)  In other words, Plaintiffs cannot anchor their procedural claim on any concrete injuries
because they suffered no concrete injuries.  (*Id.*)  Defendant also argues that Plaintiffs'
informational injury fails because a deprivation of the ability to comment on an agency action
does not confer standing.  (*Id.* at PageID 7242.)  Simply put, Defendant argues the
"informational injury" claim is Plaintiffs' attempt to relabel their failed procedural injury as
informational.  (*Id.*)  The Court will discuss these two theories in turn.

### A.     Procedural Injury

The Supreme Court made clear in *Spokeo, Inc. v. Robins*, that "Article III standing
requires a concrete injury even in the context of a statutory violation."  578 U.S. 330, 341 (2016).
To show procedural injury, Plaintiffs must prove that "the agency violated certain procedural
rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that
the challenged action will threaten these concrete interests."  *Friends of Tims Ford v. Tenn.
Valley Auth.*, 585 F.3d 955, 968 (6th Cir. 2009).  Also "the causation and redressability
requirements are relaxed," in procedural right cases.  *Klein v. U.S. Dep't of Energy*, 753 F.3d
576, 579 (6th Cir. 2014).  But the "deprivation of a procedural right without some concrete
interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create
Article III standing."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Therefore, when
claiming procedural injury under a statutory violation, Plaintiffs must tie their claim to a concrete
injury because "the requirement of injury in fact is a hard floor of Article III jurisdiction that
cannot be removed by statute."  *Id.* at 497.

The Court agrees with Defendant that Plaintiffs' lack of a concrete injury dooms their procedural injury claim.  While Plaintiffs enjoy the benefit of relaxed causation and redressability standing requirements through their procedural injury argument under NEPA, their irreducible burden to prove injury in fact remains.  And for the reasons already discussed above, Plaintiffs environmental and economic injuries fail.  There can be no procedural injury without a separate concrete injury.  Their claim here is exactly the procedural right *in vacuo* that *Summers* warns against.  The Court therefore may not confer standing here.

### B.     Informational Injury

Informational injury arises from a denial of information to which someone has a legal right.  In *Federal Election Commission v. Akins*, the Supreme Court recognized informational injury as a valid basis for Article III standing.  524 U.S. 11 (1998).  The issue in *Akins* was whether the American Israel Public Affairs Committee ("AIPAC") was a "political committee" under the Federal Election Campaign Act of 1971 ("FECA"), because if it were, then it would have been subject to reporting requirements.  *Id.* at 13.  The Federal Election Commission ("FEC") determined AIPAC was not a "political committee."  *Id.*  A group of plaintiffs challenged FEC's determination, claiming informational injury from FEC's exemption of AIPAC from disclosure requirements—depriving plaintiffs of information that, in their view, the law requires.  *Id.* at 15–16.  The FEC, along with the United States Solicitor General, argued that Plaintiffs did not have standing to challenge FEC's decision.  *Id.* at 19.

The Supreme Court disagreed, holding that Plaintiffs' informational injury satisfied both Article III and prudential standing.  *Id.* at 20 ("The injury of which respondents complain—their failure to obtain relevant information—is injury of a kind that FECA seeks to address.").  Noting FECA's purpose and its similarity to the APA's judicial review provisions, the Supreme Court

stressed that Congress intended "to protect voters . . . from suffering the kind of injury here at issue[.]" *Id.* at 19–20. The Supreme Court emphasized that it "previously held that a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Id.* at 21 (enumerating examples).

The United States Court of Appeals for the D.C. Circuit uses a two-part test for assessing informational injury. A plaintiff can show concrete and particularized informational injury where it demonstrates that: "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).

The Court finds that Plaintiffs have standing to pursue their NEPA claims under this test. Under the first prong, Plaintiffs' declarations claim that its members "would have used information from NEPA reviews to inform distributors, local elected officials, and the public about the environmental and economic harm posed by the Never-ending contracts." (ECF No. 80 at PageID 6943 (identifying uses of NEPA-related information for Plaintiffs members' advocacy).) In sum, Plaintiffs assert that TVA's decision to not perform an EIS before adopting the long-term and flexibility provisions deprived them of information from a required NEPA review.

In like manner, Plaintiffs point to what they describe as Defendant's belated environmental review. That is, Plaintiffs claim that TVA included the flexibility provisions as "part of the quid pro quo for the Contracts," before performing the required NEPA review for such action. (ECF No. 87 at PageID 7505.) Plaintiffs also contend that NEPA requires Defendant to perform a NEPA review before incorporating the long-term and flexibility

41

provisions into their contracts with the LPCs.  (*Id.*)  Defendant counters that NEPA, while "aimed at the protection of the environment," is "not a disclosure statute per se."  (ECF No. 82 at PageID 7243.)  Defendant contests Plaintiffs' characterization of the facts, arguing that their adoption of the flexibility provisions complied with both NEPA and their implementing regulations.  (*Id.* at PageID 7254–56.)

The Court acknowledges the overlap between jurisdictional and merits questions in finding that Plaintiffs have satisfied the first prong.  Plaintiffs have alleged their interest in Defendant's NEPA disclosures.  As discussed earlier, one of NEPA's purposes is to ensure government agencies like TVA will guarantee that "relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  Defendant retorts that NEPA "is a public participation statute, not a public disclosure statute."  (ECF No. 82 at PageID 7243–44.)  But central to Plaintiffs' "participation," is access to information.  (ECF No. 80 at PageID 6944 (describing Plaintiffs' use of NEPA publications in their advocacy).)

Simply put, Plaintiffs interpret NEPA as providing a mechanism by which agencies like TVA can publicly show that they have taken a "'hard look' at environmental consequences" of their actions prior to adopting them.  *See Latin Americans for Social & Economic Development v. Adm., Federal Highway Administration*, 756 F.3d 447, 463 (6th Cir. 2014); *see also* 40 C.F.R. § 1500.1 ("NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action.").  Whether Defendant needed to have disclosed that information, in the form of an EIS or EA under NEPA, is a merits question.  But the Court finds that an alleged deprivation of information from Defendant's allegedly unlawful

decision not to perform—or to perform belatedly—a NEPA review is a valid informational injury under Article III.

The Court also finds that Plaintiffs have satisfied the second prong of the test because under NEPA, a failure to perform required, publicly-available environmental reviews is the type of harm Congress sought to prevent by requiring disclosure. *Robertson*, 490 U.S. at 350 ("The sweeping policy goals announced in § 101 of NEPA are thus realized through a set of 'action-forcing' procedures that require agencies take a 'hard look' at environmental consequences, and that provide for broad dissemination of relevant public information."); *see also* 40 C.F.R. § 1500.1 ("The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information and the public has been informed regarding the decision-making process.") This second aim is important to the Court's finding that Plaintiffs have standing to sue.

Unlike other environmental statutes of the era, NEPA commands no substantive environmental results. In that sense, it does not compel the selection of an environmentally-friendly action. It only requires that agencies follow the necessary process in measuring an agency action's environmental effects. So its "mandate is essentially procedural." *Tenn. Env't Council v. Tenn. Valley Auth.*, 32 F. Supp.3d 876, 883 (E.D. Tenn. 2014) (citing *Robertson*, 490 U.S. at 350). The core of Plaintiffs' argument is that Defendant injured Plaintiff when it disregarded NEPA's procedures before taking a major action that will impact the environment. Afterall, "NEPA is a procedural statute." *Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 968 (6th Cir. 2009).

NEPA's protections will be rendered hollow if purported procedural deviations go unchecked. Since NEPA publications, like an EIS, serve as a "springboard for public comment,"

citizen groups like Plaintiffs are within the scope of NEPA's protection.  *Robertson*, 490 U.S. at 349.  Whether Defendant violated NEPA is a merits question.  But for determining informational injury, the Court underscores NEPA's procedural protections in apprising the public of agency actions.  The Court therefore finds that Plaintiffs' purported denial of access to NEPA-required information is the type of harm Congress sought to prevent by enacting NEPA. [10]

Finally, the Court finds that Plaintiffs have met their burden for proving causation and redressability at this stage.  Their purported informational injuries are fairly traceable to TVA's actions.  The causal chain is straightforward—TVA did not perform, or belatedly performed, a NEPA review and both actions resulted in a deprivation of NEPA-related information for use in Plaintiffs' advocacy.  As for redressability, a favorable judicial decision could redress Plaintiffs' injuries by ordering a NEPA review.  The APA provides the Court a mechanism to "compel agency action unlawfully withheld."  5 U.S.C. § 706.  If an analysis of the merits mandate NEPA review, the APA allows the Court to compel it.

### MERITS

The Court's jurisdiction to review the NEPA claim is through the APA.  Under the APA, a plaintiff "must allege that his or her injury stems from a final agency action for which there is no other adequate remedy in court."  *Bangura v. Hansen*, 434 F.3d 487, 500 (6th Cir. 2006)

---

[10] The D.C. Circuit's second prong assesses whether the informational injury is "the type of harm Congress sought to prevent by requiring disclosure."  *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).  This test is like the prudential standing standard, which asks whether the aggrieved party's interest is "arguably within the zone of interests to be protected or regulated by the statute."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).  The Court incorporates the same analysis in finding no prudential standing obstacles to the Plaintiffs in this case.  *See also Patel v. U.S. Citizenship & Immigr. Servs.*, 732 F.3d 633, 635 (6th Cir. 2013) ("The prudential standing test is not meant to be especially demanding.  Rather, in enacting the Administrative Procedure Act, Congress intended to make agency action presumptively reviewable.").  The Plaintiffs' informational injury is within ambit of the NEPA's protected zone of interests.

(citing 5 U.S.C. § 704). Based on Plaintiff's pleadings, the Court finds that two of Defendant's NEPA-related actions are final agency actions appropriate for APA review—(1) TVA's decision to not perform an EIS before adopting the long-term contractual provisions, and (2) its decision to perform an EA about the flexibility provisions/caps.[11] (ECF No. 80 at PageID 6954–6967; ECF No. 86 at PageID 7486–87).

The Parties agree that the Court must review these decisions under the APA for "reasonableness under the circumstances." *Sw. Williamson Cty. Cmt. Ass'n. Inc. v. Slater,* 243 F.3d 270, 277 (6th Cir. 2001). In doing so, the Court will not "substitute [its] judgment of the environmental impact for the judgment of the agency, once the agency has adequately studied the issue." *Kelley v. Selin*, 42 F.3d 1501, 1518 (6th Cir. 1995). At bottom, this suit is "not an invitation for judicial second-guessing," but a mechanism for the Court to review whether Defendant's actions were reasonable. *Ky. Coal Ass'n, Inc. v. Tenn. Valley Auth.*, 804 F.3d 799, 801 (6th Cir. 2015) (J. Sutton).

### A.  Defendant's Decision Not to Perform an EIS Prior to Adopting the Long-Term Provisions

Defendant does not deny that it did not perform an EIS before adopting the long-term contract provisions. In a memo dated August 19, 2019 ("Memo"), Defendant informed its Board that the long-term provisions "would have the effect of continuing the 'environmental status quo'

---

[11] For an agency action to be considered "final," it must meet two criteria: (1) the action must mark the consummation of the agency's decision-making process, (2) the action must be one by which rights or obligations have been determined such that legal consequences will flow. *See Bennett v, Spear*, 520 U.S. 154, 177–78 (1997); *Berry v. U.S. Dep't of Labor*, 832 F.3d 627, 633 (6th Cir. 2016). Defendant's decisions here are final agency actions under NEPA because they produce the result of Defendant's decision-making process, and afford Defendant the procedural clearance to implement a proposed action that will significantly impact the environment. *See Friends of Tims Ford*, 585 F.3d at 964 (explaining that issuing an EIS constitutes final agency action).

45

for which review under NEPA is not required since the current environmental conditions would continue under the proposal without change." (ECF No. 33-26 at PageID 4235.) Plaintiffs argue that this decision is not reasonable for two reasons. First, TVA's own NEPA-implementing regulations require it to conduct some level of NEPA review for proposed actions that "would result in a *non-trivial* change to the environmental status quo," and prolonging TVA's contracts to perpetuity does more than non-trivial change. (ECF No. 74-1 at PageID 5859 (citing 18 C.F.R. § 1318.101(a) (emphasis in original)).) Second, Plaintiffs contend that there is "nothing 'trivial' about using everlasting agreements to hinder the natural evolution of the energy market toward renewable energy." (*Id.* at PageID 5859–60.)

Considering the parties' positions and the record here, the Court finds that Defendant's decision was reasonable under the circumstances for three reasons. First, the NEPA-implementing regulations on which Plaintiffs rely were not in effect in August 2019, when Defendant chose not to conduct NEPA reviews. Rather, the controlling NEPA-implementing regulations then had two Categorical Exclusions which could favor Defendant's decision.[12] (ECF No. 75 at PageID 6697; *see also* ECF No. 17 at PageID 1208 n.2.)

Second, the long-term contractual provisions do not have a reasonably close causal relationship to the alleged environmental impacts. So the Court finds that Defendant's determination that the long-term provisions will have no physical environmental impact is

---

[12] Defendant argues that the adoption of the long-term provisions in August 2019 fall under two CEs—"Contracts or agreements for the sale, purchase, or interchange of electricity," and "Any action which does not have a primary impact on the physical environment." (ECF No. 75 at PageID 6697.) Because the Parties did not fully brief this issue, the Court does not opine on whether the CEs justify Defendant's decision to not perform a NEPA review. But the Court does note that the administrative record shows that Plaintiffs' preferred standard of NEPA review for proposed actions that "would result in a non-trivial change to the environmental status quo," did not apply in August 2019. (ECF No. 74-1 at PageID 5859; ECF No. 17 at PageID 1208.)

reasonable.  NEPA does not require review of every major federal action.  Rather, the Supreme Court has held that NEPA reaches actions that have a "reasonably close causal relationship between a change in the physical environment and the effect at issue."  *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983).  In short, the evaluated action must be "proximately related to a change in the physical environment."  *Id.*

The agency action here does not involve the construction of a powerplant or a similar action.  Had that been the case, a decision not to conduct a NEPA review may have been unreasonable.  But here, the agency action is Defendant's decision not to perform a NEPA review about its proposed long-term agreements with the LPCs.  Do these contracts affect the environment because they "lock-in" Defendant's load, permitting it to construct more gas powerplants, which eventually lead to both global warming and environmental degradation?  Phrased in legal terms, do the long-term agreements proximately cause these environmental effects?  Maybe.  Maybe not.  Plaintiffs certainly think so and Defendant thinks not.  Reasonable people can and will disagree on this question.  Considering the totality of the record here, the Court finds Defendant's action to be reasonable and consistent with longstanding practice.[13]

Third, the Court is persuaded by Defendant's reasoning and record citations indicating that the long-term provisions do not guide planning for TVA's generation portfolio mix.  But even if Defendant's resource-selection impacts the environment during the contracts, Defendant has complied with NEPA.  Defendant produced an EIS, the highest level of NEPA review, for its resource-selection.  (ECF Nos. 33-18–29.)  Defendant points out that 16 U.S.C. § 831m-1 mandates it to perform a planning program that accounts for its resource portfolio.  (ECF No. 75

___

[13] Examples of agency actions where Defendant has completed NEPA reviews include construction of powerplants, retirement of powerplants, waste management projects, and resource plan programming.  (ECF No. 33-18 at PageID 3799–801.)

47

at PageID 6669–70.); *see also Kentucky Coal*, 804 F.3d at 801–02 (noting 16 U.S.C. § 831m-1(a) tells TVA to implement a planning process for selecting an energy source portfolio so it does not "skip over" new renewable resources that may be more efficient).  Defendant implements this program through its Integrated Resource Plan ("IRP").  *See id.* at 707 ("An IRP is the culmination of a comprehensive utility planning process that evaluates the merits of using kinds of energy sources to meet forecasted future demands for electricity with the goal of meeting demand reliably and cost effectively."); (ECF No. 33-14 at PageID 3495.).

The 2019 IRP, which Defendant initiated in February 2018 and completed eighteen months later, had an accompanying EIS that studied the environmental impacts of TVA's portfolio of energy sources for the next twenty years.  (ECF Nos. 33-14–29.)  Defendant completed this EIS *before* adopting the long-term provisions and offering them to any LPCs. (ECF No. 33-26.)  This further reassures the Court that TVA's decision was reasonable when it concluded that the long-term provisions "would have the effect of continuing the 'environmental status quo' for which review under NEPA is not required."  (*Id.* at PageID 4235.)  The IRP, not the long-term agreements, determine TVA's energy portfolio.

Still, Plaintiffs insist that the IRP contemplates a twenty-year period, not the "Perpetual Term" created by the "Never-ending Contracts."  (ECF No. 80 at PageID 6957.)  So they challenge the credibility of the 2019 IRP EIS, arguing that Defendant did not adopt what they "think is the appropriate baseline for evaluating the environmental impacts associated with the contract, which would be a high load loss future."  (ECF No. 92 at PageID 7646.)  By "high load loss future," Plaintiffs refer to a scenario in which TVA loses a good deal of demand from its customers.

NEPA requires agencies to "present the environmental impacts of the proposal and the alternatives in comparative form . . . providing a clear basis for choice among options by the decisionmaker and the public." *Tennessee Environmental*, 32 F.Supp.3d at 886 (quoting 40 C.F.R. § 1502.14). Agencies must provide a "no action" alternative, which simply explains what would happen if the agency did not execute the proposed agency action. By requiring a "no action" alternative, agencies can compare the potential impacts of their agency action to the known impacts of keeping the status quo. So, "the current level of activity is used as a benchmark." *Kentucky Coal*, 68 F.Supp.3d at 719 (holding that TVA's EA "conforms to CEQ requirement" when it reflected the status quo).

Plaintiffs claim that Defendant's 2019 IRP EIS is defective because it used the wrong base case for a "no action" alternative. Defendant's EIS considered the environmental status quo as of August 2019 as its base case—reflecting things as they stood at that time with "the minimum amount of capacity required to ensure reliable power." (ECF No. 33-14 at PageID 3501). But Plaintiffs allege that Defendant should have used, as its base case, a high load loss future scenario—where Defendant loses LPC customers despite their ongoing requirements contracts. (ECF No. 92 at PageID 7646.) This high load loss scenario, which Defendant named the Rapid Distribution Energy Resources ("Rapid DER") Adoption scenario, is one of the six scenarios that Defendant studied in its 2019 IRP. (ECF No. 33-18. at PageID 3822.) The Rapid DER scenario contemplates decreased market demand for Defendant's power production stemming from the availability of other energy sources for consumers. (*Id.*) Plaintiffs argue that the EIS' "no action" alternative should be "like the one [Defendant] studied in the Rapid DER scenario." (ECF No. 92 at PageID 7646.)

The Court finds that Defendant's decision to use the August 2019 status quo as a base case for its EIS was reasonable under the circumstances. Since "no action" alternative requires using the "current level of activity" as a status quo benchmark, then the Court looks to the level of activity during the time of the EIS's development in 2019. This is exactly what Defendant used as its base case—the August 2019 status quo. (ECF No. 33-18 at PageID 3823–24 ("No specific resource types are promoted beyond business as usual."); *see also* ECF No. 33-26 (noting that the 2019 IRP and accompanying EIS "already incorporate the assumption of serving LPC electricity for 20 years regardless of the actual level of commitment" under the contracts).) And as Defendant points out, no LPC had given notice to terminate as of August 2019. (ECF No. 92 at PageID 7256.) Contrary to Plaintiffs' preference, there is no indication from the administrative record that the Rapid DER scenario reflected the current level of activity in August 2019. The Court therefore finds Defendant's decision on this point to be reasonable.[14]

Plaintiffs have presented no binding case law, and the Court has found none, supporting Plaintiffs' suggested "no action" alternative analysis. The Court conferred standing to Plaintiffs because, as citizen groups, Plaintiffs could challenge Defendant's failure to comply with NEPA's "action forcing procedures" that require agencies to publish information signaling they have taken a "hard look" at the environmental consequences of their actions. *Robertson*, 490 U.S. at 350. But Plaintiffs have no right to force agencies to conduct NEPA reviews in the exact way

---

[14] The Court is not blind to Plaintiffs' concerns that the 2019 IRP does not adequately cover immediate developments that could affect Defendant's load. Setting aside Defendant's ability to maximize its statutory authority under the TVA Act, the TVA board addressed Plaintiffs' NEPA concerns through the IRP. Its approval of the 2019 IRP commits Defendant to "monitor future developments that would serve as signposts to guide long term actions." (ECF No. 33-5 at PageID 3384.) In that document, TVA's board directs Defendant to "initiate an update of the 2019 IRP no later than 2024 and, if appropriate, earlier if future developments make this appropriate." (*Id.*)

they would prefer them.  In this APA suit, the Court cannot substitute its own judgment for that

of the agency's.  The Court's jurisdiction is limited to reviewing whether Defendant's actions

here were reasonable.  For the reasons above, the Court finds for Defendant.

**B.    Defendant's Decision to Perform an EA Regarding the Flexibility Provisions/Caps**

Both sides agree that TVA performed an EA about its proposed flexibility provisions.

(ECF No. 33-28.)  The EA, dated June 2020, studied the effects of a proposal to "provide

enhanced power supply flexibility" to LPCs that have signed long-term agreements with

Defendant.  (*Id.* at PageID 4248.)  In the end, the EA showed a "finding of significant impact,"

meaning TVA could adopt the action without needing to conduct further NEPA review.  (ECF

No. 81-7.)  Before the flexibility provisions, TVA had full requirements contracts with the LPCs,

which means LPCs had to purchase all their power from TVA.  The flexibility provisions

allowed LPCs who signed long-term agreements with TVA to get up to three to five percent of

their energy from other sources.  (*Id.* at PageID 4250.)

Plaintiffs' second NEPA claim depends on when TVA adopted the flexibility provisions.

And the parties disagree about that.  Plaintiffs argue that the July 2020 EA was "too little too

late," because Defendant contracted with LPCs "to provide flexibility and imposed the 5% cap,"

as early as August 2019.  (ECF No. 92 at PageID 7640; ECF No. 87 at PageID 7505.)  Defendant

disagrees maintaining that it only committed to studying the flexibility provisions in August

2019 and did not adopt them until after completing an EA in June 2020.  (ECF No. 82 at PageID

7251.)

Because the administrative record supports Defendant's position, the Court rules against

Plaintiffs in their second NEPA claim.  Defendant's board resolution, approved in August 2019,

does not adopt flexibility provisions.  Rather it commits to "negotiate in good faith with an

interested participating LPC (and other similarly-situated LPCs) to provide additional power supply flexibility."  (ECF No. 33-6 at PageID 3417.)  Another TVA board resolution, approved in January 2020, states that the "Flexibility Option will be implemented upon the later of June 1, 2020, or the date on which all required environmental reviews are satisfactorily completed." (ECF No. 33-27 at PageID 4240.)  The record here shows that Defendant was careful to mention the flexibility provisions before performing an EA, but waited to adopt them only until after the EA found no significant impact.  (*See id.* ("The implementation of a Flexibility Option would be contingent upon satisfactory completion of any required environmental reviews.").)

Plaintiffs invite the Court to find that Defendant violated NEPA because the flexibility provisions were "part of the quid pro quo for the Contracts."  (ECF No. 87 at PageID 7505.)  The Court declines because this argument is a plea for the Court to impermissibly stretch the legal standard.  NEPA requires review of "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  If Defendant adopted the flexibility provisions before completing a NEPA review, that would be a different suit altogether.  But here, the record shows that Defendant only committed to negotiate developing flexibility provisions in good faith.[15]  A commitment to negotiate a major federal action is not the same as taking a major federal action.  The difference, while subtle, matters in this case.  NEPA requires review for the latter but not for the former.  Plaintiffs have not presented, and the Court has not found, binding

---

[15] Citing Defendant's form long-term agreement as an example, Plaintiffs argue that Defendant committed itself to the flexibility provisions before completing the July 2020 EA. (ECF No. 17-1 at PageID 1264.)  They argue that Defendant provided an "off-ramp" to the LPCs through conditions subsequent without reserving a similar "off-ramp" for itself.  (*Id.*)  This argument does not persuade the Court.  Defendant needs no "off-ramp" given the relevant contractual provision is a commitment to collaborate—not a binding flexibility provision.  (*Id.* ("TVA *commits to collaborating* with Distributor . . . to develop and provide enhanced power supply flexibility with mutually agreed-upon pricing structures, for 3-5% of Distributor's energy.") (emphasis added).)

52

case law that supports Plaintiffs' expansive reading of NEPA. As a result, the Court finds that Defendant did not violate NEPA in developing its flexibility provisions EA.

## CONCLUSION

At the start of the New Deal, Congress gave Defendant wide latitude to address the Great Depression's devastation of the Tennessee Valley. Defendant, like a big brother, came to the rescue and helped turn this once impoverished area into one of the nation's largest-growing regions. Today, Defendant makes no secret that its contractual regime tries to maximize the TVA Act's statutory authority with its evergreen provisions and twenty-year termination notice requirements.

Congress passed the TVA Act in 1933—ninety years ago.[16] In those days, many of our citizens proudly smoked cigarettes inside their lead-painted houses and worked in buildings kept warm with asbestos insulation. What seemed reasonable in the age of the New Deal seems irresponsible in this new day. And for many of our citizens today, the sight of emissions from inland factories raises concern for coasts thousands of miles away.

For TVA to propose contracts laden with a twenty-year initial term, a twenty-year termination notice requirement, and an evergreen provision, some may say that big brother TVA has become a bully. While others may remark that TVA is simply using the power Congress gave it. With advances in scientific sophistication and increased public engagement on

---

[16] The TVA Act predates both the enactment of the APA and the modern administrative state. Had the TVA Act been drafted later, its regulatory scheme may have been different. An example from a comparable federal power company illustrates the point. In 1980, Congress passed the Pacific Northwest Electric Power Planning and Conservation Act, which, in part, explicitly defined actions by the Bonneville Power Administration (headquartered in Portland, Oregon) as final agency actions subject to judicial review under the APA. Among agency actions explicitly marked for judicial review include power sale contracts with LPCs. *See* 16 U.S.C. § 839f(e)(1)(B).

environmental issues, the TVA Act of 1933 cannot solve many issues related to energy consumption in the Tennessee Valley of 2023.  What makes sense economically, may no longer make sense environmentally.  But in the end, this Court is presently without jurisdiction to address the TVA Act concerns in this suit.  Congress, though, can address the TVA Act through the legislative process.

For the reasons above, the Court finds Plaintiffs lack standing to bring the TVA Act claim, and Defendant acted reasonably under NEPA.  The Court therefore **GRANTS** summary judgment for Defendant.

**SO ORDERED**, this 1st day of February 2023.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE